IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| COUNCIL OF ATHABASCAN TRIBAL GOVERNMENTS, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 07-1270 (RWR) |
| UNITED STATES OF AMERICA; MICHAEL O. LEAVITT, Secretary of the Department of Health and Human Services; and ROBERT G. McSWAIN, Acting Director, Indian Health Service; | ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## DEFENDANTS' MOTION TO DISMISS
## OR IN THE ALTERNATIVE FOR MOTION FOR SUMMARY JUDGMENT

Defendants hereby move to dismiss Plaintiff's Complaint, pursuant to Rule 12(b)(1) and 12(b)(6), because the Court lacks subject matter jurisdiction over one of the claims and, for all claims, the facts alleged in the complaint and attachments thereto establish that Plaintiff's claims fail as a matter of law. Alternatively, Defendants move for summary judgment pursuant to Rule 56 on the basis of laches because Plaintiff waited ten years to bring this contract action, despite having full knowledge of any claims ten years ago and the ensuing prejudice to Defendants from the delay. A memorandum of points and authorities in support of this motion is attached.

December 21, 2007                                Respectfully submitted,

_____
JEFFREY A. TAYLOR, D.C. Bar # 498610
United States Attorney

_/s/_
_____
RUDOLPH CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney

_/s/_
_____
ALAN BURCH, D.C. Bar # 470655
Assistant United States Attorney
555 4th St., N.W.
Washington, D.C. 20530
(202) 514-7204
alan.burch@usdoj.gov

2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
_____
                                )
COUNCIL OF ATHABASCAN           )
TRIBAL GOVERNMENTS,             )
                                )
          Plaintiff,            )
                                )
          v.                    )        Civil Action No. 07-1270 (RWR)
                                )
UNITED STATES OF AMERICA;       )
MICHAEL O. LEAVITT, Secretary   )
of the Department of Health and )
Human Services; and             )
ROBERT G. McSWAIN, Acting Director, )
Indian Health Service;          )
                                )
          Defendants.           )
_____ )
```

## DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT

### Introduction

In 1994, the Indian Health Service ("IHS"), an agency of the U.S. Department of Health and Human Services ("HHS"), entered into a contract with Plaintiff Council of Athabascan Tribal Governments ("CATG") to provide certain health care services to Alaska Native villagers pursuant to the Indian Self Determination and Education Assistance Act, 25 U.S.C. § 450 *et seq.* ("ISDA"). Now, more than ten years later, Plaintiff has brought breach of contract claims to recover additional funds for indirect contract support costs in fiscal year 1995. Relying on snippets of language from the ISDA, Plaintiff asserts three theories to claim it should have been awarded additional money under the contract. The bottom line, however, is that the contract itself specified a dollar amount IHS would pay to Plaintiff for indirect contract support costs and,

as Plaintiff concedes in its complaint, IHS did pay that amount to Plaintiff for indirect contract

support costs.  Moreover, Plaintiff's second and third claims for damages assume that IHS used a

negotiated rate to calculate the amounts due but the contract itself makes clear that IHS did not

use such a rate.  Because Plaintiff concedes that IHS paid it in accordance with the express terms

of the contract, IHS did not breach the contract and Plaintiff's complaint must be dismissed for

failure to state a claim.

      Plaintiff altogether failed to present its claim relating to carry forwards to the agency,

which is a jurisdictional prerequisite to judicial review under the Contract Disputes Act.  See

Tunica-Biloxi Tribe of Louisiana v. United States, No. 02-2413, slip op. at 8-15 (D.D.C. Dec. 9,

2003) (presentment of  claim to contracting officer is a jurisdictional requirement for ISDA

contractors), copy attached hereto.  Therefore, this Court lacks jurisdiction over the third claim.

      In addition, Defendants move in the alternative for summary judgment because Plaintiff's

claims are barred by laches.  Plaintiff waited ten years after IHS completed performance under

the contract in September 1995 before presenting IHS with two of its three claims in September

2005, and did not present its third claim until July 2007.  This unreasonable and unjustifiable

delay has undermined the government's ability to rebut any extrinsic evidence Plaintiff may now

attempt to introduce in support of its claims and adversely affects Defendants' access to

appropriated funds to pay any judgment against them.  Plaintiff should not be allowed to proceed

at this late date.[1]

---

[1] Note that the six-year catch-all statute of limitations does not apply to actions controlled by the Contract Disputes Act, as this one is.  See 28 U.S.C. § 2401(a).

## STATUTORY BACKGROUND

Congress enacted the ISDA to allow Indian tribes and Alaska Native Villages to contract with the federal government to operate many of the programs which the government previously operated for the benefit of their members, through what is termed a self-determination contract. The ISDA has the stated purpose to "permit an orderly transition from Federal domination of programs for, and services to, Indians to effective and meaningful participation by the Indian people in the planning, conduct, and administration of those programs and services." 25 U.S.C. § 450a(b). To achieve these policy objectives, the ISDA provides a framework for the orderly transfer of the administration and operation of traditionally government-run programs to the Indian and Alaska Native people. A primary means for achieving this transfer is the self-determination contract. Pursuant to 25 U.S.C. § 450m-1(a), this Court has concurrent jurisdiction with the Court of Federal Claims for this case.

IHS, an agency within the Department of Health and Human Services, was established to carry out the responsibilities, authorities, and functions of the United States in providing health care services to Indians and Indian tribes, including Alaska Native villages. 25 U.S.C. 1661(a). See 25 U.S.C. § 1603(d) (defining "Indian tribe" to include Alaska Native villages). Under the Indian Health Care Improvement Act, 25 U.S.C. §§ 1601-1683, IHS is authorized to provide a wide range of health care programs, including clinical programs and public health programs. 25 U.S.C. § 1621(a)(4). IHS provides these programs either directly or through contracts with tribes or tribal organizations under the ISDA. 25 U.S.C. § 1680(a).

Section 450f(a)(1) of the ISDA directs the Secretary of Health and Human Services ("the Secretary" or "HHS"), "upon the request of any Indian tribe by tribal resolution, to enter into a

self-determination contract or contracts with a tribal organization to plan, conduct, and administer programs or portions thereof[.]"  25 U.S.C. § 450f(a)(1).[2]  If the parties are unable to agree on the appropriate funding level, the Secretary can decline the proposal in part or in full. The tribe has the right either to seek review of a declination through the administrative appeals process or by a direct federal court action.  See 25 U.S.C. § 450f(b).

There are two types of funding for each ISDA contract.  First, the ISDA contractor receives the amount the Secretary "would have otherwise provided for the operation of the programs" ("Secretarial amount"), which "shall not be less than the appropriate Secretary would have otherwise provided for the operation of the programs."  25 U.S.C. § 450j-1(a)(1).  Second, it receives contract support costs ("CSC"), id. § 450j-1(a)(2), which are the focus of this lawsuit.

CSC can be broken down into three categories: (1) direct CSC, which are administrative costs specific to the contracted-for program, such as unemployment taxes or workers' compensation insurance, see id. § 450j-1(a)(3)(A)(i) and § 450b(c); (2) startup costs for the initial year of the contract "consisting of the reasonable costs that have been incurred or will be incurred on a one-time basis," id. § 450j-1(a)(5); and (3) indirect CSC, which are administrative costs that are shared by the IHS program with other programs or services.  See id. § 450j-1(a)(3)(A)(ii); id. § 450b(f).  Only indirect CSC are at issue in this lawsuit.  See Compl. ¶¶ 20, 27.

Many ISDA contractors recover indirect costs using an indirect cost rate, which is the ratio of the contractor's total indirect costs (known as the indirect cost pool) to the contractor's

---

[2]  The statute also applies to certain (non-healthcare) services provided to Native Americans by the Department of the Interior and the Secretary of the Interior by Interior's Bureau of Indian Affairs ("BIA").  However, BIA contracts are not at issue in this case.

total direct funding for all of its programs.  See Compl. ¶ 21.  For example, if a tribe operates a total of $100,000 in programs, and incurs $20,000 in common indirect costs, then it would have an indirect rate of 20%.  To determine the amount of common overhead costs the tribe could allocate to an individual award, the tribe would multiply the amount of the award by the rate.  So, if the tribe operated a dental program for $50,000, then it could allocate $10,000 of its overhead costs to the award.  See Compl. ¶ 20 (applying indirect rate to a program base).

Using indirect cost rates is not required by the ISDA, however, which gives contractors the option of annually negotiating with IHS for the amount of funds the contractor is eligible to receive for indirect costs with IHS.  25 U.S.C. § 450j-1(a)(3)(B).  Thus, the hypothetical contractor operating a dental program for $50,000 could negotiate a different amount for its overhead costs directly with IHS.  Regardless of the method used to calculate the amount, the ISDA's statutory authority permits payment of only those CSC that are reasonable in light of the activities to be conducted.  Id. § 450j-1(a)(2).  Moreover, appropriations for IHS "may be expended only for costs directly attributable to [ISDA contracts or grants] and no funds . . . shall be available for any [CSC] associated with [any non-IHS contracts or grants]."  Id. § 450j-2.  Finally, IHS's payment of CSC, like all funding under the ISDA, is subject to the availability of appropriations.  See id. § 450j-1(b); id. § 450j(c).

**Factual and Procedural Background**

Plaintiff CATG is a tribal organization that operates health facilities and provides public health services to Alaska Natives and other beneficiaries pursuant an ISDA contract with IHS.  Compl. ¶ 1.  In 1994, IHS entered into contract number 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 with Plaintiff to provide for the operation and administration of the Yukon Flats Health Center, an ambulatory care referral

center in Fort Yukon, Alaska, and certain health development activities and support services for the eight villages served by CATG. <u>See</u> Def's Ex, A, Administrative Record (A.R.) 18-19.[3]  The contract provided funding from June 1, 1994 through September 30, 1995.  Plaintiff does not challenge the payments it received for the first four months of the contract during FY 1994.

Plaintiff brings this action under the Contract Disputes Act, 41 U.S.C. § 601 <u>et seq.</u> ("CDA").  <u>Id.</u> ¶ 6.  Plaintiff asserts IHS underpaid it indirect CSC in fiscal year 1995 using three theories.  First, Plaintiff alleges that IHS should have reprogrammed money from its lump-sum appropriation to pay the difference between the amount IHS awarded in the contract and what Plaintiff now claims is the "full amount" of indirect CSC.  <u>Id.</u>  ¶¶ 16-20.  Plaintiff's second claim is a "miscalculation" claim, in which Plaintiff alleges that the defendants used a method to establish indirect CSC that "understated" CATG's "true costs of operating the IHS's contracted programs."  <u>Id.</u>  ¶¶ 21, 24.  Plaintiff's third claim is that the defendants used "carryforward calculations to "improperly deflate" CATG's indirect cost recovery further.  <u>Id.</u> ¶¶ 24-26.

Pursuant to the CDA, which requires that contract claims against the government first be submitted to the contracting officer for a decision, 41 U.S.C. § 605(a), Plaintiff sent two of its three claims for fiscal year 1995 to the Indian Health Service on September 2, 2005.  <u>See</u> Compl. ¶ 7.[4]  IHS denied the claims in a letter dated July 17, 2006, which Plaintiff received "some days later."  <u>Id.</u> ¶  Plaintiff filed the instant action on July 17, 2007.

_____

[3] The entire contract and modifications are included in the agency's Administrative Record.  Defendants attach hereto only relevant excerpts of the 1995 contract and modifications thereto.  Page numbers therein are cited by the Bates numbering of the Record.

[4] Plaintiff also submitted claims for fiscal years 1996-2000 at that time, but appealed the agency's denial of those claims to the Civilian Board of Contract Appeals pursuant to 41 U.S.C. § 606.

## Standards of Review

The District Court should grant a Rule 12(b)(6) motion when the complaint does not contain factual allegations that support recovery under a viable legal theory.  <u>Bell Atlantic Corp. v. Twombly</u>, __ U.S. __, 127 S. Ct. 1955, 1969 (2007).  In deciding a motion to dismiss under Rule 12(b)(6), a court "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [it] may take judicial notice."  <u>EEOC v. Francis Xavier Parochial Sch.</u>. 117 F.3d 621, 624 (D.C. Cir. 1997).  Because the contract is central to Plaintiff's allegations and is referenced in the Complaint, <u>see</u> Compl. ¶¶ 1-2, 13, it is incorporated therein.  This should not convert the motion to one for summary judgment.  <u>See</u> <u>Kaempe v Myers</u>, 367 F.3d 958, 965 (D.C. Cir. 2004); <u>Venture Assocs. Corp. v. Zenith Data Sys. Corp.</u>, 987 F.2d 429, 431 (7th Cir. 1993).

In addition, Defendants move to dismiss Plaintiff's claim for miscalculation of carry forwards under Rule 12(b)(1) of the Federal Rules of Civil Procedure because Plaintiff failed to meet the Contract Disputes Act's jurisdictional requirement that this claim be presented to the agency contracting officer before bringing suit in this Court.  Rule 12(b)(1) permits a defendant to move to dismiss a claim on the ground that the court lacks jurisdiction over the subject matter.  Where necessary, "the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts."  <u>Herbert v. Nat'l Acad. of Sciences</u>, 974 F.2d 192, 197 (D.C. Cir. 1992).  Accordingly, a motion to dismiss for lack of jurisdiction that relies on matters outside the pleadings, such as a declaration or other documents, should not be converted to a Rule 56 motion for summary judgment.  <u>See</u> <u>Fed. for Am. Immigration Reform, Inc. v. Reno</u>, 897 F. Supp. 595,

600 n.6 (D.D.C. 1995), aff'd, 93 F.3d 897 (D.C. Cir. 1996).

Defendants also move in the alternative for summary judgment because Plaintiff's claims

are barred by laches.  Summary judgment is appropriate when "there is no genuine issue as to any

material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ.

P. 56(c).  "Summary Judgment procedure is properly regarded not as a disfavored procedural

shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to

secure the just, speedy and inexpensive determination of every action.'"  Celotex Corp. v.

Catrett, 477 U.S. 317, 327, 106 S. Ct. 2548, 2555 (1986) (citing Fed. R. Civ. P. 1).

The initial burden is on the moving party to point out the absence of any genuine issue of

material fact.  See Celotex, 477 U.S. at 323, 106 S. Ct. at 2552.  "By its very terms, this standard

provides that the mere existence of some alleged factual dispute between the parties will not

defeat an otherwise properly supported motion for summary judgment; the requirement is that

there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

247-48, 106 S. Ct. 2505, 2510 (1986).  The substantive law identifies which facts are material

and "[f]actual disputes that are irrelevant or unnecessary will not be counted."  477 U.S. at 248,

106 S. Ct. at 2510.  Once the initial burden of the moving party is satisfied, the burden shifts to

the responding party to demonstrate through the production of probative evidence that there

remains an issue of fact to be tried.  See 477 U.S. at 250, 106 S. Ct. at 2511.  In considering a

motion for summary judgment, "the court must draw all reasonable inferences in favor of the

nonmoving party, and it may not make credibility determinations or weigh the evidence."  Worth

v. Jackson, 377 F. Supp. 2d 177, 181 (D.D.C. 2005).  However, "the non-moving party cannot

rely on mere allegations or denials but must set forth specific facts showing that there are genuine

8

issues for trial." Id. at 180-81.

**Argument**

I.   **This Case Should Be Dismissed Because Defendants Fully Performed under Plaintiff's Contract.**

Plaintiff asserts that Defendants breached its ISDA contract by failing to pay the full

contract support costs owed to Plaintiff.  See Compl. ¶ 1, 2.  However, a review of the contract,

which has been incorporated into the Complaint, demonstrates that it has not been breached.  To

the contrary, Defendants fully performed all of their obligations under the express terms of the

contract at issue.

The Supreme Court has recently interpreted the nature of ISDA contracts, and has held

that ISDA contracts are to be interpreted like any other contract, holding the parties to the

explicit terms of the contract.  Cherokee Nation v. Leavitt, 543 U.S. 631, 639, 125 S. Ct. 1172,

1178 (2005).  The Supreme Court found nothing in the ISDA's statutory language that warranted

special treatment of ISDA contracts and concluded that "Congress, in respect to the binding

nature of a promise, meant to treat alike promises made under the Act and ordinary contractual

promises (say, those made in procurement contracts)."  Id. at 639, 125 S. Ct. at 1178 (emphasis

in original).  Therefore, in order to determine whether there has been a breach of contract, the

Court must look to the terms of the contracts and the explicit promises made therein.

The plain language of a contract is controlling.  Craft Mach. Works, Inc. v. United States,

926 F.2d 1110, 1113 (Fed. Cir. 1991).  As the D.C. Circuit has noted, a contract "must be

enforced as written."  Welch v. Sherwin, 300 F.2d 716, 718 (D.C. Cir. 1962).  In this case, the

contract specified the amount of funding for indirect CSC that the government would provide to

9

Plaintiff, and the government provided the full funding specified in the contract. Because the government fully performed under the express terms of the contract, there has been no breach and Plaintiff's case must be dismissed.

**A.    Plaintiff Concedes Defendants Paid All Funds Promised by the 1995 Contract.**

Plaintiff has failed to state a claim for breach of contract because Plaintiff's contract with IHS sets forth the payment amount for indirect CSCs, the subject of this lawsuit, and Plaintiff's Complaint admits that IHS paid that amount. Section B of the Contract breaks out the services to be provided and the costs. For the initial contract period of June 1-September 30, 1994, it lists a line-item figure for indirect-type CSC to be paid under the contract as $114,084.00, as part of a total amount of $435,769.00. See Defs.' Ex. A, A.R.17. Subsection G.1.E provided that "[i]n lieu of a negotiated indirect cost rate by a cognizant agency, ISDM 92-2 is applicable for recipients without established indirect rate agreements." Ex. A, A.R.28. (ISDM 92-2 refers to Indian Self-Determination Memorandum 92-2, an agency guidance document regarding CSC).

On September 30, 1994, Modification 2 to the contract added $152,815.00 for indirect type costs. Id. at A.R.56-57. On October 1, 1994, Modification 3 extended the performance period until September 30, 1995, and added $61,938 for indirect type costs. Id. at A.R.58-59. CATG submitted a Contract Pricing Proposal with a budget for indirect type costs of $307,003. Id. at A.R.60, 65,[5] which IHS incorporated in Modification 3. Id. at A.R.58. Thereafter, IHS added another $160,432 for indirect type CSC. Id. at A.R.71-74. In sum, the total indirect CSC

_____

[5] This document actually shows two columns, one with a budget for $307,003 and one with a budget of $61,938, see Ex, A at A.R.65, but for purposes of this motion to dismiss, will be read in favor of Plaintiff.

that IHS promised for the 1995 contract was $375,185.  This is the exact amount that Plaintiff

alleges was paid for indirect CSC under this contract.  Compl. ¶ 20.  Because IHS paid the entire

amount for indirect CSC that was promised to Plaintiff in the contract, it did not breach the 1995

contract.

> **B.    Plaintiff Fails to State a Claim for Indirect Rate Miscalculation
> Because an Indirect Cost Rate Was Not Used under the Contract.**

Plaintiff also fails to state a claim when it alleges IHS improperly used an indirect cost

rate to calculate the amount due because the contract documents show that IHS did not use an

indirect cost rate to calculate the amount due under the contract.  Plaintiff's claim that IHS

improperly used a rate that understated carry forward amounts fails for the same reason.

Plaintiff's miscalculation claim can be illustrated using the hypothetical tribe with the

$50,000 IHS dental program and 20% rate.  Suppose that the tribe added another federal program

for $50,000, and suppose its total indirect costs rose from $20,000 to $25,000.  The tribe's new

rate would be 25/150 or 16.67%.  If the new rate is applied to the IHS dental program ($50,000 x

16.67%), the total amount of indirect costs allocated to the IHS program would now be $8335.  If

the new federal program does not pay for its share of indirect costs, then, according to Plaintiff's

theory, the tribe has lost $1665 previously used to administer the IHS dental program.  See

generally Ramah Navajo Chapter v. Lujan, 112 F.3d 1455 (10th Cir. 1997) (setting forth rate

miscalculation theory).

Regardless of its merits, this theory has no application to Plaintiff in FY 1995 because it

did not use a percentage rate to recover indirect costs, but instead negotiated its overhead costs

directly with IHS.  As made clear by section G(1)(E) of the initial contract award and the

subsequent modifications, which are incorporated into Plaintiff's complaint by reference, IHS did not use a negotiated indirect cost rate to award funds to CATG in FY 1995. First, CATG did not have a negotiated indirect rate when the contract was awarded. See Ex, A at A.R.28. For fiscal year 1995, CATG proposed an indirect type costs budget, which was incorporated in Modification 3. Id. at A.R.58. None of the subsequent contract modifications in FY 1995 incorporate a negotiated indirect cost rate. See id. at 66-76. Since IHS did not use an indirect rate to calculate the amount of funds due to CATG in FY 1995, it cannot be held liable for misusing such a rate.[6]

Plaintiff's new, unexhausted, carry forward claim has the same flaw. Plaintiff again asserts that the Defendants erred by using an indirect cost rate that incorporated carry-forward adjustments that, according to Plaintiff, did not properly take under recoveries into account, and instead treated funding shortfalls as over-recoveries to depress the indirect cost rate further. Compl. ¶¶ 25-26. Whether true or not, these allegations are irrelevant since, as demonstrated above, IHS did not use an indirect cost rate to calculate the amount due Plaintiff under the contract. Instead, IHS paid Plaintiff the funds it promised for indirect-type costs.

### C.    The ISDA Does Not Trump the Contract Analysis.

Despite the fact that Defendants fully complied with the terms of the contract, Plaintiff asserts a breach because Defendants allegedly did not comply with the ISDA. See Compl. ¶ 2. Such an allegation, however, runs directly contrary to the Supreme Court's holding in Cherokee Nation, which mandates that ISDA contracts be treated as any other procurement contract, where

---

[6] Indeed, CATG's Complaint does not allege that a negotiated indirect cost rate was used as part of the contract, and mentions an indirect rate only in the context of an agency report to Congress on implementation of the ISDEAA. See Compl. ¶20.

the parties are to rely on the terms and conditions therein. <u>Cherokee Nation</u>, 543 U.S. at 643-45,

125 S. Ct. at 1180-81.

Moreover, the mere fact that the contract was entered pursuant to the ISDA does nothing

to further Plaintiff's claims of breach. The ISDA does not mandate the payment of a specific

amount of indirect CSC or that a specific formula be included in the contract. Rather than

providing specific dollar amount for funding, the ISDA requires that the parties negotiate a

contract. <u>See</u> <u>e.g.</u>, 25 U.S.C. §§ 450b(g); 450j(c). An ISDA contract negotiation starts with a

contractor's proposal. <u>See</u> 25 U.S.C. §§ 450f(a)(2), 450j-1(a)(3)(B); 25 C.F.R. §§ 900.12,

900.8(h). A contract proposal will be accepted if the Secretary agrees to the proposed terms. <u>See</u>

25 U.S.C. § 450f(a)(2). If the Secretary declines the proposal, the Tribe or Tribal organization

may: (1) challenge the Secretary's declination in an administrative proceeding or directly in

federal court as inconsistent with the ISDA, <u>see</u> <u>id.</u> §450f(b)(3), or (2) acquiesce in the terms

offered by the Secretary and accept the contract and funding. If the contractor does not avail

itself of immediate review and instead acquiesces in the amount of funding proposed by IHS, the

contractor is bound by the negotiated amount in the executed contract. If the contractor

determines at a later time that the amount of funding is insufficient, it can suspend operation of

the contract or retrocede the program for lack of funding. <u>See</u> <u>id.</u> §§ 450*l*(c)(b)(5), 450j(e). In

future annual funding agreement negotiations, the contractor may again propose desired terms

and if they are rejected by IHS, the contractor can force a declination and obtain review in federal

court. The availability of immediate judicial review prior to contract formation demonstrates

Congress's intent that a Tribe or Tribal organization must challenge the Secretary's rejection of

the proposed amounts at the time of contract formation. The statutory scheme and purpose

13

demonstrates that there is no "independent" right under the ISDA to CSC.

The Federal Circuit reached this conclusion in Samish Indian Nation v. United States, 419 F.3d 1355 (Fed. Cir. 2005).  In Samish, the Federal Circuit reviewed the ISDA and determined that its funding provisions did not curtail the Secretary's discretion to pay funds, did not set clear standards for the Secretary's payment of funds, did not specify precise amounts to be paid, and did not compel the payment of funds.  419 F.3d at 1364-65; see also Pueblo of Zuni v. United States, 467 F. Supp. 2d 1114, 1116-17 (D.N.M. 2006) (tribes may not bring claims for additional contract funding under the ISDA alone).  Regardless of whether Plaintiff characterizes its claims as "shortfall" claims under the ISDA, see Compl. ¶ 16, "miscalculation" claims under the ISDA, see Compl. ¶ 22, or "carry forward" claims under the ISDA, see Compl. ¶ 25, Plaintiff's theories that the ISDA demands an alternate amount of payment under the contracts must fail.  It is the contracts themselves that create an entitlement to CSC, the scope of which is determined under traditional contract principles.[7]  See Cherokee Nation, 543 U.S. at 639, 125 S. Ct. at 1178; Samish, 419 F.3d at 1365; Pueblo of Zuni, 467 F. Supp. 2d at 1116-17.  It is clear that, following traditional contract principles, there has been no breach.[8]

_____

[7] Even if the Court were to find that the ISDA, as incorporated into the contracts, requires payment in an amount other than that specified in the contract, the Court would still need to resolve conflicting (not ambiguous) provisions in the contract.  Any such conflict should be resolved by reference to contract law directing that a specific provision of a contract governs over a general one.  See Hometown Fin. Inc. v. United States, 409 F.3d 1360, 1369 (Fed. Cir. 2005); Hills Materials Co. v. Rice, 982 F.2d 514, 517 (Fed. Cir. 1992).  Here, the contract and modifications setting the dollar amounts for indirect CSC would govern.

[8] Because the omission of a breach of contract disposes of Plaintiff's claims in their entirety, Defendants base their motion to dismiss on this ground.  There are several defenses that Defendant has not raised in the instant motion, but will raise in a motion for summary judgment, if necessary.  These include the fact that Plaintiff signed a release waiving all claims for FY 1995, which disposes of all of Plaintiff's claims, see Herson v. Gibralter Bldg. & Loan Ass'n,

14

**II.    Plaintiff's Failure to Present its Carryforward Claim to the Contracting
       Officer Deprives this Court of Jurisdiction.**

The Contract Disputes Act governs Plaintiff's claims.  Compl. ¶ 7; 25 U.S.C. § 450m-

1(d); 41 U.S.C. § 609(a).  See Tunica-Biloxi Tribe, No. 02-2413, slip op. at 8-15 (Dec. 9, 2003).

The CDA requires that "[a]ll claims by a contractor against the government relating to a contract

. . . shall be submitted to the contracting officer for decision."  41 U.S.C. § 605(a).  This

presentment requirement is jurisdictional.  See U.S. v. Intrados/International Management Group,

277 F. Supp.2d 55, 65 (D.D.C.2003) (contracting officer's decision is the "linchpin" for judicial

review of contract claims under the CDA ... for the court to accept jurisdiction over [an

unexhausted counterclaim] without the defendants exhausting the administrative protocol would

frustrate the scheme of the  CDA"); Thoen v. United States, 765 F.2d 1110, 1116 (Fed. Cir.1985)

("Congress has determined that submission of a certified claim to the contracting officer in the

first instance is a jurisdictional prerequisite to filing a suit in the Claims Court").

To present a claim, the contractor must submit the operative facts to the contracting

officer.  See SMS Data Prods. Group, Inc. v. United States, 19 Cl. Ct. 612, 615-16

(1990)(plaintiff could not claim damages on claim not submitted to contracting officer when new

claim required proof of different circumstances than original claim).  To determine whether an

argument is a new claim or an alternate theory of relief based on the original claim, it is helpful

to examine whether the operative facts underlying the new claim are so different from the

original claim that failure of the new claim would not logically preclude the contractor from

succeeding on the original claim, or vice versa.  Pueblo of Zuni v. United States 467 F. Supp. 2d

864 F.2d 848, 854 (D.C. Cir. 1989), and the fact that Plaintiff recovered more than the actual
costs it incurred under the agreement.

15

1099, 1111 (D.N.M. 2006).  Moreover, presentment is not excused when the contractor had the

requisite information about the new claim in its possession when it presented the original claim.

Id. at 1112.

In this case, Plaintiff presented its claim for rate miscalculation to the contracting officer,

but not its claim for carry forward adjustments.  Ex, B, A.R. at 2.  The new claim related to carry

forward adjustments is logically distinct from its claim for rate miscalculation: the rate

miscalculation claim is premised on the failure of other federal agencies to reimburse their share

of indirect costs, Compl. ¶ 22-23, while the carryforward claim is premised on how the rate

negotiators treat the Secretary's alleged failure to fully fund CATG's ISDA contract in FY 1995.

Compl. ¶ 25.  Even if Plaintiff prevailed on the rate miscalculation claim, it could still lose on the

carry forward claim if, for example, Defendants proved that Plaintiff's indirect rate agreement

did not provide for any carryforward calculations.  Thus, failure on one claim does not equal

failure on the other, and the carry forward claim is a separate claim.  Plaintiff concedes as much,

stating that its carry forward claim is an additional theory of recovery, not an alternate one, based

on different factual allegations than its rate miscalculation claim.  Id.  Moreover, Plaintiff has not

asserted that it lacked the information necessary to present the carry forward claim with the rate

miscalculation claim in September 2005, since both claims relate to a ten year old indirect cost

rate.  See Ex, C, A.R.92-93.  Since CATG did not present this claim to the contracting officer, it

should be dismissed for lack of jurisdiction.

**III.    The Court Should Grant Summary Judgment Because Plaintiff's Ten Year Delay
         Has Prejudiced the Government's Ability to Defend the Case.**

As demonstrated above, Plaintiff has failed to state a claim for breach of contract, and

failed to meet the statutory presentment requirement for its carryforward claim. Those grounds

support Defendants' motion to dismiss under Rule 12(b). In the alternative, Defendants also

move for summary judgment on the basis of laches. Plaintiff presented two of its three claims to

IHS in September 2005, ten years after the end of its contract in September 1995. "Laches

applies where there has been an unfair and prejudicial delay by a plaintiff in bringing an action."

CarrAmerica Realty Corp. v. Kaidanow, 321 F.3d 165, 171 (D.C. Cir.), op. supplemented by 331

F.3d 999 (D.C. Cir. 2003). A laches defense exists when: (1) there is an unreasonable and

inexcusable delay from the time the claimant knew or reasonably should have known about its

claim; and (2) that this delay caused either economic prejudice or injury to the defendant's ability

to mount a defense. See, e.g., Pfeiffer v. Central Intelligence Agency, 60 F.3d 861, 865 (D.C.

Cir. 1995) (barring former CIA employee's claim that government waived its property right in

document under doctrine of laches); Independent Bankers Ass'n of Am. v. Heimann, 627 F.2d

486, 488 (D.C. Cir. 1980) (laches barred claim brought 12 years after accrual); see also Village

of Elk Grove Village v. Evans, 997 F.2d 328, 331 (7th Cir. 1993); A.C. Aukerman Co. v. R.L.

Chaides Constr. Co., 960 F.2d 1020, 1032 (Fed. Cir. 1992); Cornetta v. United States, 881 F.2d

1372, 1377-78 (Fed. Cir. 1988). The undisputed facts demonstrate both of these elements here.

 First, Plaintiff delayed ten years before bringing this lawsuit. At the latest, Plaintiff's

contract claim accrued by the end of the contract year (which corresponds with the federal fiscal

year). See Oceanic S.S. Co. v. United States, 165 Ct. Cl. 217, 225 (1964) (per curiam) ("A claim

against the United States first accrues on the date when all the events have occurred which fix the

liability of the Government and entitle the claimant to institute the action. Therefore, where a

claim is based upon a contractual obligation of the Government to pay money, the claim first

17

accrues on the date when the payment becomes due and is wrongfully withheld in breach of the

contract.") (internal citations omitted).  Plaintiff's cause of action accrued by September 1995 at

the latest, when the contract year ended and Plaintiff had been fully paid under the contract.

Plaintiff was fully aware at this time of its payment under the contract – if it had disputes

regarding the amount of payment, it could have brought suit immediately.  By its own admission,

Plaintiff did not submit its claim for fiscal year 1995 until September 2, 2005.  See Compl. ¶ 7.

This 10-year delay is significantly longer than the current six year statute of limitations, and is

certainly long enough to meet the standards under the first prong of the test for laches.  See

Mexican Intermodal Equip., S.A. v. United States, 61 Fed. Cl. 55, 71 (2004) (noting delays

ranging from 3½ to 5 years can constitute unreasonable delay); cf. 41 U.S.C. § 605(a) (requiring

presentment of all claims within six years of accrual for contracts entered on or after October 1,

1995). (Note, here the contract was entered into 1994.)

     To show prejudice, the government must show either evidentiary prejudice or economic

prejudice.  As discussed elsewhere, the contract documents themselves should dispose of this

case.  However, to the extent that plaintiff attempts to introduce extrinsic evidence, the

government's ability to present a defense has been hampered significantly.  See Warren v. United

States, 4 Cl. Ct. 552 (1984) ("Prejudice may be shown by some indication that the government's

defense has been hampered by the belated prosecution of the plaintiff's claim").  When Plaintiff

presented its claim ten years after the fact, memories had faded, and several key witnesses had

retired.

     For example, as the Contracting Officer's Representative (COR), Paul Young approved

CATG's budget for indirect-type costs for FY 1995.  See Ex. A, A.R.50-51 (appointing Paul

18

Young as COR, and requiring him to review performance and financial reports from CATG),
A.R 65 (indirect type costs budget initialed "PY").  He was separated from federal service
November 12, 1994.  See Decl. Maria Cunningham at ¶ 3, attached hereto.  Contract Specialist
Deborah Segelhorst processed modifications to CATG's contract award in FY 1995.  See Ex, A,
A.R.56-59; 69-72.  She retired from federal service July 2, 2004.  See Cunningham Decl. ¶ 3.  In
1999, IHS closed out Contract 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.  As part of the close out, Contract Specialist Olinga
Fagan received the Tribe's release of claims under the contract.  Ex, D, A.R. AT 146-47.  She
retired from federal service April 1, 2005.  See Cunningham Decl. ¶ 3.

Second, Defendants have been economically prejudiced by this delay, as the
appropriations for 1995 have long since lapsed.  Congress appropriated money to IHS for Indian
Health Services that was available for one year.  See Dep't of the Interior & Related Agencies
Appropriations Act, 1995, Pub. L. No. 103-332, 108 Stat. 2499, 2527-28, 2536, 2537-38 (1994).
Congress specifically stated in the Appropriations Act that "[n]o part of any appropriation
contained in this Act shall remain available for obligation beyond the current fiscal year unless
expressly so provided herein."  Id., 108 Stat. at 2536.  By law, IHS funds for ISDA contracts had
to be obligated within the appropriation year.  Id., 108 Stat. at 2528.  Therefore, by the terms of
the Appropriations Act itself, this funding has long since expired, and to allow Plaintiff to revive
a claim for appropriations that expired over a decade ago would be prejudicial to Defendants.[9]

_____

[9]  This is particularly true because the 1995 contract contained a limitation of cost
provision, which specified the total cost to the government would not exceed $787,820.  See Ex.
A at 28 (limitation of cost provision), Mod. 8 (modifying cost ceiling).  This provision limits the
government's liability to that amount, and the government should have been able to rely on the
fact that it would not need to provide additional funds well into the future. See, e.g.,
Sociotechnical Research Applications, Inc. v. Whitman, No. 01-1232, 2002 WL 123557, at *3-4
(Fed. Cir. Jan. 30, 2002) (finding limitation of cost provision limited government's liability for

Plaintiff has asserted no reason why it delayed for ten years before bringing these claims. It now seeks damages beyond the amounts promised and paid by Defendants under the contract, and its theories are contradicted by the contract documents themselves. Plaintiff had its opportunity to challenge the award amounts back in 1994 and 1995, before IHS's witnesses had retired and its appropriation had lapsed. Plaintiff chose not to do so, and it would be unfair to allow it to proceed with this action now.

## CONCLUSION

For the foregoing reasons, Defendant requests that its motion to dismiss be granted and judgment entered in its favor.

December 21, 2007                                Respectfully submitted,

 

_____
JEFFREY A. TAYLOR, D.C. Bar # 498610
United States Attorney

  /s/
_____
RUDOLPH CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney

  /s/
_____
ALAN BURCH, D.C. Bar # 470655
Assistant United States Attorney
555 4th St., N.W.
Washington, D.C. 20530
(202) 514-7204
alan.burch@usdoj.gov

---

funds allotted in the contract); Advanced Materials, Inc. v. Perry, 108 F.3d 307, 310 (Fed. Cir. 1997) (finding the government's estimated cost a ceiling for its contractual liability when contract contained a limitation of cost provision); Titan Corp. v. West, 129 F.3d 1479, 1482 (Fed. Cir. 1997) (holding the government is not liable for additional costs in the face of a limitation of cost provision).

20

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
_____
                                    )
COUNCIL OF ATHABASCAN               )
TRIBAL GOVERNMENTS,                 )
                                    )
            Plaintiff,              )
                                    )
      v.                            )      Civil Action No. 07-1270 (RWR)
                                    )
UNITED STATES OF AMERICA;           )
MICHAEL O. LEAVITT, Secretary       )
of the Department of Health and     )
Human Services; and                 )
ROBERT G. McSWAIN, Acting Director, )
Indian Health Service;              )
                                    )
            Defendants.             )
_____)
```

