# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **COUNCIL OF ATHABASCAN** | ) | |
| **TRIBAL GOVERNMENTS**, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-1270 (RWR) |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| **MICHAEL O. LEAVITT**, Secretary of the | ) | |
| Department of Health & Human Services; and | ) | |
| **ROBERT G. McSWAIN**, Acting Director, | ) | |
| Indian Health Service; | ) | |
| | ) | |
| DEFENDANTS. | ) | |
| | ) | |

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT**

**Table of Contents**

INTRODUCTION ..................................................................................................1

I.      Statement of Facts................................................................................2

        A..     The ISDEAA and the Importance of Full CSC .............................2

        B.      The Payment Process Under an ISDEAA Contract. ......................5

        C       The IHS Shortfall Reports Document Unpaid CSC ....................7

        D.      *Cherokee Nation v. Leavitt* ........................................................8

II.     Standard of Review................................................................................9

III.    Rules of Construction ..........................................................................10

IV.     Argument ............................................................................................11

        A.      Defendants Failed to Pay CATG's Full Indirect Cost Need as
                Promised in the ISDEAA and the Contract ..............................11

                1.      *Defendants Promised to Pay in Accordance with
                        Section 106 of the ISDEAA* .........................................12

                2.      *Section 106 Requires Full Payment of Indirect Costs
                        From Available Appropriations*....................................12

                3.      *Defendants Were Bound to, and Did in Fact, Determine
                        CATG's Indirect Cost Requirement by the Rate-Times-Base
                        Method* .......................................................................15

        B.      CATG Did Not—and Could Not—Waive its Statutory and
                Contractual Right to Full Indirect Costs..................................17

                1.      *CATG Did Not Waive Its Claim to Full Indirect Costs
                        Because CATG Had No Way to Know the Amount Paid
                        Until the End of the Contract Year* ..............................17

                2.      *The Text of the ISDEAA Precludes Tribal Waiver of
                        Statutory Rights*..........................................................18

                3.      *Tribal Waiver Would Subvert the Purpose and Policies
                        of the ISDEAA, and Is Thus Precluded*.........................20

        *4.*    *This Court Should Follow the* Seldovia *Case, in which*
              *The IBCA Rejected the IHS's "Waiver" Argument* ........................24

  C.     CATG's Claims Are Not Barred by Laches ...............................................25

        *1.*    *CATG's Delay in Bringing Its Claims Was Reasonable*
              *Given the CSC Class Action* .........................................................25

        *2.*    *The IHS Was Not Prejudiced by CATG's Delay in*
              *Filing Its Claims* ...........................................................................26

CONCLUSION...........................................................................................................28

## Table of Authorities

<u>**Cases**</u>

*Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.*, 988 F.2d 1157
(Fed. Cir. 1993)................................................................................................25

*Aleutian Constructors v. United States*, 24 Cl. Ct. 372 (1991)...........................18

*American Airlines, Inc. v. Austin*, 75 F.3d 1535 (Fed. Cir. 1996) .....................18

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ......................................10

*Appeal of White & McNeil Excavating, Inc.*, No. 2488, 93-1 B.C.A. (CCH)
WL 181690 (1992)............................................................................................10

*Appeals of Cherokee Nation*, 99-2 BCA P 30462 (I.B.C.A. 1999), 1999 WL 440045 .....22

*Appeals of Seldovia Village Tribe*, IBCA 3862-3863/97 (October 20, 2003).............14, 24

*Assurance Co. v. United States*, 813 F.2d 1202 (Fed. Cir. 1987)......................10

*Bell Atlantic Corp. v. Twombly*, 550 U.S. __, 125 S. Ct. 1955 (2007) ...............9

*Brever v. Rockwell Int'l Corp.*, 40 F.3d 1119 (10th Cir. 1994)............................9

*Brooklyn Sav. Bank v. O'Neill*, 324 U.S. 697 (1945).........................................20

*Burnside-Ott Aviation Training Center v. Dalton*, 107 F.3d 854
(Fed. Cir. 1997).........................................................................................19, 20, 22

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .................................................10

*C.I.T. Corp. v. Carl*, 85 F.2d 809 (D.C. Cir. 1936) ..........................................18

*Carter v. Exxon Co.*, 177 F.3d 197 (3d Cir. 1999) ...........................................20

*Cherokee Nation v. Leavitt*, 543 U.S. 631 (2005).................................1, 6, 12, 23

*Choctaw Nation of Indians v. United States*, 318 U.S. 423 (1943) ...................11

*Christianson v. Harris County*, 529 U.S. 576 (2000) ........................................19

*Coalition for Underground Expansion v. Mineta*, 333 F.3d 193 (D.C. Cir. 2003) .............9

*Cornetta v. United States*, 851 F.2d 1372 (Fed. Cir. 1988) .....................25, 27, 28

*Costello v. United States*, 365 U.S. 265 (1961) .................................................................25

*Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345 (1983) ...........................................26

*CW Gov't Travel, Inc. v. United States*, 61 Fed. Cl. 559 (Fed. Cl. 2004) ..........................25

*Do-Well Mach. Shop, Inc. v. United States*, 870 F.2d 637 (Fed. Cir. 1989).......................22

*E. Walters & Co. v. United States*, 576 F.2d 362 (Cl. Ct. 1978) ........................................18

*Empagren S.A. v. F. Hoffman-LaRoche, Ltd.*, 315 F.3d 338 (D.C. Cir. 2003)....................9

*Gardner v. Panama R.R. Co.*, 342 U.S. 29 (1951) .................................................25, 26, 28

*Haghighi v. Russian American Broadcasting Co.*, 173 F.3d 1086 (8th Cir. 1999) ............20

*Hermes Consol., Inc. v. United States*, 58 Fed. Cl. 409 (2003) ....................................18,21

*Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167 (2005) .................................................9

*K.P. Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111 (2004).........19

*McCann v. Newman Irrevocable Trust*, 458 F.3d 281 (3d Cir. 2006)..................................9

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614 (1985) ............18

*Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759 (1985)............................................10

*Norfolk & Western Ry. Co. v. American Train Dispatchers Ass'n*, 499 U.S. 117 (1991) .12

*Oelberman v. Toyo Kisen Kabushiki Kaisha*, 3 F.2d 5 (9th Cir. 1925)..............................18

*Pueblo of Zuni v. United States*, 467 F. Supp.2d 1114 (D.N.M. 2006) ..............................14

*Pueblo of Zuni v. United States*, No. CV 01-1046 (D.N.M.)..............................................26

*Ramah Navajo Chapter v. Lujan*, 112 F.3d 1455 (10th Cir. 1997) ...................................23

*Reservation Ranch v. United States*, 39 Fed. Cl. 696 (1997)........................................18.22

*Samish Indian Nation v. United States*, 419 F.3d 1355 (Fed. Cir. 2005) ...................13, 23

*Scheuer v. Rhodes*, 416 U.S. 232 (1974) .........................................................................9

*Seaboard Lumber Co. v. United States*, 903 F.2d 1560 (Fed. Cir. 1990).........................18

*Stampco Construction Co. v. Guffey*, 572 N.E.2d 510 (Ind. Ct. App. 1st Dist. 1991) .......20

*Stone Container v. United States*, 229 F.3d 1345 (Fed. Cir. 2000) ...................................26

*Test Masters Educ. Servs. v. Singh*, 428 F.3d 559 (5th Cir. 2005) ......................................9

*Tompkins v. United Healthcare*, 203 F.3d 90 (1st Cir. 2000).............................................20

*Thompson v. Cherokee Nation of Oklahoma*, 334 F.3d 1075
(Fed. Cir. 2003)...................................................................................................1, 8, 12

*Thompson v. Seldovia Village Tribe*, No. 04-1230 (Fed. Cir. March 2004).....................24

*Tunica-Biloxi Tribe of Louisiana v. United States*, No. 02-2413 (Dec. 9, 2003) ........16, 17

*United Tribe of Shawnee Indians v. United States*, 253 F.3d 543 (10th Cir. 2001) .............9

*United Van Lines, Inc. v. United States*, 448 F.2d 1190 (D.C. Cir. 1971).........................12

*Whittaker Electronic Systems v. Dalton*, 124 F.3d 1443 (Fed. Cir. 1997)..................18, 21

## Statutes

25 U.S.C. § 450(a)(1)...................................................................................................2

25 U.S.C. § 450a(b) ...............................................................................................21, 22

25 U.S.C. § 450b(g) ....................................................................................................6

25 U.S.C. § 450b(j)......................................................................................................13

25 U.S.C. § 450j-1 .....................................................................................................1, 3

25 U.S.C. § 450j-1(b)...................................................................................................7

25, U.S.C. § j-1(a)(1) ..................................................................................................3

25 U.S.C. § 450j-1(a)(2), (3)........................................................................................4

25 U.S.C. § 450j-1(c)................................................................................................7, 15

25 U.S.C. § 450j-1(c)(2) ..............................................................................................7

25 U.S.C. § 450j-1(c)(3)–(5).........................................................................................6

25 U.S.C. § 450j-1(g)...............................................................................................4, 12

25 U.S.C. § 450k(e) ..............................................................................................19, 20

25 U.S.C. § 450*l*(c), ...........................................................................................10, 23

25 U.S.C. § 450n ........................................................................................................13

25 U.S.C. § 458aaa-11(b)(2) ....................................................................................19

25 U.S.C. § 458aaa-16(e) .........................................................................................19

31 U.S.C. § 7501 .........................................................................................................3

41 U.S.C. § 605(a) and (b) ...................................................................................10, 25

## Regulations

25 C.F.R. Part 900, Subpart K ..................................................................................19

## Other

15 Corbin on Contracts § 88.7 (rev. ed. 2003)..........................................................21

Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment,
*Tunica-Biloxi Tribe of Louisiana v. United States*, Case No. 1:02CV02413
(D.D.C.) (Dec. 21, 2006) ...........................................................................................16

Federal Acquisition Streamlining Act, Pub. L. No. 103-355 § 2351,
108 Stat. 3243 (Oct. 13, 1994)..................................................................................25

Federal Rules of Civil Procedure
    8..................................................................................................................9
    8(c)............................................................................................................25
    12(b)(1) .....................................................................................................9
    12(b)(6) .....................................................................................................9
    23..............................................................................................................26

Indian Self-Determination Amendments of 1987, Pub. L. No. 100-472, § 205
(Oct. 5, 1988) ..............................................................................................................4

S. Rep. No. 100-274, 1987 U.S.C.C.A.N. 2620, 2627 (Dec. 21, 1987) ...............3, 4, 6, 22

S. Rep. 103-374 (Sept. 26, 1994)...............................................................................11

WILLISTON ON CONTRACTS (4th ed. 2000) § 39:22 ....................................................12, 18

## INTRODUCTION

Relying on the ruling of the Supreme Court in *Cherokee Nation v. Leavitt*, 543 U.S. 631 (2005) interpreting the Indian Self Determination and Education Assistance Act, 25 U.S.C. §450 *et seq.*, ("ISDEAA"), the Council of Athabascan Tribal Governments ("Tribe" or "CATG") is seeking to enforce the Tribe's contract with the Indian Health Service ("IHS"). Section 106 of the Act "require[s] that the Secretary provide funds for the full administrative costs to the tribes." *Thompson v. Cherokee Nation of Oklahoma*, 334 F.3d 1075, 1081 (Fed. Cir. 2003) ("*Thompson*"), *aff'd Cherokee Nation v. Leavitt*, 543 U.S. 631 (2005) ("*Cherokee Nation*"). The Supreme Court agreed that federal agencies owe the duty to pay full contract support. *Cherokee Nation*, 543 U.S. at 634 (citing section 106, 25 U.S.C. § 450j-1, for proposition that "[t]he [ISDEAA] specifies that the Government must pay a tribe's costs, including administrative expenses"). In other words, the Government must pay 100% of the Tribe's contract support cost ("CSC") requirement, as calculated by procedures established by statute and regulation. The IHS failed to do so and breached the contract with CATG. CATG now seeks damages for that breach.

