IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| COUNCIL OF ATHABASCAN TRIBAL GOVERNMENTS, | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil Action No. 07-1270 (RWR) |
| UNITED STATES OF AMERICA; MICHAEL O. LEAVITT, Secretary of the Department of Health and Human Services; and ROBERT G. McSWAIN, Acting Director, Indian Health Service; | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS
OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT**

The Government moved to dismiss this case for failure to state a claim because Plaintiff failed to plead a breach of its contract with the Indian Health Service (IHS) under the Indian Self-Determination Act (ISDA) for FY 1995. Plaintiff now argues that the contract was amended to provide for more funds despite the absence of any actual amendment. Alternatively, Plaintiff asserts that the contract should have been amended because the ISDA somehow requires the payment of additional funds over and above any amount to which the parties agreed. Plaintiff's contractual arguments are not supported by the contract itself, nor the evidence Plaintiff would now introduce. Plaintiff's statutory arguments are equally unavailing, because nothing in the contract between the parties contradicts the Act.

The Government also moved in the alternative for summary judgment because Plaintiff's

claims are barred by laches. Plaintiff waited ten years after IHS completed performance under the contract in September 1995 before presenting IHS with its two claims in September 2005. Plaintiff now contends that it was relying on two successive class actions before bringing its individual claim in this case. However, it is well established that once a class action has been denied, a claimant may not reasonably rely on a second class action to extend limitations periods. Moreover, Plaintiff's own actions during this time period demonstrate that it was not relying on class actions for further recovery under the contract. Instead, Plaintiff sent IHS documents releasing the government from any further claims. IHS was not on notice of Plaintiff's claims, and would be prejudiced if Plaintiff is allowed to proceed with its arguments for relief beyond the four corners of the contract.[1]

## I.    THE CONTRACT SET FORTH AND IHS PAID THE FULL AMOUNT DUE UNDER THE ISDA.

Plaintiff does not even dispute that its contract contained specific funding figures and that IHS paid those amounts in full. What Plaintiff now claims is "circular" reasoning is, in fact, full performance. The amounts provided in the Contract and Modifications are not just the amounts paid but the amounts promised as the result of the parties' negotiations. (A.R. 58, 65) Neither the Contract nor the ISDA supports Plaintiff's arguments that the Court should now read additional indirect cost funding into the documents. Plaintiff has fully recovered and should not receive a windfall.

---

[1] Plaintiff concedes that its claim relating to carry-forwards is not supported by the administrative record. *See* Pl. Opp. Mot. to Dismiss or for Sum. J. (hereinafter "Pl. Opp.") at 2 n.1.

**A.     Plaintiff Has Already Received "Full Funding" Under Its ISDA Contract.**

Plaintiff's primary argument is that since the contract references the ISDA, it must be read to provide for "full" funding.  However, section 106 of the ISDA does not specify a formula or other measure to calculate how much CSC is "full funding."  Def. Memo. in Support of Mot. to Dismiss or Sum. J. (hereinafter "Def. Memo") at 5.  The ISDA provides that an amount shall be added for "reasonable costs" that are necessary to carry out the contract and "prudent management."  25 U.S.C. § 450j-1(a)(2).  It further provides that these additional costs may not duplicate other funding.  25 U.S.C. § 450j-1(a)(3).  The ISDA contemplates that the parties may use an indirect cost rate to calculate the "reasonable costs," see 25 U.S.C. § 450b(g) (defining "indirect cost rate"); § 450j-1(c)(3) (requiring the Secretary to report indirect cost rates and types of rates to Congress).  However, the ISDA in no place requires the use of a rate times base formula.  *See* 25 U.S.C. § 450j-1(a)(3)(B) (authorizing annual negotiations for the amount of contract support costs).[2]

In this case, the parties negotiated an amount for indirect type costs to be paid (A.R. 28, 65), and that amount was paid, plus additional amounts added by modification.  Compl. ¶ 20.  Plaintiff has not provided any persuasive evidence that the amount paid was less than "full."  Therefore, the statute does not trump the contract because they do not conflict.

