**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **COUNCIL OF ATHABASCAN TRIBAL GOVERNMENTS**, | ) ) ) |
| PLAINTIFF, | ) ) |
| v. | ) )   Civil Action No. 07-1270 (RWR) |
| **UNITED STATES OF AMERICA,** **MICHAEL O. LEAVITT**, Secretary of the Department of Health & Human Services; and **ROBERT G. McSWAIN**, Acting Director, Indian Health Service; | ) ) ) ) ) ) |
| DEFENDANTS. | ) ) |

**PLAINTIFF'S MOTION FOR LEAVE TO FILE SURREPLY
TO DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS
OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT**

The Plaintiff CATG hereby moves for leave to file a surreply brief in response to the Defendants reply, which was filed on February 14, 2008. In its reply the Defendants have raised for the first time two new arguments that were not raised in their original motion: (1) that the indirect cost rate agreement was not incorporated into the CATG contract even though it was agreed to during the contract year; and (2) that CATG signed a release of claims for FY 1995.

Of course these are both significant assertions based on facts that apparently the Defendants have only now gleaned from the record. The Plaintiff believes it should be allowed to respond to these new arguments and that the Court would benefit from a full written briefing before proceeding to oral argument.

The Surreply brief is attached to this motion.[1] The Plaintiff understands that the Defendants would have an opportunity to respond to this pleading.

                                                          Respectfully Submitted,

                                                          _____/s/_____
                                                          F. Michael Willis
                                                          HOBBS, STRAUS, DEAN & WALKER, LLP
                                                          2120 L Street, NW, Suite 700
                                                          Washington, DC  20037
                                                          202-822-8282 (Tel.)
                                                          202-296-8834 (Fax)

                                                          _____/s/_____
                                                          Geoffrey D. Strommer
                                                          HOBBS, STRAUS, DEAN & WALKER, LLP
                                                          806 SW Broadway, Suite 900
                                                          Portland, Oregon 97205
                                                          503-242-1745 (Tel.)
                                                          202-242-1072 (Fax)

                                                          Attorneys for the Council of
                                                          Athabascan Tribal Governments

Dated: March 5, 2008

---

[1] The brief is eleven pages long, well within the 25-page limitation for replies set forth in Local Civil Rule 7(e).

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **COUNCIL OF ATHABASCAN TRIBAL GOVERNMENTS**, </br></br> PLAINTIFF, </br></br> v. </br></br> **UNITED STATES OF AMERICA,** **MICHAEL O. LEAVITT**, Secretary of the Department of Health & Human Services; and **ROBERT G. McSWAIN**, Acting Director, Indian Health Service; </br></br> DEFENDANTS. | Civil Action No. 07-1270 (RWR) |

### PLAINTIFF'S SURREPLY TO DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT

In what can only be termed an effort to completely undermine the Congressional mandate for full funding under the Indian Self-Determination and Education Assistance Act ("ISDEAA"), the Defendants argue in their reply that the indirect cost rate agreement negotiated between the Council of Athabascan Tribal Governments ("CATG") and the Indian Health Service ("IHS") is not part of the FY 1995 contract and therefore does not stand as a basis to measure the full amount of contract support funding called for by statute and contract. There are three aspects to this new argument that we address below in turn.

1. <u>What Was Paid Under the Contract and Why It Was Paid</u>. The Defendants argue that CATG "agreed to the payment of a negotiated lump sum for indirect type costs, and IHS paid those costs." Def. Reply, p. 5. The Defendants also say, "the parties negotiated an amount for indirect type costs to be paid (A.R. 28, 65) and that amount was paid, plus

additional amounts by modification." Def. Reply at 3. For this proposition the Defendants cite to the Record at pages 28 and 65. Record page 28 is the contract. This page makes two references to costs--significantly the Defendants fail to note that at § G.1.B, the contract expressly states that "[t]he contractor will be reimbursed for all costs incurred in the performance of this contract, claimed by the contractor, and accepted by the Contracting Officer in accordance with ....General Provision 5, Negotiated Overhead Rates, if appropriate." That clause is the standard boilerplate for IHS that requires an indirect cost rate, once negotiated, to be applied to this very contract.[2] Indeed, on the same page of the contract is a paragraph on "Indirect Cost": "In lieu of a negotiated indirect cost rate by a cognizant agency, ISDM 92-2 is applicable for recipients without established indirect cost agreements." A.R. 28. At the beginning of the year, when CATG had no rate in place, negotiation of a lump-sum amount under ISDM 92-2 was proper, but the later agreement with the cognizant agency on an indirect cost rate—or "Negotiated Overhead Rate"—became part of the contract under these provisions.

