# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **COUNCIL OF ATHABASCAN** | ) | |
| **TRIBAL GOVERNMENTS**, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-1270 (RWR) |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| **MICHAEL O. LEAVITT**, Secretary of the | ) | |
| Department of Health & Human Services; and | ) | |
| **ROBERT G. McSWAIN**, Acting Director, | ) | |
| Indian Health Service; | ) | |
| | ) | |
| DEFENDANTS. | ) | |
| | ) | |

## PLAINTIFF'S RESPONSE TO DEFENDANTS'
## NOTICE OF SUPPLEMENTAL AUTHORITY

The Government has filed with this court a copy of the district court's ruling in

*Menominee Tribe of Wisconsin v. United States*, No. 07-812 (RMC) (D.D.C. March 14, 2008)

[2008 WL 680379 (D.D.C.)]. Defendants' Notice of Supplemental Authority (March 17, 2008).

Attached to this Response is the Plaintiff's Motion for Partial Reconsideration, filed in the

*Menominee* case, which sets forth in depth the errors made in that ruling.

The main point is that the court did not have any analysis from the Plaintiff on the

*NuFarm* case, which served as the entire underpinning of the court's ruling. Failing to fully

analyze the *NuFarm* case and to realize its clear conflict with class action law and Supreme

Court precedent, it is our view that the court missed the mark and should reconsider its decision.

We think that there is no doubt that *NuFarm* is a case wrongly decided and cannot withstand

close scrutiny. Our attached brief explains that point in detail.

– 1 –

The *Menominee* ruling on the other hand does agree with our arguments on substance that an Indian Self-Determination and Education Assistance Act ("ISDEAA") contract requires full funding. The court agreed with our position that the Government's arguments that the indirect cost rate lacks significance or that the amounts paid periodically are all that are due under the contract cannot stand up to the Supreme Court's clear holding in *Cherokee Nation v. Leavitt*, 543 U.S. 631 (2005). While the *Menominee* court's analysis of these issues is brief, the court correctly interpreted the ISDEAA and recognized the import of *Cherokee Nation*.

Respectfully Submitted,

_____/s/_____

F. Michael Willis (D.C. Bar No. 467462)
HOBBS, STRAUS, DEAN & WALKER, LLP
2120 L Street, NW, Suite 700
Washington, DC 20037
202-822-8282 (Tel.)
202-296-8834 (Fax)

_____/s/_____
Geoffrey D. Strommer
HOBBS, STRAUS, DEAN & WALKER, LLP
806 SW Broadway, Suite 900
Portland, Oregon 97205
503-242-1745 (Tel.)
202-242-1072 (Fax)

Attorneys for the Council of
Athabascan Tribal Governments

Of Counsel
Marsha K. Schmidt
Hobbs Straus Dean & Walker, LLP

Dated: March 24, 2008

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MENOMINEE INDIAN TRIBE )
OF WISCONSIN, )
          )
      PLAINTIFF, )
          )   Case No.: 1:07cv00812
    v. )
          )   Hon. Rosemary M. Collyer
UNITED STATES OF AMERICA, )
MICHAEL O. LEAVITT, Secretary of the )
Department of Health & Human Services, and )
CHARLES W. GRIM, Director of the )
Indian Health Service, )
          )
      DEFENDANTS. )
          )

## PLAINTIFF'S MOTION FOR PARTIAL RECONSIDERATION

Plaintiff, the Menominee Indian Tribe of Wisconsin (the "Tribe"), by and through

undersigned counsel, respectfully moves pursuant to Rule 54(b) of the Federal Rules of Civil

Procedure and Local Rule 7 for partial reconsideration of the Court's Memorandum Opinion and

Order dated March 14, 2008 ("Mem. Op.").  Specifically, the Tribe requests that the Court

reconsider that portion of its Order dismissing the Tribe's claims for years 1995-1998 because of

a lack of subject matter jurisdiction under rule 12(b)(1).  Mem. Op. at 2-3.

The grounds for this motion are that the Court relied on case law that was discussed by

the Government for the first time in its Reply.  Specifically, the Court relied on *NuFarm Am.,*

*Inc. v. United States*, 398 F.Supp.2d 1338 (Ct. Int'l Trade 2005) for the proposition that class

members who are later found to be outside of the Court's jurisdiction are not entitled to tolling.

The briefing schedule afforded no opportunity for the Tribe to respond to this argument in

writing, nor did it come up at oral argument.  The *NuFarm* case is in direct conflict with the

Supreme Court's ruling in *American Pipe and Construction Co. v. Utah*, 414 U.S. 538 (1974). We request the opportunity to brief the court on the grounds for that assertion.

In addition, this court, once again relying on the Government's argument in reply, held that the Tribe's claim for 1995 was barred by laches.   However, there is direct precedent against this court's holding that eleven years is a significant time period as well as this Court's agreement with the Government's view that there is an economic harm to the Government based on lapsed appropriations.

The above grounds are fully set forth in a Memorandum of Points and Authorities filed herewith.  Wherefore, the Tribe respectfully requests that the court grant this Motion. In addition, the Tribe requests an oral hearing on this Motion pursuant to Local Rule 7(f).

Respectfully Submitted,

_____/s/_____
F. Michael Willis
Geoffrey Strommer
HOBBS, STRAUS, DEAN & WALKER, LLP
2120 L Street, NW, Suite 700
Washington, DC  20037
202-822-8282 (Tel.)
202-296-8834 (Fax)

Attorneys for the Menominee Indian Tribe
of Wisconsin

Of Counsel:
Marsha K. Schmidt
Hobbs Straus Dean & Walker

DATED: March 24, 2008.

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**MENOMINEE INDIAN TRIBE**
**OF WISCONSIN,**

PLAINTIFF,

v.

**UNITED STATES OF AMERICA,**
**MICHAEL O. LEAVITT**, Secretary of the
Department of Health & Human Services, and
**CHARLES W. GRIM**, Director of the
Indian Health Service,

DEFENDANTS.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.: 1:07cv00812

Hon. Rosemary M. Collyer

## PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL RECONSIDERATION

As stated in Plaintiff's Motion, this Court ruled largely without having heard from the Plaintiff either in writing or during the oral argument on arguments and cases raised for the first time in the Defendants' Reply brief. The Tribe believes reconsideration of the Court's Memorandum Opinion of March 14, 2008 is warranted for the reasons below.

## I.       Standards Governing Reconsideration

This court has broad discretion to grant a motion for partial reconsideration "as justice requires." *See Childers v. Slater*, 197 F.R.D. 185, 190, 48 Fed.R.Serv.3d 396 (D.D.C. 2000), *citing* FED. R. CIV. P. 60(b) Advisory Committee Notes ("interlocutory judgments are not brought within the restrictions of [Rule 60(b)], but rather they are left subject to the complete power of the court rendering them to afford such relief from them *as justice requires*") (emphasis added).

- 1 -

In *Powell v. Castaneda*, 247 F.R.D. 179, 181 (D.D.C. 2007), the court explained that the "as justice requires" standard "amounts to determining 'whether reconsideration is necessary under the relevant circumstances,'" *citing Cobell v. Norton*, 224 F.R.D. 266, 272 (D.D.C. 2004).

In *Defense of Animals v. National Institutes of Health*, 527 F.Supp.2d 23, 28-29 (D.D.C. 2007) (Kollar-Kotelly, J.) this Court stated: "Considerations a court may take into account under the 'as justice requires' standard include whether the court 'patently' misunderstood the parties, made a decision beyond the adversarial issues presented, made an error in failing to consider controlling decisions or data, or whether a controlling or significant change in the law has occurred," *citing Singh v. George Washington University*, 383 F. Supp. 2d 99, 101 (D.D.C. 2005).   Judge Kollar-Kotelly further explained:

> *Cobell* also suggests that even if justice does not "require" reconsideration of an interlocutory ruling, a decision to reconsider is nonetheless within the court's discretion: "[E]ven if the appropriate legal standard does not indicate that reconsideration is warranted, the Court may nevertheless elect to grant a motion for reconsideration if there are other good reasons for doing so." *Id*. at 540. However, the efficient administration of justice requires that a court at the very least have good reason to reconsider an issue which has already been litigated by the parties: "The district court's discretion to reconsider a non-final ruling is, however, limited by the law of the case doctrine and 'subject to the caveat that where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again.'" *Singh*, 383 F.Supp.2d at 101 (quoting *In re Ski Train Fire in Kaprun, Austria, on November 11, 2000*, 224 F.R.D. 543, 546 (S.D.N.Y. 2004)). Thus, if the court chooses to reconsider a motion even if justice does not so require, there must be a "good reason" underlying the parties' re-addressing an already decided issue.

*Id*. at 29.

We are mindful that the tribe bears the burden to "demonstrate that some harm, legal or at least tangible, would flow from a denial of reconsideration." *Cobell v. Norton*, 355 F.Supp.2d 531, 540 (D.D.C. 2005).  We believe that such is the case here.  The Court's opinion dismisses a large swath of Plaintiff's claims without having heard from the Plaintiff on controlling precedent.

The reconsideration requested here is "necessary under the relevant circumstances" of this case, and there are "good reasons" for reconsidering whether tolling applied to the statute of limitations and whether laches applies. Given the lack of opportunity to respond to the Government's late assertion of new authority and facts, which we had hoped and expected would be part of the oral argument, the Court did not have the benefit of the Plaintiff's analysis and may not, as a result, been fully aware of the pertinent case law on the subject.

