# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

```
_____
                              )
COUNCIL OF ATHABASCAN          )
TRIBAL GOVERNMENTS,            )
                              )
        Plaintiff,             )
                              )
        v.                     )      Civil Action No. 07-1270 (RWR)
                              )
UNITED STATES OF AMERICA       )
et al.,                        )
                              )
        Defendants.            )
_____)
```

## MEMORANDUM OPINION AND ORDER

Plaintiff Council of Athabascan Tribal Governments ("the Council") brings breach of contract claims against the United States of America, the Secretary of the Department of Health and Human Services, and the Director of the Indian Health Service ("IHS"). The defendants move to dismiss under Federal Rule of Civil Procedure 12(b)(6) asserting that the Council has failed to state a claim upon which relief can be granted, or, in the alternative, for summary judgment arguing that the doctrine of laches bars the Council's claims. Because the Council has pled plausible claims and the defendants have not shown that the claims should be barred by laches, the defendants' motion will be denied.

## BACKGROUND

During the 1995 fiscal year, the Council, a tribal organization, operated public health facilities and provided

health care services under a contract with the IHS, a part of the Department of Health and Human Services. (Compl. ¶¶ 1, 13.) The parties entered into the contract under the Indian Self-Determination and Education Assistance Act ("ISDEAA"), 25 U.S.C. § 450 et. seq. (Id. ¶ 1.) The ISDEAA "authorizes [the Council] . . . to assume responsibility to provide programs, functions, services and activities ("[PFSA]") that the Secretary would otherwise be obligated to provide." (Id. ¶ 14.) The Secretary must provide the Council with program funds to cover the costs of services that IHS would have incurred if it had retained responsibility to provide services and contract support costs to cover "reasonable administrative and overhead costs associated with carrying out the PFSAs[.]" (Id.) Contract support costs include start-up costs "to plan, prepare for and assume operation of a new or expanded PFSA[,]" indirect costs, which are "costs incurred for a common or joint purpose [that benefit] more than one PFSA, such as administrative and overhead costs," and direct costs, which are "expenses directly attributable to a certain PFSA[,]" such as workers compensation insurance. (Id. ¶ 15.)

The complaint alleges that the ISDEAA requires the Secretary to pay the Council the full contract support costs due under its contracts and that IHS has failed to do so, resulting in a shortfall. (Id. ¶¶ 16, 18-19.) Indirect costs are calculated using a ratio between the "[indirect costs] pool, the amount

considered necessary to run the contractor's entire PFSAs -- the numerator -- and the total direct funding for those PFSAs -- the denominator." (Id. ¶ 21.) The Council alleges that IHS used a ratio that "systematically undercalculate[d] the [indirect costs] needed to operate" ISDEAA contracts by including funds received from other federal agencies in the calculation. (Id. ¶ 22.) Inclusion of these funds decreases the ratio and reduces the indirect costs needed to execute ISDEAA contracts because unlike IHS, other federal agencies "heavily restrict or forbid the use of program dollars for [indirect costs.]" (Id.)

Before filing this suit, the Council submitted its claims to IHS for a decision from a contracting officer on September 2, 2005. (Id. ¶ 7.) The contracting officer denied the claims on July 17, 2006, and the Council received notice of the decision "some days later." (Id. ¶ 8.) The Council filed this suit on July 17, 2007, bringing one count alleging that the Secretary underpaid contract support costs for the 1995 fiscal year in violation of the ISDEAA and one count alleging that the Secretary used a "flawed [indirect costs] rate calculation methodology" in calculating the ratio. (Id. ¶¶ 30, 33.) The defendants move to dismiss, arguing (1) that the shortfall claim fails because the defendants fully performed under the ISDEAA contact and (2) that the ratio miscalculation claim fails because an indirect costs

rate was not used in the ISDEAA contract.[1]  (Defs.' Mem. of P. &
A. in Supp. of Mot. to Dismiss or in the Alternative for Summ. J.
("Defs.' Mem.") at 9, 11.)  The defendants have also moved in the
alternative for summary judgment, arguing that the Council's
claims are barred by laches.  (Id. at 16-17.)