### <u>DEFENDANT'S STATEMENT OF MATERIAL FACTS</u><br><u>AS TO WHICH THERE IS NO GENUINE ISSUE</u>

Pursuant to Local Civil Rules 7(h) and 56.1, Defendants submit the following statement of material facts as to which there is no genuine issue in support of their alternative motion for summary judgment on the basis of laches.

1.      On September 30, 1995, the performance period ended for Contract No. 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 between the Council of Athabascan Tribal Governments (CATG) and the Alaska Area Native Health Service (AANHS), an area office of the Indian Health Service (IHS).  Exhibit A, A.R.58.

2.      On September 2, 2005, CATG sent two claims to AANHS under the Contract Disputes Act, 41 U.S.C. §§ 601-613.  Compl. ¶ 7.

3.      Paul Young was the Contracting Officer's Representative (COR) for Contract No. 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 and required to review performance and financial reports from CATG.  Ex, A, A.R.50-

51.

4.    Paul Young approved CATG's budget for indirect-type costs for FY 1995.  A.R 65.

5.    Paul Young was separated from federal service on November 12, 1994.  Decl. Maria Cunningham at ¶ 3.

6.    Contract Specialist Deborah Segelhorst processed modifications to CATG's contract award in FY 1995.  See Ex, A, A.R.56-59; 69-72.

7.    Deborah Segelhorst retired from federal service July 2, 2004.  Cunningham Decl. ¶ 3.

8.    In September 1999, Contract Specialist Olinga Fagan received the Tribe's release of claims under Contract 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.  Ex. D, A.R.146-47.

9.    Olinga Fagan retired from federal service April 1, 2005.  Cunningham Decl. ¶ 3.

10.    Contract 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 contained a limitation of cost provision, which specified the total cost to the government would not exceed $787,820.  See Ex. A, A.R.28 (limitation of cost provision), A.R.75-76 (modifying cost ceiling).

11.    For fiscal year 1995, Congress appropriated money for Indian Health Services that was available for one year, Dep't of the Interior & Related Agencies Appropriations Act, 1995, Pub. L. No. 103-332, 108 Stat. 2499, 2527-28, 2536, 2537-38 (1994), stating in the Appropriations Act that "[n]o part of any appropriation contained in this Act shall remain available for obligation beyond the current fiscal year unless expressly so provided herein."  Id., 108 Stat. at 2536.  By law, IHS funds for ISDA contracts in fiscal year 1995 had to be obligated within the appropriation year.  Id., 108 Stat. at 2528.

12.    By the terms of the Appropriations Act itself, IHS's authority to obligate any funding it would have used to fund CATG's contract in fiscal year 1995 expired at the close of fiscal year

1995.

December 21, 2007                          Respectfully submitted,

_____

JEFFREY A. TAYLOR, D.C. Bar # 498610
United States Attorney


  /s/
_____

RUDOLPH CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney


  /s/
_____

ALAN BURCH, D.C. Bar # 470655
Assistant United States Attorney
555 4th St., N.W.
Washington, D.C. 20530
(202) 514-7204
alan.burch@usdoj.gov

3

OMB 0990-0115

| AWARD/CONTRACT | 1. THIS CONTRACT IS A RATED ORDER UNDER DPAS (15 CFR 350) | RATING | PAGE OF PAGES 1    29 |
|---|---|---|---|

| 2. CONTRACT (Proc. Inst Ident.) NO. 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 | 3. EFFECTIVE DATE June 1, 1994 | 4. REQUISITION/PURCHASE REQUEST/PROJECT NO. A-ORCH (A-DRHD)-94-0123, 0138 |
|---|---|---|

| 5. ISSUED BY                                     CODE | 6. ADMINISTERED BY (If other than Item 5)    CODE |
|---|---|
| DHHS, PHS, IHS<br>Alaska Area Native Health Service<br>Division of Tribal Awards<br>250 Gambell Street<br>Anchorage, Alaska  99501-2781 | |

| 7. NAME AND ADDRESS OF CONTRACTOR (No., street, city, county, State and ZIP Code) | 8. DELIVERY |
|---|---|
| Council of Athabascan Tribal Governments<br>P.O. Box 33<br>Fort Yukon, Alaska  99740 | ☐ FOB ORIGIN    ☐ OTHER (See below)<br>9. DISCOUNT FOR PROMPT PAYMENT<br><br>10. SUBMIT INVOICES (4 copies unless otherwise specified) TO THE ADDRESS SHOWN IN: ► ITEM see Section G-3 (c) page 15 |

| CODE | FACILITY CODE |
|---|---|

| 11. SHIP TO/MARK FOR                     CODE<br>N/A | 12. PAYMENT WILL BE MADE BY                     CODE<br>Division of Payment Management/Payment Management System, P.O. Box 6021, Rockville, MD  20852 |
|---|---|

| 13. AUTHORITY FOR USING OTHER THAN FULL AND OPEN COMPETITION:<br>25 USC 450 (g)<br>☐ 10 U.S.C. 2304(c)(    )    ☐ 41 U.S.C. 253(c)(    ) | 14. ACCOUNTING AND APPROPRIATION DATA<br>See Section G-5, Page 16 |
|---|---|

| 15A. ITEM NO. | 15B. SUPPLIES/SERVICES | 15C. QUANTITY | 15D. UNIT | 15E. UNIT PRICE | 15F. AMOUNT |
|---|---|---|---|---|---|
| | To provide health services with regard to the Yukon Flats Health Center, Health Development & Support Services programs for the Alaska Natives/ American Indians residine within Arctic Village, Beaver, Birch Creek, Chalkyitsik, Circle, Fort Yukon, Stevens Village, Venetie. | | | | |

15G. TOTAL AMOUNT OF CONTRACT ► $ 435,769.00

### 16. TABLE OF CONTENTS

| (√) | SEC. | DESCRIPTION | PAGE(S) | (√) | SEC. | DESCRIPTION | PAGE(S) |
|---|---|---|---|---|---|---|---|
| | | PART I — THE SCHEDULE | | | | PART II — CONTRACT CLAUSES | |
| X | A | SOLICITATION/CONTRACT FORM | 1 | X | I | CONTRACT CLAUSES | 24-28 |
| X | B | SUPPLIES OR SERVICES AND PRICES/COSTS | 2 | | | PART III — LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACH. | |
| X | C | DESCRIPTION/SPECS./WORK STATEMENT | 3-11 | X | J | LIST OF ATTACHMENTS | 29 |
| N/A | D | PACKAGING AND MARKING | | | | PART IV — REPRESENTATIONS AND INSTRUCTIONS | |
| N/A | E | INSPECTION AND ACCEPTANCE | | | K | REPRESENTATIONS, CERTIFICATIONS AND OTHER STATEMENTS OF OFFERORS | |
| X | F | DELIVERIES OR PERFORMANCE | 12 | X | | | |
| X | G | CONTRACT ADMINISTRATION DATA | 13-20 | N/A | L | INSTRS., CONDS., AND NOTICES TO OFFERORS | |
| X | H | SPECIAL CONTRACT REQUIREMENTS | 21-23 | N/A | M | EVALUATION FACTORS FOR AWARD | |

*CONTRACTING OFFICER WILL COMPLETE ITEM 17 OR 18 AS APPLICABLE*

| 17. ☒ CONTRACTOR'S NEGOTIATED AGREEMENT (Contractor is required to sign this document and return original copies to issuing office.) Contractor agrees to furnish and deliver all items or perform all the services set forth or otherwise identified above and on any continuation sheets for the consideration stated herein. The rights and obligations of the parties to this contract shall be subject to and governed by the following documents: (a) this award/contract, (b) the solicitation, if any, and (c) such provisions, representations, certifications, and specifications, as are attached or incorporated by reference herein. (Attachments are listed herein.) | 18. ☐ AWARD (Contractor is not required to sign this document.) Your offer on Solicitation Number _____ including the additions or changes made by you which additions or changes are set forth in full above, is hereby accepted as to the items listed above and on any continuation sheets. This award consummates the contract which consists of the following documents: (a) the Government's solicitation and your offer, and (b) this award/contract. No further contractual document is necessary. |
|---|---|
| 19A. NAME AND TITLE OF SIGNER (Type or print)<br>Clarence L. Alexander<br>Chairman | 20A. NAME OF CONTRACTING OFFICER<br>Margretta J. Akagi, Tribal Awards Officer |
| 19B. NAME OF CONTRACTOR<br>BY _Clarence L. Alexander_<br>(Signature of person authorized to sign) | 19C. DATE SIGNED<br>05/23/94 | 20B. UNITED STATES OF AMERICA<br>BY _Margretta J. Akagi_<br>(Signature of Contracting Officer) | 20C. DATE SIGNED<br>5/31/94 |

NSN 7540-01-152-8069<br>PREVIOUS EDITION UNUSABLE

26-107

STANDARD FORM 26 (REV. 4-85)<br>Prescribed by GSA<br>FAR (48 CFR) 53.214(a)

DEF0014

Contract No. 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

# TABLE OF CONTENTS

**PAGE NO.**

AWARD/CONTRACT                                                                                      1

SECTION B - Supplies or Services and Prices/Costs_____ 2

SECTION C - Description/Specifications/Work Statement_____3
    1.    SCOPE OF WORK (SOW)_____3
    2.    INCORPORATION BY REFERENCE OF CONTRACTOR'S TECHNICAL
        PROPOSAL_____3
    3.    HOLIDAYS_____3

        (SOW) YUKON FLATS HEALTH CENTER_____4-11

SECTION F - Deliveries or Performance_____12
    1.    PERIOD OF PERFORMANCE_____12
    2.    PROGRAM REPORTING REQUIREMENTS_____12

SECTION G - Contract Administration Data_____13
    1.    PAYMENT_____13
        A.    Limitation of Cost_____13
        B.    Allowable Cost_____13
        C.    Travel and Subsistence_____13
        D.    Direct Costs_____13
        E.    Indirect Costs_____13
    2.    METHOD OF PAYMENT_____14
    3.    SUBMISSION OF INVOICE, PLACE OF PAYMENT AND FINANCIAL
        REPORTING (AUGUST 1989)_____15
        A.    Advance Payment Method_____15
        B.    Reimbursement Method of Payment_____15
        C.    Invoices and financial reports Address_____15
    4.    DESIGNATION OF PROJECT OFFICER_____16
    5.    ACCOUNTING AND APPROPRIATION DATA_____16
    6.    PROPERTY REQUIREMENTS (AUGUST 1990)_____16
    7.    ADMINISTRATION OF GOVERNMENT PROPERTY (ALTERNATE 1)
        (AUGUST 1990)_____19
    8.    UNILATERAL MODIFICATIONS (AUGUST 1989)_____20
    9.    REDUCTIONS IN FUNDING (AUGUST 1989)_____20
    10.    CONTRACT REDUCTIONS_____20

2

Contract No 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

# TABLE OF CONTENTS
## (Continued)

SECTION H - Special Contract Requirements_____21

   1.   SAVINGS/UNEXPENDED FUNDS AND PROGRAM INCOME UNDER THE
        CONTRACT (AUGUST 1989)_____21
   2.   KEY PERSONNEL_____22
   3.   AUDIT_____22
   4    INTERAGENCY MOTOR POOL VEHICLES AND RELATED SERVICES22
   5.   EQUAL ACCESS TO JUSTICE ACT (AUGUST 1989)_____22
   6.   POSTAWARD REBUDGETING (JUNE 1990)_____22
   7.   SERVICE TO NON-BENEFICIARIES_____23
   8.   FEDERAL TORT CLAIMS COVERAGE_____23

SECTION I - Contract Clauses_____24

   1.   Clauses Incorporated by Reference_____24
        A   FAR 52 203-7 ANTI-KICKBACK PROCEDURES (OCT 1988)_____24
        B   FAR 52 224-1 PRIVACY ACT NOTIFICATION (APR 1984)_____24
        C   FAR 52 224-2 PRIVACY ACT (APR 1984)_____24
        D   HHSAR 352 224-70 CONFIDENTIALITY OF INFORMATION
           (APR 1984)_____24
   2    AVAILABILITY OF FUNDS FOR NEXT FISCAL YEAR
        (FAR 52 232-18, APR 1984)_____24
   3.   GENERAL PROVISIONS FOR A COST REIMBURSEMENT
        CONTRACT UNDER P L 93-638_____24
   4    REFERENCE GENERAL PROVISION NO 2_____25
   5    REFERENCE GENERAL PROVISION NO 7 ADVANCE PAYMENT____26
   6    REFERENCE GENERAL PROVISION NO 10_____27
   7    REFERENCE GENERAL PROVISION NO 42_____28
   8    OVERTIME_____28

SECTION J - List of Attachments_____29

SECTION K - Representations, Certifications, and Other Statements
        of Offerors_____Attached

**ATTACHMENTS**

3

---

Contract No.   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                                    Page 2 of 29 Pages

---

## SECTION B - Supplies or Services and Price/Costs

| Program | Amount |
|---|---|
| Hospital & Clinics | 191,475 00 |
| Start-up Costs | 130,210 00 |
| Indirect Like Costs | 114,084.00 |
| TOTAL | 435,769.00 |

4'

DEF0017

## SECTION C - Description/Specifications/Work Statement

1. **SCOPE OF WORK**

   This contract is to provide health services for the Alaska Native people (Indian Health Service beneficiaries) who present for care within the Contractor's regional area specifically Arctic Village, Beaver, Birch Creek, Chalkyitsik, Circle, Fort Yukon, Stevens Village and Venetie. The health and related services programs set forth below are taken from the Contractors technical proposal and are made a part of this contract and were negotiated under Public Law 93-638. The following eight (8) pages are the Scope of Work for the Yukon Flats Health Center, Health Development and Support Services.