Defendants argue in their Motion to Dismiss ("Def. MTD"), that they met the letter of the Supreme Court's holding in *Cherokee*. Their view is that *Cherokee* only required that a contract be carried out as agreed and they were required to pay what was expressly called for in the contract. As the Government tells it, since they paid 100% of what they said they would pay in contract modification documents, there was no breach.

This argument begs the question of how much the Government *should* have paid in total to comply with the contractual and statutory mandate of full payment. Critically, Defendants do not (and cannot) show that the amount actually paid equaled the amount owed under the terms of

the statute and contract.  Rather the Government relies on a series of partial payments and declares them evidence of all that was contractually owed.  This circular argument strangles itself with its own illogic and must fail.  The motion to dismiss on grounds of full performance should be denied.

Defendants suggest that CATG waived its statutory right to full indirect cost funding by "acquiesc[ing]" in the lesser amount the IHS provided.  In fact, however, CATG did not waive its right, and indeed could not waive by contract any rights that are guaranteed by the ISDEAA, which was enacted for the benefit and protection of Indian tribes and tribal organizations in contracting with the Government.

Defendants also argue that CATG's claims should be barred by laches but fail to meet the burden of proof.  Defendants make only vague allegations of prejudice and fail to acknowledge that these CSC claims were commonly known and understood by the Government since they were being litigated in courts and before administrative boards.  Indeed, CATG's delay in bringing the claims was reasonable in light of the CSC class actions pending throughout most of the period, and involving claims identical to CATG's.[1]

## I.  STATEMENT OF FACTS

A.  The ISDEAA and the Importance of Full CSC

The ISDEAA was enacted in 1975 to redress "the prolonged Federal domination of Indian service programs" by allowing tribes to exercise increased control over those programs.  25 U.S.C. § 450(a)(1).  The mechanism for doing so relevant to this action is the self-determination contract under Title I of the ISDEAA.  In FY 1995, CATG carried out a Title I

---

[1]  The Defendants argue that CATG failed to present a separate claim for misuse of carry-forward.  Def. MTD at 15-16.  The complaint makes two assertions of damages from the miscalculation claim—a rate miscalculation and an improper use of carry-forward.  See Complaint, ¶¶ 21-28.  While CATG disagrees that the carry-forward error is a separate claim, as argued by the Defendants, CATG concedes that this component of damages cannot be supported by the administrative record and need not be further considered by the Court.

contract to operate the Yukon Flats Health Center and provide a variety of health care programs and services for eligible individuals within the service area. *See* Administrative Record ("A.R.") at 18-25 (describing scope of work in 1995 contract).

To enable CATG to provide these services, the ISDEAA requires that the contract include two types of funding. First, the Tribe is entitled to funding in an amount "not less than the appropriate Secretary would have otherwise provided for the operation of the program or portions thereof for the period covered by the contract...." 25 U.S.C. § 450j-1(a)(1). This amount, often referred to as the "Secretarial" or "program" amount, does not reflect the full cost of carrying out programs in the contract. Therefore Congress provided for a second type of funding, CSC, to cover costs for administrative activities necessary to support the program. These costs are not reflected in the Secretarial amount since they are performed by other federal agencies, for example the Office of Personnel Management, the General Services Administration, the General Accountability Office, and the Department's Office of General Counsel. CATG also incurs costs to carry out ISDEAA contracts that the Secretary does not incur when he carries out the activities directly, such as obtaining insurance and completing annual audits under the Single Agency Audit Act, 31 U.S.C. § 7501 *et seq.*

When the ISDEAA was first enacted, Tribes were compelled either to divert federal program funds to cover these additional administrative costs, thus reducing services, or to expend tribal funds, in effect subsidizing the federal program. Congress recognized this dilemma twenty years ago when it found that:

> [T]he single most serious problem with implementation of the Indian self-determination policy has been the failure of the Bureau of Indian Affairs and the Indian Health Service to provide funding for the indirect costs associated with self-determination contracts.

S. Rep. No. 100-274, at 8 (1987).

Responding to "the overwhelming administrative problems caused by indirect cost

shortfalls," *id*. at 12, Congress amended the ISDEAA by adding a new section 106.[2]  Section

106(a)(2) and (3) provide as follows:

> **(2)**  There shall be added to the amount required by paragraph (1) contract support costs which shall consist of an amount for the reasonable costs for activities which must be carried on by a tribal organization as a contractor to ensure compliance with the terms of the contract and prudent management, but which --
>
> **(A)**  normally are not carried on by the respective Secretary in his direct operation of the program; or
>
> **(B)**  are provided by the Secretary in support of the contracted program from resources other than those under contract.
>
> **(3)**     **(A)**  The contract support costs that are eligible costs for the purposes of receiving funding under this Act shall include the costs of reimbursing each tribal contractor for reasonable and allowable costs of-
>
> **(i)**  direct program expenses for the operation of the Federal program that is the subject of the contract, and
>
> **(ii)**  any additional administrative or other expense related to the overhead incurred by the tribal contractor in connection with the operation of the Federal program, function, service, or activity pursuant to the contract, except that such funding shall not duplicate any funding provided under section 106(a)(1).

25 U.S.C. § 450j-1(a)(2), (3).

Congress emphasized in section 106(g) that tribal contractors are to receive not just some

CSC, but their full need: "Upon approval of a self-determination contract, the Secretary shall add

to the contract the <u>full amount</u> of funds to which the contractor is entitled under section

106(a)...." *Id*. § 450j-1(g) (emphasis added).[3]

The statute could not be more clear: Tribes are entitled to be funded for 100% of the

contract support costs that they need to carry out their programs.

---

[2] Indian Self-Determination Amendments of 1987, Pub. L. No. 100-472, § 205 (Oct. 5, 1988), codified at 25 U.S.C. § 450j-1.

[3] The Senate Report emphasizes several times that these provisions are not half-way measures meant to <u>reduce</u> diversion of program and tribal funds, but to <u>eliminate</u> such diversion by mandating full funding. *E.g.*, S. Rep. No. 100-274, at 12 ("The most relevant issue is the need to fully fund indirect costs associated with self-determination contracts."); *id*. at 13 ("Full funding of tribal indirect costs associated with self-determination contracts is essential if the federal policy of Indian Self-Determination is to succeed.").

B.  <u>The Payment Process Under an ISDEAA Contract.</u>

The process by which CATG received its funding for FY 1995 is fairly typical of the

payment process for most ISDEAA contracts.  Each year CATG develops a budget and proposes

an initial contract amount based on historical and projected figures.  There is an understanding

that additional funds will be added incrementally to the contract by amendment during the year

if, for example, CATG assumes new or expanded programs, functions, services, and activities

(PFSAs), its indirect cost rate changes, or once the amount of formula funding for a particular

PFSA is determined.  In FY 1995, this is exactly how CATG's contract was handled.  CATG's

contract was amended several times over the course of the contract year to add funding and

associated responsibilities.[4]  Modifications also included partial payments of indirect cost

funding.[5]

Thus, because CATG's direct cost base could expand significantly during the course of a

contract year, and CATG's negotiated indirect cost rate could change as well, it was impossible

for CATG or the IHS to know CATG's full indirect cost need for FY 1995 at the time of signing

the initial contract on June 1, 1994, or even the FY 1995 contract modification on October 1,

1994.

Defendants point out that the initial payment of indirect costs under the contract at issue

was not determined by application of a negotiated rate to the direct cost base, but came as a

lump-sum for "indirect type costs."  Def. MTD at 11-12.  That appears to be true for the period

from June 1, 1994, when the contract first became effective, through the end of FY 1994,

September 30, 1994.  Later in FY 1995, however, Defendants did negotiate and enter an indirect

---

[4] *See, e.g.*, A.R. at 71-72 (adding $93,500 in CSC); *id.* at 73-74 (adding $66,932 in CSC on September 28, 1995); *id.* at 75-76 (adding Hospital and Clinic funds on last day of fiscal year, September 30, 1995).

[5] *See, e.g.*, A.R. at 73-74 (adding $66,932 in indirect cost funding two days before end of fiscal year, on September 28, 1995).

cost rate agreement with CATG that applied to all of FY 1995. *See* A.R. at 92-93 (rate

agreement entered June 29, 1995, with effective period beginning October 1, 1994).[6]

The indirect cost requirement is calculated under established federal procedures by

multiplying a negotiated indirect cost rate by the direct cost base.[7]  This is the Government's

standard method, the method intended by Congress when it enacted section 106, and the

principal method adopted by the IHS's own policies.[8]  The agreed-on rate for CATG was 76.8%.

*Id.*[9]  By virtue of this agreement, and its applicability to FY 1995, the IHS was required by

section 106 of the ISDEAA to pay indirect costs in the amount of the direct cost base multiplied

by .768.  The direct cost base of $567,300 multiplied by the approved indirect cost rate of 76.8%

resulted in an indirect cost requirement of $435,686.

---

[6] The Government argues that the Complaint fails to state a claim for the miscalculation claim because an indirect cost rate was not used under the contract. Def. MTD at 11. However, the record establishes that an indirect cost rate was used. The request for dismissal on this ground therefore is completely unsupported by, and indeed relies on facts contrary to, the record and should be denied. CATG sees no need to further brief this point.

[7] The direct cost base, for the purpose of calculating indirect costs, is comprised of the "Secretarial" or program amount under section 106(a)(1), less capital expenditures and pass-through funds, plus direct contract support costs. *See* A.R. at 83 (IHS CSC policy circular, ISDM 92-2, provision that direct contract support funds will be considered part of the recurring base); *id.* at 92 (providing, in FY 1995 indirect cost rate agreement, that applicable base excludes capital expenditures and subawards).

[8] *See* discussion below § IV.A.3. *See also, e.g., Cherokee Nation v. Leavitt*, 543 U.S. 631, 635 (2005) (quoting Government's brief as saying that indirect costs are "generally calculated by applying an 'indirect cost rate' to the amount of funds otherwise payable to the Tribe"); 25 U.S.C. § 450j-1(c)(3)–(5) (requiring IHS, in its CSC shortfall report to Congress, to include information on indirect cost rates, direct cost bases, and the resulting indirect cost pool amounts); *id.* § 450b(g) (defining "indirect cost rate" as "the rate arrived at through negotiation between an Indian tribe or tribal organization and the appropriate Federal agency"); S. Rep. No. 100-274, at 17-18 (explaining Congress's expectation that indirect costs be calculated in accordance with Office of Management and Budget ("OMB") Circular A-87, which uses rate-times-base method); A.R. at 85 (ISDM 92-2 provision that indirect costs for recipients with indirect cost rates "will be determined by applying the negotiated rate(s) to the direct cost base amount for this purpose").

[9] The agreement contains two rates, 36% for "on-site" and 76.8% for "off-site." As clarified in the administrative record, "all IHS contracted programs are Off-site so their [sic] only need to apply 76.8% against recoverable direct costs." A.R. at 96 (email from Michael M. Rowe to Frank E. Vaughn). *See also* A.R. at 97-104 (quarterly Financial Status Reports for FY 1995 calculating indirect costs by multiplying direct cost base by rate of 0.768); *id.* at 105 (FY 1995 shortfall report calculating CATG's "Indirect Cost Requirement" by applying rate of 76.8%).

In FY 1995, the incremental payments of additional indirect cost funding provided by contract amendments did not bring CATG up to 100% of its full requirement in that year.  The IHS made funding "available" in the amount of only $375,185, leaving a shortfall of $60,501.  The total available includes the $222,370 actually paid in FY 1995, plus the $152,815 ISD funds carried forward from the previous year that the IHS considered available for indirect costs.  These facts are established in the IHS's own CSC shortfall reports.