---

[2] The Government acknowledges that tribal contractors frequently use indirect cost rates to calculate their need for indirect costs and that the ISDA permits it.  In *Tunica-Biloxi Tribe of Louisiana*, the defendants stated, "[t]he ISDA does not prohibit IHS from using indirect cost rates negotiated under OMB A-87."  Defs. Mem. in Support of Mot. to Dismiss or Sum. J. at 35, *Tunica-Biloxi Tribe of Louisiana v. United States*, Case No. 02-2413 (D.D.C., Dec. 21, 2006).  Defendants did not argue that the ISDA mandated the use of indirect cost rates, but rather that the ISDA contemplated the use of rates as negotiated under OMB Circular A-87.  *Id.*  None of this has any application here, however, because the contractor neither had a rate at the beginning of the contract, nor asked IHS to amend the contract to incorporate it.

Plaintiff misleads the Court when it asserts that because it negotiated an indirect cost rate with "Defendants," that indirect cost rate automatically became part of the contract. Although Plaintiff did negotiate an indirect cost rate agreement, pursuant to Office of Management and Budget (OMB) Circular A-122, that negotiation was with the Department of Health and Human Services Division of Cost Allocation ("DCA"). (A.R. 92-93). The DCA is part of a different operating division from IHS and does not have the authority to enter into or amend an ISDA contract. Instead, Congress has identified the Director of the Indian Health Service (and his delegates) as having the authority to enter into and amend ISDA contracts. 25 U.S.C. § 1661(c)(3).

Examining the indirect rate agreement does not help Plaintiff. By its own terms, the indirect rate agreement does not purport to amend any existing contracts or other awards. It states "[t]he rates in this Agreement are subject to any statutory or administrative limitations and apply only to the extent that funds are available." (A.R. 93) *See also* 2 C.F.R. § 230.10(b) (cost principles in OMB Circular A-122 "deal with the subject of cost determination, and make no attempt to identify the circumstances or dictate the extent of agency and non-profit organization participation in the financing of a particular project"). In this instance, the indirect cost agreement did not change the amount of any award, but provided a rate that Plaintiff could use to allocate indirect costs among programs, and limited those indirect costs to the actual costs incurred. The agreement conditioned acceptance of the rate "subject to the following conditions . . . only costs incurred by the organization were included in its indirect cost pool as finally

accepted." *Id.*[3] *See also* 2 C.F.R. § 230.20(a) (cost principles in OMB Circular A-122 "shall be used by all Federal agencies in determining the costs of work performed . . . . The principles do not apply to awards under which an organization is not required to account to the Federal Government for actual costs incurred.").

Critically, after Plaintiff negotiated its provisional indirect cost rate agreement with DCA in June 1995, it did not request that IHS amend the ISDA contract to incorporate the indirect rate agreement, and no such amendment was made. The ISDA does not allow for unilateral amendments. *See* 25 U.S.C. § 450f(a)(2) (requiring Secretarial approval of amendments proposed by tribes); 25 U.S.C. § 450j-1(b)(5) (authorizing the Secretary to add funds to a contract at the request of the tribal contractor). Nor did IHS policy require that IHS unilaterally amend the agreement. The policy, ISDM 92-2, provides that the parties may negotiate indirect type costs in the absence of an indirect cost rate agreement. (A.R. 82, 85) It does not require that the parties change the agreement to incorporate the policy mid-year, but instead requires the parties to identify an indirect type costs award amount for twelve months of operation. (A.R. 85) Here, these permissive procedures were not used, and the contract itself and the contract modifications remained clear and unambiguous: IHS and Plaintiff agreed to the payment of a negotiated lump sum for indirect type costs, and IHS paid those costs.[4]

---

[3] Plaintiff also relies on a provisional rate of 76.8% but the final rate was 74.0%. (A.R. 94)

[4] Plaintiff's arguments regarding canons of construction that favor Indian tribes are irrelevant where, as here, the contract is unambiguous. "The canon of construction regarding the resolution of ambiguities in favor of Indians, however, does not permit reliance on ambiguities that do not exist; nor does it permit disregard of the clearly expressed intent of Congress." *Catawba v. South Carolina*, 476 U.S. 498, 506 (1986).