The second reference is to A.R. 65, which is a sheet showing the CATG budget for FY 1995. This document has two columns, one of which is crossed out. It is not clear who made that edit but the Defendants say that they will read it "in favor of the Plaintiffs" and assume that the entire budget amount of $303,003 was incorporated into the contract. Def. Motion, p. 10, n. 5. The Defendants can point to no document in the record that suggests this budget was incorporated into the contract but just assume it to be so. The second column, which lists costs at two months or $61,938, is the amount that the Defendants claim is the

---

[2] We do not agree that these clauses are applicable to the contract once the model agreement was in place; see discussion below at 9.

2

negotiated amount for CSC and there is a contract document adding that amount. See Def. Motion, p. 10 and A.R. 58-59 and Def. Reply, p. 3.

Some months later, however, the IHS modified the contract twice to add CSC. An amount of $93,500 was added on September 19, 1995, A.R. 71-72, and another $66,932 was added on September 28, 1995, A.R. 73-74, making the total paid under the contract for FY 1995 the amount of $227,370. See A.R. 77. [3] The Defendants don't explain why these modifications were made. There is no evidence of "negotiation" in the record. There is no evidence that CATG sent a formal request for funds. Nor is there any evidence that IHS had an internal discussion about the need for additional funds beyond the initial lump sum amount. What is clear is that the amount paid does not match the purported incorporated budget amount of $303,000.

Given the lack of evidence in the record, one could reasonably ask if the money was a gift. But even if the contracting officer were generous, we think there is a better explanation and one that would provide the Government with the legal authority to add the funds to the contract. The explanation is this--IHS adds contract support funds to the contract as they become available and IHS was required by the indirect cost agreement to add amounts to bring CATG's indirect cost funding up to 100% of its need as determined by the negotiated rate.

A provisional indirect cost rate was agreed upon prior to the time the money was added to the contract, on May 23, 1995. A.R. 92. The Defendants argue that the indirect cost rate agreement was not added as a formal amendment to the contract. Def. Reply, p. 4.

---

[3] In it opening motion, the Defendants claim that an additional $152,815 was added for FY 1995. Def. Motion, p. 10. That is incorrect and we dispute that assertion. The amount was added to the FY 1994 contract. See A.R. 56 ("This contract is hereby increased by $152,615.00 ...for FY-94 by reason of this modification.")

It does not have to be, and in fact, the IHS recognized its applicability to FY 1995.[4] The Defendants also contend, without any support, that the rate agreement is merely a document that CATG could use to figure out how to allocate the money it received for indirect costs. Def. Reply, p. 10. Those assertions flatly contradicted by federal law, the ISDM 92-2, and IHS's own practices.

OMB Circular A-87, which governs indirect cost agreements, is incorporated into ISDM 92-2, see A.R. 86. The Circular makes clear that the objective of a cost agreement is to "provide that Federal awards bear their fair share of cost recognized under these principles." OMB Circular A-87, p. 4. The Circular also recognizes that the negotiation of an indirect cost rate takes months if not years and may occur during the course of a contract. See, e.g., p. 52, which notes that provisional rates are used on an interim basis until the final rate can be determined. In CATG's case, the "final" IDC rate for FY 1995 was not completed until Feb. 19, 1997. A.R. 94. These rates "will be accepted and used by all Federal agencies unless prohibited or limited by statute." OMB Circular A-87, p. 56.

The ISDM 92-2 quotes Section 106 of the ISDEAA, 25 U.S.C. § 450j-1, and states that the Circular A-87 is to be used as a basis for determining the need for contract support, i.e., the amount required by the ISDEAA. A.R. 81. When Congress enacted Section 106, it recognized that the indirect cost rate was the predominant method by which the full amount of the necessary CSC was calculated and it expected the use of the IDC rate to continue. The Senate report stated, "Tribal governments, like state and local governments, use indirect costs

---

[4] The Defendants make an odd argument that the Department of Health and Human Services officer who negotiates the IDC Rate has no authority to amend the ISDEAA contract to incorporate it. Def. Reply, p. 4. However, the Model Contract provides that the contracting officer has the delegated authority to modify the contract, and if it involves the addition of funds, can do so without that amendment being in writing. 25 U.S.C. § 450*l*(c) provisions (e)(1) and (2)(B). Although the contract at issue here was not the Model Contract, during the contract term the 1994 ISDEAA amendments introduced the mandatory Model Contract, which was incorporated by reference into existing agreements, as discussed below.