## II.    Reconsideration Is Warranted In This Case.

### A.    This Court Should Reconsider Its Reliance on the *NuFarm* Case Since that Decision Conflicts with Supreme Court Precedent

The Tribe asks this court to reconsider its ruling in which it declined to apply tolling to the CDA's six-year statute of limitations to present a claim to the contracting officer. The ruling, as explained in footnote 2 of the opinion, relies largely on the reasoning of *NuFarm Am., Inc., v. United States*, 398 F. Supp. 2d 1338 (Ct. Int'l Trade 2005). This decision, now on appeal to the Federal Circuit, held without support that a putative class member that must exhaust administrative remedies is not within the Court's jurisdiction and therefore could not be the beneficiary of class action tolling.[1]

*NuFarm*'s holding is directly contrary to applicable Supreme Court precedent and flies in the face of the purpose of tolling as it has developed in class action cases. In fact, there are many cases in which courts have been presented with a putative class defined in a complaint that is not later certified on any number of grounds or that lead the court to decline to exercise jurisdiction over certain class members. We could find no instance in which a claimant who was excluded

---

[1] While we understand that presentment as required by § 605 is necessary for court jurisdiction, we disagree with the conclusion that the statute of limitations for presentment may not be tolled. See discussion below at 8-11.

from a class was later held to be barred from bringing an individual claim because of lack of tolling.

1.     A Putative Class Member Is Within the Jurisdiction and Protection
        of the Court Until a Certification is Decided.

*NuFarm* held that if a class is not proper because the class members cannot meet the Court's jurisdictional requirements, then tolling could never have occurred.  That is, tolling only applies if the court later finds it has jurisdiction over the class member.  This holding is directly contrary to the notion that "Because of the representative nature of class litigation, it is settled that only the class representative must satisfy the requirements of subject matter jurisdiction, venue, and service of process on the named defendants in order to commence a suit styled as a class action."  Newberg on Class Actions, § 1:3.  In addition, those in the putative class are absent class members under the protection of the court and they are entitled to remain passive until the class issues are resolved.  *Id.*

The Supreme Court made it clear in *American Pipe and Construction Co. v. Utah*, 414 U.S. 538 (1974), that *all* members of the putative class, that is, those members of the class *as defined in the complaint*, are to be given the benefit of tolling until the class certification and the definition of the class is resolved, which is to say, until the court addresses whatever grounds for class opposition are raised.  If the class is not certified, is modified, or is otherwise resolved against the putative class member, the complaint is then to be amended to conform to the court's ruling.  If the court declines to certify, or modifies the class to exclude certain members, then the excluded claimant has the right to proceed to pursue an individual claim, and at that time must meet the re-started applicable statute of limitations. See Wright, Miller & Kane, 7B Fed. Prac. & Proc., § 1795.  See also Newberg on Class Actions, § 7:28 "[A] class complaint is presumed to

state a class action for purposes of tolling the statute of limitations for absent class members, before a formal class ruling, even if the class is ultimately denied."

The *NuFarm* court's holding denying tolling turns *American Pipe* and the Rule 23 legal tolling rule on its head, ignores the purposes of tolling, and leaves unsuspecting class members, particularly those who have knowledge of the pendency of the class, subject to loss of significant due process rights.  Wright, Miller, & Kane, *supra*.

  2.  <u>The Basis of *American Pipe* and Its Application.</u>

As explained in *American Pipe*, in the prior iteration of Rule 23, classes were spurious in that they were essentially joinder actions.  The courts had split on whether those joining could meet timeliness requirements based on the filing of the initial complaint or whether each individual claimant had to meet timeliness requirements as they filed to join the action.  414 U.S. at 550-551.  This in turn raised the thorny problem of what to do about limitations if the class certification was denied.  Wright, Miller & Kane, 7B Fed. Prac. & Proc., § 1795.

The Supreme Court answered that question directly in *American Pipe* when it recognized that some potential class members may not qualify or the class might be denied in its entirety:

> "[T]he commencement of the action satisfied the purpose of the limitation provision as to all those who *might* subsequently participate in the suit as well as for the named plaintiffs.  To hold to the contrary would frustrate the principal function of a class suit...."  414 U.S. at 551 (emphasis added).

> ***

> "[A] rule requiring successful anticipation of the determination of the viability of the class would breed needless duplication of motions.  We are convinced that the rule most consistent with federal class action procedure must be that the commencement of a class action suspends the applicable statute of limitations as to all *asserted members of the class who would have been parties had the suit been permitted to continue as a class action.*"  *Id.* at 554 (emphasis added).[2]

---

[2]  The D.C. Circuit has followed *American Pipe*.  *See, e.g.*, *McCarthy v. Kleindienst*, 562 F.2d 1269 (D.C. Cir. 1977).

*NuFarm* clearly violates these stated principles by refusing tolling for those who *might* have been members of a class or those who were *asserted* to be class members.

      3.      Administrative Exhaustion Cases Follow *American Pipe* and Place in the Court the Discretion to Address the Issue.

There are several cases that address the issue of exhaustion and how it may be addressed in a class action tolling situation.  In most cases, the courts agree that tolling is applied until resolution of certification and the court determines whether the excluded class member can then proceed to exhaustion.  For example, in *Barrett v. United States Civil Service Commission,* 439 F.Supp. 216, 218 (D.D.C. 1977), in the context of an administrative class action, the Court considered "the effect of decertification of the class on the running of the statute of limitations." *Id.* at 217.  The plaintiffs argued that the statute of limitations was tolled for all purported class members in a discrimination case until the Court resolved the class certification issue.  The Government argued that since the class was only conditionally certified, the statute was not tolled for those who we later declared to be excluded from the class.  The Court agreed that the tolling was applicable at the administrative level and included those individuals the Court later found were not proper class members.  *Id.* at 218.  "[T]he tolling rule protects all persons who were asserted to be members of the class, even if they later were removed." *Id.*  The Court then held that those excluded could proceed administratively with individual claims and fashioned an order defining who could and could not proceed individually based on the application of tolling. *Id.*

In *Armstrong v. Martin Marietta Corp.*, 138 F.3d 1374 (11th Cir. 1998), the Court of Appeals held that the pendency of a class action tolled both the initial administrative charge period under the Age Discrimination in Employment Act, which is the initial presentment of a claim under the ADEA, as well as the 90-day period for filing suit in federal court after notice of

dismissal of the charge.  138 F.3d at 1392-1393.  Here, too, the court examined the factual circumstances of those excluded and set forth specific orders as to who could proceed to exhaust administrative remedies and who would be barred, e.g., those whose claims had lapsed before the class was filed were barred and those who had not presented could proceed.  *Id.*

At least two other federal courts have agreed that administrative claims are tolled during the class action period.  "Applying the tolling rule to the filing of administrative claims will have the same salutary effect as exists for the filing of lawsuits.  In both cases, tolling the statute of limitations during the pendency of a class action will avoid encouraging all putative class members to file separate claims with the EEOC and the respective state agencies in deferral states.... This Court concludes that the *American Pipe-Parker* analysis applies equally well to putative class members who have yet to file an administrative claim." *Sharpe v. American Express Co.*, 689 F. Supp. 294, 300-01 (S.D.N.Y. 1988); *cited with approval in Griffin v. Singletary*, 17 F.3d 356, 360 (11th Cir. 1994); *see also McDonald v. Sec'y of Health & Human Servs.*, 834 F.2d 1085, 1092 (1st Cir. 1987).

Indeed, as one commentator noted:

"It is now settled that proceedings for judicial review of a governmental agency decision may be maintained as a class action.  Some courts have held that certain statutes require each individual class member to exhaust administrative remedies, thus precluding a representative class suit.  Because virtually all statutes that provide an administrative remedy that must be exhausted before judicial relief is available require individual exhaustion, those decisions holding that administrative exhaustion precludes class actions either do not survive the ruling or are based on genuinely unique statutory requirements."  Newberg on Class Actions, § 5:15.

Thus, the question of exhaustion or remedies is not a new one and *NuFarm* failed to deal with or even cite to the analysis of these cases.  Further, *NuFarm* failed to cite to any case to

suggest that class members are outside of a court's jurisdiction prior to resolution of class certification.

    4.  <u>The Presentment Requirement Does Not Preclude Tolling.</u>

This Court also held in footnote 2 that administrative presentment is a mandatory jurisdictional requirement and, following *NuFarm*, further held that without presentment, jurisdiction did not attach and therefore tolling was inapplicable.

As we establish above, tolling does attach to a putative class member, even if the Court later concludes certain members are not within its jurisdiction.  The narrower issue is whether a class action may toll a statute of limitations for presentment while the class issue is being decided.  The answer is most assuredly, yes.  The Government's position is that if the limitations period is jurisdictional it cannot be tolled.  U.S. Reply Brief at 4-5.  But the Supreme Court rejected this very argument in *Irwin v. Department of Veterans Affairs*, 498 U.S. 89 (1990).  In *Irwin*, the Supreme Court expressly considered a statute of limitations that the Government argued was a jurisdictional statutory filing deadline.  *Id.* at 93-94.  The Court, per Chief Justice Rehnquist, was undeterred holding that there would be a general tolling rule applicable to suits against the Government.  *Id.* at 457.  Surely, if jurisdictional limitations can be tolled equitably, they can be legally tolled under Rule 23.[3]

---

[3]  The Government cites to an FTCA case for the proposition that presentment is jurisdictional.  *Founding Church of Christ Scientology of Washington D.C. v. Director,* 459 F.Supp. 748 (D.C.D.C. 1978).  U.S. Reply Brief at 6.  While we agree that this pre-*Irwin* case stands for the proposition that under the FTCA the exhaustion requirement can defeat a class action, it does not address tolling the exhaustion period.  In fact, the court states that the FTCA expressly precludes waiver of the exhaustion requirement for Rule 23. *Id.* at 755.  Thus, this is one of those unique statutes referred to by Newberg in the quote above at page 7. Moreover, the FTCA cases are based on the specific FTCA regulations that preclude a class representative from fulfilling the administrative exhaustion requirement. The FTCA regulations required that the claim be presented "by the injured person" or his authorized representative, 28 C.F.R § 14.3.  *See Caidin v. United States*, 564 F.2d 284, 286 (9th Cir. 1977).  In the case of the ISDEAA or the CDA, there are no such restrictive regulations.  We also note that the FTCA specifically permits claimants who have proceeded to court without exhausting an opportunity to go forward.  28 U.S.C. § 2679(d)(5).  Thus there

This view was emphatically confirmed in *Kirkendall v. Dep't of the Army*, 479 F.3d 830 (Fed. Cir. 2007) (en banc), in which the Court exhaustively analyzed tolling principles as applied to limitations periods for claims submissions.   In *Kirkendall* the government argued that filing within the statutory deadline was "mandatory and jurisdictional" and thus not subject to tolling. *Id*. at 842.  The court squarely rejected this argument as "without merit": "time prescriptions, however emphatic, are not properly typed 'jurisdictional.'"  *Id*. (quoting *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 126 S. Ct. 1235, 1242 (2006)) (citations and internal quotation marks omitted). Thus the court rejected the government's attempt to establish a category of "mandatory" or "jurisdictional" limitations periods exempt from the presumption of tolling.  This reasoning should apply to both legal tolling and equitable tolling.