## DISCUSSION

I.  MOTION TO DISMISS UNDER RULE 12(b)(6)

In a motion to dismiss for failure to state a claim under
Rule 12(b)(6), the complaint must be construed in the light most
favorable to the plaintiff, Browning v. Clinton, 292 F.3d 235,
242 (D.C. Cir. 2002), and "the court must assume the truth of all
well-pleaded allegations."  Warren v. District of Columbia, 353
F.3d 36, 39 (D.C. Cir. 2004).  "However, the court need not
accept inferences drawn by [a] plaintiff[] if such inferences are
unsupported by the facts set out in the complaint.  Nor must the
court accept legal conclusions cast in the form of factual
allegations."  Kowal v. MCI Commc'ns Corp., 16 F.3d 1271, 1276
(D.C. Cir. 1994); see also Ashcroft v. Iqbal, 129 S. Ct. 1937,

---

[1] The defendants argue that the Council has raised a third
claim in its complaint involving a carry forward adjustment but
failed to present this claim to the contracting officer.  (Defs.'
Mem. at 15-16.)  While the Council believes that the carry
forward adjustment argument is part of its miscalculation claim,
not a separate claim, the Council concedes that any damages from
improper use of the carry forward adjustment "need not be further
considered by the Court."  (Pl.'s Mem. of P. & A. in Opp'n to
Defs.' Mot. to Dismiss or in the Alternative for Summ. J. ("Pl.'s
Mem.") at 2 n.1.)  Therefore, the issue of damages caused by a
carry forward adjustment error will not be addressed.

1949 (2009).  A plaintiff does not need to plead detailed factual allegations.  <u>Aktieselskabet AF 21. Nov. 2001 v. Fame Jeans Inc.</u>, 525 F.3d 8, 16 (D.C. Cir. 2008) (stating that "[i]n general, a complaint should simply identify the 'circumstances, occurrences, and events' giving rise to the claim" (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 n.3 (2007))).  But, enough facts must be pled to "state a claim to relief that is plausible on its face."  <u>Twombly</u>, 550 U.S. at 570.

       A.   <u>Contractual requirement to fund indirect contract support costs</u>

Congress passed the ISDEAA "to promote Indian self-determination by providing for the transition of federal programs and services for Indians, including health care services, to the control of Indian communities."  <u>Three Affiliated Tribes of Fort Berthold Indian Reservation v. United States</u>, 637 F. Supp. 2d 25, 26 (D.D.C. 2009).  Under the ISDEAA, "[u]pon the approval of a self-determination contract, the Secretary shall add to the contract the full amount of funds to which the contractor is entitled under subsection (a) of this section[.]"  25 U.S.C. § 450j-1(g).  "The amount of funds provided under the terms of self-determination contracts entered into pursuant to this subchapter shall not be less than the appropriate Secretary would have otherwise provided for the operation of the programs or portions thereof for the period

covered by the contract[.]" 25 U.S.C. § 450j-1(a)(1). The
ISDEAA also provides that

> [t]here shall be added to the amount required by
> [§ 450j-1(a)(1)] contract support costs which shall
> consist of an amount for the reasonable costs for
> activities which must be carried on by a tribal
> organization as a contractor to ensure compliance with
> the terms of the contract and prudent management, but
> which . . . normally are not carried on by the
> respective Secretary in his direct operation of the
> program; or . . . are provided by the Secretary in
> support of the contracted program from resources other
> than those under contract.

25 U.S.C. § 450j-1(a)(2). Funding under the ISDEAA is
constrained by Congress' appropriation of funds. Three
Affiliated Tribes of Fort Berthold Indian Reservation, 637 F.
Supp. 2d at 27.

The defendants move for dismissal, arguing that they paid
the full amount owed for indirect contract support costs and that
"the mere fact that the contract was entered pursuant to the
[ISDEAA] does nothing to further [the Council's] claims of
breach." (Defs.' Mem. at 13.) According to the defendants, the
ISDEAA "does not mandate the payment of a specific amount of
indirect [contract support costs] or that a specific formula be
included in the contract." (Id.) However, the ISDEAA does
create "statutory obligations to fully fund indirect [contract
support costs] insofar as possible[,]" Menominee Indian Tribe of
Wis. v. United States, 539 F. Supp. 2d 152, 155 (D.D.C. 2008);
see also Ramah Navajo School Bd., Inc. v. Babbitt, 87 F.3d 1338,

1341 (D.C. Cir. 1996) (noting that the ISDEAA refers to contract support funds for administrative costs as "an entitlement of the contracting Tribes"), and the complaint alleges that the defendants violated this obligation. (Compl. ¶ 19.) Citing Cherokee Nation v. Leavitt, 543 U.S. 631 (2005), the Council alleges that "IHS should have reprogrammed funds to pay the tribal contractors the full [contract support costs] due under their contracts for [fiscal year] 1994 through [fiscal year] 1997 when Congress appropriated lump sums for the IHS without earmarking an amount for [contract support costs,]" but that IHS "took no such action." (Compl. ¶¶ 18-19.)