2. **INCORPORATION BY REFERENCE OF CONTRACTOR'S TECHNICAL PROPOSAL**

   The Contractor shall, in meeting the requirements of this contract, perform work and services in accordance with the Contractor's technical proposal to the Alaska Area Native Health Service, Indian Health Service dated September 21, 1993 and amended February 14, 1994, provided, however, that to the extent that any provisions of the articles of this contract are in conflict or inconsistent with any provisions of said proposal, the provisions of the articles of this contract shall be controlling and shall supersede the provisions of said proposal.

3. **HOLIDAYS**

   Services will be provided to each community for five (5) days of the week, except paid holidays which are:

   (1) New Year's Day             (7) Athabascan Subsistence Day
   (2) Traditional Chiefs Day     (8) Veteran's Day
   (3) Washington's Birthday      (9) Thanksgiving Day
   (4) Memorial Day               (10) Christmas Day
   (5) Independence Day           (11) Martin Luther King Day
   (6) Labor Day                  (12) Columbus Day

The above are recognized holidays. No more than ten of the holidays listed above may be taken utilizing Federal Funds. Other days as authorized by the President or Governor of the State of Alaska and confirmed by the Board President, shall be recognized as legal holidays. Emergency clinic/health periods shall be conducted as necessary.

5

## YUKON FLATS HEALTH CENTER

This section supports the operations of the Yukon Flats Health Center, an ambulatory care referral center for the community of Fort Yukon and eight other villages in the Yukon Flats. Primary care and 24-hour emergency care are provided by Yukon Flats Health Center staff. Subregional PHN services are provided by the State PHN stationed at the health center.

Objectives:

1       The CATG objective is to provide the following staffing in the Fort Yukon Health Center:

| | | |
|---|---|---|
| a | Medical Director - Physicians Assistant (PA) or Family Nurse Practitioner (FNP) | 1 FTE |
| b | PA or FNP | 1 FTE |
| c. | PA or FNP | .5 FTE |
| d | Medical Assistant | 1 FTE |
| e | Office Manager | 5 FTE |
| f. | Secretary/Receptionist | 1 FTE |
| g | Data Entry Clerk | .5 FTE |
| h | Housekeeper | 1 FTE |
| i | Maintenance Worker | 1 FTE |

The CATG objective is to provide administrative assistance and support through the following positions located at the CATG central office in Fort Yukon.

| | | |
|---|---|---|
| a. | Executive Director | .6 FTE |
| b. | Health Director | 1 FTE |
| c. | Fiscal Officer | .9 FTE |
| d. | Administrative Assistant | 1 FTE |

In addition, the State of Alaska may provide:

a.      Public Health Nurse - Yukon Flats Health Center

6

DEF0019

Contract No.  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                          Page 12 of 29 Pages

## SECTION F - Deliveries or Performance

### 1.  PERIOD OF PERFORMANCE

Performance of this contract shall begin on June 1, 1994 and shall not extend beyond the completion date of September 30, 1994 unless the period is changed by written modification of the contract

### 2.  PROGRAM REPORTING REQUIREMENTS

In addition to the reports identified in General Provision Clause 9, Inspection and Reports, the following reports are required:

| Report | Submit Through Project Officer To Program | Due Date | Format |
|---|---|---|---|
| Annual Report to Native People | Contracting Officer | Annually by January 1 | Narrative |
| Expenditure Report | Contracting Officer | Quarterly by 30 days after end of each quarter | SF-269A line item report. |
| Property Inventory | A-DPM/Contracting Officer | November 15th | HEW 565 |
| Program Narrative | Program Officer/ Contracting Officer | Quarterly by 30 days after end of each quarter | Narrative/ Evaluation |
| Program Income | Contracting Officer | Quarterly | Narrative |
| Single Audit | Contracting Officer | Annually by March 30 | Single Audit |

**All other mandatory Reporting Requirements will be based on the Core Data Set Requirements, published in the Federal Register on January 20, 1994.**

14

Contract     No.   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                              Page 13 of 29 Pages

## SECTION G - Contract Administration Data

1.   **PAYMENT**

   A.   **Limitation of Cost:**

   Subject to General Provision Clause 3, "Limitation of Cost" the total cost to the Government, including all direct and indirect costs for the performance of this contract, shall not exceed $435,769.00 until and unless the Contractor is notified in writing by the Contracting Officer that this ceiling amount has been increased.

   B.   **Allowable Cost:**

   The Contractor will be reimbursed for all costs incurred in the performance of this contract, claimed by the Contractor, and accepted by the Contracting Officer, in accordance with General Provision Clause 3, Limitation of Cost, General Provision Clause 4, Allowable Cost and General Provision Clause 5, Negotiated Overhead Rates, if appropriate

   C.   **Travel and Subsistence:**

   The Contractor shall be reimbursed for actual transportation costs and travel allowances/per diem of personnel authorized to travel under this contract in accordance with the Contractor's established policy which has been approved by the Contracting Officer   In the event the Contractor has not established an approved policy, such reimbursements shall not exceed those established by the Standard Government Travel Regulations in effect at the time travel is performed

   D.   **Direct Cost:**

   The Contractor shall be paid for all allowable cost incurred directly and specifically in the performance of the contract, claimed by the Contractor, and accepted and approved by the Contracting Officer.

   E.   **Indirect Cost:**

   In lieu of a negotiated indirect cost rate by a cognizant agency, ISDM 92-2 is applicable for recipients without established indirect rate agreements

*15*

DEF0028

 DEPARTMENT OF HEALTH & HUMAN SERVICES

Public Health Service

Date  :  May 17, 1994

From  :  Tribal Awards Officer, Div. of Tribal Awards
         Alaska Area Native Health Service

Alaska Area Native Health Service
250 Gambell Street
Anchorage, Alaska 99501-2781

Subject : Appointment as Contracting Officer's Representative for
          **Contract No. 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, Council of Athabascan Tribal Governments**

To    :  **Paul Young,** Division of Regional Health Development
         Alaska Area Native Health Service

You are hereby designated as the Contracting Officer's Representative (COR) for the subject contract and will work with the Contractor to ensure compliance with the contract terms and conditions.

As COR, you are a vitally important member of the contract administration team.

In order to fulfill your duties and responsibilities under this assignment, you must:

1. Thoroughly familiarize yourself with the terms and conditions of the Contract;

2. Contact the Contractor to ensure that the Contractor understands financial and performance reporting requirements, the procedures for the payment system under the contract and any other special provisions which may not be readily apparent to the Contractor. In addition, a copy of all correspondence between you and the Contractor shall be provided promptly to the Contracting Officer;

3. Provide liaison services to facilitate communication between the Contractor, Area program and administrative staff through contact on a periodic basis during the life of the Contract. Review and analyze actual performance compared to agreed upon standards and to determine if problems are being encountered by the Contractor which may require assistance by the representatives of IHS. The frequency of this contact will vary according to the size and complexity of the Contract, but should be no less frequent than quarterly;

4. Provide, at least quarterly, a reconciliation between current Area Advices of Allowance and the current cumulative contract including verification of projected use of government provided personnel and/or services.

DEF0050

Assignment as Contracting Officer's Representative
Page 2

5. Maintain a "suspense" file so that the Contractor can be notified when performance reports, financial status reports, or other formal reports are overdue for presentation to the Area;

6. Notify the Contractor when required reports are more than 5 days late.

7. Review all performance reports, health program workload data, and financial reports forwarded by the Contractor and recommend approval or disapproval of them. When inaccuracies are found, have the Contractor correct the invoices before you recommend approval;

8. Advise the Contractor of any action which you believe to be a violation of the Contract terms and conditions and promptly bring the matter to the Contracting Officer's attention;

9. Maintain an official file in which the major events that occur are recorded;

10. Provide advice and technical assistance to the Contractor. All changes requested by the Contractor must be submitted in writing to the Contracting Officer. The requests must include justification and indicate the effect the proposed change will have on the contract terms and conditions. You will provide applicable program official recommendations of approval or disapproval along with your recommendations, in writing, to the Contracting Officer. Provide a revised statement of work when necessary;

11. Submit a copy of semi-annual written report to the Contracting Officer informing her/him of the status of progress under the Contract and pointing out any problems in performance which may require action by the Area for resolution.


**Your authority may not be redelegated. You are not authorized to take any of the following actions:**

1. You are not authorized to issue directions which change the scope of the requirements, the work to be performed, the compensation, or period of performance under this contract;

2. Commit the Government in any matter, except as authorized herein

Assignment as Contracting Officer's Representative
Page 3


As the COR, it is vital that you have direct and free communications with this office on any matter at any time. Urgent matters should be discussed by the most expedient method available.

This assignment supersedes any prior assignments as COR for this contract.


Peggy J. Akagi

cc: Contractor
    A-NOAS
    A-DRHD

## AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

| 1. CONTRACT ID CODE | | PAGE | OF PAGES |
|---|---|---|---|

| 2. AMENDMENT/MODIFICATION NO. Two (2) | 3. EFFECTIVE DATE 9-30-94 | 4. REQUISITION/PURCHASE REQ. NO A-NOAS (A-OFM) 94-0038-2 | 5. PROJECT NO. (If applicable) |
|---|---|---|---|

| 6. ISSUED BY | CODE | 7. ADMINISTERED BY (If other than Item 6) | CODE |
|---|---|---|---|
| Alaska Area Native Health Service<br>Area-Division of Tribal Awards<br>250 Gambell Street<br>Anchorage, Alaska 99501 | | FY 1994 | |

| 8. NAME AND ADDRESS OF CONTRACTOR (No., street county State and ZIP Code) | (√) | 9A. AMENDMENT OF SOLICITATION NO. |
|---|---|---|
| Council of Athabascan Tribal Governments<br>P O Box 33<br>Fort Yukon, Alaska 99740 | | 9B. DATED (SEE ITEM 11) |
| | X | 10A. MODIFICATION OF CONTRACT/ORDER NO. 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 |
| | | 10B. DATED (SEE ITEM 13) 06/01/94 |

| CODE | FACILITY CODE |
|---|---|

### 11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

[ ] The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers [ ] is extended, [ ] is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods: (a) By completing Items 8 and 15, and returning _____ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified

| 12. ACCOUNTING AND APPROPRIATION DATA (If required) See Page #2 of this Modification |
|---|

### 13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

| | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
|---|---|
| | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation data, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43 103(b). |
| X | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: 25 USC 450 (g) |
| | D. OTHER (Specify type of modification and authority) |

E. IMPORTANT: Contractor [X] is not, [ ] is required to sign this document and return _original_ copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

The above referenced Public Law 93-638 contract to provide various Indian Health Service programs is hereby modified as follows

A. The contract is hereby increased by $152,615.00 from $439,569.00 to $592,184.00 for FY-94 by reason of this modification. Program funding levels are identified on page 2 of this modified contract. These funds shall provide services within the present contract scope of work and within the approved budgets.

*m T*
*9/30/94*

*34*

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A. NAME AND TITLE OF SIGNER (Type or print) | 16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print) Deborah D. Segelhorst, Senior Contracts Officer |
|---|---|
| 15B. CONTRACTOR/OFFEROR<br><br>(Signature of person authorized to sign) | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA<br>BY _(Signature of Contracting Officer)_ | 16C. DATE SIGNED 9/30/94 |

| NSN 7540-01-152-8070<br>PREVIOUS EDITION UNUSABLE | 30-105 | STANDARD FORM 30 (REV. 10-83)<br>Prescribed by GSA<br>FAR (48 CFR) 53.243 |
|---|---|---|

DEF 0056

COUNCIL OF ATHABASCAN TRIBAL GOVERNMENTS
CONTRACT NO. 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
MODIFICATION NO. 2                                      28-Sep-94

B.    | STATUS OF FUNDS |

HOSPITALS & CLINICS
AOA #3, Note 4:  Medical Equipment Adjustment (NR)          (200.00)

ISD
Balance of ISD "X" (NR)                                    152,815.00

TOTAL STATUS OF FUNDS                                      152,615.00

C    | ACCOUNTING & APPROPRIATION DATA |

| | | PRIOR BALANCE | CHANGES (+ OR -) | NEW BALANCE |
|---|---|---|---|---|
| **HOSPITALS & CLINICS** | | | | |
| FY-94 | 7540390 4 -39159 61 J597878 886 25 82 (R) | 191,475.00 | 0.00 | 191,475.00 |
| FY-94 | 7540390 4 -39159 61 J597878 886 25 82 (NR) | 3,800.00 | (200.00) | 3,600.00 |
| | TOTAL H & C | 195,275.00 | (200.00) | 195,075.00 |
| | **CONTRACT SUPPORT COSTS** | | | |
| FY-94 | 7540390 4 -39859 61 J59C78A 886 25 85 (NR) | 20,646.00 | 0.00 | 20,646.00 |
| | **INDIAN SELF DETERMINATION** | | | |
| FY-94 | 75X0390 4 -41459 04 01 54 J599469 886 25 82 (NR) | 130,210.00 | 0.00 | 130,210.00 |
| FY-94 | 75X0390 4 -41459 04 01 54 J599469 886 25 85 (NR) | 93,438.00 | 152,815.00 | 246,253.00 |
| | TOTAL ISD | 223,648.00 | 152,815.00 | 376,463.00 |
| | **FY94 TOTAL** | 439,569.00 | 152,615.00 | 592,184.00 |

D.    | CONTRACT VALUE: |                                      CHANGES

PRESENT FISCAL YEAR 1994            439,569.00        152,615.00        592,184.00

TOTAL CONTRACT VALUE:               439,569.00        152,615.00        592,184.00

ALL OTHER TERMS AND CONDITIONS OF THIS CONTRACT SHALL REMAIN THE SAME.

35

DEF0057

OMB 0990-0115

| AMENDMENT OF SOLICITAT' \I/MODIFICATION OF CONTRACT | | 1. CONTRACT ID CODE | PAGE OF PAGES | |
|---|---|---|---|---|
| | | | | 2 |

| 2. AMENDMENT/MODIFICATION NO. | 3. EFFECTIVE DATE | 4. REQUISITION/PURCHASE REQ. NO. | 5. PROJECT NO. (If applicable) |
|---|---|---|---|
| Three (3) | 10/01/94 | A-NOAS (A-OFM) 95- 0049 | |

| 6. ISSUED BY                    CODE | 7. ADMINISTERED BY (If other than Item 6)        CODE |
|---|---|
| Alaska Area Native Health Service<br>Area-Division of Tribal Awards<br>250 Gambell Street<br>Anchorage, Alaska 99501 | |

| 8. NAME AND ADDRESS OF CONTRACTOR (No., street, county State and ZIP Code) | (✓) | 9A. AMENDMENT OF SOLICITATION NO |
|---|---|---|
| Council of Athabascan Tribal Governments<br>P O Box 33<br>Fort Yukon, Alaska 99740 | | 9B. DATED (SEE ITEM 11) |
| | X | 10A. MODIFICATION OF CONTRACT/ORDER NO.<br>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 |
| | | 10B. DATED (SEE ITEM 13)<br>06/01/94 |

| CODE | FACILITY CODE |
|---|---|

## 11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14 The hour and date specified for receipt of Offers ☐ is extended ☐ is not extended

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods:

(a) By completing Items 8 and 15, and returning _____ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers  FAILURE OF YOUR ACKNOWLEDGEMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

| 12. ACCOUNTING AND APPROPRIATION DATA (if required) |
|---|
| See Page #2 of this Modification |

## 13  THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

| (✓) | |
|---|---|
| | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
| | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation data, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b) |
| X | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF:<br>25 USC 450 (g) |
| | D. OTHER (Specify type of modification and authority) |

E  IMPORTANT:  Contractor ☐ is not, ☒ is required to sign this document and return Original _____ copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

The above referenced Public Law 93-638 contract to provide various Indian Health Service programs is hereby modified as follows:

A.  The Contract is modified to extend the period of performance to cover the period October 1, 1994 through September 30, 1995 and to place FY-1995 funds in the amount of $636,363.00 into the contract  Funds will be used to support the current scope of work, and in accordance with the Contractor's prepared budget

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15. NAME AND TITLE OF SIGNER (Type or print) | 16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print) |
|---|---|
| Clarence L. Alexander, Chairman | Deborah D. Segelhorst, Senior Contracts Officer |

| 15B. CONTRACTOR/OFFEROR | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA | 16C. DATE SIGNED |
|---|---|---|---|
| *(Signature of person authorized to sign)* | | BY *(Signature of Contracting Officer)* | 9/23/94<br>DEP 0058 |

| NSN 7540-01-152-8070 | 30-105 | STANDARD FORM 30 (REV. 10-83) |
|---|---|---|
| PREVIOUS EDITION UNUSABLE | | Prescribed by GSA |

COUNCIL OF ATHABASCAN TRIBAL GOVERNMENTS
CONTRACT NO. 243—94—0038
MODIFICATION NO. 3                                           09—Aug—94

B    1    Reimbursement will be subject to the Availability of Funds clause

     2    The level of funding represents the Contractor's recurring base funding
          level available for FY—1995

C    | STATUS OF FUNDS |

     IHS Resources Available Fiscal Year 1995 Recurring            574,425.00
     Contract Support Non—Recurring                                 61,938.00

        TOTAL STATUS OF FUNDS                                      636,363.00

D    | ACCOUNTING & APPROPRIATION DATA |

| | | PRIOR BALANCE | CHANGES (+ OR −) | NEW BALANCE |
|---|---|---|---|---|
| | HOSPITALS & CLINICS | | | |
| FY—95 | 7550390 5—39159 61 J597878 886 25 82 (R) | 0.00 | 574,425.00 | 574,425.00 |
| FY—95 | 7550390 5—39159 61 J597878 886 25 82 (NR) | 0.00 | 0.00 | 0.00 |
| | TOTAL H & C | 0.00 | 574,425.00 | 574,425.00 |
| | CONTRACT SUPPORT COSTS | | | |
| FY—95 | 7550390 5—39859 61 J59C78A 886 25 85 (NR) | 0.00 | 61,938.00 | 61,938.00 |
| | INDIAN SELF DETERMINATION | | | |
| FY—95 | 75X0390 5—41459 04 01 54 J599469 886 25 82 (NR) | 0.00 | 0.00 | 0.00 |
| FY—95 | 75X0390 5—41459 04 01 54 J599469 886 25 85 (NR) | 0.00 | 0.00 | 0.00 |
| | TOTAL ISD | 0.00 | 0.00 | 0.00 |
| | FY95 TOTAL | 0.00 | 636,363.00 | 636,363.00 |

E.   | CONTRACT VALUE: |                                    CHANGES |

| | PRIOR | CHANGES | NEW |
|---|---|---|---|
| FISCAL YEAR 1995 | 0.00 | 636,363.00 | 636,363.00 |
| TOTAL CONTRACT VALUE: | 0.00 | 636,363.00 | 636,363.00 |

ALL OTHER TERMS AND CONDITIONS OF THIS CONTRACT SHALL REMAIN THE SAME.