C.  The IHS Shortfall Reports Document Unpaid CSC.

While section 106, as enacted in the 1988 amendments, required full payment of CSC from available appropriations, the IHS continued to underpay tribal contractors considerably.  It did so based on the agency's interpretation of section 106(b), which makes funding "subject to the availability of appropriations."  25 U.S.C. § 450j-1(b).  From 1994 through 1997, the IHS maintained that the Secretary was bound by the limitations on funding for CSC that were designated as "available" funds in committee report recommendations issued in conjunction with the appropriations bills.  The IHS treated the difference in the funds allocated to CSC in the committee reports and the full funding owed under Section 106 as funding shortfalls.  Therefore, in all of those years, the IHS severely underpaid the CSC of tribal contractors, including CATG.

Section 106(c) requires that the Secretary provide Congress an annual report that includes "an accounting of any deficiency in funds needed to provide required contract support costs to all contractors for the fiscal year for which the report is being submitted."  25 U.S.C. § 450j-1(c)(2).  These "shortfall reports" were to include detailed information for each tribal contractor on direct cost bases, indirect cost rates, and indirect cost shortfalls, if any, and illustrate the IHS policy of underfunding based on its belief that it lacked funding.  *See id*. § 450j-1(c).

Like other IHS Area Offices, the Alaska Area Office, in whose region CATG is located, created shortfall reports documenting CSC underpayments to tribal contractors in its region. *See* A.R. at 105 (FY 1995 Alaska Area shortfall report). The first line of the shortfall report shows how the IHS calculated CATG's shortfall for FY 1995, consistent with the ISDEAA and the CSC circular: The IHS multiplied the direct cost base ($567,300) by the most current approved indirect cost rate (76.8%) to determine the indirect cost requirement ($435,686). The IHS then subtracted from the indirect cost requirement the funding "available," $375,185,[10] to arrive at the indirect cost shortfall of $60,501. This is the amount of the "shortfall claim" CATG presented to the contracting officer and claimed in the Complaint.[11] A.R. at 02; Complaint ¶ 31.

D. Cherokee Nation v. Leavitt

In 1997, the Cherokee Nation challenged the IHS's policy of underfunding CSC, specifically arguing that the IHS adherence to the committee reports' funding recommendations was in error. The Nation argued that the IHS was required to fully fund contracts when the agency had a lump-sum appropriation available. The Federal Circuit and the Supreme Court agreed. In *Thompson v. Cherokee Nation*, 334 F.3d 1075, 1087-88 (Fed. Cir. 2003), the court summarized the methodology used by IHS. The Court held that funds available for payment of CSC included the agency's entire unrestricted lump-sum appropriation, rejecting the Secretary's interpretation as unlawful. The Supreme Court confirmed this holding in *Cherokee Nation*, 543 U.S. at 644.

---

[10] This figure includes $222,370 actually paid in FY 1995 and $152,815 carried forward from FY 1994. *See* discussion above § I.B.

[11] The shortfall reports apply rates that are not adjusted to account for federal programs that pay little or no indirect costs, so the rates are diluted and result in exacerbated shortfalls, as CATG maintains in its "miscalculation claims." Complaint ¶¶ 21-28. The "shortfall claim" asserts that the IHS failed to pay even the lesser amount yielded by applying the diluted rate, as documented in the shortfall report and other records.

## II.  STANDARD OF REVIEW

In considering Defendants' motion to dismiss under FRCP 12(b)(6), the court must presume that all well-pleaded allegations are true, resolve all doubts and inferences in CATG's favor, and view the Complaint in the light most favorable to CATG.  *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 170-71 (2005); *Bell Atlantic Corp. v. Twombly*, 550 U.S. __, 125 S. Ct. 1955, 1965 (2007) ("*Twombly*").  The Rules "erect a powerful presumption against dismissing pleadings for failure to state a claim."  *Brever v. Rockwell Int'l Corp.*, 40 F.3d 1119, 1125 (10th Cir. 1994) (citations and internal quotation marks omitted).  Motions to dismiss are disfavored and rarely granted.  *Test Masters Educ. Servs. v. Singh*, 428 F.3d 559, 570 (5th Cir. 2005); *see also* FRCP 8 (requiring only short, plain statement showing entitlement to relief).  A claim will not be dismissed if it "nudge[s] ... across the line from conceivable to plausible." *Twombly*, 125 S. Ct. at 1974. (2007).  Once a claim is stated adequately, "it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id.* at 1969.

In considering a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure ("FRCP"), the court assumes the truth of the allegations made and views all reasonable inferences in plaintiff's favor.  *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Empagren S.A. v. F. Hoffman-LaRoche, Ltd.*, 315 F.3d 338, 343 (D.C. Cir. 2003).  The court may receive and consider extrinsic evidence.  *Coalition for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003).  The court must permit the pleader to respond with supporting evidence and, where necessary, convene an evidentiary hearing when jurisdiction depends on findings of fact.  *See McCann v. Newman Irrevocable Trust*, 458 F.3d 281, 290 (3d Cir. 2006); *United Tribe of Shawnee Indians v. United States*, 253 F.3d 543, 546 (10th Cir. 2001).

Summary judgment is appropriate when a party is unable to show a genuine issue as to a material fact on which that party will bear the burden of proof, so long as judgment against that party is appropriate as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986); *Sheinbein v. Dudas*, 465 F.3d 493, 495 (Fed. Cir. 2006). The movant bears the initial burden of "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323 (quoting Fed. R. Civ. P. 56(c)). A "material fact" is one that will "affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All doubts must be resolved against the moving party, and all justifiable inferences must be drawn in favor of the non-moving party. *Beard v. Banks*, 126 S. Ct. 2572, 2578 (2006) (citing *Anderson*, 477 U.S. at 255).

An appeal from a contracting officer's decision under the Contract Disputes Act is reviewed *de novo*. *E.g., Assurance Co. v. United States*, 813 F.2d 1202, 1206 (Fed. Cir. 1987); *Appeal of White & McNeil Excavating, Inc.*, No. 2488, 93-1 B.C.A. (CCH) ¶ 25,286 at 125,961, 1992 WL 181690 (1992) (citing 41 U.S.C. § 605(a) and (b)).

### III. RULE OF CONSTRUCTION

Statutes enacted for the benefit of Indians, such as the ISDEAA, must be liberally construed in their favor. *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985). The ISDEAA model contract mandates that "[e]ach provision of the [ISDEAA] and each provision of this Contract shall be liberally construed for the benefit of the Contractor...." 25 U.S.C. § 450*l*(c) (§ 1(a)(2) of the Model Contract). Although the contract at issue in this case is not the model contract, the interpretive principle that contractual agreements with Indians (such as treaties) be liberally construed for their benefit predates the model contract, which merely codifies that

-10-

longstanding principle. *E.g.*, *Choctaw Nation of Indians v. United States*, 318 U.S. 423, 431–32 (1943) (agreements with tribes to be liberally construed); *see also* S. Rep. 103-374 (Sept. 26, 1994) at 11 (conveying understanding that ISDEAA model contract provision requiring liberal construction of statute and contract "incorporates the longstanding canon of statutory interpretation that laws enacted for the benefit of Indians are to be liberally construed in their favor"). Therefore any ambiguities in the contract, as well as the ISDEAA, must be resolved in favor of CATG.

## IV.  ARGUMENT

### A.    Defendants Failed to Pay CATG's Full Indirect Cost Need as Promised in the ISDEAA and the Contract.

CATG's shortfall claim is straightforward: the Government made a contractual promise to pay CATG's full indirect costs as required by Section 106. Defendants also agreed to an indirect cost rate that determined what the full amount of indirect costs would be. Defendants failed to pay 100% of CATG's indirect costs in FY 1995, as determined by applying the negotiated rate to the applicable direct cost base. The contract amendments, the indirect cost rate agreement, and the IHS shortfall report confirm this to be so.

To avoid liability, Defendants argue that "the contract specified the amount of funding for indirect CSC that the government would provide." Def. MTD at 9. They point to accounting data in the several contract modification documents showing how much the IHS paid for indirect costs in that year. Def. MTD at 10 (citing figures from Accounting and Appropriations Data in contract modifications). Defendants then argue that because they paid every penny of the amount recorded as paid, they did not breach the contract. This argument confuses the contractual promise to pay in full (in accordance with section 106) with the accounting data tracking how much progress has been made toward full payment. Defendants urge this court to

focus solely on the amount they actually paid, and ignore the amount they agreed to pay under the indirect cost rate agreement that the IHS itself used to determine the amount owed. Under Defendants' circular argument, the amount owed is the amount indicated in the contract as paid, so whatever the IHS pays would be precisely what it owes. The IHS could pay CATG one dollar for indirect costs and still claim "full performance" of this breach-proof contract. This absurd result is hardly what Congress intended in the ISDEAA, and it is not what the parties' agreements say.

1.    *Defendants Promised to Pay in Accordance with Section 106 of the ISDEAA.*

Since 1988, the ISDEAA has required the Secretary to "add to the contract the full amount of funds to which the contractor is entitled under section 106(a)." 25 U.S.C. § 450j-1(g). Applicable provisions of law existing at the time of the making of a contract enter into and form a part of the contract as fully as if expressly incorporated into the contract. *Norfolk & Western Ry. Co. v. American Train Dispatchers Ass'n*, 499 U.S. 117, 130 (1991); *United Van Lines, Inc. v. United States*, 448 F.2d 1190, 1195 (D.C. Cir. 1971); 11 Williston on Contracts § 30:19 (4th ed.). Thus the contract, and the FY 1995 modification extending the contract, incorporated section 106's promise of full payment.

2.    *Section 106 Requires Full Payment of Indirect Costs from Available Appropriations.*

Section 106 "require[s] that the Secretary provide funds for the <u>full administrative costs</u> to the tribes." *Thompson v. Cherokee Nation of Oklahoma*, 334 F.3d 1075, 1081 (Fed. Cir. 2003) ("*Thompson*") (emphasis added), *aff'd Cherokee Nation*, 543 U.S. 631, 634 (2005) ("[t]he [ISDEAA] specifies that the Government must pay a tribe's costs, including administrative expenses").

Despite this clear language, Defendants argue that the ISDEAA does not require full payment, or indeed any payment.  Def. MTD at 12-14.  In Defendants' view, the ISDEAA requires only that the parties negotiate a contract, and "there is no 'independent' right under the ISD[EA]A to CSC."  *Id*. at 14.[12]  Defendants misread *Cherokee Nation* as "mandat[ing] that ISD[EA]A contracts be treated as any other procurement contract," Def. MTD at 12, but the Supreme Court said nothing of the sort.  The Court said that ISDEAA agreements are as <u>legally binding</u> as procurement contracts.  *Cherokee Nation*, 543 U.S. at 639.  The Court did not suggest that the contract could trump the requirements of Section 106 nor did the Court strike down section 4(j)[13] or in any other way imply that Defendants shed their trust responsibility to CATG.  *See* 25 U.S.C. § 450n (providing that nothing in the ISDEAA "shall be construed as ... authorizing or requiring the termination of any existing trust responsibility").

The Government's contention is that the contract negotiated was embodied in the contract modifications as they were paid.  However, this argument ignores the contract funding process such as that encountered by CATG.  As explained above, while there is an overarching agreement on the amount due under the contract, the contract is funded in installments through contract modifications which are used to generate a payment.  Each modification is not a separate contract subject to negotiation.  In this case, the indirect cost rate was not finally determined until well into the contract year so it was impossible to know until the end of the

---

[12]  In support of this proposition, which runs directly counter to the *Thompson* and *Cherokee Nation* decisions quoted above, Defendants cite *Samish Indian Nation v. United States*, 419 F.3d 1355 (Fed. Cir. 2005).  Samish is inapposite since in that case,  the Nation sought to collect funds for the contracts it could have had under the ISDEAA had the federal government not wrongly removed the Nation from its list of federally recognized tribes.  The court declined to award "damages for contract support costs never incurred, on contracts never created."  *Id*. at 1367.  In contrast, CATG in this case had a contract with Defendants in the year at issue, fully performed in accordance with the terms of that contract, and in doing so incurred a large amount of indirect costs for which CATG was not fully paid.