Plaintiff mistakenly relies on another document to establish a greater contract amount. IHS compiled a "shortfall report" to forecast the agency's need for contract support cost funding in fiscal year 1996. (A.R. 105). *See* 25 U.S.C. 450j-1(c) (requiring IHS to report funding shortfalls to Congress). Unlike Plaintiff's FY 1995 budget for indirect type costs, which was negotiated and incorporated into the contract (A.R. at 58, 65), this document appears nowhere in the Contract or modifications. The Government's motion to dismiss Plaintiff's breach of contract claim based on full performance is brought under Fed. R. Civ. P. 12(b)(6). While the contract documents are incorporated into the Complaint and properly before the Court, *see Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004), Plaintiff cannot force the Court to convert Defendant's motion to dismiss into one for summary judgment by simply offering any extrinsic evidence. On the contrary, any such extrinsic evidence needs to be both part of the contract and material to the outcome of the 12(b)(6) motion. *See* Fed. R. Civ. P. 12(d); *Thomas v. District of Columbia*, 887 F. Supp. 1, 5, n.1 (D.D.C. 1995) ("The Court has discretion not to accept matters outside the pleadings presented by any party in conjunction with a 12(b)(6) motion, particularly where the proffered material and the conversion from a motion to dismiss to one for summary judgment will not facilitate disposition of the action.").[5] Here, the shortfall report fails on both points because it did not calculate amounts due, but instead estimated Plaintiff's need for FY 1996, whereas the contract at issue here concerns FY 1995. (A.R. 105)

Instead of relying on the shortfall report, which was not designed as a measure of contract

---

[5] Plaintiff asserts that it may rely on extrinsic evidence to defend against the Government's motion to dismiss for lack of subject matter jurisdiction, *see* Pl. Opp. at 9, but no jurisdictional question remains because the Government moved to dismiss--on jurisdictional grounds--only the carry-forward claim and Plaintiff has conceded that claim. Pl. Opp. at 2, n.1.

performance, the Court should instead look at Plaintiff's own reports of its indirect cost expenditures in its quarterly financial status reports, Standard Form 269A. (A.R. 97-104)[6] Unlike the shortfall report, these reports were required by the contract, and are thus properly before the Court on a motion to dismiss. Section G.2.F of the contract required Plaintiff to submit reports of quarterly expenditures of direct and indirect costs to "Area Contracting to determine the allowability, allocability and reasonableness of costs." (A.R. 29)  On April 17, 1996, six months after the close of the fiscal year, and at a time when it could be expected to know its expenses, Plaintiff reported that it had expended $335,854 in indirect costs in FY 1995 (A.R. 103-104), against the $375,185 IHS paid it. (Compl. ¶ 20)  In short, IHS and Plaintiff entered into a contract for "reasonable" indirect type costs to be paid as a lump sum, Plaintiff concedes that IHS paid the costs as set forth in the contract, and Plaintiff reported that it covered its "reasonable costs" with almost $40,000 to spare for future expenditures. Therefore, Plaintiff received "full funding" under the contract and the ISDA and is entitled to no more.[7]

### B. The ISDA Does Not Require Payment Beyond the Amount in the Contract.

Despite the fact that IHS fully complied with the terms of the contract, Plaintiff asserts that the ISDA gives it an unwaivable right to "full funding" in an amount greater than set forth in the contract. Plaintiff's argument is not supported by the ISDA, which, instead of a formula, sets

---

[6] Plaintiff asserts that because Plaintiff submitted reports allocating its costs using the provisional indirect cost rate, IHS agreed to use the rate to calculate the amount due under the contract. Pl. Opp at 6 n.9. As discussed above, using an indirect cost rate to allocate costs does not change the amount due under the contract. 2 C.F.R. § 230.10(b).

[7] Plaintiff does not contest the Government's motion to dismiss its claim for rate miscalculation except to assert that IHS used a rate to calculate the amount due under its contract. *See* Pl. Opp. at 6 n.6. This assertion should be disregarded because, as shown above, IHS did not use a rate to calculate the amount Plaintiff would receive under its FY 1995 Contract.

forth a process by which the parties are to negotiate CSC funding. *See* 25 U.S.C. § 450f(a)(1) (requiring the Secretary to review tribal proposals to contract); 25 U.S.C. § 450j(a)(3)(B) (authorizing annual negotiation of amount of funds due under the contract); 25 U.S.C. § 450j(c)(2) (same). *See also* 25 U.S.C. § 450*l*(c) at section (b)(14) (Model Title I contract requires negotiations for successor annual funding agreement). Congress addressed its concerns about uneven bargaining power by providing ample protections for tribal contractors. *See e.g.* 25 U.S.C. § 450f(a)(2) (requiring IHS to decline tribal contract proposals for specified reasons within 90 days of receipt of the proposal), 25 U.S.C. § 450m-1(a) (providing tribes and tribal organizations with right to immediate judicial review of contract proposal declinations). For example, had Plaintiff wished to amend its FY 1995 contract to incorporate an indirect cost rate, the ISDA provides that IHS would have had to review the proposed amendment and either approve it or decline it within 90 days. However, Plaintiff did not make such a proposal for its FY 1995 contract. Plaintiff's failure to make such a proposal should not be construed as an illegal "waiver" but instead as its continuing agreement to the terms of the bargain.