4

to pay for these administrative costs.  ... The term indirect cost is used [in the statute, see 25 U.S.C. § 450b(f) and (g)] because it is associated with known management practices.  Those practices are recognized and defined in [OMB] Circular A-87."  S. Rep. 100-274 at 9, 17.  This intent was carried through in the 1988 amendments.  See 25 U.S.C. § 450j-1(c)(3)–(5) (requiring IHS, in its CSC shortfall report to Congress, to include information on indirect cost rates, direct cost bases, and the resulting indirect cost pool amounts); *id*. § 450b(g) (defining "indirect cost rate" as "the rate arrived at through negotiation between an Indian tribe or tribal organization and the appropriate Federal agency").  ISDM 92-2 also recognized indirect cost rates as the procedure for assessing that statutory need.  Def. Ex. G at A19.  ISDM 92-2 does not prohibit the application of an indirect cost rate to an ongoing contract once it is negotiated, and indeed, given the time it takes to negotiate rates, such a position would negate the purpose of the provisional rate and it would hamper both the IHS and the contractor in solidifying the basis for the payment of CSC.  In any event, in practice, IHS used the provisional rate once stated in a written agreement.

       The CATG rate agreement states that the agreement is "for use on Federal contracts" and its effective date is October 1, 1994.  A.R. 92.  IHS did in fact recognize the provisional rate.  At A.R. 96, an IHS email discusses the fact that CATG is going to turn in revised Final Report vouchers for FY 1995 using an IDC rate.[5]  In fact, CATG did just that and in so doing, they reference their provisional rate.  See A.R. 97-98, Line 11 noting that a "provisional" type of rate is being used to state CSC.  See also A.R. 99-104.  Those reports

---

[5] These vouchers are required per the ISDEAA regulations, see 25 C.F.R. § 900.45.

are part of the record, the Defendants cite them as evidence that CATG was paid, see Def. Reply, p. 7, and there is no evidence that they were rejected by the agency.[6]

The Indirect Cost Rate is also a basis for the preparation of the shortfall report. The Defendants make much of the fact that these reports are not part of the contract. Def. Reply, 6. The Shortfall reports are public documents and therefore are subject to judicial notice. CATG does not argue they are part of the contract. We argue that the shortfall report depicts what happened in the contract as reported by IHS by Congressional mandate.[7] A close inspection of the CSC FY 1995 shortfall report confirms CATG's version of the facts. For example, the headings include a category titled "Indirect Cost Rate." CATG is the first contractor identified. An indirect cost rate of 76.8 is listed and it is recorded under "Rate Type" as "Provisional" (PV). Below that is a tribe, "Chitina Village," whose rate is listed as "None" and it is typed as "OR." If, in fact, CATG did not have an indirect cost rate applicable to FY 1995, one would expect the same notations.

---

[6] The Defendants argue that these reports show that all that was owed was paid. Def. Reply, p. 7. In fact, these reports are intended to document how the amount actually paid was used. See 25 C.F.R. § 900.45. Of course, CATG did not spend more than it received from the IHS. CATG is not going to go into debt or otherwise engage in deficit spending. CATG has to live within the amounts that IHS decides to pay. But that does not mean, and certainly these reports are no admission that, CATG was paid all the amounts owed under its rate agreement.

[7] Section 106(c) requires that the Secretary provide Congress an annual report that includes "an accounting of any deficiency in funds needed to provide *required contract support costs* to all contractors for the fiscal year for which the report is being submitted." 25 U.S.C. § 450j-1(c)(2) (emphasis added). These "shortfall reports" were to include detailed information for each tribal contractor on direct cost bases, indirect cost rates, and indirect cost shortfalls, if any. Like other IHS Area Offices, the Alaska Area Office, in whose region CATG is located, created shortfall reports documenting CSC underpayments to tribal contractors in its region. Although the format of the reports varied over the years, all included the essential information to calculate the shortfall: (1) the tribe's "requirement" or "need" (i.e., full funding under section 106(a) and (g)); (2) the amount paid; and (3) the difference (i.e., the shortfall).