Applying the *Irwin* test, the *Kirkendall* court examined statutory language similar to the CDA, which requires that all claims "shall be submitted within 6 years after the accrual of the claim."  41 U.S.C. § 605(a).  Kirkendall appeared to miss two statutes of limitations, but the court held them both tolled and thus met.  The first statute required that "[a] complaint under this subsection must be filed within 60 days after the date of the alleged violation."  5 U.S.C. § 3330a(a)(2)(A).  This statute has mandatory language similar to that of the CDA ("must" instead of "shall"), yet the government conceded that it was subject to equitable tolling.  *Id.* at 837.  The court noted that this statute was "less emphatic, less detailed, and less technical," *id.*, than the second statutory section, which stated that "in no event may any such appeal be brought ... later than 15 days after the date on which the complainant received written notification from the Secretary...."  5 U.S.C. § 3330a(d)(1)(B).  Despite this stringent language, which is surely more emphatic than the CDA's, the court held this statute subject to tolling as well.

---

was no need for these courts to engage in any equitable analysis of the impact of the holding that exhaustion is mandatory and unwaivable in a class context.

*Kirkendall* also recognized that the *Irwin* presumption in favor of tolling is strengthened by the canon that veterans' benefit statutes must be construed in favor of veterans. *Id.* at 843. Congress embedded a closely analogous rule of construction in the Indian Self-Determination and Education Assistance Act ("ISDEAA"), which incorporates the CDA by reference, and which is in turn incorporated into the Tribe's contracts: "Each provision of the [ISDEAA] and each provision of this Contract shall be liberally construed for the benefit of the Contractor...." FY 1996 Contract § (a)(2); *see also* 25 U.S.C. 450*l*(c) (§ 1(a)(2) of statutory Model Contract).

Nor were the *Irwin* or *Kirdendall* holdings impacted by the Supreme Court's recent ruling in *John R. Sand & Gravel Co. v. United States*, 552 U.S. __, 128 S. Ct. 750 (2008). In *John R. Sand & Gravel*, the Supreme Court, affirming a ruling of the Federal Circuit, held that 28 U.S.C. § 2501 is jurisdictional and may not be equitably waived by the government. In so doing, the Supreme Court did not overrule the *Irwin* test but rather relied largely on *stare decisis*, citing cases back to 1883, which held that § 2501 is jurisdictional and not subject to equitable waiver. In addressing *Irwin*, the Court acknowledged the presumption that even a jurisdictional statute of limitations such as § 2501 could be tolled, but it read *Irwin* as a "prospective rule, which does not imply revisiting past precedents." 128 S. Ct. at 756 (citation omitted).

In other words, *Irwin* did not overrule prior cases which found that § 2501 could not be tolled. But the Court made clear: "Any anomaly the old cases and *Irwin* together create is not critical; at most, it reflects a different judicial assumption about the comparative weight Congress would likely have attached to competing legitimate interests." *Id*. Thus, the court acknowledged that other statutes could be read differently under *Irwin*, and that this case was decided based on *stare decisis*. Justice Ginsberg noted in her dissent that because of the majority's use of *stare decisis* for this one statute, other statutes, although nearly identical, such as 28 U.S.C. § 2401,

may be construed differently under *Irwin*.  *Id*. at 760.  The majority did not disagree, but rather

acknowledged that fact in the text quoted above.   In assessing the issue under *Irwin*, the Court

found that Congress's presumed awareness of the Court's prior interpretations of § 2501 and

acquiescence in that interpretation, was enough to rebut the *Irwin* presumption that tolling would

otherwise apply to § 2501.  *Id*. at 756.

 Given that *Irwin* is still good law and that 41 U.S.C § 605 has never been interpreted by

the Supreme Court to permit or deny tolling, we respectfully believe that this Court should

freshly analyze equitable tolling under *Irwin*.   Under that test, as we establish in the Tribe's brief

in opposition, pp. 35-37, the CDA statute of limitations may be tolled because (1) tolling would

be available in a similar suit between private parties and (2) Congress did not state any clear

intention that tolling not apply.  *Irwin*, 498 U.S. at 95-96.  See also our detailed discussion of

*United States v. Brockamp*, 519 U.S. 347 (1997).  Tribe's Opposition Brief, pp. 38-39.[4]

 5. In the Circumstances, the Tribe Acted Reasonably in Relying on
   the *Cherokee* Class Action for Tolling of Exhaustion.

 In addressing the exhaustion requirements of the CDA, the Government has taken

conflicting positions and indeed, in *Cherokee Nation of Oklahoma v. United States*, 199 F.R.D.

357, 362 (E.D. Okla. 2001), the Government argued the opposite position that it presents here.

In *Cherokee*, the Government argued that those tribes who had filed separate administrative

actions should be *excluded* from the class.  In addressing whether class members were properly

identified, the IHS argued that "plaintiffs fail to exclude tribes that are litigating or have litigated

---

[4]   The Government argues that courts have already held the CDA statute of limitations is not waivable,
citing to *Renda Marine Inc. v. United States*, 71 Fed. Cl. 782 (2006), and *Hamza v. United States*, 36 Fed.
Cl. 10 (1996).  Government Reply at 11.  However, the court in *Renda* made no analysis of the equitable
tolling doctrine since it was not argued.  Neither *Renda* nor *Hamza* even cited *Irwin*, much less applied its
analytical framework to a tolling argument.  Thus, neither case refutes the Tribe's analysis of the tolling
doctrine under the CDA.  Moreover, neither case deals with § 605(a), the statute at issue here; both deal
with the limitation on bringing appeals to federal court under § 609(a)(3).

cases in other judicial or administrative forums." *Id*.[5] Clearly, if the IHS believed that the putative class members were required to exhaust administrative remedies, it could (and likely would) have made that argument in that class action. Instead it sought to punish those who had filed administrative claims by attempting to segregate them out of the class.

Given that the IHS took this position in the class action at issue in the *Cherokee* appeal, it cannot now seek to argue to the contrary. Indeed, the IHS's argument in *Cherokee* could very well have created reliance on the part of the putative class members that exhaustion was not required. It certainly would have had a deterrent effect on those putative class members since IHS was suggesting that to file an administrative claim would result in exclusion from the class. This is an important factor in tolling and an important element to evaluate the equities of the particular circumstances. As the Supreme Court noted in *American Pipe*, a class members should not be forced into the position of having to determine independently the risks of whether the class will be certified. See discussion above at 4-5.

Significantly, during that period, there was also clear precedent to allow an ISDEAA class action claim to go forward without exhaustion by the individual class members. In *Ramah Navajo Chapter v. Lujan,* another contract support costs ("CSC") case filed under the CDA, the federal district court held that, since the class representative had exhausted its remedies, the other class members would not be required to exhaust. *Ramah Navajo Chapter v. Lujan*, No. CIV 90-0957 LH/RWM, Order, (D.N.M. 1993) (hereinafter "1993 Order") (*see* Exhibit A), *aff'd* 112 F.3d 1455 (10th Cir. 1997), *on remand Ramah Navajo Chapter v. Babbitt*, 50 F. Supp. 2d 1091 (D.N.M. 1999). The federal court found that where the question presented by the class action

---

[5] The IHS tried to separately exclude those whose claims were barred as falling outside of the six-year limitation period. *Cherokee* Nation, 199 F.R.D. 357 at 362. These claims could only have been those that accrued prior to the filing of the class action. This means that IHS was trying to remove from the class not only those whose claims would have been barred for failing to meet the six-year deadline, but also those who had met the deadline by filing administrative claims. Clearly no group of claimants could have found solace in the class as defined by IHS.

challenged the legality of specific agency policy, exhaustion would be futile. 1993 Order at 3-4. Case law supports the idea that there is no need to exhaust where the regulation or policy that is challenged would not be "interpreted or applied differently in the cases of class members if they were to pursue their claims through the administrative process." *Jackson v. Harris*, 86 F.R.D. 452, 454 (D.C. Ind. 1980). The *Ramah* court cited to *Association for Community Living in Colorado v. Romer*, 992 F.2d 1040, 1044 (10th Cir. 1993) for the proposition that exhaustion would be futile where an agency has adopted a policy of general applicability that is contrary to law. 1993 Order at 4. This reasoning is sound. Why require hundreds of class members to exhaust remedies when the agency's policy is uniform and the agency would not defend against the policy differently for any particular claim?