Under the Council's theory, a contract formed under the ISDEAA imposes an obligation on the defendants to pay a certain level of contract support costs that has not been satisfied. While the defendants assert that the $375,185 paid fully satisfies the contract, the Council disputes that the defendants have fulfilled their contractual obligation, arguing that "IHS paid [the Council] less than its full [contract support costs] requirement in [fiscal year] 1995" and that "IHS [has] breached its agreements with [the Council] and violated the ISDEAA's requirement of full payment from available appropriations[.]" (Id. ¶ 30.) In Menominee, the court rejected the defendants' argument that the ISDEAA "does not mandate the payment of a specific amount of indirect [contract support costs]," noting

that the ISDEAA "mandates the payment of *full* indirect [contract support costs] and ISDEAA itself establishes that entitlement." 539 F. Supp. 2d at 155. "Although the Secretary cannot disburse funds he does not have or amounts in excess of limitations set by Congress, he still has the obligation to fund indirect [contract support costs] to the greatest extent possible inasmuch as the statutory promise is full funding." Id. Therefore, construing the complaint in the light most favorable to the Council, the Council's allegation that the defendants violated the agreement by not paying full contract support costs constitutes a plausible claim.

      B.   Indirect rate miscalculation

The defendants assert that the miscalculation claim fails because "the contract documents show that IHS did not use an indirect cost rate to calculate the amount due under the contract" and the Council "instead negotiated its overhead costs directly with IHS." (Defs.' Mem. at 11.) The defendants rely on the contract, which states that "[i]n lieu of a negotiated direct cost rate by a cognizant agency, ISDM 92-2[2] is applicable for

---

    [2] ISDM, or Indian Self-Determination Memorandum, 92-2 was an "unpromulgated, internal agency guideline" that "explained how [contract support costs] needs were to be calculated." Shoshone-Bannock Tribes of Fort Hall Reservation v. Shalala, 988 F. Supp. 1306, 1329 (D. Or. 1997).

recipients without established indirect rate agreements."[3]
(Defs.' Mem, Ex. 1 at 0028.)  The Council argues that the lump
sum amount was appropriate when there was no rate in place, but
that a later indirect costs rate agreement became part of the
contract.  (Pl.'s Surreply to Defs.' Reply in Supp. of Mot. to
Dismiss or in the Alternative for Summ. J. ("Pl.'s Surreply") at
2; see also Compl. ¶ 28 (stating that "[d]efendants' use of
incorrect and illegal [indirect cost] rates . . . violates the
mandate of the ISDEAA to pay the full [contract support costs]
incurred by [the Council] in carrying out federal health care
PFSAs under their contracts").)  According to the Council, "the
parties agreed to an indirect cost rate agreement that applies to
all grants, contracts, and other agreements with the Federal
Government" and that "[t]his agreement is binding on the IHS and
applies to its contract with [the Council]."  (Pl.'s Mem. of P. &
A. in Opp'n to Defs.' Mot. to Dismiss or in the Alternative for
Summ. J. ("Pl.'s Mem.") at 15-16 (internal quotation marks
omitted).)  The complaint alleges that a 76.8% [indirect costs]

---

[3] While the Council disputes the effect and validity of this
provision, the Council does not dispute that this provision was
included in the contract.  (Pl.'s Surreply to Def.'s Reply in
Supp. of Mot. to Dismiss or in the Alternative for Summ. J. at
2.)  A document outside the complaint can be considered in a
motion to dismiss under 12(b)(6) if it is "referred to in the
complaint and [is] integral to" the plaintiff's claim.  Kaempe v.
Myers, 367 F.3d 958, 965 (D.C. Cir. 2004).  The contract is
integral to the Council's claim and was mentioned in the
complaint, so it will be considered.

rate applied to the Council's contract (Compl. ¶ 20) and that the
"[d]efendants further damaged [the Council] in [fiscal year] 1995
by employing the flawed [indirect costs] rate calculation
methodology."  (Id. ¶ 33; see also id. ¶ 24 (stating that the
"rates employed by the Secretary[] do not accurately determine
[the Council]'s true costs of operating IHS's contracted
programs").)