DEF0059

| CONTRACT PRICING PROPOS )COVER SHEET | 1. SOLICITATION/CON ACT/MODIFICATION NO. 243-94-00 | | FORM APPROVED OMB NO. 3090-0116 |
|---|---|---|---|

NOTE: This form is used in contract actions if submission of cost or pricing data is required. *(See FAR 15.804-6(b))*

| 2. NAME AND ADDRESS OF OFFEROR *(Include ZIP Code)* | 3A. NAME AND TITLE OF OFFEROR'S POINT OF CONTACT | 3B. TELEPHONE NO. |
|---|---|---|
| Council of Athabascan Tribal Governments P.O. Box 33 Fort Yukon, Alaska 99740 | Patricia J. Stanley, Administrator | 662-2597 |

4. TYPE OF CONTRACT ACTION *(Check)*

| A. NEW CONTRACT | D. LETTER CONTRACT |
|---|---|
| B. CHANGE ORDER | E. UNPRICED ORDER |
| X C. PRICE REVISION/ REDETERMINATION | F. OTHER *(Specify)* |

| 5. TYPE OF CONTRACT *(Check)* | | | | 6. PROPOSED COST *(A+B=C)* | | |
|---|---|---|---|---|---|---|
| ☐ FFP | ☐ CPFF | ☐ CPIF | ☐ CPAF | A. COST | B. PROFIT/FEE | C. TOTAL |
| ☐ FPI | ☒ OTHER *(Specify)* | | | $ | $ | $ |

7. PLACE(S) AND PERIOD(S) OF PERFORMANCE

8. List and reference the identification quantity and total price proposed for each contract line item. A line item cost breakdown, supporting this recap is required unless otherwise specified by the Contracting Officer. *(Continue on reverse, and then on plain paper, if necessary. Use same headings.)*

| A. LINE ITEM NO. | B. IDENTIFICATION | C. QUANTITY | D. TOTAL PRICE | E. REF. |
|---|---|---|---|---|
| | See Attached Budgets | | | |

9. PROVIDE NAME, ADDRESS, AND TELEPHONE NUMBER FOR THE FOLLOWING *(If available)*

| A. CONTRACT ADMINISTRATION OFFICE | B. AUDIT OFFICE |
|---|---|
| Alaska Area Native Health Service Area Division of Tribal Awards 250 Gambell Street Anchorage, Alaska 99740 | |

| 10. WILL YOU REQUIRE THE USE OF ANY GOVERNMENT PROPERTY IN THE PERFORMANCE OF THIS WORK? *(If "Yes," identify)* | 11A. DO YOU REQUIRE GOVERN-MENT CONTRACT FINANCING TO PERFORM THIS PROPOSED CONTRACT? *(If "Yes," complete Item 11B)* | 11B. TYPE OF FINANCING *(√ one)* |
|---|---|---|
| ☐ YES ☐ NO | ☒ YES ☐ NO | ☒ ADVANCE PAYMENTS   ☐ PROGRESS PAYMENTS ☐ GUARANTEED LOANS |

| 12. HAVE YOU BEEN AWARDED ANY CONTRACTS OR SUBCONTRACTS FOR THE SAME OR SIMILAR ITEMS WITHIN THE PAST 3 YEARS? *(If "Yes," identify item(s), customer(s) and contract number(s))* | 13. IS THIS PROPOSAL CONSISTENT WITH YOUR ESTABLISHED ESTI-MATING AND ACCOUNTING PRACTICES AND PROCEDURES AND FAR PART 31 COST PRINCIPLES? *(If "No," explain)* |
|---|---|
| ☒ YES ☐ NO | ☒ YES ☐ NO |

14. COST ACCOUNTING STANDARDS BOARD (CASB) DATA *(Public Law 91-379 as amended and FAR PART 30)*

| A. WILL THIS CONTRACT ACTION BE SUBJECT TO CASB REGULA-TIONS? *(If "No," explain in proposal)* | B. HAVE YOU SUBMITTED A CASB DISCLOSURE STATEMENT *(CASB DS-1 or 2)? (If "Yes," specify in proposal the office to which submitted and if determined to be adequate)* |
|---|---|
| ☒ YES ☐ NO | ☐ YES ☐ NO |
| C. HAVE YOU BEEN NOTIFIED THAT YOU ARE OR MAY BE IN NON-COMPLIANCE WITH YOUR DISCLOSURE STATEMENT OR COST ACCOUNTING STANDARDS? *(If "Yes," explain in proposal)* | D. IS ANY ASPECT OF THIS PROPOSAL INCONSISTENT WITH YOUR DISCLOSED ACCOUNTING PRACTICES OR APPLICABLE COST ACCOUNTING STANDARDS? *(If "Yes," explain in proposal)* 38 |
| ☐ YES ☒ NO | ☐ YES ☒ NO |

This proposal is submitted in response to the RFP, contract, modification, etc. in Item 1 and reflects our best estimates and/or actual costs as of this date.

| 15. NAME AND TITLE *(Type)* | 16. NAME OF FIRM |
|---|---|
| Patricia J. Stanley, Administrator | Council of Athabascan Tribal Governments |

| 17. SIGNATURE | 18. DATE OF SUBMISSION |
|---|---|
| *Patricia J Stanley* | 8/1/94 |

NSN 7540-01-142-9845        1411-101

☆ U.S. GOVERNMENT PRINTING OFFICE : 1984 O - 421-526 (37)

STANDARD FORM 1411 (10-83)
Prescribed by GSA
FAR (48 CFR) 53.215-2(c)

DEF 0060

FAR 15.804-4  CERTIFICATE OF CURRENT COST OR PRICING DATA:

This is to certify that, to the best of my knowledge and belief, the cost or pricing data (as defined in Section 15.801 of the Federal Acquisition Regulation (FAR) and required under FAR subsection 15.804-2) submitted, either actually or by specific identification in writing, to the Contracting Officer or to the Contracting Officer's Representative in support of Contract No  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*  are accurate complete, and current as of September 1, 1994 for Fiscal Year 1995.**  This certification includes the cost or pricing data supporting any advance agreements and forward pricing rate agreements between the offeror and the Government that are part of the proposal.

Firm:  COUNCIL OF ATHABASCAN TRIBAL GOVERNMENTS

Name: Patricia J. Stanley

Title:       Executive Director

Date of Execution:     ***   5/23/94

*       Identify the proposal, quotation, request for price adjustment, or other submission involved, giving the appropriate identifying number (e.g., RFP No.)

**      Insert the day, month, and year when price negotiations were concluded and price agreement was reached.

***     Insert the day, month, and year of signing, which should be as close as practicable to the date when the price negotiations were concluded and the contract price was agreed on.

39

# Council of Athabascan Tribal Governments

# Hospital & Clinics Breakdown

| Chart of Accounts | Categories | YFHC Recurring |
|---|---|---|
| 6000 | Salaries | 300,000 |
| 6100 | Fringe Benefits | 99,000 |
| 6340 | Materials & Supplies | 22,590 |
| 6200 | Travel | 50,680 |
| 6900 | Contractual | 0 |
| 6600 | Equipment | 3,900 |
| 6470 | Construction | 0 |
| 6590 | Other | 98,255 |
| | Total | 574,425 |

40

DEF0062

AUG 16 '94  8:26 NO.001 P.02

# Council of Athabascan Tribal Governments
## Hospital & Clinics Breakdown

| Chart of Accounts | Categories | YFHC Recurring |
|---|---|---|
| 6000 | Salaries | 300,000 |
| 6100 | Fringe Benefits | 99,000 |
| 6340 | Materials & Supplies | 22,590 |
| 6200 | Travel | 50,680 |
| 6900 | Contractual | 0 |
| 6600 | Equipment | 3,900 |
| 6470 | Construction | 0 |
| 6590 | Other | 98,255 |
| 6902 | Professional Services | 15,000 |
| 6450 | Facilities Rent/Lease | 20,000 |
| 6430 | Facility Utilities/Janitorial | 40,000 |
| 6350 | Telephonic Communications | 5,000 |
| 6320 | Postage/Freight | 5,000 |
| 6900 | Service & Maintenance | 1,295 |
| 6330 | Adver./Dues/Subs./Repro. | 2,460 |
| 6220 | Meetings/Tuition | 1,500 |
| 6360 | Automobile Expenses | 5,000 |
| 6550 | Insurance | 3,000 |
| | **Total** | 574,425 |

41

Revised 8/16/94 7:48 AM

DEF0063

# Council of Athabascan Tribal Governments
# Hospital & Clinics Breakdown: Personnel

| Chart of Accounts | Categories | YFHC Recurring |
|---|---|---|
| 6000 | **Salaries YFHC** | **300,194** |
|  | Clinic Director/FNP or PA | 56,000 |
|  | P A | 53,500 |
|  | PA .5 FTE | 26,000 |
|  | Medical Assistant/CHA | 28,891 |
|  | Office Manager | 30,493 |
|  | Secretary/Reception | 20,800 |
|  | Data Entry Clerk | 23,712 |
|  | Housekeeper | 27,622 |
|  | Maintenance | 33,176 |
| 6100 | **Fringe Benefits** | **99,004** |

42

Revised 8/16/94 8:22 AM

DEF0064

# Council of Athabascan Tribal Governments

## FY1995 Indirect Budget
## IHS Contract #243-94-038

|  | 12 Months | 12 Months |
|---|---|---|
| PERSONNEL | 151,700 | 25,283 |
| FRINGE BENEFITS (33%) | 50,061 | 8,343 |
| OFFICE SUPPLIES | 13,390 | 3,000 |
| TRAVEL | 41,332 | 14,200 |
| REPAIR & MAINTENANCE | 700 | 700 |
| OTHER | 49,820 | 10,412 |
| CONTRACTUAL | 0 | 0 |
| FY 1995 Indirect Expenses | 307,003 | 61,938 |

43

DEF0065

| AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT | | 1. CONTRACT ID CODE | PAGE OF PAGES 1    3 |
|---|---|---|---|

| 2. AMENDMENT/MODIFICATION NO. Four (4) | 3. EFFECTIVE DATE 7/7/95 | 4. REQUISITION/PURCHASE REQ. NO. | 5. PROJECT NO. (If applicable) |
|---|---|---|---|

| 6. ISSUED BY                              CODE |
|---|
| Alaska Area Native Health Service<br>Division of Tribal Awards<br>250 Gambell Street<br>Anchorage, AK  99501-2781 |

| 7. ADMINISTERED BY (If other than Item 6)    CODE |
|---|

| 8. NAME AND ADDRESS OF CONTRACTOR (No. street county, State and ZIP Code) | (✓) | 9A. AMENDMENT OF SOLICITATION NO. |
|---|---|---|
| Council of Athabascan Tribal Governments<br>P.O. Box 33<br>Fort Yukon, AK  99740-0033 | | 9B. DATED (SEE ITEM 11) |
| | X | 10A. MODIFICATION OF CONTRACT/ORDER NO.<br>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 |
| | | 10B. DATED (SEE ITEM 13)<br>6/1/94 |

| CODE | FACILITY CODE |
|---|---|

**11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS**

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended, ☐ is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended by one of the following methods:

(a) By completing Items 8 and 15, and returning _____ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

| 12. ACCOUNTING AND APPROPRIATION DATA (If required) Not Applicable |
|---|

**13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.**

| (✓) | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
|---|---|
| | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). |
| | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: |
| X | 25 U.S.C. 450 (g) |
| | D. OTHER (Specify type of modification and authority) |

E. IMPORTANT:  Contractor ☐ is not, ☒ is required to sign this document and return Original copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

The above referenced Public Law 93-638 contract to provide various Indian Health Services Programs is hereby modified as follows:

A.  The purpose of this modification is to incorporate the provisions of P.L. 93-638, as amended by P.L. 103-413, Sections 106 (k), (m), and (o) into the referenced contract. (See pages 2 and 3)

B.  The contract value is neither increased or decreased by this modification.

44

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A. NAME AND TITLE OF SIGNER (Type or print) Clarence L. Alexander, Chairman | | 16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print) OLINGA FAGAN CONTRACTING OFFICER | |
|---|---|---|---|
| 15B. CONTRACTOR/OFFEROR *(Signature of person authorized to sign)* | 15C. DATE SIGNED 6/29/95 | 16B. UNITED STATES OF AMERICA BY *(Signature of Contracting Officer)* Olinga Fagan | 16C. DATE SIGNED 7/7/95 |

| NSN 7540-01-152-8070 PREVIOUS EDITION UNUSABLE | 30-105 | STANDARD FORM 30 (REV. 10-83) Prescribed by GSA FAR (48 CFR) 53.243 |
|---|---|---|

DEF0066

Contract Number: 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
Modification Number: 4

The purpose of this modification is to incorporate the provisions of P.L. 93-638, as amended by P.L. 103-413, Sections 106(k), (m), and (o) into the referenced contract as follows:

## SECTION 106(k):

(k)    Without intending any limitation, a tribal organization may, without the approval of the Secretary, expend funds provided under a self-determination contract for the following purposes, to the extent that the expenditure of funds is supportive of a contracted program:

(1)    Depreciation and use allowances not otherwise specifically prohibited by law, including the depreciation of facilities owned by the tribe or tribal organization.

(2)    Publication and printing costs.

(3)    Building, realty, and facilities costs, including rental costs or mortgage expenses.

(4)    Automated data processing and similar equipment or services.

(5)    Costs for capital assets and repairs.

(6)    Management Studies.

(7)    Professional services, other than services provided in connection with judicial proceedings by or against the United States.

(8)    Insurance and indemnification, including insurance covering the risk of loss of or damage to property used in connection with the contract without regard to the ownership such property.

(9)    Costs incurred to raise funds or contributions from non-Federal sources for the purpose of furthering the goals and objectives of the self-determination contract.

(10)    Interest expenses paid on capital expenditures such as buildings, building renovation, or acquisition or fabrication of capital

45

DEF0067

equipment, and interest expenses on loans necessitated due to delays by the Secretary in providing funds under a contract.

(11)  Expenses of a governing body of a tribal organization that are attributable to the management or operation of programs under this Act.

(12)  Costs associated with the management of pension funds, self-insurance funds, and other funds of the tribal organization that provide for participation by the Federal Government.

## SECTION 106(m):

(m)  The program income earned by a tribal organization in the course of carrying out a self-determination contract -

(1)  shall be used by the tribal organization to further the general purposes of the contract; and

(2)  shall not be a basis for reducing the amount of funds otherwise obligated to the contract.

## SECTION 106(o):

(o)  Notwithstanding any other provision of law (including any regulation), a tribal organization that carries out a self-determination contract may, with respect to allocations within the approved budget of that contract, rebudget to meet contract requirements, if such rebudgeting would not have an adverse effect on the performance of the contract.

46

DEF0068

OMB NO. 0990-0115

| AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT | 1. CONTRACT ID CODE | PAGE | OF PAGES |
| | | 1 | 2 |

| 2. AMENDMENT/MODIFICATION NO. | 3. EFFECTIVE DATE | 4. REQUISITION/PURCHASE REQ NO. | 5. PROJECT NO. (If applicable) |
| Five (5) | 9/18/95 | A-NOAS(A-OFM)95-0041-1 | |

| 6. ISSUED BY | CODE | 7. ADMINISTERED BY (If other than Item 6) | CODE |

Alaska Area Native Health Service
Division of Tribal Awards
250 Gambell Street
Anchorage, Alaska  99501-2781

| 8. NAME AND ADDRESS OF CONTRACTOR (No., street, county, State and ZIP Code) | (✓) | 9A. AMENDMENT OF SOLICITATION NO. |

Council of Athabascan Tribal Governments
P.O. Box 33
Fort Yukon, AK  99740-0033

9B. DATED (SEE ITEM 11)

| | XX | 10A. MODIFICATION OF CONTRACT/ORDER NO. |
| | | 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 |

10B. DATED (SEE ITEM 13)
6/1/94

| CODE | FACILITY CODE |

## 11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended, ☐ is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods:

(a) By completing Items 8 and 15, and returning _____ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

| 12. ACCOUNTING AND APPROPRIATION DATA (If required) |
| See Page Two |

## 13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

| (✓) | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |

| | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). |

| X | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: |
| | 25 U.S.C. 450 (g) |

| | D. OTHER (Specify type of modification and authority) |

E. IMPORTANT: Contractor ☐ is not, ☒ is required to sign this document and return **Original** copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

The above referenced Public Law 93-638 contract to provide various Indian Health Service Programs is hereby modified as follows:

A.  The amount of this contract is hereby decreased by $31,413.00 from $636,363.00 to $604,950.00 by reason of this modification.  Program adjustments in funding level are identified in page two.  These funds shall be used to provide services within the present contract scope of work and within the Contractor's prepared budget.

47

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A. NAME AND TITLE OF SIGNER (Type or print) | 16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print) |
| Clarence L. Alexander, Chairman | DEBORAH D. SEGELHORST |
| | Senior Contracts Officer |

| 15B. CONTRACTOR/OFFEROR | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA | 16C. DATE SIGNED |
| (Signature of person authorized to sign) | 8/31/95 | BY (Signature of Contracting Officer) | 9/18/95 |

NSN 7540-01-152-8070
PREVIOUS EDITION UNUSABLE

30-105

STANDARD FORM 30 (REV. 10-83)
Prescribed by GSA
FAR (48 CFR) 53.243

DEF0069

COUNCIL OF ATHABASCAN TRIBAL GOVERNMENTS
CONTRACT NO. 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
MODIFICATION NO. 5                                                    02-Aug-95

B.    STATUS OF FUNDS

HOSPITAL & CLINICS
| | |
|---|---|
| Mandatory (R) | 4,567.00 |
| Adm Reduction (R) | (913.00) |
| Proc Reduction (R) | (144.00) |
| Conf Reduction (R) | (355.00) |
| Establish W/H (NR) | (34,568.00) |

TOTAL STATUS OF FUNDS                    (31,413.00)

C.    ACCOUNTING & APPROPRIATION DATA

| | | PRIOR BALANCE | CHANGES (+ OR --) | NEW BALANCE |
|---|---|---|---|---|
| | **HOSPITALS & CLINICS** | | | |
| FY-95 | 7550390 5-39159 61 J597878 886 25 82 (R) | 574,425.00 | 3,155.00 | 577,580.00 |
| FY-95 | 7550390 5-39159 61 J597878 886 25 82 (NR) | 0.00 | (34,568.00) | (34,568.00) |
| | TOTAL H & C | 574,425.00 | (31,413.00) | 543,012.00 |
| | **CONTRACT SUPPORT COSTS** | | | |
| FY-95 | 7550390 5-39659 61 J59C78A 886 25 85 (NR) | 61,938.00 | 0.00 | 61,938.00 |
| | **INDIAN SELF DETERMINATION** | | | |
| FY-95 | 75X0390 5-41459 04.01.54 J599469 886 25 82 (NR) | 0.00 | 0.00 | 0.00 |
| FY-95 | 75X0390 5-41459 04.01.54 J599469 886 25 85 (NR) | 0.00 | 0.00 | 0.00 |
| | TOTAL ISD | 0.00 | 0.00 | 0.00 |
| | **FY95 TOTAL** | 636,363.00 | (31,413.00) | 604,950.00 |

D.    CONTRACT VALUE:                                          CHANGES

| | | | |
|---|---|---|---|
| FISCAL YEAR 1995 | 636,363.00 | (31,413.00) | 604,950.00 |
| TOTAL CONTRACT VALUE: | 636,363.00 | (31,413.00) | 604,950.00 |

ALL OTHER TERMS AND CONDITIONS OF THIS CONTRACT SHALL REMAIN THE SAME.

E.    WITHHELD/SUPPLY SECTION

48

HOSPITALS & CLINICS
| | | | | |
|---|---|---|---|---|
| FY-95 | 7550390 5-39159 61 J597878 886 25 82 | 0.00 | 34,568.00 | 34,568.00 |
| | TOTAL WITHHELD | 0.00 | 34,568.00 | 34,568.00 |

DEF0070

OMB No. 0990-0115

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

| 1. CONTRACT ID CODE | PAGE OF PAGES |
|---|---|

| 2. AMENDMENT/MODIFICATION NO.  Six (6) | 3. EFFECTIVE DATE 9/19/95 | 4. REQUISITION/PURCHASE REQ. NO. A-NOAS(A-OFM)95-0041-2 | 5. PROJECT NO. (If applicable) |

6. ISSUED BY                    CODE

Alaska Area Native Health Service
Division of Tribal Awards
250 Gambell Street
Anchorage, AK  99501-2781

7. ADMINISTERED BY (If other than Item 6)    CODE

| 8. NAME AND ADDRESS OF CONTRACTOR (No. street, county, State and ZIP Code) | (√) | 9A. AMENDMENT OF SOLICITATION NO. |
|---|---|---|

Council of Athabascan Tribal Government
P.O. Box 33
Fort Yukon, AK  99740-0033

9B. DATED (SEE ITEM 11)

10A. MODIFICATION OF CONTRACT/ORDER NO.

X    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

10B. DATED (SEE ITEM 13)
6/1/94

| CODE | | FACILITY CODE |
|---|---|---|

## 11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended, ☐ is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods:

(a) By completing Items 8 and 15, and returning _____ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA (If required)
      See Page Two

## 13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

| (√) | |
|---|---|
| | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
| | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b) |
| X | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: 25 U.S.C. 450 (g) |
| | D. OTHER (Specify type of modification and authority) |

E. IMPORTANT: Contractor ☒ is not, ☐ is required to sign this document and return Original copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

The above referenced Public Law 93-638 contract to provide various Indian Health Service Programs is hereby modified as follows:

A.   The amount of this contract is hereby increased by $101,821.68 from $604,950.00 to $706,771.68 by reason of this modification.  Program adjustments in funding level are identified in page two.  These funds shall be used to provide services within the present contract scope of work and within the Contractor's prepared budget.

49

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A. NAME AND TITLE OF SIGNER (Type or print) | 16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print) DEBORAH D. SEGELHORST Senior Contracts Officer |
|---|---|
| 15B. CONTRACTOR/OFFEROR  (Signature of person authorized to sign) | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA BY (Signature of Contracting Officer) | 16C. DATE SIGNED 9/19/95 |

| NSN 7540-01-152-8070 PREVIOUS EDITION UNUSABLE | 30-105 | STANDARD FORM 30 (REV. 4-93) Prescribed by GSA FAR (48 CFR) 53.243 |
|---|---|---|

DEF0071

2:1.   9/10/05

COUNCIL OF ATHABASCAN TRIBAL GOVERNMENTS
CONTRACT NO. 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
MODIFICATION NO. 6                                            09-Sep-95

B.    | STATUS OF FUNDS |

HOSPITAL & CLINICS
    Bio-med 1st qtr (NR)                    (1,008.81)
    Bio-med 2nd qtr (NR)                      (436.11)
    Bio-med 3rd qtr (NR)                      (404.40)
    TOTAL H&C                                              (1,849.32)

CONTRACT SUPPORT COSTS
    Adjustment per AOA #1 (NR)              93,500.00
    TOTAL CSC                                              93,500.00

RIM
    From A-OEH (NR)                         10,171.00
    TOTAL RIM                                              10,171.00

        TOTAL STATUS OF FUNDS                            101,821.68

C.    | ACCOUNTING & APPROPRIATION DATA |

| | PRIOR BALANCE | CHANGES (+ OR −) | NEW BALANCE |
|---|---|---|---|
| HOSPITALS & CLINICS | | | |
| FY-95  7550390 5-39159 61 J597878 886 25 82 (R) | 577,580.00 | 0.00 | 577,580.00 |
| FY-95  7550390 5-39159 61 J597878 886 25 82 (NR) | (34,568.00) | (1,849.32) | (36,417.32) |
| TOTAL H & C | 543,012.00 | (1,849.32) | 541,162.68 |
| CONTRACT SUPPORT COSTS | | | |
| FY-95  7550390 5-39859 61 J59C78A 886 25.85 (NR) | 61,938.00 | 93,500.00 | 155,438.00 |
| REPAIR, IMPROVEMENT, & MAINT. | | | |
| FY-95  75X0391 5-29048 J59R286 000 25 82 (NR) | 0.00 | 10,171.00 | 10,171.00 |
| TOTAL RIM | 0.00 | 10,171.00 | 10,171.00 |
| FY95 TOTAL | 604,950.00 | 101,821.68 | 706,771.68 |

D.    | CONTRACT VALUE: |                              CHANGES

| | | | |
|---|---|---|---|
| FISCAL YEAR 1995 | 604,950.00 | 101,821.68 | 706,771.68 |
| TOTAL CONTRACT VALUE: | 604,950.00 | 101,821.68 | 706,771.68 |

ALL OTHER TERMS AND CONDITIONS OF THIS CONTRACT SHALL REMAIN THE SAME.

E.    | WITHHELD/SUPPLY SECTION |                                    *So*

| | | | |
|---|---|---|---|
| HOSPITALS & CLINICS | | | |
| FY-95  7550390 5-39159 61 J597878 886 25 82 | 34,568.00 | 0.00 | 34,568.00 |
| TOTAL WITHHELD | 34,568.00 | 0.00 | 34,568.00 |

DEF0072

OMB No. 0990-0115

| AMENDMENT OF SOLICITATI /MODIFICATION OF CONTRACT | CONTRACT ID CODE | PAGE OF PAGES 1 2 |
|---|---|---|

| 2. AMENDMENT/MODIFICATION NO. Seven (7) | 3. EFFECTIVE DATE 9/28/95 | 4. REQUISITION/PURCHASE REQ. NO. A-NOAS(A-OFM)95-0041-3 | 5. PROJECT NO (If applicable) |
|---|---|---|---|

| 6. ISSUED BY          CODE | 7. ADMINISTERED BY (If other than Item 6)          CODE |
|---|---|

Alaska Area Native Health Service
Division of Tribal Awards
250 Gambell Street
Anchorage, AK  99501-2781

| 8. NAME AND ADDRESS OF CONTRACTOR (No., street, county State and ZIP Code) | (v) | 9A. AMENDMENT OF SOLICITATION NO. |
|---|---|---|

Council of Athabascan Tribal Government
P.O. Box 33
Fort Yukon, AK  99740-0033

9B. DATED (SEE ITEM 11)

10A. MODIFICATION OF CONTRACT/ORDER NO.