[13]  "[N]o contract ... entered into pursuant to Title I of this Act shall be construed to be a procurement contract."  25 U.S.C. § 450b(j).

contract year how much CSC was owed per the rate agreement.  Combined with the IHS policy

of underfunding and relying on the shortfall report to account for unpaid CSC, it was also

impossible for CATG to know the specific amount IHS would actually pay under the contract

until very near the end of the contract year.  The Government's position that the contract

expressed how much CSC would be paid is simply unsupported by the actual process of how

IHS carried out the contract.[14]

      Defendants argue that the ISDA cannot trump the contract language.  Rather they say that

the specific dollar amounts identified in the "Appropriations and Accounting Data" in the

contract amendments trump the more general full-payment requirement of section 106.  Def.

MTD at 12, 14 n.7.  But there is no conflict between the promise of full payment and the

documentation of a specific and lesser amount paid toward the total amount of funding due.  In

essence, the IHS issues a contract modification as it makes payments against the total.  These

amendments or modifications are not statements of the overall contract rights of CATG, as

embodied in Section 106.  The contract must simply be modified to increase the amount

"available," i.e., paid, to CATG.  If the IHS fails to eventually pay the total amount due under the

contract, meaning the amount arrived at through the indirect cost rate calculation, as was the case

in FY 1995, the IHS has breached the contract.  *See, e.g.*, *Appeals of Seldovia Village Tribe*,

IBCA 3862-3863/97 (October 20, 2003) (attached as Exhibit A) (holding IHS liable for failure to

amend funding agreement to reflect a higher negotiated indirect cost rate, despite IHS payment

of full amount of CSC specified in funding agreement).

---

[14] Defendants also cite *Pueblo of Zuni v. United States*, 467 F. Supp.2d 1114, 1116-17 (D.N.M. 2006) in
support of the idea that the contracts, not the ISDEAA, create an entitlement to CSC.  Def. MTD at 14.  In
that case, the court held that the Pueblo could not avoid the mandatory exhaustion requirement of the
Contract Disputes Act ("CDA") by framing its contract claims as statutory rights.  That holding is
irrelevant to this case, because CATG has exhausted its administrative remedies under the CDA and seeks
damages for the breach of statutory requirements incorporated into the contract.

3.      *Defendants Were Bound to, and Did in Fact, Determine CATG's Indirect Cost Requirement by the Rate-Times-Base Method.*

Defendants assert that the ISDEAA does not require "a specific formula" to determine the indirect costs to be paid to a tribe, suggesting that the parties could have agreed to a lump-sum or some other form of payment.  While it is clear from section 106(g) that the "full amount" of CSC must be paid, some means for determining that amount must be employed.  The calculation of indirect cost requirements for CATG, as for the vast majority of Tribes and indeed federal contractors generally, was made by applying a negotiated indirect cost rate to the direct cost base.  IHS policy since at least 1992 has been clear: for contractors with established indirect cost rates, such as CATG, the IHS was required to award indirect costs "by applying the negotiated rate(s) to the direct cost base amount for this purpose."  A.R. at 85 (Indian Self-Determination Memorandum ("ISDM") 92-2 at 6).  Moreover, the IHS was required by statute to include the base, rate, resulting need, amount paid, and shortfall (if any) in its annual shortfall report to Congress.  25 U.S.C. § 450j-1(c).  And the IHS did just that, in its FY 1995 Alaska Area shortfall report.  A.R. at 105.  After acknowledging the CSC shortfalls for years, Defendants have now adopted a post hoc litigation position that the amounts made available through the contract amendments were always necessarily exactly what was owed.  In this new construct, there never were any shortfalls, because the promise of full payment in accordance with section 106 means the payment of that amount which was actually paid.  The court should reject this novel, and wishful, notion of a breach-proof contract.

The simple fact is that the parties agreed to an indirect cost rate agreement that applies to all "grants, contracts, and other agreements with the Federal Government."  A.R. at 92.  Consistent with the ISDEAA, 25 U.S.C. § 450j-1(c), the ISDEAA regulations, OMB Circular A-87, and the IHS's own CSC policy circulars, the IHS in fact calculated the indirect cost

-15-

requirement for CATG by applying its approved rate to the direct cost base. *See* discussion above in § I.B. The rate agreement is signed by the Director of the Division of Cost Allocation in the Department of Health and Human Services. A.R. at 93. This agreement is binding on the IHS and applies to its contract with CATG. The IHS has never challenged CATG's approved rate, and in fact referenced it in the shortfall report and other agency records. *Compare* A.R. at 92 (rate agreement establishing 76.8% indirect cost rate for CATG for FY 1995) *with* A.R. at 105 (calculating CATG's indirect cost requirement by applying 76.8% rate to direct cost base); *see also* A.R. at 97 (referencing indirect rate of .768 in Financial Status Report for first quarter of FY 1995); A.R. at 99 (referencing .768 rate for second quarter); A.R. at 101 (referencing .768 rate for third quarter); A.R. at 103 (referencing .768 rate for fourth quarter).

Defendants' attempt to disclaim the rate method now, when application of that method has been agency policy and practice for over fifteen years, is disingenuous at best. In fact, Defendants have argued to Judge Walton in this court that "the text of the ISD[EA]A demonstrates ... that Congress intends IHS to use indirect cost rates, negotiated under OMB A-87, to make indirect CSC funding awards...." Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment at 35, *Tunica-Biloxi Tribe of Louisiana v. United States*, Case No. 1:02CV02413 (D.D.C.) (Dec. 21, 2006).

While Defendants now argue that the ISDEAA does not require a "specific formula," such as rate-times-base, to determine indirect cost requirements, Def. MTD at 13, Defendants sang a different tune just over a year ago in this court: "the plain language of the 1988 amendments [to the ISDEAA] demonstrates that Congress fully expected IHS to continue to use OMB A-87 indirect cost rates as the starting point for calculating indirect costs." *Id.*[15] This

---

[15] In the *Tunica-Biloxi* case, in which a decision on dispositive motions is pending, the plaintiff Tribes have argued, as does CATG, that Defendants' use of the method of calculating indirect costs set forth in

court should pay little heed to Defendants' attempt in this case to disclaim the rate method and ignore their rate agreement with CATG.

### B. CATG Did Not—and Could Not—Waive its Statutory and Contractual Right to Full Indirect Costs.

Defendants appear to argue that CATG waived its right to claim additional indirect cost funding by "acquiesc[ing]" in the lower funding amount and performing the contract rather than declining to enter it and appealing the inadequate funding level.  Def. MTD at 13.  The Defendants point to no express waiver by CATG of its contract or statutory rights.  Rather they maintain that CATG's failure to object to the contract modifications and the acceptance of the partial payments implies a waiver of any claim to additional funding.

Defendants also argue that the contract amendment documenting a dollar amount paid trumps CATG's right to full CSC guaranteed by sections 106(g) and 106(a) of the ISDEAA and the contract provisions incorporating these statutory terms.  Def. MTD at 17 n.5.  Allowing the parties to contract away the statutory right to full CSC, however, would directly subvert both the general purpose of the ISDEAA and the specific purpose of section 106.  The ISDEAA does not permit such an implied waiver.

#### 1. CATG Did Not Waive Its Claim to Full Indirect Costs Because CATG Had No Way to Know the Amount Paid Until the End of the Contract Year.

Defendants take the position that CATG implicitly waived its right to recover for breach by accepting partial performance.  Defendants' waiver argument might be more plausible if CATG had known, when it entered the contract for each year, (1) what its direct cost base would

---

OMB Circular A-87 results in systematic depression of tribes' indirect cost rates and thus violates the ISDEAA's requirement of full payment.  CATG agrees; this proposition forms the basis of the "miscalculation" claim.  *See* Complaint ¶¶ 22-24.  CATG cites Defendants' statements in *Tunica-Biloxi* merely to show that Defendants have acknowledged—in this court—not only that the IHS uses the rate-times-base methodology but that "the plain language" of the ISDEAA shows Congress's intent that the IHS do so.

be for the year; (2) what its approved indirect cost rate would be for the year; (3) what its full indirect cost requirement would be for the year; (4) how much the IHS would pay for indirect costs in that year; and thus (5) whether CATG would suffer an indirect cost shortfall, and the extent of the shortfall, in that year.

Waiver requires the "intentional relinquishment of a known right." *C.I.T. Corp. v. Carl*, 85 F.2d 809, 811 (D.C. Cir. 1936) (quoting *Oelberman v. Toyo Kisen Kabushiki Kaisha*, 3 F.2d 5, 6 (9th Cir. 1925), *cert. denied* 268 U.S. 693 (1925)); *see also* WILLISTON, CONTRACTS (4th ed. 2000) § 39:22 (citing cases).  Given that the contract incorporated the statutory right to full payment of CSC and given the payment process, CATG could not have known when it signed the contract or accepted contract modifications adding payments to the contract that Defendants would not fulfill the promise of full payment of CSC.  Since it was an unknown, CATG did not waive the right to full payment or its right to recover the unpaid indirect cost funding.[16]  In any event, a statutory right cannot be waived by contract.

2.    *The Text of the ISDEAA Precludes Tribal Waiver of Statutory Rights.*

The equitable doctrine of waiver cannot trump statutory law.  "Generally, a provision in a government contract that violates or conflicts with a federal statute is invalid or void." *American Airlines, Inc. v. Austin*, 75 F.3d 1535, 1538 (Fed. Cir. 1996).  When the text of a statute, or its legislative policies, indicates that waiver was not intended, waiver cannot be applied.  *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985) (agreement to arbitrate

---

[16] These facts distinguish the cases allowing waiver, all of which involve contractors who see a problem (such as an illegal contract clause) *prior* to execution, yet sign and perform the contract anyway. *Whittaker Elec. Sys. v. Dalton*, 124 F.3d 1433, 1446 (Fed. Cir. 1997) (invalid contract clause not challenged prior to execution); *Seaboard Lumber Co. v. United States*, 903 F.2d 1560 (Fed. Cir. 1990 (acceptance of contract provision at variance with statute); *Reservation Ranch v. United States*, 39 Fed. Cl. 696 (1997) (same); *Hermes Consol., Inc. v. United States*, 58 Fed. Cl. 409 (2003) (acceptance of contract clause later challenged as illegal; *E. Walters & Co. v. United States*, 576 F.2d 362 (Cl. Ct. 1978) (same); *Aleutian Constructors v. United States*, 24 Cl. Ct. 372 (1991) (same).

invalid if Congress has indicated intent to preclude waiver of judicial remedies); *Burnside-Ott Aviation Training Center v. Dalton*, 107 F.3d 854, 858-59 (Fed. Cir. 1997) (waiver of right to appeal invalid where it would subvert policies of statute).  The text and policies of the ISDEAA preclude waiver of tribal statutory rights such as the right to full CSC.

The ISDEAA contains a number of provisions authorizing, and providing a mechanism for, the Secretary to waive applicable regulations <u>when so requested in writing by a tribe</u>.  In 25 U.S.C. § 450k(e) Congress provided that "The Secretary may ... waive regulations if the Secretary finds that such exception or waiver is in the best interest of the Indians served by the contract or is consistent with the policies of this subchapter and is not contrary to statutory law. In reviewing each request, the Secretary shall follow [declination procedures]."  Similarly in 25 U.S.C. § 458aaa-11(b)(2), the statute provides that "Not later than 90 days after receipt by the Secretary of a written request by an Indian tribe to waive application of a regulation...the Secretary shall either approve or deny the requested waiver in writing."  *See also* 25 C.F.R. Part 900, Subpart K ("Waiver Procedures").  There is even authority for tribes to agree to what would otherwise be inapplicable agency rules or policies, provided the tribe does so expressly in the compact or funding agreement.  25 U.S.C. § 458aaa-16(e).

But there is <u>no</u> ISDEAA provision for tribes to waive any <u>statutory</u> rights.  Because Congress has expressly and thoroughly considered waiver in the statute, and limited it to specific parties and subjects, the ISDEAA must be deemed to preclude its general application beyond these subjects.[17]   In those few instances in the ISDEAA where Congress has allowed waiver,

---

[17] *See, e.g.*, *Christianson v. Harris County*, 529 U.S. 576, 583 (2000) (noting canon of construction that "[w]hen a statute limits a thing to be done in a particular mode, it includes a negative of any other mode"); *K.P. Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 118 (2004) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (citations and internal quotation marks omitted).