      The courts have recognized that the ISDA does not create an entitlement to funding outside an ISDA contract. *Samish Indian Nation v. United States*, 419 F.3d 1355, 1364-65 (Fed. Cir. 2005). In *Samish*, the court examined whether the ISDA is "money mandating," that is, whether the ISDA, standing alone, set a measure of recovery. The court determined that it did not. *Id.* In *Cherokee*, the Supreme Court held that an ISDA contract was as binding as any other contract. 543 U.S. 631, 639.

      A lone administrative decision is Plaintiff's only support for its argument that the ISDA creates a statutory right to a certain amount of contract support costs that cannot be altered by

agreement of the parties. *Appeals of Seldovia*, IBCA 3862 and 3863/97 (2003). This decision is neither authoritative nor binding and was decided before *Cherokee Nation*. The decision's discussion of statutory waiver is not persuasive because the administrative judge did not discuss authoritative Federal Circuit decisions such as *Whittaker Electric System v. Dalton*, 124 F.3d 1443 (Fed. Cir. 1997) and *E. Walters & Co. v. United States*, 576 F.2d 362 (Cl. Ct. 1978), which hold that a contractor waives its right to challenge the legality of a contract provision by agreeing to it.[8] To hold, as the *Seldovia* administrative judge did, that the ISDA permits a party to agree to a contract, accept its benefits, and then claim that it is entitled to a better deal, would make it virtually impossible for the government to contract within its appropriation and render such limits meaningless. Yet the ISDA provides that all contract funding is "subject to the availability of appropriations." 25 U.S.C. 450j-1(b)(2).

Moreover, on its facts, *Seldovia* does not apply to a case, such as this one, where the tribal contractor did not seek to use an indirect cost rate to determine the amount of indirect cost funding to be paid. *Compare Seldovia* at 12 (where tribe sought to amend contract to add indirect cost rate, agency could not rely on funds allocation policy to pay less than amount generated by the rate). This Court should disregard *Seldovia*.

Since the ISDA does not create a statutory right to any specific amount of funding,

---

[8] Plaintiff would distinguish these cases by arguing that it did not know that its contract was "illegal" at the time it signed it because it did not know how much IHS would pay. (Pl. Opp. at 18 n.16 and accompanying text.) This argument lacks credibility because the contract stated that the parties would negotiate indirect type costs (A.R. 28), and incorporated Plaintiff's FY 1995 budget for those costs in Modification 3. (A.R. 58) Plaintiff knew how much it would receive, and had it disagreed, could have refused to sign Modification 3 and proposed something else. *See* 25 U.S.C. 450f(a)(1) (Secretary required to review and approve, or decline, tribal proposals to amend self-determination contracts).

Plaintiff's arguments regarding a waiver of a regulation versus waiver of a statutory right are equally beside the point. The principle of waiver can apply to a statute "unless Congress itself has evinced an intention to preclude waiver." *Do-Well Mach. Shop, Inc. v. United States*, 870 F.2d 637, 641 (Fed. Cir. 1989). Nothing in the ISDA states that the rules of waiver are inapplicable to it. To the contrary, the ISDA contemplates that issues regarding contract funding are to be resolved promptly. *See* 25 U.S.C. § 450(f)(a)(2)(D) (requiring declination of contract proposals due to disagreements over funding levels); 25 U.S.C. § 450f(b) (requiring Secretary to provide opportunity for tribe to appeal declination decision); 25 U.S.C. § 450m-1(a) (granting original jurisdiction to federal district courts to hear declination appeals). These provisions demonstrate that Congress intended for contract disputes to be resolved before entering into the contract, and not to foreclose waiver principles after the parties have come to agreement.[9]

## II. PLAINTIFF'S ACTION IS BARRED BY LACHES.

### A. Plaintiff Cannot Rely on Successive Class Actions to Excuse its Ten Year Delay Bringing this Action.

The Government moved for summary judgment on laches because Plaintiff presented two of its three claims to IHS in September 2005, almost ten years after the end of its contract in