The next category of columns is entitled "Funds for Indirect Costs" with the subheadings "Indirect Cost Funding Requirement," "Total IDC Funding Available," and "Indirect Cost Shortfall/Surplus." The Defendants describe this chart as a calculation of "need." Def. Reply, p. 6. Why would the agency need more funding if they had paid all they owed? Why would there have been a shortfall? A shortfall of what? Interestingly, the amount of funds listed in the column entitled "Indirect Cost Funding Requirement" is derived by multiplying the direct cost base times the Indirect Cost Rate. Thus, according to this chart, CATG's "Funding Requirement" for FY 1995 was $435,000. But according to the chart, they were paid only $375,185.

We submit that "Funding Requirement" as stated in the shortfall report is the "full amount" of funding called for under Section 106. Congress specifically mandated that the agency was to report when there was a deficiency in "required contract support costs," that is, the full amount required to be paid by the statute. See note 6. The Defendants' efforts to completely discount this report are disingenuous at best. Their continuing efforts to explain the report away as a meaningless planning document and to refuse to recognize "shortfalls" as an agency generated concept that indicates that contractors were not paid all that was owed under the indirect cost agreement, contract and statute, gives greater credence to the express Congressional concern that the agencies have deliberately sought to underfund ISDEAA contracts and particularly CSC. See CATG Opp. Br. at 3-4; See also *Thompson v. Cherokee Nation of Oklahoma*, 334 F.3d 1075, 1080-1081 (Fed. Cir. 2003) *aff'd Cherokee Nation of Oklahoma v. Leavitt,* 543 U.S. 631 (2005).

2. <u>The Agency Cannot Enforce a Release that Is Not Part of the ISDEAA Model Contract.</u> The Defendants now newly claim that CATG's complaint must be dismissed since the Tribe signed a release. See Def. Reply, pp. 2, 13. This argument was not raised in the initial motion to dismiss.

This "release," which is really a contract close-out document, cannot be construed as a release of the claim for full contract support for several reasons. First, the Government cannot rely on this release because it is not provided for under the ISDEAA. In 1994, Congress enacted amendments to the ISDEAA, which included the model contract, 25 U.S.C. § 450*l*, whose terms are incorporated by reference into every ISDEAA contract. 25 U.S.C. § 450*l*(a). These are the minimum requirements of an ISDEAA contract. Additional terms may be added to an ISDEAA contract but only upon negotiation and agreement by the tribal contractor. *Id.* at (b)(11).

In addition to the imposition of the model contract, upon the enactment of the 1994 Amendments, Congress expressly nullified existing regulations by declaring that any regulations that conflicted with the newly amended ISDEAA had been superseded, 25 U.S.C. § 450k(b), and also expressly prohibited the Secretary from promulgating any regulations regarding ISDEAA contracts except within a very narrow set of circumstances. 25 U.S.C. § 450k(a)(1). In addition, Section 450j(a)(1) precludes the applicability of general Federal contracting laws, such as FAR regulations, except to the extent that such laws expressly apply to Indians. Thus, under the terms of the ISDEAA, the Model Contract stands as the terms of the CATG contract, without the incorporation of any extraneous regulations unless CATG agreed to the application of additional terms.

In the CATG contract, there is an incorporation of boilerplate contract clauses from Public Health Service Acquisition Regulations. A.R. 39. Clause No. 6, "Payment," includes a reference to a release. There is also a provision that the "closing documents" are to include a "Contractor's Release." A.R. 47. But given that the contract spanned the 1994 amendments to the ISDEAA, those amendments voided these types of boilerplate clauses unless they were specifically agreed to by the tribe as part of a model contract negotiation. This conclusion is affirmed by 25 U.S.C. § 450k(b), which provides that any conflicting laws or regulations in effect before the amendments "shall" be superceded. This language suggests that Congress did not intend obsolete regulations to apply to contracts when it had ordered the agency to promulgate new regulations to carry out the 1994 amendments. *Id*. § 450k(a)(1). *See Ramah Navajo Chapter v. Lujan*, 112 F.3d 1455, 1463 (10th Cir. 1997) (court found it significant that Congress specifically directed defendants, with the participation of the tribes, to promulgate new implementing regulations, leading the court to believe that Congress did not intend pre-amendment regulations to be applied to a contract). The model agreement makes no provision for a release, nor do the regulations applicable to ISDEAA contracts. See 25 C.F.R. Part 900. Thus, these boilerplate clauses may not be enforced after the 1994 Amendments and long after the contract has been completed. Without the authority to impose this release on CATG, the Defendants cannot rely upon it.[8]

Second, the release cannot be imposed upon CATG since it would constitute a waiver of statutory rights. See CATG Opp. at 18-23. In addition, at the time the release was signed, a class action lawsuit was pending against IHS and IHS was aware that the claim for full funding was at issue in that lawsuit. *See Cherokee Nation of Oklahoma v. United States*, 199

---

[8] To the extent that the agency may rely on internal procedures or guidelines to require the release, those too may not be incorporated into a contract without tribal agreement. See 25 U.S.C. § 450k.