So too here, the *Cherokee* class action and indeed, the claim filed in this action, concerns an IHS agency-wide policy to underfund CSC for all ISDEAA contracts. This claim is identical to the claims argued and decided in the *Cherokee* case before the Supreme Court, the same case where class status was denied. *Cherokee Nation of Oklahoma v. United States*, 199 F.R.D. 357, 362 (E.D. Okla. 2001), *rev'd on other grounds*, *Cherokee Nation of Oklahoma v. Leavitt*, 543 U.S. 631 (2005). The claim was one for breach of contract to which the IHS asserted as a defense its policy of interpreting the contracts as requiring funding of CSC only to the arbitrary amount set by the agency, and not using its lump-sum appropriation, based on language of the appropriation committee reports. This policy or interpretation applied to every contractor and the IHS's justification would have been the same for every contractor—that funding was subject to appropriations, that the agency lacked adequate funds and that Congress had imposed appropriation caps. That this policy applied to everyone is made clear in the shortfall reports, which document underpayment of virtually all ISDEAA contractors. Thus, once the Cherokee

Nation had exhausted, and they did, then that would have been sufficient to cover all of the putative class members, including Menominee.

The problem, of course, is that Cherokee did not succeed in establishing its class action. Cherokee claimed that it presented a legal question common to all class members regarding an agency-wide policy. *Cherokee Nation of Oklahoma,* 199 F.R.D. at 363. The Court disagreed and unfortunately left the issue of exhaustion and tolling undecided because it was never raised. If the IHS had made the argument in *Cherokee* that all tribal contractors were required to exhaust, the court could very well have ordered such exhaustion even if the class was certified and the putative class members, such as the Tribe, could have been referred back to the agency at that time. In the alternative, the court could have certified the class and found that exhaustion was futile or that the exhaustion of the class representative was sufficient for all class members as occurred in *Ramah Navajo* and which is generally the rule. *See* Newberg, § 5:15. With lack of certification, the court could have addressed the impact on presentment for class members as was done in *Barrett* and *Armstrong*, see discussion above at 6-7. There is no way to know because the issue was never raised. The fact is that the court would have had only one solution if it considered the exhaustion requirement when it denied certification: to find tolling and to send the excluded class members back to the agency. See *Barrett* and *Armstrong*, *supra*. The issues were being litigated in a putative class action, and under *American Pipe* and its progeny, the statute had to remain tolled for class members until the federal court sorted it out, including the class status of the case and the need of class members to exhaust. Instead, the Government now seeks to punish those who followed *American Pipe*, despite the agency's conflicting position. The Government's position is inequitable and unsustainable given the law on point.

- 14 -

Finally, tolling the statute would—and in fact did—promote administrative and judicial economy. The Government argues that tolling § 605(a) would not promote judicial economy, so the *American Pipe* rule should not apply. U.S. Reply at 4. This is incorrect. Tolling the statute most certainly would promote administrative and judicial economy, not to mention conserve limited tribal resources.

At the time the *Cherokee Nation* class action was filed, many, if not most, tribes never intended to litigate their CSC claims on their own, due to their relatively small amounts compared to the expense and risk of litigation, yet wished to share in a potential class settlement similar to that in the *Ramah Navajo* case. Had they not relied on the tolling rule, these tribes would have flooded the IHS with claims they never meant to litigate, but filed merely to preserve their rights to participate in the proposed class. Once the IHS denied the claims, tribes would then have had to appeal them to an agency Board or a federal court, again to preserve them, since the IHS would surely have argued that the limitations periods in CDA sections 606 and 609(a) could not be tolled. As a result, the IHS, the agency Board, and the courts would have been inundated with thousands of claims, appeals and actions.

Tolling the statute avoids that result, as history proves. Tribes relied on the class action to vindicate their rights, as Rule 23 encouraged them to do, and *American Pipe* and *Crown, Cork & Seal Co., Inc. v. Parker,* 462 U.S. 345 (1983), assured them that the statute of limitations on their claims was tolled. Once class certification was denied, most tribes with CSC shortfalls never filed their own claims at all. Only those tribes with the greatest shortfalls—those for which the potential rewards most exceeded the risks—pursued their claims individually and in a timely fashion after the *Cherokee* denial of class certification. As a result, significant tribal,

agency, Board, and court resources were conserved.  This is the point of judicial economy and the point of the tolling rule.

While the Government in its reply goes through the *Irwin* factors, we have presented our own analysis of *Irwin* and the legislative history of the CDA to support the Tribe's position that the under the *Irwin* and *Brockamp* factors, the statute does not preclude tolling and we will not reiterate that analysis here.  *See* Tribe's Opposition Brief at 35-37.  Given the lack of underpinning for *NuFarm*, we respectfully ask this court to reconsider its decision and apply the analysis of the legal and equitable tolling standards.

**B.     The Secretary Did Not Meet His Burden to Prove Laches for the FY 1995 Claims.**

The Secretary has the burden to prove that laches bars the FY 1995 claims.  To meet that burden the Secretary must establish both that (1) the Tribe was not diligent in asserting its claim; and (2) the Secretary suffered prejudice.  *Cornetta v. United States,* 851 F.2d 1372, 1380 (Fed. Cir. 1988) (en banc) (citing FRCP 8(c)); *Costello v. United States,* 365 U.S. 265, 282 (1961); *Pro-Football, Inc. v. Harjo,* 415 F.3d 44, 47 (D.C. Cir. 2005).  Under the unique circumstances in this case we believe the Court erred in concluding that the Secretary met his burden of proving that laches bars the FY 1995 claims.

1.   The Tribe's Decision to Wait Was Reasonable.

Mere lapse of time does not meet the first prong of the test, *Dollar v. Land,* 184 F.2d 245, 257 (D.C. Cir. 1950); *United States ex rel Givens v. Work,* 13 F.2d 302, 304 (D.C. Cir. 1926) (citing *Galliher v. Cadwell,* 145 U.S. 368 (1892));  *Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.,* 988 F.2d 1157, 1161 (Fed. Cir. 1993), yet in this case the Secretary's "proof" relied only on the amount of time that passed.  Under the unique facts of this case – where there were two proposed CSC class actions filed after the Tribe's FY 1995 claim for unpaid CSC first

accrued – the amount of time that passed alone should not be a basis for finding that the Tribe did not diligently assert its claims. There is persuasive precedent for relying on a pending class action to defeat the laches defense against the United States for periods as long as those in the present case.[6]

For example, in *Solow v. U.S.,* 78 Fed. Cl. 86 (Fed. Cl. Ct. 2007), the Court held that a lawsuit initiated by federal employees, to recover unpaid annual leave seven to eleven years *after* they left federal employment, was not barred by laches because of an intervening class action. Plaintiffs left federal service between 1995 and 1999. A class action was filed in 1999 on behalf of federal employees for miscalculation of annual leave payouts. The class action eventually limited the settlement class to employees of seventeen agencies, which did not include the Plaintiffs. Six months later, Plaintiffs filed their own suit in December 2006. Even though the Plaintiffs in *Solow* were not in privity with the class members, the Court found that the Plaintiffs had been reasonable to wait until the class action settled before filing their own case. *Solow* at 89-90.

In the present case, one CSC class action was filed in 1999 and a second CSC class action was filed in 2001. *See Cherokee Nation of Oklahoma v. United States,* 199 F.R.D. 357 (E.D. Okla. 2001), *and Pueblo of Zuni v. United States,* No. CV -1-1046 (D.N.M.). The Tribe could not know whether the classes would be certified, whether the Tribe would be included in the classes, or which claims would ultimately be covered. Under these unique circumstances the Tribe was in fact diligent: it filed its own CSC claims after the *Cherokee Nation* certification was denied in 2001. Like the Plaintiffs in *Solow,* the Tribe was reasonable to await resolution of the *Cherokee* CSC class actions before bringing its own separate claims, and even filed earlier than it

---

[6] To be clear, the Tribe relies on the *Cherokee* class action to toll the shortfall claims and it relies on *Zuni* to toll the miscalculation claims. See Opposition Brief at 32-34.

need have done if the Tribe had awaited certification in the second CSC case.  "Class members

who do not file suit while the class action is pending cannot be accused of sleeping on their

rights...."  *Crown, Cork*, 462 U.S. at 352; *see also* Tribe's Opposition Brief at 30.

In sum, the Tribe did not lack diligence by waiting during the pendency of the CSC class

actions and the passage of time alone should not serve to trump these facts.

2.  Unavailability of Funds from Previous Year Appropriations Is Not Prejudice.

The Secretary also failed to prove prejudice under the second prong of the laches test.

The only prejudice asserted by the Secretary, that the appropriations for 1995 have long since

lapsed, is in fact not prejudicial at all.

Under the Contract Disputes Act, 41 U.S.C. § 612, judgments made by federal courts are

to be paid from the permanent, indefinite appropriation commonly referred to as the "Judgment

Fund," 31 U.S.C. § 1304.  Damages paid from the Judgment Fund are paid out of an entirely

different appropriation not controlled by the IHS.  *See, e.g., Bath Iron Works Corp. v. United

States*, 20 F.3d 1567, 1582-83 (Fed. Cir. 1994); *Wetsel-Oviatt Lumber Co. v. United States,* 38

Fed. Cl. 563, 570-72 (1997).

The Contract Disputes Act, 41 U.S.C. § 612(c), requires agencies to reimburse the

Judgment Fund with current appropriations:

> Reimbursements are chargeable to the appropriated funds which were available for the
> subject federal agency's procurement activities at the time of the relevant board award or
> court judgment.  If an agency's funds are determined to be insufficient at the time of the
> award or judgment, 41 U.S.C. § 612 allows the agency to seek supplemental
> appropriations.

United States Department of Treasury Financial Management Service: "Reimbursement

Responsibilities Under the Contract Disputes Act," *available at* http://fms.treas.gov/

judgefund/regulations.html (last visited Mar. 20, 2008).  *See also* 31 U.S.C. § 1501(a)

(pertaining to general appropriations accounting regarding government obligations).