The defendants concede that tribes contracting with the
federal government "frequently use indirect cost rates to
calculate their need for indirect costs and that the ISDEAA
permits it."  (Defs.' Reply in Support of Mot. to Dismiss or in
the Alternative for Summ. J. ("Defs.' Reply") at 3 n.2.)
Moreover, the defendants acknowledge that an indirect cost rate
for the Council did exist.  (Defs.' Reply at 4 (stating that the
Council "did negotiate an indirect cost rate agreement . . . with
the Department of Health and Human Services Division of Cost
Allocation").)  While the defendants contest the Council's
allegations, the allegations as stated give rise to a plausible
claim on the grounds that a cost rate agreement existed and
applied to the ISDEAA contract and that the defendants improperly
calculated the rate.

II.  MOTION FOR SUMMARY JUDGMENT: LACHES

On a motion for summary judgment, "[t]he inquiry performed
is the threshold inquiry of determining whether there is the need

for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986). Summary judgment may be granted only where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); <u>see also</u> <u>Moore v. Hartman</u>, 571 F.3d 62, 66 (D.C. Cir. 2009). A material fact is one that is capable of affecting the outcome of the litigation. <u>Liberty Lobby, Inc.</u>, 477 U.S. at 248. A genuine issue is one where the "evidence is such that a reasonable jury could return a verdict for the nonmoving party[,]" as opposed to evidence that "is so one-sided that one party must prevail as a matter of law." <u>Id.</u> at 248, 252. A court considering a motion for summary judgment must draw all "justifiable inferences" from the evidence in favor of the nonmovant. <u>Id.</u> at 255. The nonmoving party, however, "must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). Rather, the nonmovant must "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" <u>Id.</u> at 587 (quoting Fed. R. Civ. P. 56(e)). In the end, "the plain language

of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The defendants argue that summary judgment should be granted because the Council's claims are barred by the doctrine of laches. To invoke the defense of laches to bar a claim, a defendant "must show that the plaintiff has unreasonably delayed in asserting a claim and that there was 'undue prejudice' to the defendant as a result of the delay." Jeanblanc v. Oliver Carr Co., No. 94-7118, 1995 WL 418667, at *4 (D.C. Cir. June 21, 1995); see also Pro-Football, Inc. v. Harjo, 415 F.3d 44, 47 (D.C. Cir. 2005) (stating that laches "requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense" (quoting Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 121-22 (2002)). "If only a short period of time elapses between accrual of the claim and suit, the magnitude of prejudice required before suit would be barred is great; if the delay is lengthy, a lesser showing of prejudice is required." Gull Airborne Instruments, Inc. v. Weinberger, 694 F.2d 838, 843 (D.C. Cir. 1982). The circumstances of any delay or prejudice are a factual inquiry. Major v. Plumbers Local Union No. 5, 370 F. Supp. 2d 118, 128

(D.D.C. 2005); see also Mahan v. Tash, 703 F. Supp. 130, 132
(D.D.C. 1989) ("Summary judgment is appropriate based on a laches
defense where there are no genuine issues of material fact
relating to either inexcusable delay or material prejudice and
where the movant is entitled to judgment as a matter of law.").

Regardless of whether the Council's ten-year wait from the
alleged breach to the time it brought suit is unreasonable, the
defendants have failed to show prejudice. "[T]he party asserting
a laches defense must have relied on the plaintiff's inaction and
must have been harmed on account of that reliance." Nat'l R.R.
Passenger Corp. v. Lexington Ins. Co., 357 F. Supp. 2d 287, 297
(D.D.C. 2005). Evidentiary or defense prejudice involves the
"impairment of the ability to mount a defense due to
circumstances such as loss of records, destruction of evidence,
or witness unavailability." JANA, Inc. v. United States, 936
F.2d 1265, 1269-70 (Fed. Cir. 1991); see also Jeanblanc, 1995 WL
418667, at *4 (finding undue prejudice where the defendant
asserted that business documents, which could have been used to
establish a defense, had been destroyed in the normal course of
business).

The defendants claim that faded memories and the retirement
of key witnesses involved in the contract process constitute
prejudice. (Defs.' Mem. at 18.) Memory loss caused by the
passage of time could be prejudicial if the defendants sought to

introduce extrinsic evidence, requiring these witnesses to testify. Here, however, the Council's claims involve issues of statutory and contract interpretation, and the defendants concede that "the contract documents themselves should dispose of this case." (Id.) The defendants neither show why testimony from these witnesses would be necessary nor provide any evidence supporting their claim that these witness' memories have actually faded. Cf. Smith v. Caterpillar, Inc., 338 F.3d 730, 734 (7th Cir. 2003) (stating that the defendants supported their argument of prejudice by filing affidavits showing that "memories have faded and that the inability to recall information was caused by the plaintiff's delay").