X  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

10B. DATED (SEE ITEM 13)
6/1/94

| CODE | FACILITY CODE |
|---|---|

### 11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended, ☐ is not extended

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended by one of the following methods:
(a) By completing Items 8 and 15, and returning _____ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers  FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified

| 12. ACCOUNTING AND APPROPRIATION DATA (if required) |
|---|

See Page Two

### 13 THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

| (v) | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
|---|---|
| | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). |
| | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: |
| X | 25 U.S.C. 450 (q) |
| | D. OTHER (Specify type of modification and authority) |

E. IMPORTANT: Contractor ☒ is not, ☐ is required to sign this document and return Original copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCP section headings, including solicitation/contract subject matter where feasible.)

The above referenced Public Law 93-638 contract to provide various Indian Health Service Programs is hereby modified as follows:

A.  The amount of this contract is hereby increased by $81,049.00 from $706,771.68 to $787,820.68 by reason of this modification.  Program adjustments in funding level are identifed in page two.  These funds shall be used to provide services within the present contract scope of work and within the Contractor's prepared budget.

51

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A. NAME AND TITLE OF SIGNER (Type or print) | 16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print) OLINGA FAGAN CONTRACTING OFFICER |
|---|---|
| 15B. CONTRACTOR/OFFEROR | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA BY  Olinga Fagan  (Signature of Contracting Officer) | 16C. DATE SIGNED 9/28/95 |
| (Signature of person authorized to sign) | | | |

COUNCIL OF ATHABASCAN TRIBAL GOVERNMENTS
CONTRACT NO. 243–94–0038
MODIFICATION NO. 7                                    27–Sep–95

**B**   | STATUS OF FUNDS |

HOSPITAL & CLINICS
Adjust to the Advice of Allowance Annualized from TCC (R)    575.00
Transfer from TCC:  Admin Reduction (R)    (1,829.00)
Transfer from TCC:  Procurement Reduction (R)    (288.00)
Transfer from TCC:  Conference Reduction (R)    (710.00)
Transfer from TCC:  Mandatory Increase (R)    9,148.00
TOTAL H&C    6,896.00

CONTRACT SUPPORT COSTS
CSC Indirect (NR)    66,932.00
TOTAL CSC    66,932.00

BIOMED EQUIPMENT
FY95 Biomed Equipment Funds (NR)    7,221.00
TOTAL BIOMED EQUIPMENT    7,221.00

TOTAL STATUS OF FUNDS    81,049.00

**C.**   | ACCOUNTING & APPROPRIATION DATA |

| | PRIOR BALANCE | CHANGES (+ OR −) | NEW BALANCE |
|---|---|---|---|
| HOSPITALS & CLINICS | | | |
| Y–95 7550390 5–39159.61 J597876 886 25.82 (R) | 577,580.00 | 6,896.00 | 584,476.00 |
| FY–95 7550390 5–39159.61 J597876 886 25.82 (NR) | (36,417.32) | 0.00 | (36,417.32) |
| TOTAL H & C | 541,162.68 | 6,896.00 | 548,058.68 |
| CONTRACT SUPPORT COSTS | | | |
| FY–95 7550390 5–39859.61 J59C79A 886 25.65 (NR) | 155,438.00 | 66,932.00 | 222,370.00 |
| REPAIR  IMPROVEMENT  & MAINT | | | |
| FY–95 75X0391 5–29048 J59R286 000 25.82 (NR) | 10,171.00 | 0.00 | 10,171.00 |
| BIOMEDICAL EQUIPMENT | | | |
| FY–95 75X0390 5–29659 J59A79A 815 25.82 (NR) | 0.00 | 7,221.00 | 7,221.00 |
| FY95 TOTALS | 706,771.68 | 81,049.00 | 787,820.68 |

**D**   | CONTRACT  VALUE: | CHANGES |

| | | | |
|---|---|---|---|
| FISCAL YEAR 1995 | 706,771.68 | 81,049.00 | 787,820.68 |
| TOTAL CONTRACT  VALUE: | 706,771.68 | 81,049.00 | 787,820.68 |

ALL OTHER TERMS AND CONDITIONS OF THIS CONTRACT SHALL REMAIN THE SAME.

52

**E**   | WITHHELD/SUPPLY SECTION |

| | | | |
|---|---|---|---|
| HOSPITALS & CLINICS | | | |
| FY–95 7550390 5–39159.61 J597876 886 25.82 | 34,568.00 | 0.00 | 34,568.00 |
| TOTAL WITHHELD | 34,568.00 | 0.00 | 34,568.00 |
| TOTAL FY–95 ALLOCATION | | | 822,388.68 |

FILE NAME: CATG7

DEF0074

OMB NO. 0990-0115

| AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT | 1 CONTRACT ID CODE | PAGE OF PAGES 1  2 |
|---|---|---|

| 2. AMENDMENT/MODIFICATION NO. Eight (8) | 3. EFFECTIVE DATE 9/30/95 | 4. REQUISITION/PURCHASE REQ. NO. A-NOAS(A-OFM)95-0041-4 | 5. PROJECT NO. (If applicable) |
|---|---|---|---|

| 6. ISSUED BY                    CODE | 7. ADMINISTERED BY (If other than Item 6)     CODE |
|---|---|

Alaska Area Native Health Service
Division of Tribal Awards
250 Gambell Street
Anchorage, AK 99501-2781

| 8. NAME AND ADDRESS OF CONTRACTOR (No. street county, State and ZIP Code) | (√) | 9A. AMENDMENT OF SOLICITATION NO. |
|---|---|---|

Council of Athabascan Tribal Government
P.O. Box 33
Fort Yukon, AK 99740-0033

9B. DATED (SEE ITEM 11)

| | 10A. MODIFICATION OF CONTRACT/ORDER NO. |
|---|---|
| X | 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 |

10B. DATED (SEE ITEM 13)
6/1/94

| CODE | FACILITY CODE |
|---|---|

### 11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended, ☐ is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods: (a) By completing Items 8 and 15, and returning _____ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA (If required)
See Page Two

### 13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

| (√) | |
|---|---|
| | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
| | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). |
| | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: |
| X | 25 U.S.C. 450 (g) |
| | D. OTHER (Specify type of modification and authority) |

E. IMPORTANT: Contractor ☒ is not, ☐ is required to sign this document and return Original copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

The above referenced Public Law 93-638 contract to provide various Indian Health Service programs is hereby modified as follows:

A. The amount of this contract is hereby increased by $6,709.00 from $787,820.68 to $794,529.68 by reason of this modification. Program adjustments in funding level are identified in page two. These funds shall be used to provide services within the present contract scope of work and within the Contractor's prepared budget.

53

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A. NAME AND TITLE OF SIGNER (Type or print) | 16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print) OLINGA FAGAN CONTRACTING OFFICER |
|---|---|
| 15B. CONTRACTOR/OFFEROR (Signature of person authorized to sign) | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA BY Olinga Fagan (Signature of Contracting Officer) | 16C. DATE SIGNED 9/30/95 |

DEF0075

COUNCIL OF ATHABASCAN TRIBAL GOVERNMENTS
CONTRACT NO. 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
MODIFICATION NO. 8                                30-Sep-95

B   | STATUS OF FUNDS |

HOSPITAL & CLINICS
    Projected Adjustment to the Withheld through 9/30/95        6,709.00
    TOTAL H&C                                                                   6,709.00


TOTAL STATUS OF FUNDS                                                          6,709.00


WITHHELD SECTION
    Projected Adjustmetns to the Withheld through 9/30/95       (6,709.00)
    TOTAL WITHHELD                                                             (6,709.00)

|   | ACCOUNTING & APPROPRIATION DATA | PRIOR BALANCE | CHANGES (+ OR -) | NEW BALANCE |
|---|---|---|---|---|
| C. | | | | |
| | HOSPITALS & CLINICS | | | |
| | FY-95 7550390 5-39159.61 J597878 886 25.82 (R) | 584,476.00 | 6,709.00 | 591,185.00 |
| | FY-95 7550390 5-39159.61 J597878 886 25.82 (NR) | (36,417.32) | 0.00 | (36,417.32) |
| | TOTAL H & C | 548,058.68 | 6,709.00 | 554,767.68 |
| | CONTRACT SUPPORT COSTS | | | |
| | FY-95 7550390 5-39859.61 J59C78A 886 25.85 (NR) | 222,370.00 | 0.00 | 222,370.00 |
| | REPAIR, IMPROVEMENT, & MAINT | | | |
| | FY-95 75X0391 5-29048 J59R286 000 25.82 (NR) | 10,171.00 | 0.00 | 10,171.00 |
| | BIOMEDICAL EQUIPMENT | | | |
| | FY-95 75X0390 5-29659 J59A78A 815 25.82 (NR) | 7,221.00 | 0.00 | 7,221.00 |
| | FY95 TOTALS | 787,820.68 | 6,709.00 | 794,529.68 |

| D. | CONTRACT VALUE: | CHANGES | |
|---|---|---|---|
| | FISCAL YEAR 1995 | 787,820.68 | 6,709.00 | 794,529.68 |
| | TOTAL CONTRACT VALUE: | 787,820.68 | 6,709.00 | 794,529.68 |

ALL OTHER TERMS AND CONDITIONS OF THIS CONTRACT SHALL REMAIN THE SAME.

E.  | WITHHELD/SUPPLY SECTION |

| | HOSPITALS & CLINICS | | | |
|---|---|---|---|
| | FY-95 7550390 5-39159.61 J597878 886 25.82 | 34,568.00 | (6,709.00) | 27,859.00 |
| | TOTAL WITHHELD | 34,568.00 | (6,709.00) | 27,859.00 |
| | TOTAL FY-95 ALLOCATION | | | 822,388.68 |

FILE NAME: CATG8

54

DEF0076



**Council of Athabascan Tribal Governments**
P.O. Box 33
Fort Yukon, AK 99740-0033
TEL: (907) 662-2587 FAX: (907) 662-3333

*Via Facsimile and Certified Mail*

2 September 2005

Christopher Mandregan, Jr., Director
Alaska Area Native Health Service
4141 Ambassador Drive, Suite 300
Anchorage, AK 99508-5928

**RECEIVED**

SEP 6 2005

ALASKA AREA IHS
OFFICE OF THE DIRECTOR

> **RE:**    *Request for Contracting Officer's Decision on Contract Number 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 for FY 1995*

Dear Mr. Mandregan:

We are writing to you to request a contracting officer's decision under the Contract Disputes Act (CDA), 41 U.S.C. § 605, on the claim, detailed below, that the Council of Athabascan Tribal Governments (CATG) is entitled, by statute and its contract for FY 1995 under the Indian Self-Determination and Education Assistance Act (ISDEAA), to additional contract support costs (CSC).

In FY 1995, CATG provided health care services pursuant to Contract # 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 and an annual funding agreement with the Indian Health Service (IHS) under Title I of the ISDEAA. The Contract Disputes Act is made applicable to CATG's contract by Section 110 of the ISDEAA, 25 U.S.C. § 450m-1(d), and Section I.4 of the contract (making disputes subject to the requirements of FAR 52.233-1, which in turn incorporates the CDA).

The contract requires payment of CSC in accordance with the ISDEAA. Section 106(a)(2) of the ISDEAA mandates as follows:

> There shall be added [to the 106(a)(1) amount] contract support costs which shall consist of an amount for the reasonable costs for activities which must be carried on by a tribal organization as a contractor to ensure compliance with the terms of the contract and prudent management, but which—
> (A) normally are not carried on by the respective Secretary in his direct operation of the program; or
> (B) are provided by the Secretary in support of the contracted program from resources other than those under contract.

DEF0001

Christopher Mandregan, Director
Alaska Area Native Health Service
2 September 2005
Page 2

25 U.S.C. § 450j-1(a)(2). In FY 1995, the IHS paid CATG less than its full CSC as defined above. The IHS has acknowledged this fact in its FY 1995 CSC "shortfall" report generated for Congress in accordance with the ISDEAA.

The U.S. Supreme Court recently held that, in the years before Congress began "capping" CSC spending in the appropriations bills in FY 1998, the IHS should have reprogrammed funds from its unrestricted lump-sum appropriation to pay tribes the full CSC due under their contracts *Cherokee Nation v. Leavitt*, 125 S. Ct. 1172, 1179-80 (2005). CATG now requests an adjustment in the amount of CSC paid under its FY 1995 AFA in the amount of **$60,501**, the amount underpaid according to the IHS's own shortfall report for that year.

In addition to the shortfall claim, CATG asserts that the IHS miscalculated the amount of indirect costs (IDC) due under the ISDEAA agreement by employing the same method of IDC rate calculation declared illegal in the *Ramah Navajo* case, thus understating the shortfall considerably [1] When calculating CATG's IDC rate, the IHS divided the total IDC pool by the total direct program base, *regardless of the level of IDC funding, if any, that particular programs paid*, resulting in a lower IDC rate than if the denominator were composed only of programs that paid IDC. The IHS then applied this diluted rate to the IHS portion of the direct program base, resulting in a systematic underpayment of CSC, as found by the court in *Ramah Navajo* Based on the evidence in the *Ramah Navajo* case, CATG estimates that its IDC rate would have been 2% higher but for the miscalculation. As applied to the IHS program amount of $557,129 the miscalculation cost CATG **$11,143** in 1995. Thus the total of the miscalculation claim and the shortfall claim is **$71,644**

We therefore respectfully request payment of all of the funds to which we are entitled under CATG's contract. Thank you for your prompt attention to this request for a final decision.

Sincerely yours,

Craig Fleener, Chief Administrative Officer
Council of Athabascan Tribal Governments

Enclosure

cc:   Dr. Charles Grim, Director, IHS
      Geoffrey D. Strommer, Hobbs, Straus, Dean & Walker, LLP

---

[1] *Ramah Navajo Chapter v. Lujan*, 112 F.3d 1455 (10th Cir. 1997).

DEF0002

# CERTIFICATION

I hereby certify that:

1. The claim set out below is made in good faith;

2. The data supporting the claim are accurate to the best of my knowledge and belief;

3. The requested amount reflects the contract adjustment amount for which the Council of Athabascan Tribal Governments believes the government is liable in FY 1995;

4. I, Craig Fleener, am duly authorized to certify this claim on behalf of the Council of Athabascan Tribal Governments.

Amount Due and Owing:

$71,644, as described in the letter to which this certification is attached.

COUNCIL OF ATHABASCAN TRIBAL
GOVERNMENTS

By:     _____
Craig Fleener, Chief Administrative Officer

DEF0003

# RATE AGREEMENT
## NONPROFIT ORGANIZATIONS

COUNCIL OF ATHABASCAN TRIBAL GOVERNMENTS (THE)
1400 W. BENSON BLVD.,
SUITE 425
ANCHORAGE, AK   99503

DATE:    05/23/95
FILING REF.: The preced-
ing agreement was dated:
N/A  /      N42649.95

The rates approved in this agreement are for use on grants, contracts and
other agreements with the Federal Government, subject to the conditions
contained in Section II.

SECTION I : RATES

| Type | Effective Period From | To | Rate | Location | Applicable to |
|------|------|------|------|------|------|
| INDIRECT COST RATES* | | | | | |
| Prov. | 10/01/94 | 09/30/95 | 36.00% | ON-SITE | ALL PROGRAMS |
| Prov. | 10/01/94 | 09/30/95 | 76.80% | OFF-SITE | ALL PROGRAMS |

*BASE:  Total direct costs excluding capital expenditures (buildings,
individual items of equipment, and alterations and renovations) and
subawards.

TREATMENT OF PAID ABSENCES
   ation, holiday, sick leave pay and other paid absences are included in
salaries and wages and are charged to Federal projects as part of the normal
charge for salaries and wages.  Separate charges for the cost of these absences
are not made.

TREATMENT OF OTHER FRINGE BENEFITS
This organization charges the actual cost of each fringe benefit direct to
Federal projects.  However, it uses a fringe benefit rate which is applied to
salaries and wages in budgeting fringe benefit cost under project proposals.
The following fringe benefits are treated as direct costs:
FICA, ESC, PENSION, WORKMAN COMPENSATION, AND HEALTH INSURANCE.

64

DEF0092

## SECTION II:  GENERAL

**A.  LIMITATIONS:**  The rates in this Agreement are subject to any statutory or administrative limitations and apply to a given grant, contract or other agreement only to the extent that funds are available.  Acceptance of the rates is subject to the following conditions:  (1) Only costs incurred by the organization were included in its indirect cost pool as finally accepted; such costs are legal obligations of the organization and are allowable under the governing cost principles; (2) The same costs that have been treated as indirect costs are not claimed as direct costs; (3) Similar types of costs have been accorded consistent accounting treatment; and (4) The information provided by the organization which was used to establish the rates is not later found to be materially incomplete or inaccurate.

**B.  ACCOUNTING CHANGES:**  If a fixed or predetermined rate is in this Agreement, it is based on the accounting system purported by the organization to be in effect during the Agreement period.  Changes to the method of accounting for costs which affect the amount of reimbursement resulting from the use of this Agreement require prior approval of the authorized representative of the cognizant agency.  Such changes include, but are not limited to, changes in the charging of a particular type of cost from indirect to direct. Failure to obtain approval may result in cost disallowances.

**C.  FIXED RATES:**  If a fixed rate is in this Agreement, it is based on an estimate of the costs for the period covered by the rate.  When the actual costs for this period are determined, an adjustment will be made to a rate of a future year(s) to compensate for the difference between the costs used to establish the fixed rate and actual costs.

**D.  USE BY OTHER FEDERAL AGENCIES:**  The rates in this Agreement were approved in accordance with the authority in Office of Management and Budget Circular A-122, A-21 or HHS Hospital Cost Principles, as appropriate, and should be applied to grants, contracts and other agreements covered by the appropriate regulation, subject to any limitations in A above.  The organization may provide copies of this Agreement to other Federal Agencies to give them early notification of this Agreement.

BY THE ORGANIZATION

Council of Athabascan Tribal Governments
(ORGANIZATION)

_Patricia J. Stanley_ (Signature)

Patricia J. Stanley
(Name)

Executive Director
(Title)

June 6, 1995
(Date)

(NP-CU-H)

BY THE COGNIZANT AGENCY
ON BEHALF OF THE FEDERAL GOVERNMENT
DEPARTMENT OF HEALTH AND HUMAN SERVICES

(Agency)

_David S. Low_ (Signature)
David S. Low

(Name)
Director, Division of Cost Allocation

(Title)

05/23/95
(Date)
HHS Representative    David A. Vedder
Telephone:  (415) 556-1704

G5
DEF0093

# COUNCIL OF ATHABASCAN TRIBAL GOVERNMENTS
## PO BOX 33, FORT YUKON, ALASKA 99740
### PHONE: (907) 662-2587 FAX: (907) 662-3333

September 3, 1999

Ms. Olinga Fagan
Contracting Officer
AANHS
4141 Ambassador Drive
Anchorage, Alaska
99508-5928

Dear Olinga:

　　　　Enclosed please find the PHS 3567 and 3578 forms complete and in order. Also, we have signed the reconciliation spreadsheet as instructed. Our apology for the delay in sending this out. Thank you.

Sincerely,

Simone Talamaivao
Fiscal Officer

Enclosure

DEF 0146

7

1-3576
V. 2-76

**CONTRACTOR'S RELEASE
FOR ALL CONTRACTS**

 Box 32

INSTRUCTIONS TO CONTRACTOR: *Submit Original and 3 copies. All submitted copies must have original handwritten signature.*

Pursuant to the terms of Contract No. ~~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~~ and in consideration of the sum of
One million three hundred eighty-six thousand seven hundred thirteen and 68|100
_____ Dollars ($ 1,386,713.68 )
*Total of amounts payed and payable*
which has been or is to be paid under the said contract to Council of Athabascan Tribal Governments
*Contractor's name and address*

hereinafter called the Contractor or to its assignees, if any, the Contractor, upon payment of the said sum by the
UNITED STATES OF AMERICA hereinafter called the Government, does remise, release, and discharge the
Government, its officers, agents, and employees, of and from all liabilities, obligations, claims, and demands whatsoever
under or arising from the said contract, except:

　1. Specified claims in stated amounts or in estimated amounts where the amounts are not susceptible of exact statement by
the Contractor, as follows: _____None._____
*If none so state*

_____

　2. Claims together with reasonable expenses incidental thereto, based upon the liabilities of the Contractor to third parties
arising out of the performance of the said contract, which are not known to the Contractor on the date of the execution of this
release and of which the Contractor gives notice in writing to the Contracting Officer within the period specified in the said
contract.

　3. Claims for reimbursement of costs (other than expenses of the Contractor by reason of its indemnification of the
Government against patent liability), including reasonable expenses incidental thereto, incurred by the Contractor under the
provisions of the said contract relating to patents.

　(The contract sum stipulated above includes unaudited costs in the amount of $　None　The contractor agrees,
pursuant to the clause in this contract entitled Allowable Cost (for cost reimbursement contracts) or Allowable Cost and
Fixed Fee (for CPFF contracts), that the amount of any sustained audit exceptions resulting from any subsequent audit
made after final payment will be refunded to the Government.)*

　The Contractor further agrees, in connection with patent matters and with claims which are not released as set
forth above, that it will comply with all of the provisions of the said contract, including without limitation those
provisions relating to notification to the Contracting Officer and related to the defense or prosecution of litigation.

　IN WITNESS WHEREOF, this release has been executed this _____
day of _____ 19____.

WITNESSES                                      COUNCIL OF ATHABASCAN TRIBAL GOVERNMENTS
_____                        *Contractor or Corporate name*

                                               BY Patricia J. Stanley_____

_____                        TITLE   EXECUTIVE DIRECTOR_____

NOTE: In the case of a corporation, witnesses, are not required, but the certificate below must be completed.

**CERTIFICATE**

I, Patricia J. Stanley _____, certify that I am the   EXECUTIVE DIRECTOR_____
                                                              *Official title*

( COUNCIL OF ATHABASCAN TRIBAL GOVN'T) of the corporation named as Contractor in the foregoing release; that
I _____ who signed said release on behalf of the Contractor was then
EXECUTIVE DIRECTOR_____ of said corporation; that said release was duly signed
*Official title*
for and in behalf of said corporation by authority of its governing body and is within the scope of its corporate powers.

GRANTS & AGREEMENTS
SAAA-A
RECEIVED
FEB 0 5 PH 4H 33

(CORPORATE SEAL)

\*plicable to contracts where unaudited costs claimed by the
\*ntractor are less than $100,000

DEF 0147

S-3578 (Formerly HSM-702)
74

*Instructions to Contractor*
*Submit original and 3 copies*
*Sign original*
*Conform signature on copies*

---

Contractor's Name   Council of Athabascan Tribal Governments (CATG)
Street Address      P.O. Box 33                              Contract No   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
City and State      Fort Yukon, Alaska    99740              Contractor's Assignment

---

## CONTRACTOR'S ASSIGNMENT OF REFUNDS, REBATES AND CREDITS

Pursuant to the terms of Contract No. ___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___ and in consideration of the reimbursement of costs and payment of fee, as provided in the said contract and any assignment thereunder, the ___CATG   P.O. Box 33    Fort Yukon,___ ___Alaska    99740___
(Contractor's Name and Address)

(hereinafter called the Contractor) does hereby:

1. Assign, transfer, set over and release to the UNITED STATES OF AMERICA (hereinafter called the Government), all right, title and interest to all refunds, rebates, credits or other amounts (including any interest thereon) arising out of the performance of the said contract, together with all the rights of action accrued or which may hereafter accrue thereunder

2. Agree to take whatever action may be necessary to effect prompt collection of all refunds, rebates, credits or other amounts (including any interest thereon) due or which may become due, and to promptly forward to ___Alaska Area Native Health Service___ ___Indian Health Service    4141 Ambassador Drive,    Anchorage, Alaska    99508___

hecks (made payable to the Treasurer of the United States) for any proceeds as collected. The reasonable costs of any such action to effect collection shall constitute allowable costs when approved by the Contracting Officer as stated in the said contract and may be applied to reduce any amounts otherwise payable to the Government under the terms hereof.