Congress created a procedure requiring that the waiver be expressed in writing from the tribe and that the Secretary expressly agree.  If Congress intended to protect tribes from any attempt by the Secretary to waive regulations unilaterally or by a tribe to waive regulations inadvertently, then certainly Congress did not intend to allow an implicit waiver of the statute itself.  Moreover, Congress set forth a clear test for waiver of regulations.  The Secretary may waive regulations only when the "waiver is in the best interest of the Indians served by the contract or is consistent with the policies of the Act, and is not contrary to statutory law."  25 U.S.C. § 450k(e).  In effect, Congress expressly banned a statutory waiver.  To imply a waiver of the statute here would go far beyond what is permitted in the statute and would violate the very test Congress set out for the waiver of regulations: it would subject CATG to a waiver that is inconsistent with the statute and their own best interest.

>    3.    *Tribal Waiver Would Subvert the Purpose and Policies of the ISDEAA, and Is
>          Thus Precluded.*

Not only the text, but the policy and purposes of the ISDEAA preclude tribal waivers of statutory rights.  The legislative policies underlying a statute may prohibit waiver even when the express language of the statute or contract does not.  *Brooklyn Sav. Bank v. O'Neill*, 324 U.S. 697, 704-05 (1945) (employees' written waiver of right to liquidated damages under Fair Labor Standards Act ("FLSA") not enforceable).  In *O'Neill*, the court emphasized that the FLSA was designed to redress the unequal bargaining power between employers and employees, so to allow employees to waive its protections—even expressly and in writing—would thwart the legislative intent.  *Id*. at 706.[18]  Similarly, in *Burnside-Ott Aviation Training Center v. Dalton*, 107 F.3d 854

---

[18] *Accord, Tompkins v. United Healthcare*, 203 F.3d 90, 98 (1st Cir. 2000) (party cannot waive application of preemption provisions of Employee Retirement Income Security Act); *Carter v. Exxon Co.*, 177 F.3d 197, 210 (3d Cir. 1999) (gas station franchisees cannot waive protections granted by federal Petroleum Marketing Practices Act); *Haghighi v. Russian American Broadcasting Co.*, 173 F.3d 1086 (8th Cir. 1999) (inclusion of statutorily-required language in settlement agreement cannot be waived; applying Minnesota law); *Stampco Construction Co. v. Guffey*, 572 N.E.2d 510, 513 (Ind. Ct. App. 1st Dist. 1991) (employee

(Fed. Cir. 1997), a contract provision purported to make the "Award Fee" determination a

unilateral Government decision that could not be reviewed under the Contract Disputes Act

("CDA").  The Federal Circuit found that this provision conflicted with the CDA's guarantee of

appeal rights and subverted the statute's intent, to equalize the bargaining power of contractors

and the Government.

> Permitting parties to contract away Board review entirely would subvert this
> purpose and return contractors to the position they occupied before the passage of
> the CDA.  The government could insert jurisdiction defeating provisions in RFPs
> and contracts as desired, thus skewing the balance between it and contractors.  As
> a result, contractors would lose the protections sought by Congress in enacting the
> CDA.

107 F.3d at 858.  The specific Award Fee provision did not trump the general dispute resolution

provision providing CDA review because there was no statutory warrant for the Award Fee

exclusion.  "Thus, the CDA trumps a contract provision inserted by the parties that purports to

divest the Board of jurisdiction, unless the contract provision otherwise depriving jurisdiction is

itself a matter of statute primacy."  *Id*. at 859.

Like the FLSA and the CDA, the ISDEAA is legislation designed to redress unequal

bargaining power: that between the Government and the tribes for whom it acts as trustee.  *See*

25 U.S.C. § 450a(b) (declaring policy of ISDEAA to enable transition from  "Federal

domination" to tribal self-determination).[19]   In the ISDEAA, "Congress declare[d] its

---

in employment agreement cannot waive benefits of prevailing-wage statutes; "[a]llowing settlement or
release of a claim would permit unscrupulous contractors to force employees to submit to economic
pressures and accept lower wages").  *See* 15 Corbin on Contracts § 88.7, at 595 (rev. ed. 2003).

[19] While some courts have held that a contractor may waive by contract its rights under law, none of these
cases involves a contract provision at odds with a statute that specifically benefits the class of contractors
of which the other party is a member.  *See e.g.*, *Hermes Consolidated, Inc. v. United States*, 58 Fed. Cl.
409 (2003) (contractor waived right to object to a contract provision arguably at odds with the Federal
Acquisition Regulation (FAR) because the provision was not contrary to the statutes of the United States
or public policy); *Whittaker Electronic Systems v. Dalton*, 124 F.3d 1443 (Fed. Cir. 1997) (contractor
accepted the contract term at odds with a Defense Acquisition Regulation presumably after weighing
whether the risk was "undue," and performed the contract, thereby waiving the right to protest.  No

commitment to the maintenance of the Federal Government's unique and continuing relationship

with, and responsibility to, individual Indian tribes and to the Indian people as a whole through

the establishment of a meaningful Indian self-determination policy...."  25 U.S.C. § 450a(b).

Consistent with the federal trust responsibility, Congress sought to end "Federal domination" of

services to Indians by transferring resources and responsibility to tribes. *Id*.  Because those

resources initially did not include full CSC, so that tribes were forced to cut services to pay

overhead, Congress saw its self-determination policy undermined and the statute in need of

revision.

In 1988 Congress amended section 106 to address "the consistent failure of federal

agencies to fully fund tribal indirect costs."  S. Rep. 100-274, 1987 U.S.C.C.A.N. 2620, 2627

(Dec. 21, 1987).  The Senate committee emphasized the centrality of full CSC to the core policy

of the ISDEAA: "Full funding of tribal indirect costs associated with self-determination contracts

is essential if the federal policy of Indian Self-Determination is to succeed."  *Id*. at 2632 (quoted

in *Appeals of Cherokee Nation*, 99-2 BCA P 30462 (I.B.C.A. 1999), 1999 WL 440045 at 7).  Just

as the Government in *Burnside-Ott* could not subvert the policy of the CDA by inserting a

contract provision giving it unilateral authority over the Award Fee, the Government here should

not be allowed to subvert the ISDEAA with an inconsistent contract provision.  If the

Government could fix CSC funding at whatever level it wished, despite available appropriations

to carry out the statutory mandate of full CSC, tribal contractors would be returned to the

---

statutory provision or public policy implicated).  Moreover, the cases allowing waiver of statutory rights
require that the contractor knowingly and affirmatively waive the right by agreeing to a contrary contract
term.  *Reservation Ranch v. United States*, 39 Fed. Cl. 696, 712 (1997) (waiver by agreement with
contrary term); *Do-Well Mach. Shop, Inc. v. United States*, 870 F.2d 637, 641 (Fed. Cir. 1989) (same).
CATG made no such agreement here.

position they occupied before passage of the 1988 ISDEAA amendments, rendering the statute pointless and skewing the Congressionally crafted balance of power.[20]

If the contracts' full-funding provision is at all ambiguous, the ISDEAA's legislative instructions for interpretation resolve that ambiguity. Each provision of the ISDEAA and the contracts "shall be liberally construed for the benefit of the Contractor." 25 U.S.C. § 450*l*(c) (Model Agreement § 1(a)(2)); Def. Ex. B at 005, § (a)(2) (contract provision incorporating same rule of interpretation). Congress adopted this interpretive principle in recognition that the ISDEAA is remedial legislation and that a longstanding canon of construction requires that laws for the benefit of Indians must be interpreted liberally in favor of Indians. *See Samish Indian Nation v. United States*, 419 F.3d 1355, 1367 (Fed. Cir. 2005) (ISDEAA to be interpreted liberally in light of remedial purpose); *Ramah Navajo Chapter v. Lujan*, 112 F.3d 1455, 1461 (10th Cir. 1997) (applying Indian canon of construction to resolve ambiguity in ISDEAA in favor of tribe).

In summary, no case law supports the application of the waiver doctrine to a specific statutory right protecting the class of tribal contractors of which CATG is a member. CATG could not waive its right to full CSC, even if the Government convinced it to agree to do so, without running afoul of the statutory full funding requirement. The text and policy of the ISDEAA fully establish that CATG's statutory right to full CSC, as incorporated in the contracts, is not waivable.

---

[20] Defendants also suggest that CATG should have suspended performance if the IHS did not provide sufficient funds. Def. MTD at 13. First, the Government made this argument in *Cherokee Nation*, and the Supreme Court rejected it, finding that this boilerplate language does not excuse the agency's failure to fully fund the contract. *Cherokee Nation of Oklahoma v. Leavitt*, 543 U.S. 631, 638-639 (2005). Second, faced with the choice of suspending health care services to its members altogether, or offsetting a lack of CSC with program funds and/or tribal funds, CATG of course chose the latter option. Defendants' suggestion that CATG's choice to use its own funds to continue serving its members should now be used against CATG illustrates the extent to which the Government, in developing its litigation position, has lost sight of the Secretary's trust responsibility to Indian tribes and their members.

4.    *This Court Should Follow the* Seldovia *Case, in which the IBCA Rejected the IHS's "Waiver" Argument.*

Far more pertinent than the defense acquisition cases in which the waiver issue typically arises is the *Seldovia* case, which is directly on point.  *Seldovia Village Tribe*, IBCA 3862-3863/97 (October 20, 2003) (attached as Exhibit A).  The Seldovia Village Tribe had executed an annual funding agreement ("AFA") with Defendants, including a specified amount for indirect costs, an amount that was fully paid during the contract year.  During the year, however, Seldovia had negotiated a new indirect cost rate agreement that contained a higher indirect cost rate and thus required additional indirect cost funding from the IHS.  The IHS refused to amend Seldovia's AFA to reflect the higher rate, and CATG appealed to the Interior Board of Contract Appeals ("IBCA").

Just as in this case, the IHS sought to defend itself by saying it paid every dollar in the contracts and Seldovia acquiesced in accepting those amounts.  Judge Parrette of the IBCA rejected that argument, ruling that the IHS could not refuse to amend Seldovia's AFAs to reflect its higher indirect cost rate, then claim both full performance and waiver.  *Seldovia*, Exhibit A at 9-11.

The Government initially appealed the *Seldovia* case to the Federal Circuit, but later moved to stay the appeal pending the Supreme Court's ruling in *Cherokee Nation*, because *Cherokee* involved, in the Government's own words, "issues almost identical to the ones raised in this appeal."  *Thompson v. Seldovia Village Tribe*, No. 04-1230, Unopposed Motion to Stay Appellate Proceedings, at 1 (Fed. Cir. March 2004).  The Government abandoned the appeal once the Supreme Court decided *Cherokee Nation*, indicating that the Government understood that the *Seldovia* case, including Judge Parrette's conclusion that Seldovia could not waive its

right to full CSC in its agreements with the IHS, to fall squarely within the scope of the *Cherokee Nation* decision.

### C.     CATG's Claims Are Not Barred by Laches.

The defense of laches requires a showing of (a) unreasonable and unexcused delay by the claimant, and (b) prejudice to the defendant, either economic or in the ability to mount a defense. *Cornetta v. United States*, 851 F.2d 1372, 1377-78 (Fed. Cir. 1988) (en banc).  The burden of proof rests with the defendant.  *Id*. at 1380 (citing FRCP 8(c)).  Defendants must satisfy both parts of the test.  *Costello v. United States*, 365 U.S. 265, 282 (1961).  Here, Defendants have not met their burden on either prong, and their motion for summary judgment on the basis of laches should be denied.