---

[9] Plaintiff cites the ISDA's language regarding waiver of regulations, Pl. Opp. at 19, but this language does not apply to whether a tribe may waive a statutory right. To make this point, Plaintiff cites cases applying *expressio unius est exclusio alterius*, which is a "canon of construction holding that to express or include one thing implies the exclusion of the other, or of the alternative." Black's Law Dictionary, 8th ed. (2004); *see* Pl. Opp. at 19 n.17. The canon's force "depends entirely on context, whether or not the draftsmen's mention of one thing . . . does really necessarily, or at least reasonably, imply the preclusion of alternatives." *Martini v. Fed. Nat'l Mortgage Ass'n*, 178 F.3d 1336, 1343 (D.C. Cir. 1999) (internal quotations and citation omitted). One provision in the ISDA setting forth a mechanism for a tribe to seek waiver of regulations does not contain the context necessary to infer that Congress intended to foreclose the waiver that is generally present with respect to contracts.

September 1995. In response, Plaintiff argues that it relied on the pendency of two successive class actions for recovery, but finally decided to bring its individual claims in FY 2005. (Pl. Opp. at 26.)

The Cherokee Nation brought a proposed class action in 1999 seeking additional funding for contract support costs. It was filed on March 5, 1999 and class certification was denied on February 9, 2001. *See* No. 99-CV-0092-FHS (E.D. Okla); 199 F.R.D. 357, 366 (E.D. Okla. 2001). Plaintiff could not have participated in the *Cherokee* class action, however, because it had not yet presented its claim to IHS, which is a jurisdictional requirement under the Contract Disputes Act. Because presentment of claims to the contracting officer is a mandatory prerequisite to raising claims in federal court, *see Zuni*, 467 F. Supp. 2d at 1106, the putative class in *Cherokee* could not include contractors that had not presented their contract claims. *See NuFarm America's Inc. v. United States*, 398 F. Supp.2d at 1353-54 (finding no jurisdiction over class members who had failed to exhaust administrative remedies); *see also Founding Church of Scientology v. Director, FBI*, 459 F. Supp. 748, 756 (D.D.C. 1978) (when administrative presentment is jurisdictional, "each member of the plaintiff class must exhaust his or her administrative remedies"). Plaintiff had not presented its claims when *Cherokee* was filed in 1999, or even in 2001, when the class certification motion was denied.

Instead, Plaintiff brought its claim more than four years after that denial. Plaintiff thus misplaces its reliance on *Solow v. United States*, 78 Fed. Cl. 86 (2007), and *Athey v. United States*, 78 Fed. Cl. 157, because those cases involved claimants in a class brought under the Tucker Act, which does not require presentment as a jurisdictional prerequisite. *See* 28 U.S.C. § 2501 (case must be brought within six years of accrual of claim). Unlike Plaintiff, these

claimants were properly before the court in a class action, and the government was on notice of their action. *See Athey*, 78 Fed. Cl. at 160-61. Moreover, unlike Plaintiff, the *Solow* and *Athey* claimants did not wait another four years but brought their cases within six months of dismissal from the class. *See Solow*, 78 Fed. Cl. at 89; *Athey*, 78 Fed. Cl. at 160-61.

Plaintiff asserts that it did not file before 2005 because it was relying on a second class action, brought in September 2001 by the Pueblo of Zuni. The Pueblo of Zuni filed a motion for class certification in the District of New Mexico, which was ultimately denied for the same reasons as the *Cherokee* class in May 2007. *Pueblo of Zuni v. United States*, 243 F.R.D. 436, 447 (following *Cherokee* to hold against class certification on commonality); *id.* at 448-49 (following *Cherokee* to hold against class certification on typicality).

It is black letter law that where a class action may toll a statute of limitations, a class member may rely on <u>one</u> proposed class action, but not a second one, to toll limitations periods. *See, e.g., McKowan Lowe & Co., Ltd. v. Jasmine, Ltd.*, 295 F.3d 380, 386 (3d Cir. 2002) (*American Pipe* tolling does not operate to permit plaintiffs to relitigate the propriety of a class action except where the first action was denied due to inadequate representation); *Basch v. Ground Round, Inc.*, 139 F.3d 6, 11-12 (1st Cir. 1998) ("The policies--respect for Rule 23 and considerations of judicial economy--which animated the *Crown, Cork* and *American Pipe* tolling rules dictate that the tolling rules, if adopted at all in ADEA cases, [do] not permit plaintiffs to stretch out limitations periods by bringing successive class actions"); *In re Vioxx Products Liability Litigation*, 478 F. Supp. 2d 897, 907 (E.D. La. 2007) ("Federal courts have uniformly held that the *American Pipe* rule operates only with respect to the first class action filed for a specific controversy"). While this case involves laches, not tolling, the equitable principle is the

same. A class member cannot reasonably expect that a second motion to certify a class will meet a different fate than the first, and must act to vindicate its rights.