9

F.R.D. 357, 360-61 (E.D. Okla. 2001) (describing putative class and claim for full CSC funding). Despite that knowledge, IHS asked CATG to sign the release form without informing CATG of the full impact of the release on its claim to full funding. In that case, there could be no meeting of the minds as to this release. *See Axion Corp. v. United States*, 68 Fed. Cl. 468, 475-476 (2005).

Third, this release could be construed as a release of CATG's rights as a putative class member. IHS was aware of the pendency of the class action at the time and failed to inform CATG that IHS would use that release to argue that CATG was giving up its rights by signing a release as part of the contract close out. Obtaining a release during the pendency of a class action is improper and renders the release unconscionable and hence unenforceable. *In re Currency Conversion Fee Antitrust Litigation*, 361 F.Supp.2d 237, 251-253 (S.D.N.Y. 2005).

3. <u>CATG does not rely on *Zuni* to toll the limitations.</u> The Defendants argue that CATG has relied on the *Zuni* class action to toll the limitations period. Def. Reply, p. 12. This is not true. This is a laches case, not a limitations tolling issue. As Defendants recognize, no statute of limitations applies to this claim, *see id.*, so the rule cited by Defendants does not apply. The point we made and continue to make is that laches is inapplicable because CATG acted within a reasonable time under the laches analysis.[9]

---

[9] The Government also argues that CATG may not rely on the *Cherokee* class action to establish the reasonableness of its delay because CATG did not present its claim to the contracting officer, and thus the *Cherokee* court would not have had jurisdiction over the claim under the Contract Disputes Act ("CDA"). Reply at 11. Regardless of whether this is true or not—and we do not agree—CATG's reliance on the class action was reasonable in light of the *Ramah Navajo* precedent, where administrative exhaustion was not required to participate in a virtually identical class of tribal contractors. *See Ramah Navajo Chapter v. Lujan*, No. 90-957 (D.N.M. 1993) (unpublished memorandum opinion), *discussed in Pueblo of Zuni v. United States*, 467 F. Supp. 2d 1099, 1112-13 (D.N.M. 2006) ("the practical effect of the [*Ramah Navajo*] decision was that each member of the proposed class need not have exhausted its administrative remedies under the CDA").

        Respectfully Submitted,

        /s/
        F. Michael Willis
        HOBBS, STRAUS, DEAN & WALKER, LLP
        2120 L Street, NW, Suite 700
        Washington, DC  20037
        202-822-8282 (Tel.)
        202-296-8834 (Fax)

        /s/
        Geoffrey D. Strommer
        HOBBS, STRAUS, DEAN & WALKER, LLP
        806 SW Broadway, Suite 900
        Portland, Oregon 97205
        503-242-1745 (Tel.)
        202-242-1072 (Fax)

        Attorneys for the Council of
        Athabascan Tribal Governments

Dated: March 5, 2008

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **COUNCIL OF ATHABASCAN TRIBAL GOVERNMENTS**, <br><br> PLAINTIFF, <br><br> v. <br><br> **UNITED STATES OF AMERICA, MICHAEL O. LEAVITT**, Secretary of the Department of Health & Human Services; and **ROBERT G. McSWAIN**, Acting Director, Indian Health Service; <br><br> DEFENDANTS. | Civil Action No. 07-1270 (RWR) |

**[Proposed] ORDER GRANTING PLAINTIFF'S
MOTION FOR LEAVE TO FILE SURREPLY**

THIS MATTER having come before the court on Plaintiff's Motion for Leave to File Surreply to Defendants' Reply in Support of Motion to Dismiss or in the Alternative for Summary Judgment, and the court having considered the submissions of the parties and being otherwise sufficiently advised in this matter, now therefore it is

ORDERED, ADJUDGED AND DECREED, that Defendants' Motion is GRANTED.


Dated: _____          _____
                                Richard W. Roberts
                                UNITED STATES DISTRICT JUDGE