In circumstances where any damages awarded in this case will be recordable as an

obligation in the fiscal year when the judgment is rendered, the Secretary's assertions of

economic prejudice based on the lapse of the 1995 appropriation are not persuasive.  *See, e.g.,*

*Susanville Indian Rancheria*, IBIA No. 97-89-A (DHHS D.A.B. Feb 6, 2002) at 12-14 (stating

that the amount owed for failure to pay under an ISDEAA contract is not considered an expense

incurred in the year in which the contract was signed, but is an obligation in the year in which the

judgment is made).[7]  Reimbursements to the Judgment Fund for contract claims are thus treated

as new obligations.  Unavailability of funds from the 1995 appropriations does not limit the

Secretary's liability for damages and does not constitute prejudice.

---

[7]  In *Susanville*, the IHS failed to pay the amount of funds to which the Tribe was entitled under the Tribe's FY 1997 Annual Funding Agreement.  The Departmental Appeals Board determined that the IHS wrongly withheld such funds from the Tribe and that IHS must pay the funds due for its FY 1997 breach out of its FY 2002 appropriations.

## CONCLUSION

For the reasons above, the Tribe respectfully requests that the Court reconsider the

portion of its Memorandum Opinion of March 14, 2008 in which the court dismissed the Tribe's

FY 1995-1998 claims.

                                        Respectfully Submitted,


                                        _____/s/_____
                                        F. Michael Willis
                                        Geoffrey Strommer
                                        HOBBS, STRAUS, DEAN & WALKER, LLP
                                        2120 L Street, NW, Suite 700
                                        Washington, DC  20037
                                        202-822-8282 (Tel.)
                                        202-296-8834 (Fax)

                                        Attorneys for the Menominee Indian Tribe
                                        of Wisconsin

Of Counsel
Marsha K. Schmidt
Hobbs Straus Dean & Walker, LLP

DATED: March 24, 2008.

FILED
AT ALBUQUERQUE

OCT 01 1993

ROBERT M. MARCH
CLERK

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

RAMAH NAVAJO CHAPTER,

      Plaintiff,

    -vs-                                  No. CIV 90-0957 LH/RWM

MANUEL LUJAN, Secretary of the
Interior; EDDIE BROWN, Assistant
Secretary of the Interior;
MARVIN PIERCE, Chief of the
Office of Inspector General,
U. S. Department of the Interior;
and the UNITED STATES OF AMERICA,

      Defendants.

### ORDER

      **THIS MATTER** came on for consideration of Plaintiff's Motion to Certify Class Under Rule 23, filed on August 21, 1991 (Docket No. 31). The Court having reviewed the memoranda of the parties and having issued its memorandum opinion of even date, FINDS:

      That Plaintiff's motion is well taken and will be granted.

      **IT IS, THEREFORE, ORDERED** that Plaintiff's Motion to Certify Class Under Rule 23 be, and the same hereby is, **GRANTED**.

      **IT IS FURTHER ORDERED** that the plaintiff class shall include those Indian tribes and organizations who have contracted with the Secretary of the Interior under the Indian Self-Determination and Education Assistance Act.

                                         
UNITED STATES DISTRICT JUDGE



**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**



FILED
AT ALBUQUERQUE

OCT 0 1 1993

ROBERT M. MARCH
CLERK

RAMAH NAVAJO CHAPTER,

     Plaintiff,

  -vs-

No. CIV 90-0957 LH/RWM

MANUEL LUJAN, Secretary of the
Interior; EDDIE BROWN, Assistant
Secretary of the Interior;
MARVIN PIERCE, Chief of the
Office of Inspector General,
U. S. Department of the Interior;
and the UNITED STATES OF AMERICA,

     Defendants.

### MEMORANDUM OPINION

    **THIS MATTER** came on for consideration of Plaintiff's
Motion to Certify Class Under Rule 23, filed on August 21, 1991
(Docket No. 31). Plaintiff seeks to certify as a class all
Indian tribes and organizations contracting under the Indian
Self-Determination and Education Assistance Act (25 U.S.C. § 450)
(the "Act") with the Bureau of Indian Affairs ("BIA"), who
receive or are entitled to receive contract support funding based
on indirect cost rates negotiated through the office of the
inspector general. Having reviewed the positions of the parties
and the applicable law, the Court concludes that the motion is
well taken and shall be granted.

    Plaintiff claims that the BIA has failed to provide
statutorily mandated indirect costs to Plaintiff in an amount set
forth in Section 450j-1 of the Act.





Defendants resist the motion for class certification. Defendants' principal objection is that although Plaintiff has exhausted its administrative remedies and is therefore properly before this Court, the claims of Plaintiff as representative party are not typical of the proposed class members. Specifically, Defendants argue that there is no showing that the members of the class to be certified have exhausted their administrative remedies under the Act. Defendants contend that unless the administrative remedies have been exhausted by each of the members of that class that they may not be included in the class. The theory is that the exhaustion of administrative remedies is jurisdictional and that if the remedies have not been exhausted, the Court's action regarding the class would be without jurisdiction.

The Indian Self-Determination Act provides that the United States District Court shall have concurrent jurisdiction with the United States Court of Claims over any civil action or claim against the BIA for money damages arising out of self-determination contracts authorized by the Act. The Act also provides that the Contract Disputes Act, 41 U.S.C. § 601, et seq., shall apply to disputes concerning self-determination contracts. The claims being brought by Plaintiff relate to a self-determination contract with the BIA, and it is clear that the Contract Disputes Act applies to this case. Thus, decisions relating to the Contract Disputes Act are instructive in

determining whether the exhaustion of remedies under that statute is a jurisdictional prerequisite to an action in this Court.

A review of the decisions of the Court of Claims or its successor, the United States Claims Court, and appeals therefrom, make clear that when a government contractor wishes to seek relief in connection with the performance of his contract, he must first submit a claim to the agency contracting officer and receive an opinion from that official. The completion of these steps is a jurisdictional prerequisite to the filing of a complaint relative to the claim in the Court of Claims. *Thoen v. United States*, 765 F.2d 1110 (Fed. Cir. 1985); *W. M. Schlosser Co. v. United States*, 705 F.2d 1336 (Fed. Cir. 1983).

Plaintiff contends, however, that even if exhaustion of administrative remedies is a jurisdictional prerequisite, certification may still be granted if it would be futile for the potential class members to complete those jurisdictional prerequisites. The Court notes that Plaintiff has not cited, nor could it locate, any case decided under the Contract Disputes Act where exhaustion of remedies was waived as having been futile. This is not dispositive, however.

In *Association for Community Living in Colorado v. Romer*, 992 F.2d 1040 (10th Cir. 1993), a case decided under the Individuals with Disabilities Education Act ("IDEA"), the Tenth Circuit Court of Appeals concluded that a claimant under the IDEA need not exhaust its remedies if exhaustion would be futile or would fail to provide adequate relief, or where an agency has

-3-

adopted a policy or pursued a practice of general applicability that is contrary to the law. *Id.*, 992 F.2d 1040, 1044.

"Administrative remedies are generally inadequate or futile where plaintiffs allege structural or systemic failure and seek systemwide reforms." *Id.*

The *Romer* case, along with the Supreme Court's decision in *Honig v. Doe*, 484 U.S. 305 (1988) are instructive. The Court notes that Plaintiff's action does not concern a typical contract dispute wherein issues of performance need be addressed. If that were the case, the purposes behind exhaustion of administrative remedies would require that the contract claim first be brought to the attention of an agency contracting officer.[1] Instead, Plaintiff's action challenges the policies and practices adopted by the BIA as being contrary to the law and seeks to make systemwide reforms. In such a case as this, exhaustion of administrative remedies is not required.

In light of the above, it is not necessary that each member of the proposed class exhaust its administrative remedies under the Contract Disputes Act. The Court will therefore

---

[1]In *Romer*, the Court noted that exhaustion of administrative remedies under the IDEA serves the following important purposes: "(1) permitting the exercise of agency discretion and expertise on issues requiring these characteristics; (2) allowing the full development of technical issues and a factual record prior to court review; (3) preventing deliberate disregard and circumvention of agency procedures established by Congress; and (4) avoiding unnecessary judicial decisions by giving the agency the first opportunity to correct any error." *Romer*, 992 F.2d 1040, 1044 (*quoting Hayes v. Unified Sch. Dist. No. 377*, 877 F.2d 809, 812 (10th Cir. 1989) (decided under the Education of the Handicapped Act).

-4-

certify the class to include all Indian tribes and organizations who have contracted with the Secretary of the Interior under the Indian Self-Determination and Education Assistance Act.

An order in accordance with this memorandum opinion shall be entered.

_____
UNITED STATES DISTRICT JUDGE

For Plaintiff:          Mr. Michael P. Gross
                        Roth, VanAmberg, Gross,
                         Rogers & Ortiz
                        Post Office Box 1447
                        Santa Fe, New Mexico  87504-1447

For Defendants:         Mr. John W. Zavitz
                        Assistant U. S. Attorney
                        U. S. Attorney's Office
                        District of New Mexico
                        Post Office Box 607
                        Albuquerque, New Mexico  87103-0607

Department of Health and Human Services

# DEPARTMENTAL APPEALS BOARD

Appellate Division

SUBJECT: Susanville Indian Rancheria    DATE: February 6, 2002
        Docket No. A-02-30
        (IBIA Docket No. 97-89-A)
        Decision No. 1813

## DECISION ON REVIEW OF RECOMMENDED DECISION
## OF ADMINISTRATIVE LAW JUDGE

The Indian Health Service (IHS) appealed the December 14, 2001
recommended decision on remand by Administrative Law Judge (ALJ)
William E. Hammett regarding IHS's partial declination of the
Tribe's proposal to renew its contract to provide health care
programs, functions, services and activities (PFSAs) under the
Indian Self-Determination Act (ISDA). IHS had originally
declined to fund part of the Area Office and Headquarters shares
in the Tribe's proposed annual funding agreement (AFA) for 1997
based on section 102(a)(2)(D) of the ISDA, which permits IHS to
decline a proposal for funding "in excess of the applicable
funding level for the contract, as determined under section
106(a). . . ." In support of the declination, IHS concluded:
1) the proposed Area Office share was excessive because it
included funds that IHS should have withheld to pay for
administrative functions that cannot be contracted but must be
performed by the Area Office; and 2) the proposed Headquarters
share was excessive because it included funds for non-recurring
costs which IHS should have distributed among tribes on a program
formula basis. The ALJ had issued the recommended decision on
remand pursuant to my May 29, 2001 decision remanding the
parties' original appeal of the ALJ's April 6, 2001 recommended
decision in the same matter for further development of the
record.