Likewise, retirement of the witnesses is alone insufficient to establish prejudice, especially when one of the defendants' proposed witness, Paul Young, separated from federal service in 1994 before the Council's claims had accrued. (Defs.' Mem., Maria Cunningham Decl. ¶ 3.) "It is the availability and memory of witnesses, not their employment status, that is relevant[,]" and "[t]he burden of establishing witness unavailability or memory failure is not met by simply showing that a potential witness has retired." Hoover v. Dep't of Navy, 957 F.2d 861, 864 (Fed. Cir. 1992). The defendants do not allege any actual difficulties in contacting the witnesses or provide any explanation for their unavailability beside retirement.

An administrative record or the availability of documents may also mitigate the effect of any witness unavailability or lost memories. Lebrun v. England, 212 F. Supp. 2d 5 (D.D.C. 2002), rejected the evidentiary prejudice argument where an administrative record existed and "the defendant apparently believed that it had an adequate record to review the merits of the plaintiff's challenge" at the agency level. Id. at 13-14; see also Gull Airborne Instruments, Inc., 694 F.2d at 845 (noting that the death of a witness "is cured by the documentation" which provides "a full history of the transaction and gives any reviewing body the ability to reconstruct the pertinent events"). Prior to filing suit, the Council raised its claims with IHS, and an administrative record exists containing the contract and all modifications. (See Defs.' Mem. at 6 n.3.)  The existence of the administrative record substantially mitigates any possibility of evidentiary prejudice in this case, as the contract documents will likely be dispositive. (Id. at 18.)

Alternatively, economic prejudice "'may arise where a defendant . . . will suffer the los[s] of monetary investments or incur damages which likely would have been prevented by earlier suit.'" Cygnus Corp. v. United States, 63 Fed. Cl. 150, 154 (Fed. Cl. 2004) (alteration in original) (quoting Cane Tenn., Inc. v. United States, 44 Fed. Cl. 785, 796 (Fed. Cl. 1999)). However, potential liability from a judgment does not constitute

economic prejudice unless it is caused by the plaintiff's delay.
Ingham v. United States, No. 07-124 C, 2007 WL 5172422, at *10
(Fed. Cl. Nov. 26, 2007) (stating that "a defendant cannot merely
assert that he would suffer prejudice because he has to make a
monetary payment[,]" and that "[a] defendant has to show that the
economic prejudice is a consequential effect of plaintiff's delay
in filing suit").

The defendants claim that they suffered economic harm
because "Congress appropriated money to IHS to spend within
[fiscal year] 1995" and these funds are no longer available.
(Defs.' Reply at 14.)  The defendants rely on 31 U.S.C. § 1552,
which states that "[o]n September 30th of the 5th fiscal year
after the period of availability for obligation of a fixed
appropriation account ends, the account shall be closed and any
remaining balance (whether obligated or unobligated) in the
account shall be cancelled and thereafter shall not be available
for obligation or expenditure for any purpose."  31 U.S.C.
§ 1552(a); see also Lublin Corp. v. United States, 84 Fed. Cl.
678, 686 n.14 (Fed. Cl. 2008) (noting that § 1552(a) bars "access
to remaining balance 'after the period of availability for
obligation of a fixed appropriation account ends'" (quoting 31
U.S.C. § 1552)).  The defendants argue that had the Council
brought its claim by the end of the 2000 fiscal year, "IHS still
[would have] had the ability to liquidate contractual obligations

from [fiscal year] 1995 using the appropriation."  (Defs.' Reply
at 14.)

While expiration of funding could constitute economic
prejudice, <u>Menominee</u>, 539 F. Supp. 2d at 154-55, the defendants
do not assert that the amount owed under the 1995 fiscal year
contract has changed due to the Council's alleged delay or that
they would suffer any economic losses other than those associated
with the contract.[4]  See <u>A.C. Aukerman Co. v. R.L. Chaides</u>