3. Agree to cooperate fully with the Government as to any claim or suit in connection with refunds, rebates, credits or other amounts due (including any interest thereon): to execute any protest, pleading, application, power of attorney or other papers in connection therewith; and to permit the Government to represent it at any hearing, trial or other proceeding arising out of such claim or suit

IN WITNESS WHEREOF, this assignment has been executed this _____ day of _____ 19____

WITNESSES

                                         COUNCIL OF ATHABASCAN TRIBAL GOVN'T
                                                        (Contractor)

                                         By Patricia J. Stanley

                                         Title EXECUTIVE DIRECTOR

(NOTE: In the case of a corporation, witnesses are not required, but the following certificate must be completed.)

## CERTIFICATE

I, ___Patricia J. Stanley___ certify that I am the ___EXECUTIVE DIRECTOR___
(CATG)                                                    (Official Title)
of the corporation named as Contractor in the foregoing assignment; that ___I___ who signed said assignment on behalf of the Contractor was then ___EXECUTIVE DIRECTOR___ of said corporation; that said assignment was duly signed for and in behalf of
(Official Title)
said corporation by authority of its governing body and is within the scope of its corporate powers.

(CORPORATE SEAL)

RECEIVED
GRANTS A-OAAS
& AGREEMENTS

SEP 8  2 42 PH '99

DEF0149

## DECLARATION OF MARIA CUNNINGHAM

I, Maria Cunningham, upon penalty of perjury, declare and state as follows:

1.    I am employed by the Indian Health Service as Human Resource Specialist in the Office of Human Resources in the Alaska Area Native Health Service (AANHS).  I have held this position for one year and eight months.

2.    As a Human Resource Specialist my duties include acting for the Director of the Office of Human Resources and include making sure the AANHS separation database is kept up to date with all employees who have separated from the AANHS and maintaining our file documenting whose employee records have been sent to the National Federal Records Center in St. Louis, Missouri.  I obtained all of the information in this declaration in the course of my official duties.

3.    The following information was found in our separation database and our paper copy file of those records that were sent to the National Federal Records Center in St. Louis, Missouri on separated employees who worked for AANHS.  Paul Young worked for the Alaska Area Native Health Service as a Project Officer until November 12, 1994, when he separated from federal service.  Exhibit 1 is a copy of the page in our local records listing former employees (the other names on the list were redacted before copying).  Deborah Segelhorst worked for the Alaska Area Native Health Service as an Awards and Administrative Services Manager until July 2, 2004, when she retired from federal service.  Olinga Fagan worked for the Alaska Area Native Health Service as a Contract Specialist until April 1, 2005, when she retired from federal service.  Exhibit 2 is printed extracts from our local separation database showing the record of Ms Segelhorst and Ms Fagan.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this 20th day of December, 2007.

Maria Cunningham

FEDERAL RECORDS CENTER
GENERAL SERVICE ADMINISTRATION
111 WINNEBAGO STREET
ST. LOUIS, MISSOURI 63118

TRANSMITTED HEREWITH ARE 44 OFFICIAL PERSONNEL FOLDERS OF FORMER EMPLOYEES
WHO HAVE SEPARATED FROM OUR AGENCY.

| NAME | SSN | SEPARATION DATE |
|------|-----|-----------------|

41. YOUNG SR, PAUL W.                                    11-12-94

R H.

*Christina Sanchez*        4-8-96
CHRISTINA SANCHEZ          DATE
PERSONNEL ACTIONS CLERK

12/19/07

| LAST NAME | FIRST NAME | MI | COB | NOA | EXPLANATION/NOTES | POSITION TITLE |
|---|---|---|---|---|---|---|
| SEGELHORST | DEBORAH | D | 7/2/2004 | 302 | 7/2/04 RET-VOL | AWARDS &ADM SVCS MGR, |

| LAST NAME | FIRST NAME | MI | COB | NOA | EXPLANATION/NOTES | POSITION TITLE |
|---|---|---|---|---|---|---|
| FAGAN | OLINGA | B | 4/1/2005 | 302 | 04/01/05 VOLUNTARY RETIREMENT | CONTRACT SPECIALIST |

12/19/07

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                     )
TUNICA-BILOXI TRIBE OF                )
LOUISIANA, <u>et</u> al.,                          )
                                                     )
              Plaintiffs,                        )
                                                     )
       v.                                          )              **Civil Action No. 02-2413 (RBW)**
                                                     )
UNITED STATES OF AMERICA,         )
                                                     )
              Defendants.                       )
_____)

<u>**MEMORANDUM OPINION**</u>

       Plaintiffs seek to recover in this lawsuit various costs incurred under self-

determination contracts that were entered into by the parties for the provision of health

services to Indian tribes pursuant to the Indian Self-Determination and Education

Assistance Act ("ISDA"), 25 U.S.C. § 450 <u>et</u> <u>seq.</u> (2000).  Currently before the Court is

the defendants' motion to dismiss the plaintiffs' claims.  For the reasons set forth below,

the Court concludes that this motion must be granted in part and denied in part.

**I. Factual Background**

       The plaintiffs in this matter are the Tunica-Biloxi Tribe of Louisiana ("Tunica-

Biloxi"), a federally recognized Indian tribe, and the Ramah Navajo School Board,

Incorporated ("Ramah"), a New-Mexico non-profit corporation that was established by

the Ramah Navajo Chapter of the Navajo Nation.  Compl. ¶ 9.[1]  Plaintiffs brought this

_____
       [1]References to "Compl." are to the Second Amended Class Action Complaint that was filed on
March 12, 2003.

lawsuit against several federal defendants[2] for breach of contract and breach of trust regarding contracts for the provision of health services to the tribes' members that were entered into pursuant to the ISDA.

The ISDA was enacted to relinquish federal control of service programs benefitting Indian tribes and to acknowledge "the strong expression of the Indian people for self-determination by assuring maximum Indian participation in the direction of educational as well as other Federal services to Indian communities . . . ." 25 U.S.C. § 450a(a).  Pursuant to the ISDA, "[t]he Secretary[3] is directed, upon the request of any Indian tribe by tribal resolution, to enter into a self-determination contract or contracts with a tribal organization to plan, conduct and administer programs or portions thereof . . . ." Id. § 450(f)(a)(1).  Self-determination contracts are contracts "entered into . . . between a tribal organization and the appropriate Secretary for the planning, conduct, and administration of programs or services which are otherwise provided to Indian tribes and their members pursuant to Federal law[.]" Id. § 450b(j).  A tribe is entitled to receive the same amount of money the Secretary would have received to administer the programs covered under the contract, as the programs at issue are those that traditionally had been administered by the federal government for the benefit of the tribes.  Id. § 450j-1(a)(1).  These funds are characterized as the "Secretarial amount."

---

[2]The defendants include the United States, the Secretary of Health and Human Services, Tommy Thompson, the Secretary of the Interior, Gale Norton, the Interim Director of the Indian Health Service of the Department of Health and Human Services, Charles W. Grim, the Inspector General of the Department of the Interior, Earl Devaney, and the Director of the Department of the Interior's National Business Center, Timothy G. Vigotsky.  Compl. ¶¶ 10-13(B).

[3]"'Secretary', unless otherwise designated, means either the Secretary of Health and Human Services or the Secretary of the Interior or both[.]" 25 U.S.C. § 450b(i).

2

See id. § 450j-1(a)(1); Ramah Navajo Sch. Bd., Inc. v. Babbitt, 87 F.3d 1338, 1341 (D.C. Cir. 1996).

As related to this case, there are two types of contract support costs ("CSC") incurred in self-determination contracts: direct program costs and indirect costs.[4] Simply stated, direct CSC are the "direct program expenses for the operation of the Federal program that is the subject of the contract[,]" whereas indirect CSC are "administrative or other expense[s] related to the overhead incurred by the tribal contractor in connection with the operation of the Federal program, function, service or activity pursuant to the contract [.]" Id. § 450-j-1(3)(A)(i) & (ii).

Because indirect CSC are shared by several different programs or services, to calculate the amount of indirect CSC a tribe is responsible for paying, an "indirect cost rate" is "arrived at through negotiation between an Indian tribe or tribal organization and the appropriate Federal agency[.]" Id. § 450b(f). The Secretary, through the Office of the Inspector General ("OIG"), has utilized a government manual, OMB Circular A-87, to calculate tribes' indirect CSC rates. Compl. ¶ 21. At issue in this lawsuit is "whether the OIG's methodology for the calculation of indirect cost rates comports with the ISDA . . . ." Id. ¶ 29.

Plaintiffs argue that the precise methodology utilized by the OIG to calculate their indirect cost rates has already been declared illegal by the Tenth Circuit in Ramah Navajo Chapter v. Lujan, 112 F.3d 1455 (10th Cir. 1997). Id. ¶ 3. Plaintiffs seek to

---

[4]In the initial year of a contract, CSC also include "startup costs consisting of the reasonable costs that have been incurred or will be incurred on a one-time basis pursuant to the contract . . . ." 25 U.S.C. § 450-j-1(a)(5). These costs are not at issue in this lawsuit.

certify a class, which would be "virtually identical to the class certified by the District Court for the District of New Mexico on remand following the decision of the U.S. Court of Appeals in Ramah." Id. ¶ 27. The proposed class would consist of approximately 350 to 400 Indian tribes and tribal organizations, who have contracts with the director of the Indian Health Service (IHS), "whose contracts contain an indirect cost rate determined in negotiation with the . . . OIG[ ] or its successor of the . . . Department of the Interior." Id.[5] In the first two counts of a three-count complaint, plaintiffs allege that the defendants have breached their contract with the plaintiffs by failing to "reimburse contract costs" or, alternatively, by failing "to request . . . sufficient appropriations [from Congress] to meet those obligations," which plaintiffs posit is "a breach of the implied covenant of good faith and fair dealing." Id. ¶ 36.[6] Count three of the complaint asserts that the defendants have breached the duty of trust "[b]y not requesting sufficient funds from Congress to pay Indirect Contractual Support Costs . . . ." Id. ¶ 44.

The defendants have filed a motion seeking dismissal of plaintiffs' complaint on two principal grounds: (1) the Court's lack of subject matter jurisdiction and (2) plaintiffs' failure to state a claim upon which relief can be granted. Regarding the subject matter

---

[5]In an Order dated May 6, 2003, the Court granted the defendants' motion to stay a ruling on the plaintiffs' motion for class certification pending resolution of the defendants' motion to dismiss.

[6]Plaintiffs' breach of contract claims are separated into two counts: one for the years prior to fiscal year 1998, which were "lump sum years," meaning the monies for health programs were distributed in lump sums and there was no designation regarding the funds to be used for direct versus indirect CSC. First Claim for Relief, Compl. ¶ 35. For these years, plaintiffs claim that there were appropriations "legally available to reimburse contract costs . . . ." and thus the Secretary breached the contracts by failing to pay these costs. Id. In the years after fiscal year 1997, which plaintiffs term "capped years," appropriations for health programs "contained limitations or caps" that limited the amount of funds that could be used to pay indirect CSC. Second Claim for Relief, id. ¶ 39. However, plaintiffs argue that these limitations "did not limit or reduce the United States' obligation to pay the full contracted and legally required amount of Indirect Contract Support Costs after services were performed." Id. ¶ 40.

jurisdiction challenge, defendants seek dismissal on several grounds. First, defendants argue that this Court lacks subject matter jurisdiction over some of the claims raised in plaintiffs' complaint because plaintiffs have failed to exhaust their administrative remedies regarding these claims. Defendants' Memorandum of Law in Support of Defendants' Motion to Dismiss ("Defs.' Mem.") at 20. Second, defendants argue that the Court is without subject matter jurisdiction over plaintiffs' claims "for retrospective relief" as these claims "are moot because IHS's authority to obligate the relevant appropriation has lapsed." Id. at 19, 23. Third, defendants posit that some of the claims are barred by the applicable statute of limitations. Id. at 29. Fourth, defendants argue that certain claims are not ripe "because [p]laintiffs have failed to obtain current rates for the last seven years" and, therefore plaintiffs "lack standing to challenge the indirect cost formula . . . ." Id. at 19. Finally, defendants assert that the United States, Charles Grim, Earl Devaney and Timothy Vigotsky should be dismissed because sovereign immunity as to these defendants has not been waived and therefore the Court cannot exercise subject matter jurisdiction over them. Id. at 44. As to plaintiffs' allegation that they are entitled to receive funding for indirect CSC, regardless of the amount of Congressional appropriations the Secretary receives, defendants argue that this claim should be dismissed for failure to state a claim upon which relief can be granted because, "[a]s a matter of law[,] . . . [p]laintiffs (and all other tribes with self-determination contracts) are, and always were, entitled to only a share of the limited amount of CSC funding that Congress appropriated and apportioned to IHS in any given year." Id. at 34. The Court will address each of the defendants' arguments in turn.

## II. Analysis

## A. Defendants' Lack of Subject Matter Jurisdiction Challenges

### (1) Standard of Review

Defendants seek to dismiss several of plaintiffs' claims pursuant to Federal Rule of Civil Procedure 12(b)(1).  A motion for dismissal under "Rule 12(b)(1) presents a threshold challenge to the court's jurisdiction . . . ."  Haase v. Sessions, 835 F.2d 902, 906 (D.C. Cir. 1987) (citations omitted).  Specifically, Rule 12(b)(1) permits dismissal of a complaint if the Court "lack[s] jurisdiction over the subject matter . . . ."  Under this rule, "the plaintiff bears the burden of establishing that the court has jurisdiction." Fowler v. District of Columbia, 122 F. Supp. 2d 37, 39-40 (D.D.C. 2000) (citation omitted).  The rule also imposes "an affirmative obligation [on the court] to ensure that it is acting within the scope of its jurisdictional authority . . . [and for that] reason, the '[p]laintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion' than on a 12(b)(6) motion for failure to state a claim."  Id. at 40 (citations omitted).  When reviewing a challenge pursuant to Rule 12(b)(1), the Court may consider documents outside the pleadings to assure itself that it has jurisdiction. See Land v. Dollar, 330 U.S. 731, 735 n.4 (1947); see also Haase, 835 F.2d at 906 ("In 12(b)(1) proceedings, it has been long accepted that the judiciary may make 'appropriate inquiry' beyond the pleadings to 'satisfy itself on authority to entertain the case.'") (citations omitted); Artis v. Greenspan, 223 F. Supp. 2d 149, 152 (D.D.C. 2002) ("A court may consider material outside of the pleadings in ruling on a motion to dismiss for lack of venue, personal jurisdiction, or subject-matter jurisdiction.") (citation omitted).

6

By considering documents outside the pleadings on a motion to dismiss pursuant to Rule 12(b)(1), the Court does not convert the motion into one for summary judgment; "the plain language of Rule 12(b) permits <u>only</u> a 12(b)(6) motion to be converted into a motion for summary judgment." <u>Haase</u>, 835 F.2d at 905.

As a preliminary matter, plaintiffs argue that the Rule 12(b)(1) and 12(b)(6) issues are "interrelated" and thus, it "will be difficult if not impossible" for the Court to avoid considering the numerous exhibits submitted by the defendants on the 12(b)(1) issues and not the 12(b)(6) issues. Plaintiffs' Opposition to Motion to Dismiss ("Pls.' Opp'n") at 3. Plaintiffs contend that it would not be proper for the Court to grant the motion to dismiss without converting it to a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 and providing the parties with time to conduct discovery. <u>Id.</u> at 4. In the alternative, plaintiffs submit that "[e]ven if conversion . . . is not warranted," the Court should defer ruling on the 12(b)(1) issues until plaintiffs have "had adequate time to discover facts supporting the court's jurisdiction." <u>Id.</u> at 4.

"A plaintiff has no <u>right</u> to discovery in opposing a motion under 12(b)(1)." <u>Haase</u>, 835 F.2d at 908.[7] It is well established that when reviewing a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the Court "'may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.'" <u>Coalition for Underground Expansion v. Mineta</u>, 333 F.3d 193, 198 (D.C. Cir. 2003)

---

[7]Specifically, on the issue of standing, the District of Columbia Circuit has held that "[a] motion to dismiss for lack of standing . . . involves an examination of the face of the complaint, which does not depend on discovery." <u>Haase</u>, 835 F.2d at 908.

(citations omitted).  While jurisdictional discovery is warranted in some cases, such "discovery should be carefully controlled and limited."  Phoenix Consulting, Inc. v. Republic of Angola, 216 F.3d 36, 40 (D.C. Cir. 2000) (citation omitted).

In their motion, plaintiffs identify several broad areas in which they believe discovery "may" be required but they fail to specifically identify the precise facts that have been placed in dispute by defendants' motion to dismiss and which they therefore honestly believe need to be the subject of discovery.  If factual disputes exist, the Court may authorize limited discovery into those areas before resolving a Rule 12(b)(1) motion.  See, e.g., Ignatiev v. United States, 238 F.3d 464, 467 (D.C. Cir. 2001) (holding that district court should have granted limited jurisdictional discovery where plaintiffs sought to discover mandatory policies that may have been binding on the defendant and which would have supported their claims); Artis, 223 F. Supp. 2d at 155 (court granted limited jurisdictional discovery because it was "troubled by the factual disputes" concerning the defendant's argument that the plaintiffs had failed to exhaust their administrative remedies).  Accordingly, the Court will address each of the defendants' challenges to the complaint and if discovery on a particular challenge is needed, appropriate relief will be granted.

**(2) Exhaustion of Administrative Remedies**

Pursuant to section 450m-1(d) of the ISDA, the Contract Disputes Act ("CDA"), 41 U.S.C. § 602, is applicable to self-determination contracts "except that all administrative appeals relating to such contracts shall be heard by the Interior Board of Contract Appeals . . . ."  25 U.S.C. § 450m-1(d).  The CDA requires that "[a]ll claims by a contractor against the government relating to a contract shall be in writing and shall

8

be submitted to the contracting officer for a decision."  41 U.S.C. § 605(a).  As its first

basis for dismissal, defendants argue that plaintiffs failed to raise with the contracting

officer claims for "any fiscal years prior to 1993 or after 2001 . . . ." and also their claim

regarding the defendants' alleged breach of "the implied covenant of good faith and fair

dealing . . . [,]" these claims must therefore be dismissed for lack of subject matter

jurisdiction due to plaintiffs' failure to exhaust this jurisdictional requirement of the CDA.[8]

Defs.' Mem. at 23.  In opposition, plaintiffs concede that claims for fiscal years prior to

1995 are not properly before the Court, Pls.' Opp'n at 13,[9]  however, they argue that

"the content of their notices were sufficient to raise all the claims presented in the

Second Amended Complaint."  Id.

    In its initial claim letter to the contracting officer dated April 2, 2001, plaintiff

Tunica-Biloxi claimed it was entitled to compensation dating back to fiscal year 1996

through fiscal year 2001.  Exhibits in Support of Defendants' Motion to Dismiss ("Defs.'

Ex.") B (Tunica-Biloxi Contract Dispute Claim dated April 2, 2001).  In its second claim

letter dated September 27, 2001, Tunica-Biloxi claimed amounts it was owed for fiscal

year 1995.  Defs.' Ex. C (Tunica-Biloxi Contract Dispute Claim dated September 27,

2001).  Plaintiff Ramah's contract dispute claim was filed with the IHS on August 31,

2001, and it "relate[d] to fiscal year[s] 1993 through 1996."  Defs.' Ex. E (Ramah

---

[8]Defendants concede that plaintiffs' claim for breach of trust was not subject to the CDA's exhaustion requirement.  Defs.' Mem. at 21 n.12.  Therefore, the Court need not address that claim in this section of the opinion.

[9]The CDA requires that all claims "be submitted within 6 years after the accrual of the claim."  41 U.S.C. § 605(a).  Plaintiffs concede that claims relating to years prior to fiscal year 1995 (which began October 1, 1994, and extended to September 30, 1995) are "outside the claims[]" they may pursue before the Court.  Pls.' Opp'n at 13.  The Court will limit plaintiffs' request for relief accordingly.

Contract Dispute Claim dated August 31, 2001) at 1 n.1. Neither Tunica-Biloxi's or Ramah's administrative claims addressed claims for fiscal years after 2001; indeed, Ramah's claims ended at 1996. In addition, neither of the plaintiffs' administrative claims explicitly raised the argument made in claims one and two of the second amended complaint, namely, that the Secretary has breached "the implied covenant of good faith and fair dealing" by failing "to request [that] Congress . . . [provide] sufficient appropriations . . . ." Compl. ¶¶ 36, 40.

In the CDA, Congress has provided a limited waiver of sovereign immunity for suits against the government. SMS Data Products Group, Inc. v. United States, 19 Cl. Ct. 612, 614 (Cl. Ct. 1990) (citations omitted). As a prerequisite to filing a suit pursuant to the CDA, section 605(a) requires that "[a]ll claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision." 41 U.S.C. § 605(a) (emphasis added). "Compliance with these requirements is a jurisdictional prerequisite to the filing of a complaint under the CDA." Foley Co. v. United States, 26 Cl. Ct. 936, 944-45 (Cl. Ct. 1992) (citations omitted), aff'd 11 F.3d 1032 (Fed. Cir. 1993); SMS Data, 19 Cl. Ct. at 615 ("The [CDA's] limitations on the waiver of sovereign immunity necessarily restrict the jurisdiction of this court."). The administrative filing requirement serves an important purpose: "Congress required contractors to file all claims with the contracting officer to provide the Government with an opportunity to settle the case or otherwise avoid unnecessary litigation." SMS Data, 19 Cl. Ct. at 614. Thus, the CDA's clear language that

> '[a]ll claims . . . shall be submitted to the contracting officer for a decision[,]' . . . does not permit claims discovered after an initial decision to escape contracting officer review. The Act exempts no claims from

10

contracting officer review.  Upon discovery of a new claim, a contractor
must submit it to the contracting officer.

Id. at 616 (emphasis in original and emphasis added); see also Johnson Controls World

Services, Inc. v. United States, 43 Fed. Cl. 589, 592 (Fed. Cl. 1999) ("A valid final

decision by the contracting officer is thus 'a 'jurisdictional prerequisite' to further legal

action thereon.'") (citation omitted).

As indicated, plaintiffs argue that "their notices were sufficient to raise all the

claims presented in the Second Amended Complaint."  Pls.' Opp'n at 13.  They rely on

the Foley decision as support for the proposition that as long as "the claims arise from

the 'same set of operative facts' as those presented to the contracting officer for

decision[,]" the claims are properly before the Court.  Id. (citing Foley, 26 Cl. Ct. at 945).

The Court agrees that "[i]lf the complaint brought [in this Court] is based on the same

set of operative facts underlying the claim presented to the contracting officer, then this

court has jurisdiction under the CDA."  Cerberonics, Inc.  v. United States, 13 Cl. Ct.

415, 417 (Cl. Ct. 1987).  Thus, in determining whether compensation requested for

those years not presented to the contracting officer can be brought to this Court

because they are "based on the same set of operative facts[,] . . . [t]he critical test . . .

[is] whether the scheme of adjudication prescribed by the CDA is undermined by the

[tribes'] claim [it has filed in this Court] --that is, by circumventing the statutory role of

the contracting officer to receive and pass judgment on the [tribes'] entire claim."  Id. at

418.

In Cerberonics, the court concluded that it had jurisdiction over a claim that had

not been presented to the contracting officer because it was based on the same

11

operative facts as the administrative claim presented to the contracting officer.  Id.

There, the plaintiff had presented an administrative claim to the contracting officer for

the sum of $36,120, which the plaintiff described as "'a fair and equitable fee to cover

(1) finance charges . . .  as well as (2) [the plaintiff's] successful efforts to obtain the

best available price.'"  Id. at 416.  After the contracting officer denied its claim, the

plaintiff filed a complaint in the United States Claims Court, in which it also sought to

recover $36,120, but justified recovery in this identical amount on grounds expressed

differently than those articulated in the administrative claim to the contracting officer.

Id. at 417.  In holding that the complaint was based on the same operative facts as the

administrative claim that had been submitted to the contracting officer, the court noted

that "[p]laintiff's action in this court, in the identical sum of $36,120, admittedly is not

couched in exactly the same language as the claim presented to the contracting

officer."  Id. at 418.  However, the court stated that "neither the language of plaintiff's

complaint nor its explanation of this action in accompanying briefs . . . indicate that it is

based on a different set of operative facts or seeks different categories of relief."  Id.