#### 1.     CATG's Delay in Bringing Its Claims Was Reasonable Given the CSC Class Actions.

Mere passage of time does not constitute laches.  *Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.*, 988 F.2d 1157, 1161 (Fed. Cir. 1993).   In fact, "where no prejudice to the defendant has ensued from the mere passage of time, there should be no bar to relief."  *Gardner v. Panama R.R. Co.*, 342 U.S. 29, 31 (1951).  Where, as here, Congress has chosen to impose no statute of limitations, courts are reluctant to impose their own equitable limitation.  *E.g., CW Gov't Travel, Inc. v. United States*, 61 Fed. Cl. 559, 569 (Fed. Cl. 2004) ("Because Congress did not so limit the jurisdiction of this Court to hear such actions, we would be reluctant to invoke laches except under extraordinary circumstances....").[21]

---

[21] In 1994, Congress amended the CDA, 41 U.S.C. § 605(a), to include the current six-year limitation. Federal Acquisition Streamlining Act, Pub. L. No. 103-355 § 2351, 108 Stat. 3243, 3322 (Oct. 13, 1994). The regulation implementing the statute of limitations specified that it did not apply to "contracts awarded prior to October 1, 1995," such as CATG's
.

Defendants state that CATG delayed ten years, Def. MTD at 17, but CATG's claim was only a little more than three years old when the *Cherokee Nation* class action was filed on March 5, 1999. The class action aimed to recover CSC claims for all tribal contractors from 1988 forward. *Cherokee Nation of Oklahoma v. United States*, 199 F.R.D. 357, 360 (E.D. Okla. 2001). CATG was clearly a member of the putative class. CATG's reliance on the class action to vindicate its rights to unpaid CSC in FY 1995 was reasonable as a matter of law. *See Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345, 352-53 (1983) ("Class members who do not file suit while the class action is pending cannot be accused of sleeping on their rights; Rule 23 both permits and encourages class members to rely on the named plaintiffs to press their claims."); *Stone Container v. United States*, 229 F.3d 1345, 1353-54 (Fed. Cir. 2000) (statute of limitations tolled, as a matter of law, by filing of class action under Rule 23); *Solow v. United States*, 78 Fed. Cl. 86, 89 (2007) (holding delays of seven to eleven years in bringing claims reasonable due to pendency of class action, and rejecting government's laches defense).

After class certification was denied by the *Cherokee Nation* court in 2001, a second CSC class action was filed by the Pueblo of Zuni, in which the class certification decision was not made until May 22, 2007. *Pueblo of Zuni v. United States*, CIV 01-1046LH (D.N.M.). Even so, CATG filed its FY 1995 claims in 2005 rather than continuing to rely on *Zuni*.

In sum, at <u>no</u> time during 1995-2005 did CATG sleep on its rights. CATG's "delay" was reasonable and justified.

2.    *The IHS Was Not Prejudiced by CATG's Delay in Filing its Claims.*

Even if CATG's delay had been unreasonable and unexplained, which it was not, the IHS would still have to show prejudice, or its laches argument fails. *Gardner v. Panama R.R. Co.*, 342 U.S. 29, 31 (1951) ("[W]here no prejudice to the defendant has ensued from the mere

passage of time, there should be no bar to relief."). The burden of proving prejudice rests with the Defendants. *Cornetta*, 851 F.2d at 1380.

Defendants assert that between 1995 and 2005, "memories had faded, and several key witnesses had retired." Def. MTD at 18. But Defendants fail to give any indication of how this prejudices their defense. First, Defendants do not present any evidence that these witnesses are unavailable, only that they have retired. *See, e.g.*, *Maher v. City of Chicago*, 2007 WL 1725296 at *3-4 (N.D. Ill. 2007) (in laches context, "unavailability for trial must *proven*, not merely asserted") (emphasis in original). More important, these claims are based on written documentation and do not depend on witness testimony. The written documents on which the FY 1995 claim is based—the contract, its modifications, and the relevant provisions of the ISDEAA—remain available to the parties and say the same things now that they did in 1995. Mere allegations of fading memories are never enough to establish prejudice, especially when government records are available to establish or refute liability, and most especially when the government, as here, has been on notice of the claims for years because of the pending class actions. *Id.* at *6 (rejecting laches defense based on "bald assertions" of faded memories, where City presented no evidence that relevant records had been destroyed); *Solow v. United States*, 78 Fed. Cl. 86, 89-90 (2007) (rejecting laches defense where personnel records are available and government had notice of claims due to prior class action); *Athey v. United States*, 78 Fed. Cl. 157, 160-61 (2007) (same).

Defendants also present perfunctory allegations of economic prejudice based on the lapse of FY 1995 appropriations at the end of that fiscal year. Def. MTD at 19-20. Under this reasoning, CATG's claim would have been just as "prejudicial" if filed in 1996 instead of 2005, since it would have sought to "revive a claim for appropriations that expired" the year before. *Id.*

at 19.  Therefore the delay of which defendants complain made no difference even under their own logic.  Of course, CATG is not seeking to "revive" expired appropriations, but only to recover damages.[22]

Defendants' vague allegations of prejudice do not come close to meeting their burden of proof.  *See Cornetta*, 851 F.2d at 1380.  For this reason alone, Defendants' laches defense must fail.  *Gardner v. Panama R.R. Co.*, 342 U.S. 29, 31 (1951).

## CONCLUSION

For the reasons above, CATG respectfully requests that this Court deny Defendants' Motion to Dismiss or in the Alternative Motion for Summary Judgment in its entirety.

Pursuant to Local Civil Rules 7(f) and 78.1, CATG requests an oral hearing on Defendants' Motion.

Respectfully Submitted,

_____/s/_____

F. Michael Willis
HOBBS, STRAUS, DEAN & WALKER, LLP
2120 L Street, NW, Suite 700
Washington, DC  20037
202-822-8282 (Tel.)
202-296-8834 (Fax)

_____/s/_____

Geoffrey D. Strommer
HOBBS, STRAUS, DEAN & WALKER, LLP
806 SW Broadway, Suite 900
Portland, Oregon 97205
503-242-1745 (Tel.)
202-242-1072 (Fax)

Attorneys for the Council of
Athabascan Tribal Governments

Dated: January 23, 2008

---

[22] Defendants assert that their reliance on a limitation of cost provision in the 1995 contract supports their laches defense.  Def. MTD at 19 n.9.  In *Cherokee Nation*, however, the Supreme Court disagreed with a similar argument based on a boilerplate limitation of cost clause.  543 U.S. at 639-40.

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **COUNCIL OF ATHABASCAN**<br>**TRIBAL GOVERNMENTS**,<br><br>PLAINTIFF,<br><br>vi.<br><br>**UNITED STATES OF AMERICA,**<br>**MICHAEL O. LEAVITT**, Secretary of the<br>Department of Health & Human Services; and<br>**ROBERT G. McSWAIN**, Acting Director,<br>Indian Health Service;<br><br>DEFENDANTS. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 07-1270 (RWR)

## PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF
## MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE

Pursuant to Local Civil Rules 7(h) and 56.1, Plaintiff Council of Athabascan Tribal

Governments ("CATG") submits the following Response to Defendants' Statement of

Material Facts as to which There Is No Genuine Issue:

1.      Disputed.  Defendants state that on September 30, 1995, "the performance

period ended" for Contract No. 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.  While the effective period of the contract

ended on that date, Defendants' duty to perform—i.e. to pay full contract support costs as

required by statute and Defendants' agreements with CATG—did not expire on that date.

2.      Undisputed.

3.      Undisputed.

4.      Disputed.  CATG cannot determine from the cited document, which appears

to be a preliminary budget, whether or not Paul Young approved an indirect-type costs

budget for FY 1995.  Even if such a budget was approved, it was superseded by the indirect

cost rate agreement executed by Defendants and CATG later in the fiscal year. A.R. at 92-93. Therefore the assertion in this paragraph is immaterial even if correct.

5. Undisputed, but immaterial. Defendants have adduced no evidence that the named former employee possesses any knowledge relevant to CATG's claims, the merits of which can be determined through existing documentary evidence. Moreover, Defendants have not even alleged, let alone established, that this former employee is unavailable for trial.

6. Undisputed.

7. Undisputed, but immaterial. Defendants have adduced no evidence that the named former employee possesses any knowledge relevant to CATG's claims, the merits of which can be determined through existing documentary evidence. Moreover, Defendants have not even alleged, let alone established, that this former employee is unavailable for trial.

8. Undisputed.

9. Undisputed, but immaterial. Defendants have adduced no evidence that the named former employee possesses any knowledge relevant to CATG's claims, the merits of which can be determined through existing documentary evidence. Moreover, Defendants have not even alleged, let alone established, that this former employee is unavailable for trial.

10. Undisputed.

11. Disputed. This paragraph consists of legal conclusions involving statutory interpretation and appropriations law.

12. Disputed. This paragraph consists of legal conclusions involving statutory interpretation and appropriations law.

Respectfully Submitted,

_____/s/_____

F. Michael Willis
HOBBS, STRAUS, DEAN & WALKER, LLP
2120 L Street, NW, Suite 700
Washington, DC  20037
202-822-8282 (Tel.)
202-296-8834 (Fax)


_____/s/_____

Geoffrey D. Strommer
Hobbs, Straus, Dean & Walker, LLP
806 SW Broadway, Suite 900
Portland, OR 97205
503-242-1745 (Tel.)
503-242-1072 (Fax)

Attorneys for the Council of
Athabascan Tribal Governments

DATED: January 23, 2008.



# United States Department of the Interior

OFFICE OF HEARINGS AND APPEALS
Interior Board of Contract Appeals
801 N. Quincy St. Suite 300
Arlington, VA  22203

703 235 3813                     703 235 1281 (fax)

## APPEALS OF SELDOVIA VILLAGE TRIBE

| | | |
|---|---|---|
| IBCA 3862 & 3863/97 | : | Decided: October 20, 2003 |

Compact No. 58G950029-01-2
FY 1996 and 1997 Funding Agreements
Indian Health Service, HHS

Appellant's Motion for Summary
Judgment Granted; Government's
Motions for Summary Judgment
and to Dismiss Denied

APPEARANCE FOR APPELLANT:     Geoffrey D. Strommer, Esq.
Hobbs, Straus, Dean & Walker, LLP
Portland, Oregon 97204

Joseph H. Webster, Esq.
Hobbs, Straus, Dean & Walker, LLP
Washington, DC 20006

APPEARANCE FOR GOVERNMENT:     Duke McCloud, Esq.
Chief, IHS Branch, HHS
Rockville, Maryland 20857

## OPINION BY ADMINISTRATIVE JUDGE PARRETTE

Seldovia Village Tribe (Appellant or the Tribe) of Alaska has appealed two reductions in payments by the Indian Health Service (IHS) under the Tribe's FY 1996 and FY 1997 Annual Funding Agreements (AFA's). Appellant alleges that IHS failed to pay the Tribe its full contract support costs (CSC's) of $126,439 in each of those years, amounts not in dispute. IHS contends that the CSC reductions were the result of inadequate appropriations by the Congress, and avers that the Tribe's CSC reductions were both proper and proportionately the same as those experienced by other CSC recipients.

The appeals were filed in June 1997 and assigned to Judge Cheryl Rome, who is no longer with the Board. They were deferred for Board consideration because the issue of the propriety of CSC reductions was already before the Board in similar case, Cherokee Nation, which was ultimately reviewed by Court of Appeals for the Federal

Circuit.  See Appeals of Cherokee Nation of Oklahoma, IBCA 3877-79, 99-2 BCA 30,462; reconsideration granted at 01-1 BCA 31,158; decision unchanged at 01-1 BCA 31,349 (hereafter "Cherokee").  The Board's decision was affirmed in Thompson v. Cherokee Nation of Oklahoma, 334 F. 3d 1075, 2003 U.S. App., LEXIS 13483.  Familiarity with Thompson is presumed for the purposes of this opinion.

Further information on IHS's Title III Self-Determination program can be found in Shoshone-Bannock Tribes v. HHS, 279 F. 3d 660 (9th Circuit 2002) and in Cherokee Nation v. Thompson, 311 F. 3d 1054 (10th Circuit 2002).  Both Circuits have decided appeals similar to this one in favor of the Government rather than the appellant.  This Board, however, agrees with the decision of the Federal Circuit in Thompson, which is binding for us in any event.