In any event, Plaintiff's own actions show that it was not acting in reliance on either class action. In September 1999, during the pendency of the *Cherokee* class action, Plaintiff completed the close-out of its IHS contract by submitting a release of any and all claims arising under the contract. (A.R. at 147) Contrary to Plaintiff's assertions, IHS was not on notice of any individual claim by Plaintiff, but rather, had been given a signed document stating that Plaintiff would never bring any claim. *Id.* Seven years then elapsed before Plaintiff finally submitted its two claims.

    **B**    **The Government Will Suffer Evidentiary Prejudice If Plaintiff Relies on Extrinsic Evidence.**

Plaintiff states that the Government will not be prejudiced if Plaintiff is allowed to proceed with its case because the contract documents still exist. Pl. Opp. at 27. However, Plaintiff's entire argument is that the contract documents do not show the true amount Plaintiff was owed. *See* Pl. Opp. at 1-2. Plaintiff cannot have it both ways: either Plaintiff is bound by the contract documents or it is relying on extrinsic evidence, in which case the Government can establish evidentiary prejudice if its witnesses cannot remember what happened.

If Plaintiff relies on extrinsic evidence, then it has not met its burden in opposing summary judgment. Once the initial burden of the moving party is satisfied, the burden shifts to the responding party to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). In opposing a motion for summary judgment, "the non-moving party cannot rely on

mere allegations or denials but must set forth specific facts showing that there are genuine issues for trial." *Worth v. Jackson*, 377 F. Supp. 2d 177, 180-81 (D.D.C. 2005).  In this case, Plaintiff does not dispute that the Government's witnesses have long since retired.  Pl. Resp. to Def. Statement of Material Facts.  It merely makes a blanket assertion that since the government's witnesses are retired, and not dead, the ten year delay did not prejudice the Government.  Pl. Opp. at 27.  This assertion is not enough to resist summary judgment.

        **C.**        **The Government Has Shown Economic Prejudice.**

The Government has also demonstrated economic prejudice to reviving this stale claim.  Congress appropriated money to IHS to spend within FY 1995.  *See Dep't of Interior & Related Agencies Appropriations Act, 1995*, Pub. L. No. 103-332, 108 Stat. 2499, 2527-28, 2536, 2537-38 (1994).  Contrary to Plaintiff's assertion, IHS would not be in the same situation if Plaintiff brought its claim in 1996, because IHS still had the ability to liquidate contractual obligations from FY 1995 using the appropriation.  *See* 31 U.S.C. § 1552(a) (allowing agencies five years to liquidate obligations before the appropriation reverts to Treasury).  However, this authority expired at the end of FY 2000, nearly five years before Plaintiff finally brought its claims.

Plaintiff asserts that IHS can simply pay any judgment out of the Judgment Fund.  However, "[w]here a plaintiff seeks an award of funds to which it claims entitlement under a statute, the plaintiff seeks specific relief, not damages." *America's Community Bankers v. FDIC*, 200 F.3d 822, 829 (D.C. Cir. 2000).  As such, Plaintiff in this case is not truly seeking compensatory damages from the Judgment Fund.  Even if it were, Plaintiff's assertion ignores the fact that the CDA requires IHS to repay those amounts.  41 U.S.C. § 612.  Therefore, it is not simply a matter of recovering damages from the Judgment Fund.

## CONCLUSION

For the foregoing reasons, the Government requests that its motion to dismiss be granted and judgment entered in its favor.

February 14, 2008                              Respectfully submitted,

> JEFFREY A. TAYLOR, D.C. Bar # 498610
> United States Attorney
>
>   /s/
> RUDOLPH CONTRERAS, D.C. Bar # 434122
> Assistant United States Attorney
>
>   /s/
> ALAN BURCH, D.C. Bar # 470655
> Assistant United States Attorney
> 555 4th St., N.W.
> Washington, D.C. 20530
> (202) 514-7204
> alan.burch@usdoj.gov