As explained in detail below, although my rationale differs in
some respects from the ALJ's, I agree with the ALJ's ultimate
conclusion that IHS owes the Tribe the difference between the

2

amount of the Area Office share in the Tribe's proposed contract
for 1997 and the amount the Tribe actually received for the Area
Office share, and that this amount should be paid out of
appropriations for the current fiscal year.  In summary, I find
that—

- Section 900.32 of 25 C.F.R. prohibits IHS from declining
  any portion of a proposed successor AFA that is
  substantially the same as the AFA for the prior year
  even if the aggregate funding for the proposed successor
  AFA is not reduced.

- Since IHS conceded that the Area Office share in the
  Tribe's proposed AFA for 1997 was substantially the same
  as the Area Office share in the Tribe's AFA for 1996,
  section 900.32 prohibited IHS from declining the
  proposed AFA with respect to the Area Office share.

- IHS must pay the difference between the proposed Area
  Office share for 1997 and the amount received by the
  Tribe for the Area Office share out of funds
  appropriated for the current fiscal year.

- The Tribe is not entitled to any interest on the amount
  owed by IHS.  In his recommended decision on remand, the
  ALJ found that neither the ISDA nor the Tribe's self-
  determination contract required the payment of interest.
  Pursuant to 25 C.F.R. § 900.166, this finding is final
  in the absence of a timely appeal by the Tribe.

- I need not decide whether IHS was prohibited from
  declining the Tribe's proposed AFA for 1997 with respect
  to the Headquarters share since the Tribe would have no
  remedy even if it were to prevail on this issue.  In his
  recommended decision on remand, the ALJ found that the
  Tribe ultimately received at least the same amount of
  funding for the Headquarters share in 1997 as it
  received the prior year, so that IHS did not owe the
  Tribe any additional amount for this share.  Pursuant to
  25 C.F.R. § 900.166, this finding is final in the
  absence of a timely appeal by the Tribe.

3

Statutory and Regulatory Background

The ISDA, 25 U.S.C. § 450f et seq., directs IHS to award "self-determination" contracts to Indian tribes to provide programs, functions, services, and activities (PFSAs) for the benefit of Indians that had previously been provided by IHS. ISDA Section 102. Section 102(a)(2) provides that the Secretary of the Department of Health and Human Services (HHS) must approve a tribe's proposal for a self-determination contract unless the Secretary makes one of five specific findings, including a finding that the amount of funds requested exceeds the applicable funding level for the contract as determined under section 106(a). Section 102(a)(2)(D). In such cases, the Secretary is still required to "approve a level of funding authorized under section 106(a)." Section 102(a)(4).

Section 106(a)(1) provides that the amount of funds awarded under a self-determination contract--

> shall not be less than the appropriate Secretary
> would have otherwise provided for the operation of
> the programs or portions thereof for the period
> covered by the contract, without regard to any
> organizational level within the Department of the
> Interior or the Department of Health and Human Services,
> as appropriate, at which the program, function, service,
> or activity or portion thereof, including supportive
> administrative functions that are otherwise
> contractible, is operated.

Section 106(a)(3)(B) provides that, during the period that a tribe operates PFSAs pursuant to a self-determination contract, the tribe shall have the option to negotiate with the Secretary, on an annual basis, "the amount of funds that the tribe . . . is entitled to receive under such contract . . . ." Section 106(b)(2) states that the amount of funds "required by subsection (a)" "shall not be reduced by the Secretary in subsequent years" except in certain specified circumstances.[1]

---

[1] These circumstances are:

(A) a reduction in appropriations from the previous fiscal year for the program or function to be contracted;

(continued...)

4

The implementing regulations provide in pertinent part that if a
tribe's "proposed successor annual funding agreement"-

> is substantially the same as the prior annual funding
> agreement . . . , the Secretary shall approve and add
> to the contract the full amount of funds to which the
> contractor is entitled, and may not decline, any
> portion of a successor annual funding agreement.  Any
> portion of an annual funding agreement which is not
> substantially the same as that which was funded
> previously (e.g., a redesign proposal; waiver
> proposal; different proposed funding amount; or
> different program, service, function, or activity) .
> . . is subject to the declination criteria and
> procedures . . . .

25 C.F.R. § 900.32.

A tribe whose contract proposal has been declined is entitled to
a hearing on the record before an ALJ.  ISDA Section 102(b)(3);
25 C.F.R. § 900.163.  At the hearing, the Secretary has the
burden of proof to clearly demonstrate the validity of the
grounds for declining the contract proposal.  ISDA Section
102(e)(1); 25 C.F.R. § 900.163.

Any party may appeal the ALJ's recommended decision with respect
to a declination by IHS to the Secretary of HHS by filing written
objections to the ALJ's recommended decision within 30 days after
receiving it.  25 C.F.R. § 900.166.  The recommended decision
becomes final if no party files timely objections.  25 C.F.R.
§ 900.166.  The Secretary has 20 days from the date of receipt of
any timely objections to modify, adopt, or reverse the

---

[1](...continued)
(B) a directive in the statement of the managers
accompanying a conference report on an appropriation
bill or continuing resolution;

(C) a tribal authorization;

(D) a change in the amount of pass-through funds needed
under a contract; or

(E) completion of a contracted project, activity, or
program[.]

5

recommended decision.  25 C.F.R. § 900.167.  On August 16, 1996, the Secretary delegated the authority to hear such appeals to the Appellate Division of the Departmental Appeals Board.  I have been appointed by the Board Chair as the deciding official in this case.  I must uphold the ALJ's recommended decision unless I determine that it was based on an error of fact or law.

Factual and Procedural Background

On May 1, 1995, the Tribe entered into a contract under the ISDA to provide various PFSAs to its members for an indefinite period of time.  Memorandum in Support of Appellant's Motion for Summary Judgment, dated 5/12/97, Ex. A, at 3.  The annualized amounts in AFA #1, which covered the period May 1 - December 31, 1995, were $88,100 for the Area Office share and $34,646 for the Headquarters share.[2]  Id., Ex. B.  AFA #2, which covered the period January 1 - December 31, 1996, included an Area Office share of $88,100 and a Headquarters share of $100,499, some of which was to be paid as non-recurring program formula funds.  Id., Ex. C.  The Tribe's proposal for the next AFA, for the period January 1 - December 31, 1997, included an Area Office Share of $88,100 and a Headquarters share of $100,499.  Id., Ex. F.

In a letter dated January 16, 1997, the Director of IHS's California Area Office advised the Tribe that IHS was partially declining the Tribe's proposal because the amount of funding the Tribe had requested was in excess of the applicable funding level for the contract as determined under section 106(a) of the ISDA.  The letter noted the Tribe's position that the partial declination violated section 106(b) of the ISDA, which prohibits the Secretary from reducing the amount required by section 106(a) for subsequent years other than for the reasons set forth in section 106(b)(2).  The letter admitted that none of those reasons were applicable, but stated that a partial declination was nonetheless permissible because the amount the Tribe had received in 1996 exceeded the amount required by section 106(a).

---

[2]  A tribe's Headquarters and Area Office shares are used for administrative functions previously provided by the Headquarters and Area Office.  IHS Supplemental Brief Re Interpretation of Section 106(a) and (b) of the ISDA, dated 5/22/01, at 10.

6

Specifically, IHS stated that it had reduced the Tribe's Area
Office share to $59,800 because it had determined upon further
analysis that the "residual" used to calculate the amount
required by section 106(a) was $2,458,400 rather than the
$1,700,000 used in negotiating AFA #1 and AFA #2.  The residual
is an amount that IHS, through its area offices, withholds from
ISDA contracts to pay for federal administrative functions that
cannot be contracted but must be performed by IHS.  IHS used the
$2,458,400 figure in determining the Area Office share for the
self-determination contracts of all but Susanville Indian
Rancheria and one other tribe in the California Area Office.

IHS also stated that the amount required by section 106(a) for
the Tribe's Headquarters share was only $40,457.  According to
IHS, the remaining funds requested by the Tribe represented funds
which should be distributed among tribes on a program formula
basis because they are for non-recurring costs.  IHS stated that
since it "would not have spent $100,499 plus all additional
program formula funds on the Tribe's program" pursuant to AFA #2,
the $100,499 requested for the Tribe's Headquarters share was in
excess of the amount required by section 106(a).  1/16/97
declination letter at 4.

Although the Tribe appealed the partial declination, the Tribe
elected to carry out the portion of its proposed AFA for 1997
that was approved by IHS.  AFA #3, covering the period January 1
- December 31, 1997, provided for an Area Office share of $53,400
and a Headquarters share of $40,457.  Appellant's Reply to
Appellee's Opposition to Motion for Summary Judgment, dated
6/26/97, Ex. 2.  Nevertheless, the total amount paid to the Tribe
in 1997 ($1,400,280) was greater than the total amount paid in
1996 ($1,288,076) due to an increase in base funding as well as
the payment of non-recurring funds.  Joint Stipulation dated
5/23/01, Ex. A.