_____

[4] Assuming that the 1995 appropriation is no longer
available, the defendants also assert that a judgment cannot be
satisfied by the judgment fund, 31 U.S.C. § 1304, and that even
if used, the judgment would have to be repaid.  (Defs.' Reply at
14.)  The judgment fund is a "permanent appropriation of funds to
pay judgments against the United States."  <u>Trout v. Garrett</u>, 891
F.2d 332, 334 (D.C. Cir. 1989).  "Congress created the 'judgment
fund' statute to allocate '[n]ecessary amounts' to be
'appropriated to pay final judgments, awards, compromise
settlements, and interest and costs specified in the judgments or
otherwise authorized by law.'"  <u>Trout v. Winter</u>, 464 F. Supp. 2d
25, 30 (D.D.C. 2006) (alteration in original) (emphasis omitted)
(quoting 31 U.S.C. § 1304(a)).  The judgment fund could be
available to pay a judgment even if the fiscal year appropriation
is unavailable.  <u>See Thompson v. Cherokee Nation of Okla.</u>, 334
F.3d 1075, 1093 (Fed. Cir. 2003) (concluding that a tribe's
claims that the Secretary breached contracts by failing to pay
the full indirect costs of administering federal programs were
not mooted by the close of the 1994-1996 fiscal years because
"[d]amages for breach of contract may be awarded out of the
Judgment Fund when payment is not otherwise provided for");
<u>Tunica-Biloxi Tribe of La. v. United States</u>, Civil Action No. 02-
2413 (RBW), slip op. at *20-23 (D.D.C. Dec. 9, 2003) (relying on
<u>Thompson</u> to conclude that the "plaintiff's claims for indirect
[contract support costs] were not moot even for those years for
which the relevant appropriations has lapsed" because the
judgment fund might have been available).  Moreover, even if the
defendants would have to repay the judgment fund, they do not
argue that the amount to be repaid would be any greater than the
amount that the defendants would have owed when the 1995
appropriation was still available.

Constr. Co., 960 F.2d 1020, 1033 (Fed. Cir. 1992) (noting that if
the damages or monetary losses attributable to the finding of
liability could constitute economic prejudice, "[e]conomic
prejudice would then arise in every suit"); see also Pro-
Football, Inc. v. Harjo, 284 F. Supp. 2d 96, 143 (D.D.C. 2003)
(finding economic prejudice if a trademark registration were
cancelled where a defendant had invested money in marketing and
brand development).  The source of funds used to satisfy an
adverse judgment may be different now, but the principal amount
potentially owed would have been the same even if the Council had
filed suit earlier.

The defendants also contend that there would be increased
costs in contacting and transporting witnesses to Washington,
D.C.  (Defs.' Resp. at 3.)  While this might be true, the
defendants offer no evidence to support such a claim.  Moreover,
no difference in the cost of transporting and contacting Paul
Young now that he is separated from the federal service is
attributable to the Council's delay.  Young left before the
Council's claims had accrued.  (Defs.' Mem., Maria Cunningham
Decl. ¶ 3.)  The Alaska Area Native Health Service employees
involved in self-determination contracts worked in Anchorage,
Alaska (Defs.' Mem., Ex. 4 at 0148) and would likely have
required transportation to Washington, D.C. even if the Council's

suit were filed earlier.  The defendants simply have not shown

sufficient evidence of undue prejudice.[5]

CONCLUSION AND ORDER

Because the Council has alleged plausible claims and the

defendants have not shown that the claims are barred by laches,

the defendants' motion to dismiss or, in the alternative, for

summary judgment, will be denied.  Accordingly, it is hereby

ORDERED that defendants' motion to dismiss or in the

alternative for summary judgment [12] be, and hereby is, DENIED.

SIGNED this 16th day of March, 2009.


_____/s/_____
RICHARD W. ROBERTS
United States District Judge

_____

[5] The Council claims that its approximately ten-year delay
in bringing suit was reasonable because it was waiting to
determine if the class actions in Cherokee Nation of Okla. v.
United States, 199 F.R.D. 357 (E.D. Okla. 2001), filed in 1999,
and Pueblo of Zuni v. United States, 467 F. Supp. 2d 1099 (D.N.M.
2006), filed in 2001, would vindicate its rights with respect to
the unpaid contract support costs, since the Council was a
putative class member in both actions.  (Pl.'s Mem. at 26.)
Because the defendants have not shown evidence of undue prejudice
from any delay, and the doctrine of laches requires a showing of
both unreasonable delay and prejudice, the issues of whether the
delay was unreasonable and whether it was unreasonable for the
Council to rely on the unpublished opinion in Ramah Navajo
Chapter v. Lujan, No. 90-957 (D.N.M. 1993) (Pl.'s Surreply at 10
n.9), for the proposition that administrative exhaustion was not
required to participate as a class member in Cherokee Nation or
Pueblo of Zuni, will not be addressed.