The court read plaintiff's complaint as "augment[ing] the legal theories underlying its

claim[,]" and concluded that this did "not change the essence of that claim, i.e., that

plaintiff is entitled, based on its contractual relationship with defendant, to

compensation of $36,120 for the procurement of services and late payment penalty . . .

."  Id. at 419.

A similar issue, albeit resolved differently, was addressed by the court in

Johnson Controls.  There, defendant United States sought to assert a counterclaim

before the court that had not been presented to the contracting officer in a contract

12

dispute arising under two contracts.  This raised an issue similar to the dispute in

Cerberonics because pursuant to the CDA, "[a]ll claims by the government against a

contractor relating to a contract shall be the subject of a decision by the contracting

officer."  41 U.S.C. § 605(a).  The United States in Johnson Controls submitted that its

counterclaims, inter alia, arose "from the same operative facts underlying the claim in

the contracting officer's final decision," and thus argued that the court had jurisdiction

over the counterclaims.  43 Fed. Cl. at 594.  In holding that the claim did not arise from

the same set of operative facts as that aspect of the counterclaim at issue, the court

held that the contract officer's claim for $54,923,068 and the defendant's counterclaim

for the same amount arose from the same operative facts.  However, the court also

held that to the extent the defendant was claiming that its counterclaim for $54,923,068

was the same as the contract officer's claim for $1,192,254, the claims, although based

on the same legal theory, sought different relief based on a different set of operative

facts.  Id.  Thus, although the defendant's counterclaims were "based on the same legal

theory, but [sought] vastly different relief based on a different set of operative facts[,]"

the court held that the counterclaims could not be entertained.  Id. at 595.  Notably, the

court also held that a second counterclaim, in which the defendant sought $845,429

and which the plaintiff conceded was based on the same operative facts, could not be

raised because it had not been presented to the contracting officer.  Id.

The case now before the Court is more akin to Johnson Controls than to

Cerberonics.  Here, the amount of indirect contract costs awarded for each fiscal year is

not identical due to increases in the prices for services and the nature of the services

each tribe has contracted to receive.  The precise amount of money allegedly due for

each of the fiscal years after 2001 (or after 1996 for Ramah) are not known and have

never been presented to the contracting officer for decisions on their validity.  Thus,

although "each is based on the same legal theory, . . . [each] seeks . . . different relief

based on a different set of operative facts[,]"  Johnson Controls, 43 Fed. Cl. at 595,

since the mathematical calculation for each fiscal year varies.  The record

demonstrates that plaintiffs would not be seeking the same amount of recovery for the

fiscal years not presented to the contracting officer, as they have sought varying

amounts for each of the fiscal years that were presented to the contracting officer.  See,

e.g., Defs.' Ex. B (Tunica CDA claim in which the tribe sought $48,869 for fiscal year

1996; $45,001 for fiscal year 1997; $56,854 for fiscal year 1998, etc.); Defs.' Ex. E

(Ramah CDA claim in which Ramah sought $13,028 for fiscal year 1993; $12,075 or

fiscal year 1994; $68,644 for fiscal year 1995; and $52,163 for fiscal year 1996).

Therefore, these non-submitted claims should have been presented to the contracting

officer in the first instance.  Johnson Controls, 43 Fed. Cl. at 592 ("A valid claim must

give adequate notice by specifying the basis and amount of liability.") (citation omitted)

(emphasis added).

Having concluded that the claims do not arise from the same operative facts, the

Court must address plaintiffs' argument that their claims can still be salvaged under

"[t]he enlarged claim doctrine."  Pls.' Opp'n at 17; see also Johnson Controls, 43 Fed.

Cl. at 594.  This doctrine permits the Court to exercise jurisdiction over "an increase in

the amount of the claim [that had been presented to the contracting officer] if (1) the

party requesting the increase neither knew nor reasonably should have known of the

factors justifying the increase prior to issuance of the final decision, and (2) the increase

14

is based on the same operative facts." Id. (citation omitted).  The justification for this

doctrine is that

> [t]he Disputes Act does not bar plaintiff[s] from seeking an amount of
> damages that exceeds the quantum in the claim to the contracting officer.
> The excess quantum must, however, spring from the same certified claim.
> Plaintiff[s] may not seek damages for a new claim - a claim not yet
> submitted to and decided by the contracting officer.

SMS Data, 19 Cl. Ct. at 615 (citations omitted) (emphasis).  Clearly, however, this

doctrine cannot be used to salvage plaintiffs' claims here because, as stated previously,

the Court concludes that each claim involving different fiscal years involve different

facts, which results in different amounts being claimed by each plaintiff for each fiscal

year.  Therefore, plaintiffs were required to submit these claims to the contracting

officer.  Thus, the Court will dismiss the plaintiffs' claims for payments in those years for

which payments are sought before fiscal year 1995 and after fiscal year 2001.

Regarding the plaintiffs' claim that the defendants breached the "implied

covenant of good faith and fair dealing" by failing to request from Congress "sufficient

appropriations to meet [the ISDA] obligations[,]" the Court finds that this claim did not

have to be presented to the contracting officer.  This claim is merely an alternative

theory upon which plaintiffs seek relief; they are not seeking additional money pursuant

to this theory, but merely advance it as an alternative basis for obtaining judgment in

their favor.  The CDA's de novo review "permits the introduction of new facts and/or

legal theories in support of the original claim." Cerberonics, Inc., 13 Cl. Ct. at 418

(footnote omitted). For example, in Foley, the government sought to assert a

counterclaim and a defense against the plaintiff that had not been presented to the

contracting officer. <u>Foley</u>, 26 Cl. Ct. at 939. The court stated that "whether [a] claim . . . constitutes a new claim for the contract balance is whether the two issues are based on the same set of operative facts." <u>Foley</u>, 26 Cl. Ct. at 945. The court noted that while it was "clear" that a counterclaim had to be presented to the contracting officer for a final decision before it could be pursued in court, "[w]ith respect to defenses, however, there could be some doubt as to whether the requirement to have 'claims' decided by a contracting officer bars the government from asserting new defenses in the Claims Court." <u>Id.</u> at 940. The court concluded that "where the so-called 'defense' is the government's justification for withholding the contract price, it is settled that the case presents a government claim, not a contractor claim." <u>Id.</u> (citation omitted). Therefore, because the government sought to withhold money from the contractor based on its defense, the court held that "the 'defense' should have been the subject of a decision by the contracting officer.'" <u>Id.</u>

Here, plaintiffs do not seek any additional sums of money based on the defendants' alleged breach of the implied covenant of good faith and fair dealing, but merely assert this position as an alternative theory to obtain recovery of the amounts they sought from the contracting officers. As such, these "claims" will not be dismissed. <u>See</u> <u>Cerberonics, Inc.</u>, 13 Cl. Ct. at 418 (holding that the court had jurisdiction over plaintiff's claim where plaintiff sought "the identical sum" he sought before the contracting officer, despite the fact that the claim was "admittedly not couched in

exactly the same language as the claim presented to the contracting officer. . . .").[10]

### (3) Defendants' Mootness and Standing Challenges

Next defendants attack the complaint on the grounds of mootness and lack of

standing.[11]  Specifically, defendants argue that plaintiffs' claims for years in which lump

sum appropriations[12] were made are moot because these appropriations have lapsed,

and that plaintiffs do not have standing to challenge the amounts they received after

fiscal year 1996 since neither plaintiff has negotiated indirect cost rates for those years

after 1996.  For the reasons set forth below, the Court declines to dismiss plaintiffs'

claims on the grounds of mootness, and will order limited discovery and supplemental

briefing concerning whether or not the plaintiffs' claims are moot and whether they have

standing to challenge the indirect cost rates for those years after 1996.

---

[10]Defendants argue in their reply that "[p]laintiffs have abandoned their claim for breach of the implied covenant of good faith and fair dealing, as they have not responded to [d]efendants' [m]otion on this basis."  Defs.' Reply at 22.  However, the Court finds that plaintiffs did respond to this argument, although not in significant detail on page 14 of their opposition by arguing that they had properly exhausted their administrative remedies.  See Pls.' Opp'n at 14-15 ("Defendants cite failure to notify the contracting officers of the allegation in the complaint of [d]efendants' failure to request appropriations.  They contend this failure bars [p]laintiffs from raising this issue in court because it is a 'new' claim.  It is not a claim at all; it is a response to the defendant of unavailability of funds raised by the contracting officers.") (citing Foley, 26 Cl. Ct.[ ] at 939, 941-42).  Because the claim pertaining to the defendants' alleged breach of the implied covenant of good faith and fair dealing is premised on the defendants' purported duty "to request [from] Congress . . . sufficient appropriations to meet [their ISDA] obligations," Compl. ¶ 36, the Court concludes that plaintiffs adequately defended their inclusion of this theory of recovery in their complaint.  Accordingly, it will not be dismissed.

[11]Because of the Court's resolution of the mootness and standing issue, it need not address defendants' argument that plaintiffs' claims are not ripe for failure to obtain a recent rate.

[12]See footnote 6, supra at 4, and footnote 14, infra at 19, for discussions about lump sum appropriations.

**A.**

First, defendants argue that "[p]laintiffs' claims for monetary relief arising out of the distribution of indirect CSC in fiscal years [1995 - 2001][13] are moot because the relevant appropriation has lapsed and there is no other source of funding available for this purpose." Defs.' Mem. at 23. Since there are no funds available to pay plaintiffs, defendants argue plaintiffs' claims for relief are moot.

"Simply stated, a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." County of Los Angeles v. Davis, 440 U.S. 625, 631 (1979) (citation omitted). Defendants rely on City of Houston v. Department of Housing and Urban Development, 24 F.3d 1421 (D.C. Cir. 1994), in support of their mootness argument. The City of Houston court, in concluding that the city's claim for appropriated funds that had lapsed was moot, held that "[i]t is a well-settled matter of constitutional law that when an appropriation has lapsed or has been fully obligated, federal courts cannot order the expenditure of funds that were covered by that appropriation." Id. at 1424. Thus, because the appropriated funds from which the plaintiff sought payment had lapsed, and because "[a]n award of monetary relief from any source of funds other than the . . . appropriation would . . . not be authorized by [the Administrative Procedures Act] . . . [,]" the court held that the city's claim for monetary relief was moot. Id. at 1428.

In opposition to defendants' mootness argument, plaintiffs counter that

---

[13]Originally, defendants directed this argument to fiscal years 1993-2002. Defs.' Mem. at 23. Because the Court has concluded that claims prior to fiscal year 1995 and after fiscal year 2001 are not properly before it, it will assess defendants' arguments only as they pertain to fiscal years 1995 through 2001.

defendants' "lapse of appropriations" position is not relevant for the lump sum years[14]

(years prior to fiscal year 1998) because "these sums were in fact legally obligated to

[p]lantiff's contracts during the fiscal year in question . . . . " Pls.' Opp'n at 15.  Thus,

plaintiffs state that they "expect to find the so-called unobligated balances on the books

of the IHS."  Id.  Plaintiffs also note that they had "multi-year or indefinite term

contracts[,]" and thus the "methodology carries over from year to year . . . . "  Id. at 16.

In addition, plaintiffs posit that any monetary relief they could be awarded would be paid

"from the Permanent and Indefinite Judgment Fund[,]" and thus the appropriated funds

position is irrelevant.  Id.  Defendants, on the other hand, take exception to all of these

arguments and as to the Permanent Judgment Fund position contend that recovery

from the Fund "is not available to pay additional indirect CSC[,]" although they concede

that "[i]n other contexts, damages under the [CDA] can be paid from the Judgment

Fund . . . ."  Defs. Mem. at 24.

        The Court first concludes that the City of Houston mootness holding is not

applicable to the present case.  While holding that the plaintiff there could not recover

appropriated monies for fiscal years for which the appropriations had lapsed, the City of

Houston court's holding was also contingent on the fact that the APA, the statute

pursuant to which the suit had been filed, would not permit the recovery of monetary

damages, and thus, there was no other legal method by which the plaintiff could be

made whole.  24 F.3d at 1428.  However, in this case, at least one other court has

---

[14]In lump sum years, which includes fiscal years 1994-1997, "Congress did not specify directly in the appropriation acts how much IHS could spend on ongoing CSC, but instead made a general appropriation . . . to IHS for Indian [h]ealth [s]ervices, available for one year."  Defs.' Mem. at 27.  In capped years, Congress "'capped' the amount of funds that IHS could spend on ongoing CSC."  Id. at 27 n.16.

directly agreed with plaintiffs' argument and held that a plaintiff's claims for indirect CSC

were not moot even for those years for which the relevant appropriations had lapsed.

See Thompson v. Cherokee Nation of Oklahoma, 334 F.3d 1075, 1092 (Fed. Cir.

2003).[15]

The situation in Thompson is analogous to this case in many respects. There,

the Cherokee Nation of Oklahoma, had "entered into contracts with the Secretary [of

Health and Human Services] under the ISDA, to operate" various health related

programs "which were formerly operated by the Secretary." Id. at 1081. The tribe filed

suit against the Secretary claiming that he had "breached his contracts . . . by failing to

pay the full indirect costs of administering . . . the programs for fiscal years 1994

through 1996." Id. at 1079, 1081. In rejecting the Secretary's arguments that the claim

for damages was "moot[ ] because the case was filed after the close of the relevant

fiscal years, and because section 314[16] [of the ISDA] barred payment after the close of

the fiscal years[,]" arguments that the defendants make here, the court held that the

relevant

---

[15]The Thompson court acknowledged that its holding directly conflicted with the holdings of the Ninth and Tenth Circuits. See 334 F.3d at 1086 (citing Cherokee Nation of Oklahoma v. Thompson, 311 F.3d 1054, 1066 (10th Cir. 2002) and Shoshone-Bannock Tribes of the Fort Hall Reservation v. Dep't of Health & Human Services, 279 F.3d 660, 668 (9th Cir. 2002)). The Court will address the Tenth and Ninth Circuit opinions, infra at 21.

[16]"Section 314 provides, in relevant part, as follows:

'Notwithstanding any other provision of law, amounts appropriated to or earmarked in committee reports for the Bureau of Indian Affairs and the Indian Health Service [. . .] for payments to tribes and tribal organizations for contract support costs . . . are the total amounts available for fiscal years 1994 through 1998 for such purposes . . . .'"

Thompson, 334 F.3d at 1091 (quoting Pub. L. No. 105-277, 112 Stat. at 2681-288).

issue in th[e] case [before it] under the availability clause, however, [was] whether funds <u>were</u> available for the Secretary to meet his contractual obligations, not whether those funds <u>remain available</u> now. The courts have long entertained breach of contract claims against the government filed after the relevant fiscal years have expired. In such a case, damages are awarded from the judgment fund created by 31 U.S.C. § 1304.

<u>Id.</u> at 1092 (citing <u>Lee v. United States</u>, 129 F.3d 1482, 1484 (Fed. Cir. 1997)).

Based on the <u>Thompson</u> court's ruling, the Court cannot conclusively state at this juncture that there would be no alternative source of funds from which defendants could compensate plaintiffs. Unlike <u>City of Houston</u>, the payment of such funds would not violate the statute pursuant to which plaintiffs have filed this action; rather, "[d]amages for breach of contract may be awarded out of the Judgment Fund when payment is not otherwise provided for." <u>Thompson</u>, 334 F.3d at 1093 (citing <u>Lee</u>, 129 F.3d at 1484).

Defendants argue that payment of past year indirect CSC to the plaintiffs would "reward these two [p]laintiffs to the detriment of all other contracting tribes[,]" and thus is not permissible under the District of Columbia Circuit's decision in <u>Ramah Navajo Sch. Bd. v. Babbitt</u>, 87 F.3d 1338 (D.C. Cir. 1996). Defs.' Reply at 16. <u>Ramah</u> does not, as defendants contend, require a different result. The Circuit Court in <u>Ramah</u> held that the "Secretary exceeded the limited scope of his authority in promulgating . . . new allocation rules[,]" that provided that any tribe that submitted its fiscal year 1995 proposal for indirect costs beyond June 30, 1995, would not be eligible for full funding, but instead would receive 50% of the funding received for fiscal year 1994. <u>Ramah</u>, 87 F.3d at 1349. The court concluded that the Secretary exceeded his authority because "the ISDA does <u>not</u> commit the allocation of insufficient CSF to the Secretary's discretion . . . . [and the] Secretary's decision to institute the 50% penalty exceeded his

21

limited authority and violated the ISDA." Id. at 1352.

Ramah does not mandate dismissal of plaintiffs' claims for several reasons. First, it has not been established at this juncture whether or not the appropriated funds have been depleted.  For example, the defendants have not submitted affidavits or other evidence which shows that the funds the tribes claim they were legally entitled to receive have been completely dispensed.  Cf. City of Houston, 24 F.3d at 1427 (Agency had provided an affidavit to the court stating that "more than six months before Houston filed its [c]omplaint  -- the agency 'contractually obligated its entire [fiscal year] 1986 CDBG entitlement appropriation from Congress . . . .'") (citation omitted).  Second, whether or not recovery from the Judgment Fund would result in decreased funding to other tribes is an issue that would need further briefing and is perhaps more appropriate for resolution by summary judgment or trial.  The Court is unwilling to dismiss plaintiffs' claims based on the defendants' unsubstantiated and conclusory allegation, when at least one court has recently held that such recovery from the Judgment Fund is permissible.  See Thompson, 334 F.3d at 1093 (noting that the Secretary failed to clarify "how much of the lump-sum appropriations were obligated to programs serving other tribes for purposes of section 450j-1(b)[,]" but in any event, the evidence showed that the Secretary possessed an amount of funds "more than sufficient during the relevant fiscal years . . . to pay full contract support costs to the tribe, and the Secretary would not, therefore, have been forced to reduce funding for programs serving other tribes in order to meet his obligations."); see also 25 U.S.C. § 450*l*(c)(9) (Model Agreement) ("Notwithstanding any other provision of law, any funds provided under this Contract -- (A) shall remain available until expended[.]").  Therefore, the Court

concludes that plaintiffs' claims for indirect CSC for fiscal years in which there were lump-sum payments (fiscal years 1995-1997) are not moot.

The Court acknowledges that the Ninth and Tenth Circuits have reached results contrary to the one reached in Thompson.  See Cherokee Nation of Oklahoma v. Thompson, 311 F.3d 1054, 1066 (10th Cir. 2002) and Shoshone-Bannock Tribes of the Fort Hall Reservation v. Dep't of Health & Human Services, 279 F.3d 660, 668 (9th Cir. 2002).  However, the Court first notes that both cases were decided on motions for summary judgment, not at the motion to dismiss stage, and not on mootness grounds. Notably, in Cherokee Nation, the Tenth Circuit indicated that the district court's grant of summary judgment was "[b]ased on the materials before it at the summary judgment stage," which included declarations from the pertinent government officials "stat[ing] that all of the money appropriated for fiscal years 1996 and 1997 was in fact spent, leaving a zero balance at the end of the year."  Cherokee Nation, 311 F.3d at 1062. Declarations of this nature have not been submitted to the Court.  Furthermore, the issue of payment from the Judgment Fund was not raised in either the Ninth or Tenth Circuit cases.  Therefore, while these cases may ultimately serve as a basis for precluding the tribes' recovery on the merits of their claims, they do not warrant the dismissal of the tribes' claims at this stage of the proceedings.

Although plaintiffs are on less secure footing as to their second claim relating to capped years (their claims related to fiscal years 1998 through 2001), again, based on the record currently before it, the Court will not dismiss these claims.  Pursuant to 25 U.S.C. § 450j-1(b):

Notwithstanding any other provision in this subchapter, the provision of

23

funds under this subchapter is subject to the availability of appropriations and the Secretary is not required to reduce funding for programs, projects or activities serving a tribe to make funds available to another tribe or tribal organization under this subchapter.

This provision was enacted by Congress "not to excuse the Secretary's obligation to follow the mandates of the statute, but rather to make it evident that the Secretary is not required to distribute money if Congress does not allocate that money to him under the Act." Ramah, 87 F.3d at 1345. Unlike lump sum years, where money is not designated for indirect versus direct CSC, in capped years, there is a provision providing that payment of indirect CSC is not to exceed a certain amount. 25 U.S.C. § 450j-1.As plaintiffs correctly point out, "[t]he effect of these caps was to limit the amount the Secretary has paid to each contractor based on a pro rata apportionment of the appropriated 'not to exceed' amount." Compl. ¶ 40. This pro rata apportionment is exactly the type of distribution the Circuit Court held would be acceptable in Ramah. See 87 F.3d at 1348-49 ("a pro rata reduction [would] easily 'effectuate the original statutory scheme' of the ISDA, but such a plan would also comply with congressional intent behind the 1995 Appropriations Act. The legislative history of the 1995 Act indicates that Congress, aware that it had appropriated an insufficient amount for full [contract support] funding, intended for the agency to deal with the shortfall through a pro rata reduction."); Babbitt v. Oglala Sioux Tribal Public Safety Dep't, 194 F.3d 1374, 1379 (Fed. Cir. 1999) ("[W]e decline to find that Interior's pro rata allocation of the capped appropriations providing Oglala 91.74% of its indirect costs for 1995 constitutes an absurd result.") (citation omitted).

_____The court's pronouncement in Ramah is clear: in years in which Congress has

24

not appropriated sufficient funds, "if the money is not available, it need not be provided, despite a Tribe's claim that the ISDA 'entitles' it to the funds."  87 F.3d at 1345; see also Babbitt, 194 F.3d at 1378 ("[I]n the face of congressional under-funding, an agency can only spend as much money as has been appropriated for a particular program.") (citations omitted).  Capped year amounts differ from lump sum years because Congress has expressly limited the amount of funds that may be used for indirect CSC, whereas in lump sum years, the agency has more "'flexibility'" in determining how to allocate the funds.  Ramah, 87 F.3d at 1346 (citation omitted).  Despite the fact that the amount of funds that could be used for indirect CSC was "capped," plaintiffs argue that they were still entitled to the full amounts of their indirect CSC because "the United States may be liable upon an obligation, regardless whether a liquidating appropriation is made."  Pls.' Opp'n at 20.  However, as the Babbitt court made clear, the cases upon which plaintiffs rely are different because those cases "involved a situation in which the Government, as a contracting party, had simply failed to appropriate and pay its unqualified contractual obligation."  194 F.3d at 1379.  The situation here is "fundamentally" different because "the ability of the Interior to bind the Government contractually was expressly conditioned on the availability of appropriations."  Id. Section 450j-1(b) of the ISDA expressly conditions the payment of indirect CSC upon the availability of funds; in capped years, where the amount of funds that may be used for payment of such costs is established, the tribe is prevented "from asserting that it was entitled to full funding as a matter of right."  Id. at 1380 (citation omitted); Ramah, 87 F.3d at 1345 ("[I]f the money is not available, it need not be provided, despite a Tribe's claim that the ISDA 'entitles' it to the funds.").

25

However, at this stage, defendants have failed to demonstrate that these funds were completely disbursed. Although defendants suggest this fact in their motion to dismiss, see Defs.' Mem. at 26 ("Although these funds are not available as a matter of law, Defendants expect to be able to present the Court with factual support to demonstrate that all of the relevant appropriations have been obligated or otherwise are no longer available for obligation. Under City of Houston, such a showing would also render Plaintiffs' claims moot."), at this juncture, and despite the Court's inclination to dismiss these claims, it does not have the factual predicate to do so. Therefore, the Court will order limited briefing regarding the availability of funds pertaining to fiscal years 1998 through 2001, to permit the defendants to submit the requisite affidavits and other supporting evidence, and to allow plaintiffs' the opportunity to challenge the defendants' submissions. Accordingly, the Court will not dismiss plaintiffs' second claim for relief at this time.

**B.**

Mootness aside, defendants next argue that plaintiffs do not have standing to bring this action because "[p]laintiffs have not negotiated and obtained new indirect cost rates since 1996 [and] it is entirely unclear whether they have been injured by the application of the formula." Defs.' Reply at 16. Plaintiffs respond that the defendants cannot raise the defenses of standing and ripeness because these defenses were not cited in the contracting officer's decision. Pls.' Opp'n at 38. The Court can summarily reject plaintiff's position.