### Appeal Background

The present Appeals were filed pursuant to the Indian Self-Determination and Education Assistance Act (ISDA or the Act), which authorizes IHS to award to tribal organizations the same amounts that IHS would have spent in providing services to them, in order to enable the tribes to administer the programs themselves.  Under Title III of the Act, the Secretary of HHS enters into Compacts with tribes to provide these funds, known as Secretarial funds, to enable them to provide health services to eligible Indians pursuant to Annual Funding Agreements.  In addition, the tribes are entitled to funds to cover the administrative costs of the programs, called contract support costs, based on a rate arrived at through negotiation between the tribe and the cognizant Federal agency.  The only limitation on the resulting CSC funding is that the funds must come out of, and may not exceed, available appropriations.

During the years in question, IHS experienced shortfalls in the amounts recommended by the Congressional Appropriations Committees for CSC use, even though total ISDA appropriations were increasing each year.  These reductions were not incorporated into the legislation itself but were only Committee recommendations.  Nevertheless, IHS treated them as mandatory directives and apportioned the funds as recommended, despite the fact that the entitlement to full CSC funds was arguably required under 25 U.S.C. sec. 450j-1(a) and that adequate funds for CSC purposes were available under the ISDA general appropriation.

Although the present Appeals predated Thompson and involve the same issues, IHS argues here that because the tribe's AFA's expressly provided that funding was to be in accordance with IHS's existing policy memorandum, which called for the allocation of funds only within the limits of the Appropriation Committee's recommendation, full CSC payments were not required. Thus, IHS believes that the facts in this case differ from those in Thompson, and that Thompson is inapplicable. Appellant challenges this view, and both parties have moved for summary judgment.

These issues have been briefed at great length. Despite the Government's extensive arguments to the contrary, we hold that these appeals are within the ambit of Thompson and grant summary judgment for the reasons set forth in that decision. However, because they involve issues of first impression with respect to the Alaska tribes, it may be useful to set forth the general background of the Appeals as provided by Appellant in its Summary Judgment Motion. We will then address IHS' contention that Seldovia legally contracted away its entitlement to full CSC payments when it signed its Annual Funding Agreements.

## Contract Background

### A. History of Title III Compacting

The Indian Self-Determination and Education Assistance Act (ISDA), Pub.L. 93-638, 88 Stat. 2206 (Jan. 4, 1975), 25 U.S.C. § 450 et seq., was enacted by Congress in 1975, and has since been amended on a number of occasions. The ISDA allows tribes or tribal organizations to enter into agreements with the IHS to administer programs, functions, services or activities (PFSAs) which the IHS has operated for Indian tribes and their members. As originally enacted, the only mechanism for tribes to assume such PFSAs was through Title I contracts, which limited the flexibility of tribes to administer programs to accommodate unique local circumstances.

Thus, in 1988 Congress enacted Public Law 100-472, which formally established the Tribal Self-Governance Demonstration Project (Title III), 25 U.S.C. § 450f note. Title III directed the Secretary of the Interior to initiate the Project as a five-year experiment involving up to 20 tribes. Under this Project, participating tribes were given the option of negotiating compacts and annual funding agreements (AFA's) with the Secretary of the Interior for the operation of DOI programs for

3

Indians. In accordance with such compacts, tribes are authorized to administer such PFSA's and receive funds from all levels of the agency to perform these responsibilities -- funds that the Secretary otherwise would have spent to perform the PFSAs. In addition to these "Secretarial funds," tribes are also entitled to CSC funds to cover the administrative costs of operating the programs.

The AFA, which is to be negotiated as part of a compact and re-negotiated each year, establishes the funding levels for operating the programs in the compact. With certain limitations, tribes are authorized to redesign and reallocate program funds on the basis of tribal priorities.

On December 4, 1991, President Bush signed the Tribal Self-Governance Demonstration Project Act, Public Law 102-184, into law. Among other things, this Act amended Public Law 100-472 to establish an Indian Health Service Self-Governance Demonstration Project and directed IHS to study the feasibility of expanding the Project to IHS programs and services. In 1992 Congress again amended Title III by enacting Section 314 of the Indian Health Amendments of 1992.[1] The 1992 amendments authorized the Secretary of the Department of Health and Human Services (HHS) to negotiate Self-Governance compacts and AFAs with tribes that had completed the required planning activities.

B. The Alaska Tribal Health Compact

In 1994, 13 tribes and tribal organizations in Alaska negotiated and signed the Alaska Tribal Health Compact (ATHC) and AFAs authorizing them to operate health care programs under Title III in fiscal year 1995. The ATHC was subsequently signed by the Director of IHS on behalf of the Secretary of HHS. The ATHC and AFAs went into effect on October 1, 1994, after having been filed with the Congress for review by the Senate Committee on Indian Affairs and the House Committee on Natural Resources, and other affected tribes, as required by law.

Since 1994, a number of other tribes and tribal organizations in Alaska have become co-signers of the ATHC and have negotiated AFAs thereunder, including the

---

[1] Public Law 102-573.

4

Appellant Seldovia Village Tribe. To date, 18 tribes and tribal organizations from throughout Alaska are signatories to the ATHC. As a result, the vast majority of the IHS programs in Alaska are currently operated under tribal administration in accordance with the provisions of Title III and the ATHC.

C.   Calculation of Contract Support Costs

The Indian Self-Determination Act requires the Secretary to pay full contract support cost funding to a contracting or compacting tribe in addition to the Secretarial amount for direct program funding. 25 U.S.C. 450j-1(a)(2); CSC funds "cover the full administrative costs the Tribe will incur -- and which, absent the self-determination contract, the Federal government would incur -- in connection with the operation of [direct Indian] programs." Ramah Navajo School Board v. Babbitt, 87 F.3d 1338, 1341 (D.C. Cir. 1996); see also 25 U.S.C. 450b(f).

One aspect of CSC is "indirect costs." The ISDA defines these as "costs incurred for a common or joint purpose benefitting more than one contract objective, or which are not readily assignable to the contract objectives specifically benefitted without effort disproportionate to the results achieved;" 25 U.S.C. § 450b(f). The amount of indirect costs to which a tribal contractor is entitled is based upon a rate which is "arrived at through negotiation between an Indian tribe or tribal organization and the appropriate Federal agency." 25 U.S.C. § 450b(g). The ISDA provides that funds for all such CSC "shall be added" to the tribe's contract. 25 U.S.C. § 450j-1(a)(2)(emphasis added). The only limitation is that all funding is "subject to the availability of appropriations." 25 U.S.C. § 450j-1(b). [2]

---

[1]     As noted by the court in Shoshone-Bannock Tribes v. Shalala, 988 F. Supp. 1306, 1329 (D. Or. 1997), "CSC are automatically awarded as a percentage of the tribe's Secretarial Amount, but funding is 'subject to the availability of appropriations' and the Secretary's need to serve non-contracting tribes."

D.   Use of ISDM 92-2 to Distribute Contract Support Funds

IHS utilizes ISDM 92-2,[3] an unpromulgated, internal agency guideline, to determine and allocate "contract support funds for all Public Law (P.L.) 93-638 contracts." ISDM 92-2 at 2 (Appt. Exh. H). Through this mechanism, the IHS limits the availability of CSC funding for ongoing contracts and compacts to a predetermined amount based on the level of prior year CSC funding to each Area Office. In the case of ongoing contracts, ISDM 92-2 (pg. 7) provides:

> The amount of indirect contract support funds representing the previous year's base will be distributed to Areas "recurring"[⁴] to fund each Area's indirect cost need. Each contractors' need for indirect contract support shall be determined by calculating changes, if any, in indirect cost rates, bases, and pools. If funds **available** in the Area's indirect cost base are not adequate to meet total requirements, then the amount **available** shall be distributed according to each contractor's proportion of total need. <u>These funds will be awarded to the contractor as non-recurring funds.</u> (underline in original, bold added).

The term "available" is not defined by ISDM 92-2. However, historically IHS has only increased the funds "available" for CSC to the extent that such an increase is recommended in the Conference Committee Report that accompanies the IHS' annual appropriation. Thus, this limitation on the funds available for CSC is not based upon any statutory mandate, but is only based upon Committee <u>recommendations.</u>

E.   Congressional Appropriations for the IHS

The Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub. L. No. 104-134, 110 Stat. 1321 (1996) appropriated the following lump-sums for the Indian Health Service for FY 1996:

---

[3]   In 1996, ISDM 92-2 was superseded by ISDM 96-04, which is consistent in relevant parts with its predecessor. However, for purposes of this appeal, ISDM 92-2 was the applicable guideline at the time that the Tribe entered into both its FY 1996 and FY 1997 AFAs.

[4]   ISDM 96-04 (pg. 2) defines "recurring funds" as "Contract or compact funds that do not require rejustification each year to the Secretary. Annual increases are provided through congressional mandatory increases or other resource allocation methodologies applicable to the respective funding category of the award."

> For expenses necessary to carry out the Act of August 5, 1954 (68 Stat. 674), the Indian Self Determination Act, the Indian Health Care Improvement Act, and titles II and III of the Public Health Service Act with respect to the Indian Health Service, $1,747,842,000, together with payments received during the fiscal year pursuant to 42 U.S.C. 300aaa-2 for services furnished by the Indian Health Service." (emphasis added).

Of the IHS' lump-sum appropriation of $1,722,842,000 for FY 1996, non-earmarked funds totaled $1,364,937,000. Similarly, the FY 1997 Appropriations Act provided:

> For expenses necessary to carry out the Act of August 5, 1954 (68 Stat. 674), the Indian Self Determination Act, the Indian Health Care Improvement Act, and titles II and III of the Public Health Service Act with respect to the Indian Health Service, $1,806,269,000, together with payments received during the fiscal year pursuant to 42 U.S.C. 238(b) for services furnished by the Indian Health Service (emphasis added).

Omnibus Consolidated Appropriations Act for FY 1997, Pub. L. No. 104-208, 110 Stat. 3009 (Sept. 30, 1996). Thus, the FY 1997 Act is nearly identical to the FY 1996 Act except that Congress increased the Indian Health Service's lump-sum appropriation by nearly 60 million dollars to $1,809,269,000. Of this total, non-earmarked funds totaled $1,408,736,000.

Nowhere is there any suggestion in the plain language of the FY 1996 and FY 1997 Appropriations Acts that Congress intended to impose a spending cap on CSC funds.[5] Only in the Committee reports is the issue of total funding for CSC addressed and there the Committee simply makes a recommendation. Neither the report nor the recommendation rises to a binding duty. The FY 1996 Report states:

> *Contract Support Costs.*--The Committee recommends $153,040,000 for contract support costs including decreases of

---

[5]     The plain language of the Appropriation Acts must control. See Idaho First Nat'l Bank v. Commissioner of Internal Revenue, 997 F.2d 1285, 1289 (9th Cir. 1993) ("[I]f the [statutory] language ... is unambiguous, and its literal application does not conflict with the intentions of its drafters, the plain meaning should prevail."); Environmental Defense Fund v. Reilly, 909 F.2d 1497, 1502 (D.C. Cir. 1990) (the starting point of statutory construction is "the language of the statute itself and absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive").

7

$11,864,000 for pay and fixed costs and $3,770,000 for support cost shortfalls." H. R. Rep. 104-173, at 97 (1995)(emphasis added); see also S. Rep. 104-125, at 94 (1995).

The FY 1997 Report states:

> Contract support costs.--The Committee recommends $160,660,000 for contract support. This amount includes increases over the fiscal year 1996 enacted level of $120,000 for the staffing of new facilities and $7,500,000 for the Indian self-determination fund." S. Rep. 104-319, at 90 (1996)(emphasis added); see also H. R. Rep. 104-625 (1996).