On April 6, 2001, the ALJ issued a recommended decision reversing
the partial declination of the Tribe's proposed AFA for 1997.
The ALJ found that the partial declination reduced the amount of
both the Area Office and Headquarters shares below their 1996
levels and that this violated section 106(b)(2) of the ISDA and
the regulations at 25 C.F.R. § 900.32.  IHS appealed this
finding.  The Tribe appealed the ALJ's further findings that: the
Tribe was not entitled to payment of the amount declined for the
Headquarters share because IHS had already paid more than the
amount requested for the Headquarters share in the Tribe's

proposal; the Tribe was entitled to payment of the amount declined for the Area Office share only to the extent that funds were legally available for the year in question; and the ALJ had no authority to assess interest on the amount due.

In its appeal of this recommended decision, IHS argued for the first time that the Tribe's entire appeal of the partial declination should be dismissed as moot since the Tribe experienced no reduction in its aggregate funding level from 1996 to 1997. While the Tribe agreed that there had been no such reduction, it argued that this was not dispositive since the Tribe was entitled to the 1996 amount for each of the discrete funding categories in its 1997 proposal, including the Area Office and Headquarters shares. I remanded the case to the ALJ to take any actions necessary to fully develop the record on this issue and any other issue he deemed appropriate.

In his December 14, 2001 recommended decision on remand, the ALJ held that IHS's aggregate funding argument was not properly considered because it constituted an alternative rationale for the declination which was not set forth in IHS's declination decision and because it was raised too late in the appeals process. The ALJ also held that in any event IHS's aggregate funding argument had no merit. The ALJ affirmed what he described as the "essential holdings" of his initial recommended decision, although he modified that decision in some respects.[3] 12/14/01 recommended decision at 17.

On appeal of the ALJ's recommended decision on remand, IHS argued that: IHS's aggregate funding argument was properly raised; the partial declination did not violate section 106(b) of the ISDA or 25 C.F.R. § 900.32; and the current year's appropriation is not available for payment of any amount owed to the Tribe. The Tribe did not appeal the ALJ's recommended decision on remand.

Analysis

Section 900.32 of 25 C.F.R. prohibits IHS from declining any portion of a proposed successor AFA that is substantially the same as the AFA for the prior year even if the aggregate funding is not reduced.

---

[3] The modifications are identified below to the extent relevant.

8

Although IHS may decline some or all of a tribe's proposal to enter into or renew a contract to carry out PFSAs on the grounds set out in section 102(a)(2) of the ISDA, section 106(b)(2) of the ISDA restricts IHS's authority to decline the proposed funding amount after the first year of a contract regardless of the grounds for the declination.  Thus, if IHS's partial declination violated section 106(b)(2) in this case, I need not reach the issue of whether IHS properly declined the Tribe's proposed AFA for 1997 based on section 102(a)(2)(D).

In appealing the declination, the Tribe argued that section 106(b)(2) prohibits IHS from reducing below the prior year's funding levels the amounts of any discrete categories of funding in the proposed contract, including the Area Office and Headquarters shares.  IHS took the position that section 106(b)(2) prohibits IHS only from reducing aggregate funding below the amount received in the prior year.[4]  The ALJ concluded that the restriction in section 106(b)(2) "should be read to apply to aggregate funding if the contract only discusses a single aggregate funding amount, but should apply to separate categories of funding if the contract discusses those categories."  12/14/01 recommended decision at 8.  The ALJ further concluded that, in this case, "the restriction applies to the specific amounts for the Area Office and Headquarter's tribal

---

[4]  As stated above, although the ALJ concluded in his recommended decision on remand that IHS's aggregate funding argument should have been included as a basis for the declination and was raised too late in the appeals process, he nevertheless proceeded to address it in case I were to disagree.  I conclude that the aggregate funding argument was properly raised even though I ultimately conclude that this argument is not dispositive of the issues on appeal.  IHS need not have set out this argument in the declination in order to raise it in the appeal proceedings since the argument was not a basis for the declination.  Instead, the argument directly responded to the Tribe's argument that the declination violated section 106(b)(2) of the ISDA and 25 C.F.R. § 900.32.  More significantly, to the extent that a statutory provision may be dispositive of issues on appeal, it must be considered during the administrative appeals process.  The procedural guidelines adopted by the Departmental Appeals Board for the conduct of declination appeals should not be applied to limit the Board's authority in a way that might result in the Board's failing to apply an applicable statute and thus reaching a legally erroneous decision.

9

shares which are found in sections 2(C) and 2(D) of the 1996 Annual Funding Agreement." Id. at 12.[5]

I need not determine whether this conclusion is erroneous, however. Regardless of the merits of the interpretation of section 106(b)(2) that IHS advanced in this appeal, HHS and the Department of the Interior have promulgated a regulation to implement section 106(b)(2) at 25 C.F.R. § 900.32, and HHS is bound by the terms of that regulation, which are dispositive of this appeal. While IHS seemed to imply that the regulation might be inconsistent with the plain meaning of section 106(b)(2), IHS never argued that I have authority to ignore the regulation as ultra vires.

Section 900.32 is clearly intended to implement section 106(b)(2) of the ISDA since that regulation incorporates by reference the exceptions to the prohibition on the reduction of funding in the statutory provision (although, unlike section 106(b)(2), the regulation is not limited to reductions in funding). As relevant here, section 900.32 provides that "[a]ny portion of an annual funding agreement proposal which is not substantially the same as that which was funded previously . . . . is subject to the declination criteria." (Emphasis added.) This language plainly contemplates that the Secretary may decline a proposed successor AFA only to the extent that it is not substantially the same as the AFA for the prior year and that the Secretary must otherwise approve the proposed AFA. The regulation looks not at whether the proposed AFA as a whole is substantially the same, but at whether portions of the proposed AFA are substantially the same. If a portion of the proposed AFA is substantially the same, it is required to be approved at the prior year's funding level. Moreover, section 900.32 gives the following examples of a portion of a proposed AFA that IHS might determine not to be substantially the same: "a redesign proposal; waiver proposal; different proposed funding amount; or different program, service, function, or activity" (emphasis added). Thus, IHS was required

---

[5] In his initial recommended decision, the ALJ found that IHS's partial declination with respect to the Headquarters share violated 25 C.F.R. § 900.32 but not section 106(b)(2) of the ISDA. In his recommended decision on remand, the ALJ modified this finding, concluding that IHS's partial declination with respect to the Headquarters share violated the statute as well as the regulation.

10

to determine, with respect to both the Area Office share and the
Headquarters share, whether that portion of the proposed AFA--
including the proposed funding amount--was substantially the same
as in the prior year's AFA, and, if so, to approve the proposed
AFA with respect to that share, even though the aggregate funding
was not reduced.

According to IHS, however, this is not at all the meaning of the
regulation.  IHS contended that section 900.32 makes a
distinction between the PFSAs in a proposed successor AFA and the
amount of funding proposed.  Specifically, IHS contended that,
under the regulation, if the PFSAs are substantially the same,
then IHS may not decline the proposed AFA with respect to any of
the PFSAs.  However, IHS argued, IHS may still decline to provide
the amount of funding requested for a portion of the proposed AFA
if IHS determines that this amount exceeds "the full amount of
funds to which the contractor is entitled" under section
106(a)(1), even if the amount proposed is the same as the prior
year's amount.  See Transcript of 1/28/02 telephone conference at
6, 11-12.[6]

There is no support in the language of section 900.32 for the
dichotomy which IHS suggests.  The regulation excepts from the
requirement that the Secretary approve a proposed AFA that is
substantially the same as the prior AFA "funding increases
included in appropriations acts or funding reductions as provided
in section 106(b) of the Act."  It necessarily follows from this
that other changes in funding levels are subject to this
requirement.  In addition, the sentence requiring the Secretary
to "add to the contract the full amount of funds to which the
contractor is entitled" also specifies that the Secretary "shall
approve" and "may not decline" any portion of a proposed
successor AFA that is substantially the same as in the AFA for
the prior year.  IHS did not persuasively explain how it could
approve the proposed Area Office share or Headquarters share

---

[6] IHS appeared to have made a similar argument before the
ALJ, although it was not as fully articulated.  The ALJ found
IHS's reading of the regulation "unreasonable per se" since it
"robs [the regulation] of any meaning at all."  According to the
ALJ, "the full amount of funds to which the contractor is
entitled" is necessarily the amount in the prior AFA.  4/6/01
recommended decision at 14-15.

11

while at the same time reducing the funding amount nor why the reduction in funding would not function as a "declination."[7]

I therefore conclude that section 900.32 prohibited IHS from declining any portion of the Tribe's proposed AFA for 1997 if that portion was substantially the same as in the Tribe's AFA #2. IHS conceded that the Area Office share in the Tribe's proposed AFA was substantially the same as the Area Office share under AFA #2.[8] Accordingly, IHS's partial declination of the Area Office share violated section 900.32 and was invalid.[9]

---

[7]    IHS did argue that reading the regulation to preclude a declination "will lead to absurd results" because it will give the Tribe "a windfall, requiring IHS to pay the additional funding, in addition to the substantial increase it received in 1997." IHS's Objection to December 14, 2001 Recommended Decision of Administrative Law Judge (IHS Objections), dated 1/17/02, at 18. To the extent this would represent a windfall (and the Tribe disputed that it would), however, IHS failed to identify any exception in the regulation permitting a declination on this basis.