Standing and ripeness, like mootness, are doctrines that relate directly to the Court's subject matter jurisdiction, without which this Court has no authority to

26

adjudicate the claims raised in plaintiffs' complaint.  See Mahorner v. Bush, 224 F. Supp. 2d 48, (D.D.C. 2002) (Walton, J.) ("As a result of the Constitution's 'case or controversy requirement, the courts have developed a series of principles termed 'justiciability doctrines,' among which are standing[,] ripeness, [and] mootness . . . .'  An analysis of these 'justiciable doctrines' reveals beyond all doubt that this Court lacks subject matter jurisdiction to entertain the plaintiff's complaint because he is unable to satisfy . . . standing . . . .") (citations omitted) (alteration added); Tax Analysts v. IRS, No. Civ.A. 97-0260, 1998 WL 773651, at *3 (D.D.C. Mar. 31, 1998) ("Lack of ripeness denies the Court subject matter jurisdiction.") (citation omitted).  Because the Court has the independent obligation to assure itself that it has subject matter jurisdiction, which cannot be waived by either party, these issues are properly raised by the defendants and could have been considered by the Court sua sponte.  Akinseye v. District of Columbia, 339 F.3d 970, 971 (D.C. Cir. 2003) ("Although the District has not raised lack of jurisdiction in these proceedings, we may raise the question of subject-matter jurisdiction sua sponte. . . .  Moreover, because subject-matter jurisdiction is 'an Art. III  . . . requirement . . . no action of the parties can confer subject-matter jurisdiction upon a federal court.'") (citations omitted).  The fact that this Court may have jurisdiction over plaintiffs' claims under the ISDA does not alter this analysis.  See Ramah, 87 F.3d at 1344 n.6 ("Of course it is true that a statutory grant of jurisdiction cannot overcome a constitutional bar to judicial review (such as standing or mootness) . . . .").  Accordingly, the Court rejects the plaintiffs' argument that it cannot consider standing and ripeness as grounds for dismissing plaintiffs' claims.

Plaintiffs allege that there is evidence in the record which merits the Court finding

27

that although they did not specifically obtain a new indirect cost rate after 1996, there had been an agreement to use a prior year's rate.  Pls.' Opp'n at 38.  For example, in Tunica-Biloxi's self-determination contract effective January 1, 1996, through December 31, 1996, it states:

> The Tribe does not have an approved Indirect Cost Rate for the period beginning January 1, 1997.  The fixed carry forward rate of 57.9% (the Tribe's latest approved rate) is designated as a temporary rate.  Once the tribe receives a current approved rate from the Department of the Interior (DOI), for the period beginning January 1, 1997, this annual funding agreement will be modified accordingly.  The tribe will be reimbursed using the temporary rate of 57.9%, applied to total direct cost, and appropriate adjustment(s) for reimbursement for Indirect Cost will be made upon receipt of new Indirect Cost rate for this contract period.

Defs.' Ex. J (Notice of Self-Determination Contract Model Agreement for Tunica-Biloxi Tribe of Louisiana).

As a preliminary matter, it is clear to the Court that plaintiffs have standing to challenge the indirect CSC they received for fiscal years 1995 and 1996, because they have adequately demonstrated that they sustained injury as a result of the defendants allegedly making deficient payments to them for those years that timely claims were presented to the contracting officers.  Moreover, based on the Court's analysis above, these claims are not moot.[17]  Therefore, a finding in defendants' favor on the standing issue would not render the complaint a nullity, but rather would only preclude the plaintiffs from asserting claims for fiscal years after 1996.  In its CDA claim for fiscal years 1996 through 2000, Tunica-Biloxi relied on "an indirect cost rate of 54.78%" which it alleged was "established by agreement with the Office of Inspector General of the

---

[17]Ramah did not present claims beyond 1996; therefore, the Court's discussion beyond this point refers solely to Tunica-Biloxi.

DOI."  Defs.' Ex. B (Tunica-Biloxi CDA claim dated April 2, 2001).  Although the CDA

claim states that a copy of the applicable agreement was attached as Exhibit 1 of the

claim, no such exhibit was attached to the claim letter.  Therefore, it is unclear what

agreement was being referenced.  For this reason, the Court will order further briefing

on the limited issue of whether there was an agreement between the parties that a

certain rate would be applicable to fiscal years subsequent to 1996, in the absence of a

new agreement.  Accordingly, a ruling as to whether plaintiffs have standing to bring

claims for fiscal years after 1996 will be reserved.

**(4) Defendants' Statute of Limitations Challenge**

Defendants next raise a statute of limitations challenge.  They rely on 28 U.S.C.

§ 2401(a) to support their argument that any allegations regarding decisions made prior

to December 9, 1996, are time barred.  Defs.' Mem. at 29.  Plaintiffs contend that the

CDA contains its own statute of limitations and that they timely filed their complaint in

this Court pursuant to that limitation period.

28 U.S.C. § 2401 states that "[e]xcept as provided by the Contract Disputes Act

of 1978, every civil action commenced against the United States shall be barred unless

the complaint is filed within six years after the right of action first accrues."  (emphasis

added).  In light of this clear language excepting suits filed pursuant to the CDA,

defendants attempt to persuade the Court that although the plaintiffs' claims are

ostensibly filed pursuant to the CDA, "their primary contention is that the ISDA (and not

the individual contracts) required IHS to fund a specific amount of indirect CSC."  Defs.'

Mem. at 29 (citing Compl. ¶ 19).  If the Court construes the claims in this matter,

defendants opine that "any allegation related to IHS' funding decisions made prior to

29

December 9, 1996, would be barred by the six-year general statute of limitations applicable to claims against the federal government." Id. (citing 28 U.S.C. § 2401(a)).

This argument, while ingenious, must be rejected. The Court construes plaintiffs' complaint as challenging the amount of funds they received for indirect CSC. Their entitlement to these funds arose from the self-determination contracts at issue, and any disputes concerning these contracts are governed by the CDA, because the ISDA states that "[t]he Contract Disputes Act ... shall apply to self-determination contracts . . . ." 25 U.S.C. § 450m-1(d). The CDA expressly states that a claim "shall be filed within twelve months from the date of the receipt by the contractor of the decision of a contracting officer concerning the claim[ ] . . . ." 41 U.S.C. § 609(a)(3). Tunica-Biloxi's decision letter was issued by the contracting officer on May 3, 2002. See Defs. Ex. D. Ramah's decision letter was dated December 18, 2001. See id. Ex. F. The original complaint in this case was then filed on December 9, 2002. Thus, the Court having concluded that plaintiffs' claims all arise under the CDA, they were therefore filed timely since the original complaint was filed within twelve months after the decision letters were issued by the contracting officers.

**(6) Dismissal of the Named Defendants**

"It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." United States v. Mitchell, 463 U.S. 206, 212 (1983) (footnote omitted). Defendants posit that the ISDA contains only a limited waiver of sovereign immunity, which provides that

> [t]he United States district courts shall have original jurisdiction over any
> civil action or claim against the appropriate Secretary arising under this
> subchapter and . . . over any civil action or claim against the Secretary for

30

money damages arising under contracts authorized by this subchapter.

25 U.S.C. § 450m-1(a) (emphasis added).  Defendants argue that pursuant to this

limited waiver of immunity the only proper defendants in this action are the Secretaries,

as the ISDA's definition of the term "'Secretary', unless otherwise designated, means

either the Secretary of Health and Human Services or the Secretary of the Interior or

both[.]"  25 U.S.C. § 450b(i).

In opposition, plaintiffs argue when the Secretary executed the contracts at

issue, he "act[ed] as agent for the United States."  Pls.' Opp'n at 11 (citations omitted).

Plaintiffs contend that because "the CDA is expressly mentioned in §450m-1, it follows

that the use of the word 'Secretary' in that same subsection was intended to mean the

United States.  Any other conclusion would do damage to the express agency created

in 25 U.S.C. §450l(c), Model Agreement §1(a)(1)."  Id.  The Model Agreement, which is

incorporated into each self-determination contract that arises under the ISDA pursuant

to 25 U.S.C. § 450l(a)(1), states, in pertinent part: "This agreement, denoted a Self-

Determination Contract . . . entered into by the Secretary of the Interior or the Secretary

of Health and Human Services . . . for and on behalf of the United States . . . ."

Plaintiffs even go as far as to state that "[n]o court has held . . . ." that the United States

is not a proper party under the ISDA because the statute incorporates the provisions of

the CDA.  Pls.' Opp'n at 11.  However neither party has presented, nor has the Court

been able to discover, any cases that precisely hold that the United States has waived

its sovereign immunity in the ISDA.

Plaintiffs note that "[e]very action against [a] United States official is treated as

an action against the United States for purposes of the Tucker Act[,]"[18] and if plaintiffs

had filed this lawsuit in the Court of Federal Claims, an option available to it under the

CDA, the caption of such an action "would automatically have been "XYZ Plaintiff v.

United States, Defendant." Pls.' Opp'n at 11. Plaintiffs are correct that the Tucker Act

waives the sovereign immunity of the United States and provides jurisdiction <u>in the

Court of Federal Claims</u> for claims against the United States "founded either upon the

Constitution, or any Act of Congress or any regulation of an executive department, or

upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1).

However, plaintiffs fail to explain how the Tucker Act, which gives jurisdiction to the

Court of Claims, is applicable to this Court. The United States Court of Federal Claims

has itself recognized that "[t]he Tucker Act merely confers jurisdiction on the United

States Court of Federal Claims; it does not create a substantive right that is enforceable

against the United States for money damages." <u>Carlow v. United States</u>, 40 Fed. Cl.

773, 778 (Fed. Cl. 1998) (citing <u>United States v. Mitchell</u>, 445 U.S. 535, 538 (1980)).

Accordingly, because "a waiver of the traditional sovereign immunity 'cannot be implied

but must be unequivocally expressed[,]" . . . [t]he [plaintiffs] . . . must look beyond the

jurisdictional statute for a waiver of sovereign immunity." <u>Id.</u> at 779 (citations omitted);

<u>see also</u> <u>Demontiney v. United States</u>, 255 F.3d 801, 806 (9th Cir. 2001) ("[T]he

Contract Disputes Act, in conjunction with the Tucker Act . . . do not waive federal

sovereign immunity for <u>district court jurisdiction</u> here. Instead, the statues grant the

---

[18]The Tucker Act vests jurisdiction in the Court of Federal Claims for suits against the United States "founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1).

Court of Federal Claims jurisdiction to adjudicate any contract claims [the plaintiff] may have against the United States.") (emphasis added); <u>Mustard v. Forsgren</u>, No. Civ.A. 84-560, 1985 WL 1824, at *2 (N.D. Ind. May 10, 1985) (holding that although 28 U.S.C. § 1331 provided jurisdiction for the plaintiff's claim, the statute could "not be cited as a waiver of sovereign immunity.").[19]

Nonetheless, the Court finds that the United States has waived sovereign immunity in the ISDA in the context of the matters before the Court.  "A waiver of federal sovereign immunity can be found in one of two places: in the specific statute governing a governmental entity, or in one of the broad waivers of immunity made by Congress for certain classes of federal agencies.  The Tucker Act  . . . and the Contract Disputes Act . . . are examples of the latter type of waiver."  <u>Research Triangle Inst. v. Bd. of Governors of the Federal Reserve System</u>, 132 F.3d 985, 988 (4th Cir. 1997) (footnotes omitted).  At least one court has stated, in <u>dicta</u>, that the ISDA provides a waiver of federal sovereign immunity pertaining to self-determination contracts.  <u>See Demontiney</u>, 255 F.3d at 806 ("In 1988, Congress amended the [ISDA] to waive federal sovereign immunity in federal district court for certain contract claims.").  In <u>Demontiney</u>, the court stated that "[t]he [ISDA's] waiver of federal sovereign immunity is limited to 'self-determination contracts' entered into by Indian tribes or tribal organizations and the

_____

[19]Although having concluded that the statute's jurisdictional grant is not dispositive of the immunity waiver issue, the plaintiffs' reliance on the Tucker Act is also unavailing because the language in that Act differs from jurisdictional grant found in the ISDA.  The Supreme Court, in analyzing the waiver of sovereign immunity in the Tucker Act, concluded that "[t]he existence of a waiver is readily apparent in claims founded upon 'any express or implied contract with the United States.'"  <u>Mitchell</u>, 463 U.S. at 215 (quoting 28 U.S.C. § 1491).  Indeed, the Tucker Act's jurisdictional grant explicitly states that "[t]he United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States . . . ."  28 U.S.C. § 1491(a)(1).

government."  Id. at 805.  The Demontiney court held that because the plaintiff could

not "establish that he [or his corporation was] a tribe or tribal organization, he could not

have entered into a self-determination contract with the [Bureau of Indian Affairs]."  Id.

Accordingly, because the plaintiff was

> not a party to a self-determination contract, he [could] not take advantage
> of the [ISDA's] waiver of federal sovereign immunity for claims in district
> court.  Although § 450m-1 waives sovereign immunity in district court for
> contract actions pertaining to disputes arising from self-determination
> contracts, nothing therein provides support for [the plaintiff's] argument
> that a sovereign immunity waiver permits his claims against the United
> States in district court.

Id. at 808 (footnote omitted).  Further support for the conclusion that the United States

has waived its sovereign immunity as it pertains to self-determination contracts is found

in Supreme Court precedent.  For example, the Supreme Court has stated that

"government liability in contract is viewed as perhaps 'the widest and most unequivocal

waiver of federal immunity from suit.'"  Mitchell, 463 U.S. at 215 (citation omitted).

Thus, although the Tucker Act 'does not create any substantive right enforceable

against the United States for money damages[,]'" id. at 216 (citations omitted), the

Court has stated that

> a court must inquire whether the source of substantive law can fairly be
> interpreted as mandating compensation by the Federal Government for
> the damages sustained.  In undertaking this inquiry, a court need not find
> a separate waiver of sovereign immunity in the substantive provision, just
> as a court need not find consent to suit in 'any express or implied contract
> with the United States.'

Id. at 218 (citation omitted) (emphasis added).

The Court of Federal Claims has held that where the funds a party seeks to

recover would not be acquired from appropriated public funds, the court lacked

34

jurisdiction over the plaintiff's contract claims, even though the contract at issue was subject to the Contract Disputes Act.  Furrash & Co. v. United States, 46 Fed. Cl. 518 (2000).  There, the plaintiff had "entered into a professional services contract with the Federal Housing Finance Board . . . . to provide consulting services . . . ." Id. at 519. After the plaintiff filed its complaint in the Court of Federal Claims, the defendant moved for dismissal of the complaint arguing that the court did not have "jurisdiction over claims arising out of the contract activities of the Finance Board." Id. at 520.  The court agreed, holding "that the court's Tucker Act jurisdiction may not be invoked with respect to transactions that 'involved agencies where the statutory authority for the activities [in the lawsuit] specifically limited liability or expenditures to non-appropriated funds.'" Id. (citation omitted).  Because the Finance Board's expenses were privately funded, the court concluded

> that, in the absence of an affirmative commitment of appropriated funds by Congress . . . Congress has made clear its intent for the Board to be self-sustaining.  The relief to which plaintiff is entitled, if any, must come from funds raised by the Finance Board, and not from the public treasury.

Id. at 526.

In this case, there are several factors that support plaintiffs' position that the United States' sovereign immunity to suit has been waived by the ISDA.

First, any recovery by plaintiffs from the Judgment Fund would necessarily be paid from public funds.  See 31 U.S.C. § 1304(a) ("Necessary amounts are appropriated to pay final judgments . . . .").  Second, the ISDA confers on this Court jurisdiction at least as extensive as the Court of Claims' jurisdiction.  Specifically, the statute states, in relevant part:

> The United States district courts shall have original jurisdiction over any civil action or claim against the appropriate Secretary arising under this subchapter <u>and, subject to the provisions of subsection (d) [relating to Application of the Contract Disputes Act] of this section and concurrent with the United States Court of Claims</u>, over any civil action or claim against the Secretary for money damages arising under contracts authorized by this subchapter.

25 U.S.C. § 450m-1 (emphasis added). In light of the scope of this jurisdictional grant, and the fact that any payments plaintiffs may receive would be from appropriated public funds, the Court concludes that the United States' sovereign immunity to suit has been waived in the ISDA as to the claims before the Court in this lawsuit.[20] However, this conclusion does not mean that a finding of a waiver of sovereign immunity supports a finding that the individually named defendants are properly named as parties in the complaint. Although the parties frame the issue as a sovereign immunity issue, the Court sees the issue as whether the ISDA grants the Court jurisdiction over <u>any</u> named federal official based on the United States' waiver of sovereign immunity. The Court does not think it does. Rather, § 450,m-1's language, limiting the Court's jurisdiction to the "appropriate Secretary," would be rendered meaningless if the Court concluded that the ISDA permits claims against all the individually named officials. Furthermore, plaintiffs fail to assert why defendants Grim, Devaney, and Vigotsky, who have all been sued in their official capacities, are necessary parties to this action when clearly the Secretaries, who act as agents on behalf of the United States, are appropriately before the Court. These individually named defendants are merely agents of the Secretary

---

[20]Defendants indicate that "it does not appear that Secretary Norton[,] [has] been properly served pursuant to Federal Rule of Civil Procedure 4(i)(2)(A)." Defs.' Opp'n at 44. The Court will permit plaintiffs to file proof of service within a prescribed time. Failure to provide the requisite proof of service will result in dismissal of defendant Norton from this action.

and plaintiffs would not be entitled to any greater relief by the inclusion of these

defendants in this lawsuit.  Accordingly, the Court will grant the defendants' motion and

dismiss Grim, Devaney, and Vigotsky as parties in this case.

### (B) Lack of Standing or Alternatively, Failure to State a Claim Upon Which Relief Can be Granted as to Plaintiffs' Claims that the Secretary Breached the Duty of the Implied Covenant of Good Faith and Fair Dealing and the Duty of Trust

Finally, defendants argue that plaintiffs lack standing regarding their claim that

the Secretary had a duty to ask Congress for additional appropriations, or, alternatively,

that plaintiffs have failed to state a claim upon which relief can be granted "because

they can point to no statute that created a trust relationship requiring the Secretary, on

behalf of [p]laintiffs, to ask Congress for additional appropriations for indirect CSC."

Defs. Mem. at 41.  Also encompassed in this argument is defendants' position that they

did not violate the implied covenant of good faith and fair dealing.

Without definitively ruling on the issue, it would appear that defendants'

alternative theory – the non-existence of a statute creating a duty of trust between the

government and the plaintiffs – is not well founded.  The ISDA expressly acknowledges

"the Federal government's historical and special legal relationship with, and resulting

responsibilities to, American Indian people[ ] . . . . "  25 U.S.C. § 450(a)(1).  These

words of the statute at a minimum imply the existence of a trust relationship between

the United States and Indian people in those areas covered by the statute.  Cf. Mitchell,

463 U.S. at 225 ("'[W]here the Federal Government takes on or has control or

supervision over tribal monies or properties, the fiduciary relationship normally exists

with respect to such monies or properties . . . even though nothing is said expressly in

37

the authorizing or underlying statute . . . about a trust fund, or a trust of fiduciary connection.'") (citation omitted). Furthermore, the Model Agreement, which is incorporated into every self-determination contract, expressly provides that "[t]he United States reaffirms the trust responsibility of the United States to the _____ Indian tribe(s) to protect and conserve the trust resources of the Indian tribe(s) and the trust resources of individual Indians." 25 U.S.C. § 450(l)(c)(d)(1)(A). In addition, because of the federal government's continual recognition of a special trust relationship with Indian tribes, the defendants' claim of the absence of a trust relationship is unsupported by the history of the government's interaction with Indian tribes. Cf. Mitchell, 463 U.S. at 225 ("This Court has previously emphasized 'the distinctive obligation of trust incumbent upon the Government in its dealings with these dependent and sometimes exploited people.'") (quoting Seminole Nation v. United States, 316 U.S. 286, 296 (1942)).

As to plaintiffs' claim for breach of the implied covenant of good faith and fair dealing, however, even if the Court were to conclude that a fiduciary relationship between the parties exists, and that a covenant of good faith and fair dealing can be implied, these recognitions do not necessarily translate into a duty on the part of the Secretary to request additional appropriations from Congress. The text of the ISDA makes clear that Congress did not intend to obligate the Secretary to distribute funds that had not been allocated to him under the Act. See 25 U.S.C. § 450j-1(b); Ramah, 87 F.3d at 1345 ("Congress clearly included [the proviso of 25 U.S.C. § 450j-1(b)] not to excuse the Secretary's obligation to follow the mandates of the statute, but rather to make evident that the Secretary is not required to distribute money if Congress does not allocate that money to him under the Act."). Language by the court in Ramah

38

indicates that the fiduciary relationship the government has with Indian tribes does not

require the Secretary to request additional appropriations where Congress is aware that

it has provided insufficient funds under the statute.

> Perhaps an analogy helps.  Suppose a school regulation states that the
> principal must distribute one textbook per course to each student enrolled
> at the school, but also states that the provision of books under this
> regulation is 'subject to the availability of supplies.'  Furthermore, the
> regulation notes that the principal is not required to take books from one
> student to make them available to other students. . . . Our view . . . is that
> this regulation requires the principal to follow the general formula of the
> regulation (one book per student per course) as closely as possible, given
> the restraint of the shortfall.  The subject-to-availability language means
> that the principal need not go to the Salvation Army in search of extra
> books, and the last sentence means that she need not require the son of
> a math teacher to bring his extra math books from home to meet the
> needs of his classmates.

Ramah, 87 F.3d at 1346.  This analogy by the Circuit Court, although not a direct

pronouncement that the Secretary is not required to request additional appropriations

from Congress, nonetheless, supports this conclusion.

In addition, the Court agrees with defendants' assertion that plaintiffs' position

raises an issue of redressability.  In other words, defendants opine that because

"Congress is under no obligation to appropriate any additional funds [,any] injury

[claimed by plaintiffs] would not be redressed by an order requiring the Secretary (or the

President) to ask Congress for [additional] funding."  Defs.' Mem. at 40.  The Court

agrees.  While plaintiffs may have suffered injury resulting from their inability to recoup

the costs of administering their health service programs due to insufficient funding,

requiring the Secretary to ask Congress for more funds would not redress the plaintiffs'

injuries.  See US Ecology, Inc. v. United States Dep't of the Interior, 231 F.3d 20, 25

(D.C. Cir. 2000) (when redressability is dependent on the actions of a third party, it is

the plaintiff's burden to "'adduce facts showing that those choices have been or will be made in such manner as to . . . permit redressability of injury.'") (quoting <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 562 (1992)).  This reality, coupled with the Circuit Court's rejection of the notion that the Secretary has an independent duty to request additional funds from Congress, requires dismissal of these claims.

Plaintiffs nonetheless argue that the United States may be held liable for its contractual obligations regardless of whether or not they receive adequate appropriations from Congress.  While this proposition at first blush may seem attractive, it has been expressly rejected by the District of Columbia Circuit, as well as the Ninth and Tenth Circuits.  <u>See</u> <u>Ramah</u>, 87 F.3d at 1345 ("Congress clearly included [the proviso of 25 U.S.C. § 450j-1(b)] not to excuse the Secretary's obligation to follow the mandates of the statute, but rather to make evident that the Secretary is not required to distribute money if Congress does not allocate that money to him under the Act."); <u>Cherokee Nation of Oklahoma</u>, 311 F.3d at 1063 ("In sum, we agree with the district court that funding for the Tribes' ongoing CSCs was subject to the availability of appropriations from Congress . . . ."); <u>Shoshone-Bannock Tribes</u>, 279 F.3d at 665 ("Congress has plainly excluded the possibility of construing the contract support costs provision as an entitlement that exists independently of whether Congress appropriates money to cover it.").  Accordingly, plaintiffs' claim that the Secretary has breached the implied covenant of good faith and fair dealing and their third claim for relief based on the Secretary's alleged breach of trust, must be dismissed.

### III. Conclusion

For the reasons set forth above, defendants' motion to dismiss plaintiffs' second

40

amended class action complaint is granted in part and denied in part.

**SO ORDERED** on this 9th day of December, 2003.[21]

REGGIE B. WALTON
United States District Judge

---

[21]An Order consistent with the Court's ruling accompanies this Memorandum Opinion.

41