F.    IHS Budget Requests for CSC

In both FY 1996 and FY 1997, the IHS failed to request adequate CSC to cover the existing shortfall. For FY 1996, the IHS requested $161,174,000, an increase of $15,714,000 over the previous year. However, as of the end of FY 1995, the CSC shortfall was approximately $43 million. As of March 30, 1996, the CSC shortfall just for new and expanded contracts was over $25 million. Shoshone-Bannock, 988 F. Supp. at 1329.

For FY 1997, the IHS requested significantly more for CSC -- $200,955,000, an increase of $46,115,000 -- but still far short of the then existing CSC need. As of the end of FY 1996, the IHS had a CSC shortfall of approximately $62 million. Further, the IHS separately reported to Congress that its total CSC shortfall for FY 1997 was $81,956,000. See IHS CSC Annual Shortfall Report to Congress for FY 1997 (Sep. 24, 1997), at 3. Thus, the IHS requested almost $36 million less than it acknowledged was necessary to fully fund its CSC need for FY 1997.

G.    Background of the Seldovia Village's Claim

In 1995, the Tribe and the Office of Cost Allocation, Department of Health and Human Services, negotiated an indirect cost rate of 47.3 percent for FY 1996 and FY 1997. Proposed Amendments 2 & 3 to FY 1996 AFA (with attached IDC Agreement). Based upon this rate, the Tribe's CSC need for both years was $247,696.

On January 24, 1996, the Tribe submitted to the IHS proposed amendments 2 and 3 to the FY 1996 AFA. Among other things, these amendments would have adjusted the funding in the FY 1996 AFA to provide for the payment of indirect costs under the negotiated indirect cost rate of 47.3 percent in accordance with the terms of the AFA. Section 4(B) of the FY 1996 AFA provides for the payment of contract support funds for indirect costs under section 106(a)(2) of the Act and Indian Self-Determination Memorandum No. 92-2.[6] The amount requested by the Tribe was determined based on the policies in ISDM 92-2.

At a meeting between tribal and IHS representatives held on December 3, 1996, the IHS tentatively responded that no action had been taken by the IHS on the amendments submitted almost a year earlier and that consequently these amendments were not incorporated into the FY 1996 AFA. On December 10, 1996 the Area Office, after further file review, confirmed that "we find that neither the Area [Office] nor IHS Headquarters processed the proposed amendments when received."

While the IHS agreed that $247,696 was the Tribe's CSC need, it stated that only $121,257 was available for CSC. Based upon this lack of "available" funds, the IHS did not incorporate the amendment into the Tribe's FY 1996 or FY 1997 AFA's. Instead, the IHS simply noted that it "did not have contract support cost shortfall funding available to meet [the Tribe's] needs at the time the amendment was first proposed, nor does it have those funds now." Similarly, the Final Contracting Officer's Decision seeks to justify the failure of the IHS to pay the Tribe's CSC requirement by stating that "the Alaska Area IHS did not have any new funds to award for the IDC rate change." As a result, the Tribe suffered a CSC funding shortfall of $126,439 in both FY 1996 and FY 1997.

Although not clearly stated, the IHS's position that no funds were available was apparently based upon its process for determining available funds for CSC under ISDM 92-2, through which the IHS generally only increases its allocation of funds for CSC if the Conference Committee recommends such an increase in report language. Thus, although Congress increased the IHS' budgets for FY 1996 and FY 1997 by tens

---

[6] The AFA provides that ISDM No. 92-2 shall apply if no revisions of this memorandum is in effect by October 1, 1995, which was the case.

9

of millions of dollars in non-earmarked funds each year, the position of the IHS seems to be that these and other non-mandatory funds were not "available" for CSC.

<u>Positions of the Parties</u>

The Government argues that even if it accepts the <u>Thompson</u> decision, IHS is entitled to summary judgment because the funding provisions of the ISDA are not self-executing but require annual funding agreements to identify the programs, services, functions, and activities to be performed or administered, the funds to be provided, the general budget category assigned, the time and method of payment, and any other provisions to which the parties agree. Appellant agrees that how the Board rules depends upon interpretation of the relevant provisions in Appellant's AFA's for FY's 1996 and 1997, and IHS's policies ISDM 92-2 and IHS Circular 96-04.

At the time Seldovia's FY 1996 AFA was entered into, IHS was in the process of revising ISDM 92-2, so the AFA provided as follows:

<u>The parties have not agreed on the amounts to be paid or the method and process for calculation and payment of contract support costs under the AFA.</u> The IHS has proposed a new policy, which will be the successor to ISDM 92-2. This proposal is currently being circulated for tribal comment. It is anticipated that a new policy will be adopted by the IHS Director on or before October 1, 1995. <u>It is the position of the IHS</u> that any payment of or calculation of contract support costs shall be made in accordance with the new IHS policy referred to herein, except that if such a new policy is not in effect by October 1, 1995, contract support negotiations shall be based on ISDM 92-2 (emphasis added).

IHS's Circular 96-04, the successor policy to ISDM 92-2, was not issued until April 1, 1996. Thus, the Government asserts that Appellant's FY 1996 AFA was governed by ISDM 92-2, and that the amount of CSC paid for that year was in accordance with this policy. According to IHS, the only question before the Board is whether IHS met its obligations under ISDM 92-2, which it argues it did.

Seldovia requested an amendment to its 1996 AFA on January 24, 1996, approximately four months into the term of the FY 1996 AFA, because it had negotiated a new indirect cost rate with HHS's Office of Cost Allocation. IHS applied the new cost rate in determining the CSC payments the Tribe was entitled to but

10

allegedly could not pay the entire amount because of its shortfall in appropriations. Although the Tribe subsequently sought the full amount to which it was otherwise entitled, IHS maintains that Seldovia was bound by the funding scheme it had agreed to in its AFA, which limited total CSC payments to the amounts recommended by the Appropriations Committee despite an increase in the total ISDA appropriation. But Appellant cites MAPCO Alaska Petroleum, Inc., v. United States, 27 Fed. Cl. 405 (1992), for the proposition that the Government cannot contractually force the Tribe to accept less than full CSC's when the Tribe is entitled to full CSC's by law. It also asserts that the Government cannot lawfully benefit from a contract provision contrary to law, citing Beta Systems, Inc., v. United States, 838 F.2d at 1185. We agree.

IHS also renews in this Appeal its argument that Sec. 314 in the Omnibus Consolidated and Emergency Supplemental Appropriations Act for FY 1999, Pub. L. 105-277, restated the Congress's intention that the obligation to fund contract support costs is limited to the amount specifically appropriated for that purpose each year. Sec. 314 states in part:

> Notwithstanding any other provision of law, amounts appropriated to or earmarked in committee reports for the Bureau of Indian Affairs and the Indian Health Service by Public Laws 103-138, 103-332, 104-134, 104-208 and 105-83 for payments to tribes and tribal organizations for contract support costs associated with self-determination or self-governance contracts, grants, compacts, or annual funding agreements with the Bureau of Indian Affairs or the Indian Health Service as funded by such Acts, are the total amounts available for fiscal years 1994 through 1998 for such purposes.

By contrast, Appellant's position is that (1) IHS had a mandatory obligation to fully fund the Tribe's CSC requirement to the extent that funds were legally available, and (2) adequate funds were legally available in both FY 1996 and FY 1997 to fully fund the Tribe's CSC requirement. Appellant also disputes IHS' contention that it was bound by the wording of its AFA to accept a lesser amount, noting that the 1996 AFA specifically stated that Seldovia would receive CSC payments "as defined in section 106(a)(2) and (3)" of the Act (i.e., 25 U.S.C. sec. 450j-1(a)(2) and (3). According to Appellant:

> This mandatory contract language obligated the IHS to pay the Tribe's contract support requirement to the extent that funds were available in FY 1996 and FY 1997. Since more than adequate funds were available in those years, the

11

contract and statute required the IHS to pay 100 percent of the Tribe's contract support requirement. Because the IHS failed to do so, it breached its contract with the Tribe and the Tribe is entitled to a judgment for damages.

The Board is unable to conclude that the Tribe ever agreed in the FY 1996 AFA that the policies set forth in ISDM 92-2 were controlling. If anything, the relevant language indicates a lack of agreement by the parties as to the amounts to be funded and the method of funding.

As for Sec. 314, Appellant contends that IHS' position that it "extinguishes" the Tribe's claims for more contract support costs must mean that the Tribe previously had a valid claim. It further argues that giving Sec. 314 retroactive effect would be inconsistent with the plain language of that provision and in clear violation of the three-part test for retroactivity enunciated in Madrid v. Gomez, 150 F. 3d 1030 (9th Cir. 1998), citing Landgraph v. USI Film Products, 511 U.S. 244 (1994). The tests are (1) whether Congress has expressly prescribed the statute's proper reach: a statute can operate retroactively only with a clear statement to that effect; (2) whether the statute is retroactive under the ordinary rules of statutory construction, including its legislative history; but (3) if neither of the previous steps sheds light on the scope of the statute, then the court must apply the judicial default rule that statutes are not to be applied so as to create a "retroactive effect."

Appellant asserts that the terms of Sec. 314 are on their face prospective ("are the total amounts available" and "may use"). It cites the language of Landgraph that: "The largest category of cases in which we have applied the presumption against statutory retroactivity has involved new provisions affecting contractual or property rights, matters in which predictability and stability are of prime importance." 511 U.S. 244 at 271. The Landgraph court adds a footnote as follows:

> While the great majority of our decisions relying upon the antiretroactivity presumption have involved intervening statute burdening private parties, we have applied the presumption in cases involving new monetary obligations that fell only on the government [Ibid., case citations omitted].

However, we need not discuss the effect of Sec. 314 at greater length because the Board's position on that issue has already been made clear in Cherokee and been

affirmed by the Federal Circuit in <u>Thompson</u>. Briefly, as Appellant urges, we did not find it contains the necessary requisites for retroactive application. Thus, Section 314 does not preclude summary judgment for Appellant.

### Decision

Having thoroughly reviewed the parties' voluminous submissions in this matter, we find that this Appeal has no significant differences from <u>Cherokee</u>, and that the precedent in <u>Thompson</u> is controlling.

Accordingly, we grant Appellant's Motion for Summary Judgment and hold that, in the circumstances of this case, (1) the Tribe's mandatory and agreed-upon contract support costs should have been fully funded out of IHS's more than adequate lump-sum appropriations for the years in question, rather than being limited to amounts informally recommended by the Appropriations Committee; (2) IHS had an obligation to reprogram funds, if necessary, to fulfill that statutory obligation; and (3) Seldovia is entitled to an additional $252,878 in CSC to cover IHS's underpayment in FY's 1996 and 1997, together with interest calculated in accordance with the Contract Disputes Act. The Government's motions are hereby denied.

Bernard V. Parrette
Administrative Judge

I concur:

Candida S. Steel
Chief Administrative Judge

13

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**COUNCIL OF ATHABASCAN**                     )
**TRIBAL GOVERNMENTS**,                        )
                                               )
     PLAINTIFF,          )
                                               )
     v.                  )          Civil Action No. 07-1270 (RWR)
                                               )
**UNITED STATES OF AMERICA,**                  )
**MICHAEL O. LEAVITT**, Secretary of the       )
Department of Health & Human Services; and     )
**ROBERT G. McSWAIN**, Acting Director,        )
Indian Health Service;                         )
                                               )
     DEFENDANTS.         )
                                               )

## ORDER DENYING
## DEFENDANTS' MOTION TO DISMISS
## OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT

THIS MATTER having come before the court on Defendants' Motion to Dismiss or in the Alternative for Summary Judgment pursuant to Rules 12(b)(1), 12(b)(6) and 56 of the Federal Rules of Civil Procedure, and the court having considered the submissions of the parties and being otherwise sufficiently advised in this matter, now therefore it is

ORDERED, ADJUDGED AND DECREED, that Defendants' Motion is DENIED; and it is further

ORDERED, that Defendants answer the Plaintiff's Complaint within fourteen (14) days of the entering of this order.

Dated: _____          _____
                                Richard W. Roberts
                                UNITED STATES DISTRICT JUDGE