[8]    In his initial recommended decision, the ALJ stated that "the parties agree that the proposed 1997 AFA was substantially the same as AFA #2," and concluded that IHS's declination therefore violated section 900.32. 4/6/01 recommended decision, at 14. The ALJ's recommended decision on remand affirmed this conclusion. 12/14/02 recommended decision at 17. In its objections to the latter decision, IHS argued that the Tribe's proposal for the 1997 AFA was not substantially the same as the prior AFA. IHS did not identify any differences between this proposal and AFA #2 with respect to the Area Office share, however (although it pointed to alleged differences in the funding for the Headquarters share). See IHS Objections dated 1/17/02, at 21. IHS subsequently conceded that it had determined that the proposed AFA for 1997 and AFA #2 were not substantially the same with respect to the Headquarters share, but had made no such determination with respect to the Area Office share. Transcript of 1/28/02 telephone conference, at 8.

[9]    Since it is not necessary to address the merits of the ALJ's statutory interpretation, nothing in this decision should be viewed as either agreeing with the ALJ's analysis of section

(continued...)

IHS must pay the $11,300 owed for the Tribe's Area Office share
out of funds appropriated for the current fiscal year.

Since IHS was not permitted to decline the Tribe's proposal for
1997 with respect to the Area Office share, IHS owes the Tribe
the difference between the amount proposed and the amount already
paid for this share.  In his initial recommended decision, the
ALJ found that "the Tribe should have received an additional
$11,300 in Area Office funds in 1997 under the terms of the
proposed 1997 AFA."  4/6/01 recommended decision at 17.  The ALJ
stated, however, that he did not have information regarding "what
funds might currently be available," and so directed that "[t]o
the extent IHS can still pay the Tribe this amount with funds
which are legally available, it should do so."  Id.  The ALJ also
noted the Tribe's request that IHS pay interest which the Tribe
asserted had accrued on the amount of the partial declination
since January 1, 1997.  However, he stated that he considered an
award of interest to be an award of damages and that he "lacks
the authority to award damages."  Id.

The ALJ's recommended decision on remand modified his findings
regarding the remedy, concluding that 1) "funds from 1997 are not
available to meet any legal obligations IHS may have which arise
from this litigation," and 2) IHS must record "the unpaid
remainder of the Tribe's 1997 proposal as an obligation under the
current appropriation."  12/14/01 recommended decision at 19.[10]

---

[9](...continued)
106(b)(2) or as suggesting that the regulatory interpretation of
section 106(b)(2) is the only permissible interpretation.

[10]    The recommended decision on remand identifies the
difference between the proposed Area Office shares and the amount
paid as $20,800 rather than $11,300 as stated in the initial
recommended decision.  Both parties agreed that $11,300 was the
correct amount.  IHS Objections dated 1/17/02, at 25; Appellant
Susanville Indian Rancheria's Response to Objections Filed by
Appellee Indian Health Service to December 14, 2001 Recommended
Decision of Administrative Law Judge (Tribe's Response to
Objections), dated 1/22/02, at 16.  This amount consists of the
difference between the $59,800 actually paid by IHS for 1997 and
the $88,100 in the proposed AFA for 1997 minus amounts
attributable to Youth Regional Treatment Center and Model
Diabetes Project funds which were declined and ultimately not
                                                (continued...)

13

The ALJ also rejected the Tribe's argument that the payment of
interest would constitute specific performance rather than
damages since he found that neither the ISDA nor the Tribe's
self-determination contract required the payment of interest, and
accordingly reaffirmed his holding that he lacked authority to
award damages in the form of interest.[11]

On appeal, IHS argued that the ALJ erred in finding that IHS
should pay the amount owed from funds appropriated for the fiscal
year in which the final judgment is rendered.  Citing 31 U.S.C.
§ 1502(a)(1) (on appropriation accounting) and the General
Accounting Office's treatise Principles of Federal Appropriations
Law, IHS asserted that it can obligate an appropriation only for
payment of expenses properly incurred during the period for which
the funds are appropriated or to complete contracts properly made
within that period.  Thus, IHS argued, an appropriation for a
later year "is not available for an expense incurred in FY 1997,
prior to its period of availability, or to fund a contract for FY
1997, prior to its period of availability."  IHS Objections dated
1/17/02, at 22.

These principles do not require a finding that the ALJ erred in
holding that IHS should pay the amount owed from funds
appropriated for the fiscal year in which this matter is finally
resolved, however.  The amount owed does not constitute an
expense incurred in fiscal year 1997.  Rather, it would
constitute an expense incurred in fiscal year 2002 (the year of
this decision) to comply with the resolution of an administrative
appeals process authorized by statute and regulation.  IHS did
not explain why it believed the ALJ's finding to this effect was
erroneous.  Moreover, IHS's position would effectively nullify
the protection afforded by the administrative appeals process for

_____

[10] (...continued)
appealed.

[11]  The ALJ nevertheless stated that "[t]o the extent the
Tribe has been damaged by loss of interest as a result of that
improper declination, its remedy must be found in the federal
court system.  See 25 U.S.C. § 450m-1(a)."  12/14/01 recommended
decision at 21.  The statutory provision cited by the ALJ
(section 110 of the ISDA) authorizes the district courts to
"order appropriate relief including money damages."  As indicated
above, however, the Tribe had argued that the payment of interest
would constitute specific performance rather than damages.

14

declinations since there would be no guarantee of a remedy for a
tribe unless the matter were resolved in the tribe's favor in a
fiscal year overlapping the contract period at issue.

IHS also argued that the ALJ's holding regarding the availability
of appropriations was contrary to his holding that he had no
authority to award damages because "an award of monetary relief
from any source of funds other than the fiscal year in which the
obligation was incurred would constitute money damages rather
than specific relief."  IHS Objections dated 1/17/02, at 23.
Again, IHS misconstrues the nature of any payment it would make
pursuant to a successful appeal by the Tribe.  As explained
above, such a payment is an obligation in the year in which it is
made.

Accordingly, I affirm the ALJ's finding directing IHS to pay the
amount owed from appropriations for the fiscal year in which this
matter is finally resolved.  Since my current decision finally
resolves this matter, the $11,300 owed to the Tribe for the Area
Office share should be paid from IHS's appropriation for fiscal
year 2002.

The $11,300 constitutes the full amount due the Tribe for the
Area Office share.  In his recommended decision on remand, the
ALJ found that the Tribe was not entitled to interest on the
amount owed by IHS, rejecting the arguments raised in the Tribe's
original appeal.  Although the ALJ advised the parties of their
right to appeal his recommended decision on remand, no appeal was
filed by the Tribe, nor did the Tribe even refer to the interest
issue in the proceedings on IHS's appeal of the recommended
decision on remand.  Thus, pursuant to 25 C.F.R. § 900.166, the
recommended decision on remand is final with respect to this
issue.

<u>Even assuming that IHS's declination of the Headquarters share
violated 25 C.F.R. § 900.32, the Tribe would have no remedy.</u>

As noted above, IHS argued that the partial declination of the
Tribe's Headquarters share did not violate 25 C.F.R. § 900.32.
IHS also argued, however, that even if there was a violation of
section 900.32, the Tribe did not suffer any harm as a result
because the Tribe was paid more than the amount requested for the
Headquarters share in the Tribe's proposal for 1997.  I agree.

15

In his recommended decision on remand, the ALJ found that
maintenance and improvement costs are properly included in
determining the amount paid by IHS for the Headquarters share,
and that IHS paid the Tribe more than the amount of Headquarters
share requested in the Tribe's proposed AFA for 1997.  Pursuant
to 25 C.F.R. § 900.166, this finding is final in the absence of a
timely appeal by the Tribe, as is the ALJ's finding that the
Tribe is not entitled to any interest on the amount owed by
IHS.[12]  The Tribe stated in its response to IHS's appeal that "it
disagrees that the M & I funds . . . received by the Tribe in
1997 should count against" the amount of the Headquarters share
in the proposed AFA, citing briefing it submitted to the ALJ
prior to the issuance of the recommended decision on remand.
Tribe's Response to Objections, dated 1/22/02, at 13, n.11, and
16.  This argument, however, cannot reasonably be viewed as a
timely appeal nor could it be viewed as a reiteration of a prior
objection to the ALJ's initial recommended decision.  Indeed, the
initial recommended decision did not specifically address the
issue of whether maintenance and improvement costs should be
considered part of the amount paid to the Tribe for its
Headquarters share in 1997, but simply concluded that IHS had
already paid more than the required amount for this share.
4/6/01 recommended decision at 17.  Thus, even if IHS's appeal
preserved the Tribe's objections to the initial recommended
decision, there was no prior objection to the ALJ's finding on
this issue.

Since there was no timely appeal of the ALJ's finding that the
Tribe suffered no harm as a result of the partial declination of
the Headquarters share, I do not reach the question whether this
declination violated section 900.32 (or whether, if there was no
such violation, the declination was properly based on section
102(a)(2)(D) of the ISDA).

_____

[12]  Even if the ALJ's recommended decision on remand left
open the question of whether a court has authority to award
interest in declination appeals, the Tribe would not be entitled
to interest on any amount owed by IHS for the Headquarters share.
There is no dispute that the amount of the Headquarters share
that IHS declined was paid as non-recurring program funds under
AFA #2.  Since these funds are not subject to the requirements of
section 450l(b) of the ISDA regarding the timing of payments
under self-determination contracts, the non-recurring funds under
AFA #3 were not late payments on which interest could have
accrued.

16

<u>Conclusion</u>

Based on the foregoing analysis, I sustain the conclusion in the ALJ's December 14, 2001 recommended decision on remand that IHS owes the Tribe $11,300 for the Area Office share in the Tribe's proposed AFA for 1997 that IHS declined in violation of 25 C.F.R. § 900.32, and that this amount should be paid out of appropriations for the current fiscal year.  This is the final administrative determination in this matter.

Donald F. Garrett, Member
Departmental Appeals Board